UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

In re:                                                    Chapter 11

NORTHWEST AIRLINES CORPORATION, et al.,      Case No. 05-17930 (ALG)

                              Debtors.              Jointly Administered


----------------------------------------------------------------x


## MEMORANDUM OF OPINION

A P P E A R A N C E S:

ARNOLD & PORTER, LLP
Counsel for the Debtors
   By:   Brian P. Leitch, Esq.
          Timothy R. Macdonald, Esq.
          Tim Atkeson, Esq.
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202

CADWALADER, WICKERSHAM & TAFT LLP
Counsel for the Debtors
   By:   Bruce R. Zirinsky, Esq.
          Gregory M. Petrick, Esq.
One World Financial Center
New York, New York 10281

PHILLIPS, RICHARD & RIND, P.A.
Counsel for the Professional Flight Attendants Association
   By:   Mark Richard, Esq.
9360 SW 72nd Street, Suite 283
Miami, Florida 33173

SEHAM, SEHAM, MELTZ & PETERSEN, LLP
Former Counsel for the Professional Flight Attendants Association
   By:   Lee Seham, Esq.
          George Diamantopoulos, Esq.
445 Hamilton Avenue, Suite 1204
White Plains, New York 10601

COHEN, WEISS & SIMON, LLP
Counsel for the Air Line Pilots Association, International
  By:  Richard M. Seltzer, Esq.
         Thomas N. Ciantra, Esq.
         Peter Herman, Esq.
         Robin H. Gise, Esq.
         Oriana A. Vigliotti, Esq.
330 West 42nd Street
New York, New York 10036

LOWENSTEIN SANDLER, P.C.
Counsel for the International Association of Machinists
and Aerospace Workers, AFL-CIO
  By:  Sharon L. Levine, Esq.
         S. Jason Teele, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068

OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.
Counsel for the Official Committee of Unsecured Creditors
  By:  Scott Hazan, Esq.
         Todd M. Goren, Esq.
         Lorenzo Marinuzzi, Esq.
250 Park Avenue
New York, New York 10169

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

## Introduction

Before the Court is a motion (the "Motion") by Northwest Airlines Corporation

and its affiliates (the "Debtors") to reject a collective bargaining agreement and change

the terms and conditions of employment of its flight attendants. The authorized

representative of the flight attendants, the Professional Flight Attendants Association

("PFAA"), objects to the Motion and to the relief sought by the Debtors.

The Debtors filed the Motion on October 12, 2005, pursuant to § 1113 of the

Bankruptcy Code, seeking to reject their collective bargaining agreements with PFAA,

the Air Line Pilots Association, International ("ALPA") and the International Association

of Machinists and Aerospace Workers ("IAM").  After months of negotiation and ten

days of trial, the Debtors settled all their issues with ALPA and substantially all their

issues with IAM, and their respective memberships ratified the settlements.[1]  The Debtors

settled with PFAA as well, but its membership failed to ratify, and the Debtors have

returned to court for authority to reject the collective bargaining agreement and change

the terms and conditions of employment of the flight attendants.

The Motion involves issues of great significance to the nation's fifth largest

airline and to its 9,000 flight attendants, who have professionally served the traveling

public for many years and whose pay and working conditions would be materially

different under the Debtors' proposals.  The Motion obviously also involves the interests

of the Debtors' 25,000 other employees, their tens of thousands of creditors, and their

passengers.  All concerned would be well-served if the flight attendants and the Debtors

could resolve their disputes through continued negotiation, and as further discussed

below, the Court is therefore requiring the parties to make one last effort to reach a

ratifiable agreement.  Nevertheless, it is clear that the process of negotiation cannot drag

on indefinitely and that the negotiations would be assisted by a determination at this time

of the central legal issues raised by this § 1113 motion.

Section 1113 of the Bankruptcy Code permits a debtor to reject a collective

bargaining agreement if (i) rejection is "necessary" to its ability to reorganize; (ii) the

debtor has made a proposal to the authorized representative of the employees that has

been rejected by the authorized representative without "good cause"; and (iii) the balance

of the equities clearly favors rejection.  Section 1113 attempts to reconcile the public

policy that favors collective bargaining with the reality of bankruptcy, recognizing that

---

[1] Negotiations are ongoing with one small IAM bargaining unit.

Chapter 11 is not merely business as usual but an extremely serious process that can lead

to liquidation and the loss of the jobs of all the debtor's employees as well as of the

creditors' opportunity for any meaningful recovery.  For the reasons stated in the

remainder of this opinion, based on the applicable authority under § 1113 and on the

entire record of this case, there is no question that rejection of the flight attendants'

collective bargaining agreement is "necessary," that the Debtors' proposal was rejected

by the union membership without "good cause," and that the balance of the equities

clearly favors rejection.

The remaining issue in this case is the relief that should be ordered.  The Debtors

urge the Court to authorize them to put into effect their proposal of February 22, 2006,

which was the last proposal made to PFAA before agreement was reached on March 1,

2006 (the agreement that was not ratified).  PFAA argues against rejection and for more

negotiation, but asserts that if rejection is authorized, the Court should not depart from

the March 1 terms to which the union leadership agreed but its membership rejected.  For

the reasons set forth below, the Debtors cannot now repudiate the March 1 terms.

Moreover, consistent with § 1113, the parties should have every opportunity to come to

an agreement themselves.  The Debtors and IAM were able to agree on a ratifiable

agreement after the first deal was rejected by one of the bargaining units, and there is no

reason, in principle, why a new agreement with PFAA cannot be reached.  But there can

be no substantial delay.  The Court will give the parties fourteen days to reach an

agreement and will stay the effectiveness of a § 1113 order for that period.  If a new

agreement cannot be reached that can be promptly effectuated, the Debtors will be

authorized to institute new terms and conditions of employment that do not materially

differ from those described in the March 1 Agreement.

The following constitutes the Court's findings of fact and conclusions of law.

**Facts**

The Debtors' Motion to reject their collective bargaining agreement with PFAA,

as well as the agreements with ALPA and IAM, filed on October 12, 2005, was based on

the Debtors' proposals of September 26 and 27, 2005 to modify the agreements to

provide for substantial labor concessions (the "September Proposals").[2]  Each proposal

included, among other things, changes to wages and work rules, changes to medical

benefits for active employees and current retirees, a freezing of the unions' defined

benefit plans and establishment of defined contribution plans, and profit sharing.

Additionally, (i) the proposal to PFAA included obtaining the flexibility to employ

foreign national flight attendants on international flights; (ii) the proposal to ALPA

included modifications to the scope clauses in its collective bargaining agreement; and

(iii) the proposal to IAM included outsourcing baggage handling and functions of

customer service agents at certain of the Debtors' locations.  Under the September

Proposals, the Debtors sought to achieve approximately $1.361 billion in labor cost

savings in 2006, plus pension plan restructuring.  To realize the $1.361 billion, the

Debtors sought, pursuant to the Motion, a total of approximately $747.3 million in 2006

savings from its unions, which included $195 million from PFAA, $358 million from

---

[2] The Motion also sought rejection of collective bargaining agreements with the Debtors' three smaller unions, the Transport Workers Union of America ("TWU"), the Northwest Meteorologists Association ("NAMA"), and the Aircraft Technical Support Association ("ATSA"), which collectively represent less than 2% of the Debtors' unionized employees.  (Motion, at 7)  After the filing of the Motion, the Debtors and each of these unions were able to reach consensual agreements, which were authorized pursuant to entry of a consent order on November 16, 2005.

ALPA, $190.4 million from IAM, and $3.9 million from the Debtors' three smaller
unions, ATSA, NAMA and TWU.[3]  The Debtors stated in their Motion papers and have
consistently maintained throughout that they are flexible on the make-up of the
concessions from the unions, so long as the savings achieved aggregate the original
"ask."  (See, e.g., Motion, at 5: "Northwest has made clear that while it is imperative that
it reach the cost reduction targets for each union, it is flexible and open to negotiation
regarding precisely how the targets are reached.")

In early November 2005, the Debtors made further proposals to PFAA, ALPA
and IAM to obtain interim relief from each union's collective bargaining agreement
pending further negotiations and the § 1113 hearing.  Each proposal provided for interim
labor concessions that approximated 60% of the labor savings being sought from these
unions in the Motion.  The interim savings were estimated at $117 million in annualized
cost savings from PFAA, $215 million in annualized cost savings from ALPA and $114
million in annualized cost savings from IAM.  The Debtors reached consensual
agreements with PFAA and ALPA with respect to the interim relief requested of these
unions, but the interim relief requested of IAM was opposed.  On November 7, 2005, the
Debtors moved under § 1113(e) for interim relief from their collective bargaining
agreements with IAM and for approval of the interim agreements with PFAA and ALPA.
On November 16, 2005, the Court entered an order which approved the Debtors' interim
agreements with ALPA and PFAA and implemented the interim relief requested of IAM

---

[3] The Debtors calculated approximately $614 million in additional labor cost savings.  Approximately $492
million had already been achieved, including $250 million from ALPA under a prepetition Bridge
Agreement, $203 million in pay cuts and work rules changes from the outsourcing of jobs previously held
by workers with the Aircraft Mechanics Fraternal Association ("AMFA"), $35 million in savings from
management, and $4 million from international and other operations.  The Debtors achieved another $36
million in savings from management after the filing of the Motion.  In addition, the Debtors sought
approximately $80 million in savings from post-retiree medical benefit changes.  (Debtors' Ex. 81.)

pursuant to § 1113(e) based on the Debtors' showing that they were losing approximately

$4 million per day at prevailing wage rates, and that losses of that magnitude could not

continue without endangering the Debtors' continued viability and prospects for

reorganization.  The order also adjourned the hearing on the § 1113(c) Motion.[4]

The Court thereafter conducted an eight-day evidentiary hearing on the Motion,

beginning on January 17, 2006.[5]  At the outset of the hearing, the Debtors announced that

they had reached an agreement with IAM, pursuant to which IAM would send out for

member ratification the last proposal it had received from the Debtors.[6]  The hearing

continued with respect to PFAA and ALPA.  Although the Debtors' January 17 proposals

were nominally on the table at the commencement of the hearings, the testimony of the

witnesses at the hearing was scheduled so that negotiation could continue even while

evidentiary hearings went forward, and all parties agreed that any new formal proposal

made by a party would supersede any prior version.  Further, it was agreed that the

parties would formulate their "final § 1113 proposals" only after the negotiation process

had been given every opportunity to succeed, and the record of the hearings was kept

---

[4] The interim relief with respect to ALPA and IAM was set to expire upon the earlier of the effectiveness of
a consensual agreement between the Debtors and the respective union or a determination of the § 1113
Motion by the Court.  The interim relief agreed to by PFAA had a time limitation that would have caused it
to expire on February 13, 2006.  By order entered February 9, 2006, the Court extended the interim relief
pending determination of this Motion, which put the relief for PFAA, ALPA and IAM on the same
schedule.  By agreement of the parties, evidence adduced by the Debtors in support of their motion for
interim relief could not be used in connection with the entry of final § 1113 orders, and it has not been used
for purposes of this decision.
[5] On October 31, 2005, the Debtors had filed a motion to modify their retirement benefits under Bankruptcy
Code § 1114, and this matter was scheduled to be heard in conjunction with the hearing on the § 1113(c)
Motion.  The appointed committee of retirees (the "Retiree Committee") attended the hearing on the
Debtors' case in chief.  However, because the Debtors' negotiations with the Retiree Committee had been
truncated prior to the hearing, and because of the amount at issue and the nature of the relief sought, the
Retiree Committee was not required to put on its case, and the § 1114 motion is still pending as to the
Retiree Committee.
[6] As discussed further below, the IAM leadership made it clear that it would submit the proposed
agreement to its membership without endorsement.  Pursuant to stipulation, the Debtors' case with respect
to IAM would be restored to the calendar if the agreement sent out for ratification was not endorsed by the
membership.

open after the close of oral testimony on February 3, 2006 for further negotiation and, if

agreement could not be reached, the receipt of final proposals.[7]

The parties' final proposals were submitted on February 22, 2006, by the Debtors,

PFAA and ALPA (the "February Proposals").  The February Proposals that the Debtors

and PFAA exchanged purported to provide for concessions that added up to

approximately $195 million in 2006.  Although, as will be discussed below, the parties

disputed how some of the concessions should be valued, particularly "roll-up costs," the

valuation differences between the Debtors and PFAA were narrowing.  The parties were

further apart on what are sometimes (and misleadingly) termed non-economic issues.

The Debtors' collective bargaining agreement with the flight attendants dates back many

years and contains detailed provisions restricting the hiring of non-union flight attendants

and the outsourcing of work.  In their initial submissions to PFAA, the Debtors sought

major modifications to these provisions, proposing that up to 75% of the flight attendants

on their foreign routes be hired abroad (with the resulting cost savings credited toward

the PFAA $195 million "ask").  The Debtors also sought to eliminate labor protective

provisions providing for large severance payments to the flight attendants in the event of

certain successor corporate transactions affecting the Debtors, contending that these

rights would deter a potential investor.  These proposals were met with strong opposition

from PFAA, and the Debtors backed off from some of them.  Nevertheless, by the time

the February Proposals were submitted, the Debtors were still proposing that 30% of the

flight attendants on the foreign routes be hired abroad.  They also proposed material

---

[7] The Debtors also agreed that they would not immediately invoke that part of § 1113(d)(2) that provides
that if a court does not rule on a § 1113 motion within thirty days or such additional period as the parties
may agree, the debtor can impose the changes that it seeks.

changes to the successorship and other labor protective provisions in the PFAA collective

bargaining agreement.

Notwithstanding the extent of the divergence between the positions of the Debtors

and PFAA, and even greater disagreements between the Debtors and ALPA, the Court

urged further negotiations between the parties.  On March 1, 2006, after further

negotiation, the Debtors announced an agreement with PFAA providing for consensual

modifications to the PFAA collective bargaining agreement (the "March 1 Agreement").

The March 1 Agreement between the Debtors and PFAA contained relatively few

changes to the provisions in the old collective bargaining agreement relating to

outsourcing and the hiring of foreign flight attendants, as well as the successorship

provisions.[8]  However, since the $195 million "ask" remained constant, PFAA's

concessions on wages, vacation pay and other benefits cut even more deeply.  These cuts

were larger than the Debtors had originally proposed, but on March 1 the union had done

what it had said at trial it would do – buy the Debtors out of their "outsourcing"

proposal.[9]

On the same day the agreement with PFAA was announced, the Debtors and

ALPA supplemented their respective final proposals.  After further negotiation, an

agreement was reached between the Debtors and ALPA on March 3, 2006.

The Debtors' agreements with PFAA and ALPA were submitted to their

respective memberships for the lengthy process of membership ratification.  In the

---

[8] The March 1 Agreement did contain a significant "language of destination" provision, providing for
limited relief from certain seniority rules that govern assignment of flight attendants.  The new provision
would give the Debtors flexibility to give precedence to "language qualified" flight attendants.
[9] The Debtors originally proposed an average pay cut of 17.5%.  The January 17 proposal, based on
negotiations with PFAA, had a 21.7% pay cut.  The February Proposal had a 19.2% pay cut with some out-
year pay increases.  The March 1 Agreement had a 21% pay cut with certain out-year increases.  It also
required certain changes to work rules, vacation pay and other provisions whose cost savings were credited
to the "ask."

meantime, IAM had submitted its proposed agreement with the Debtors to its four affected bargaining units. Two ratified but two did not. Beginning on May 15, 2006, the Court took two additional days of testimony on the §1113 issues as they related to the larger of the two rejecting IAM units. After additional negotiation, a revised agreement was entered into between the Debtors and IAM with respect to that unit, which the union leadership agreed to endorse and which was later ratified.[10]

ALPA's membership also ratified the agreement that the union had reached with the Debtors. PFAA's membership, however, voted down the March 1 Agreement by a margin of 4:1. The reasons for the rejection are not altogether clear. The Debtors contend that the union leadership failed to support its own agreement and have submitted material from the PFAA website that demonstrates, for example, that the PFAA President, who testified at trial and was a member of the negotiating committee and the executive board, took a "neutral" stance and abstained from voting in the executive committee. The executive board of the union voted against the agreement by a vote of two to one, with one member undecided and the president abstaining. In the meantime, the union has apparently become embroiled in a representation dispute over the right to represent the Northwest flight attendants.[11]

The Debtors also suggest that the union membership would have found the February Proposal, which had smaller wage and benefit cuts and more hiring of foreign flight attendants, more palatable. PFAA blames a "threatening" letter from a Northwest

---

[10] Negotiations with respect to the smaller rejecting unit, which has only 42 employees, are continuing.
[11] The Association of Flight Attendants-Communications Workers of America ("AFA-CWA") filed an application with the National Mediation Board in April 2006 to hold a representation election for the Northwest flight attendants. See *Northwest Airlines, Inc.*, 33 N.M.B. 195, 196 (2006). On May 9, 2006, the National Mediation Board found a representation dispute to exist and authorized an election among the Northwest flight attendants. It appears that such a decision is ordinarily based on a showing that more than half of the affected workers supported the election. 29 C.F.R. § 1206.2(a). The Court has not been apprised of the consequences, if any, of these developments.

manager as having contributed to the defeat, along with the onerous nature of the proposed changes.  Moreover, far from accepting the Debtors' suggestion that the February Proposal might be more palatable, PFAA's position is that Court authorization of those terms (as opposed to the March 1 terms) would result in a strike.

In any event, at the time the Debtors resumed their motion for § 1113 relief on June 6, 2006, they also filed an adversary proceeding against PFAA and its leadership, seeking to enjoin the union from a strike or other work stoppage on the ground that any such action would violate the Railway Labor Act.[12]  PFAA denied it had plans for a work stoppage, and a stipulation was agreed to, providing that the Debtors would not put new terms and conditions into effect before June 30, 2006, and PFAA would not engage in any work stoppage prior to the imposition of new terms and conditions and without giving at least fifteen days' notice to the Debtors.  This would, among other things, give

---

[12] Outside of bankruptcy, the Debtors, as an airline, must negotiate any changes to a collective bargaining agreement in accordance with the applicable procedures in the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, enacted in 1926 and made applicable, in part, to airlines in 1936.  The Railway Labor Act is aimed at maintaining uninterrupted transportation operations and imposes a duty upon management to bargain with employees in the event of a labor dispute.  Under the Railway Labor Act, carriers and unions must "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes."  45 U.S.C. § 152.  The Railway Labor Act distinguishes between major disputes, which involve a new collective bargaining agreement or modifications to an existing agreement, and minor disputes, which involve grievances or the interpretation or application of the existing collective bargaining agreement.  See *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 302-04 (1989); *Elgin v. Burley*, 325 U.S. 711, 723 (1945).  With regard to major disputes, the Railway Labor Act provides that a carrier proposing to modify a collective bargaining agreement must give the union thirty days' written notice of its intended changes.  Thereafter, the parties bargain with regard to the proposed modifications.  If the parties are unable to negotiate mutually satisfactory modifications to the collective bargaining agreement, either party may invoke mediation by the National Mediation Board.  The National Mediation Board has authority to mediate for an indefinite period of time, during which the carrier may not change working conditions, and the union may not declare a strike or engage in other disruptive action.  The National Mediation Board may recommend arbitration if it determines that the parties have reached an impasse and further mediation would be futile.  If one or both parties refuse arbitration, the status quo will be lifted after a thirty-day cooling off period.  45 U.S.C. §§ 155-56, 160; see also Athanassios Papaioannou, *The Duty to Bargain and Rejection of Collective Agreements Under Section 1113 by a Bankrupt Airline:  Trying to Reconcile R.L.A. with Bankruptcy Code*, 18 Transp. L.J. 219, 238-39 (1990).

the Court time to decide the § 1113 Motion based on the existing record, and it would

give the parties an opportunity for additional negotiation.

Although the parties have, in fact, resumed negotiations, it is the Debtors'

position that negotiations must be limited in time and that the Debtors have already

postponed for many months their right under § 1113(d)(2) to a judicial decision within

thirty days of the hearing.  The Debtors further assert that the need for a resolution of

their dispute with the flight attendants is particularly compelling as a consequence of the

agreements with ALPA and IAM.  Both of those agreements have clauses providing that

the concessions will not become effective if all other major union groups do not provide

concessions of commensurate value.  Since ALPA and IAM both have substantially

agreed to the Debtors' "ask," that means that concessions of a proportionate aggregate

value are required from the flight attendants before the ALPA and IAM revised

agreements can go into effect.  Moreover, the Debtors have represented that a resolution

of their collective bargaining obligations must precede any material progress on obtaining

financing and a plan to exit Chapter 11.

### Discussion

Section 1113 of the Bankruptcy Code is a comprehensive provision designed by

Congress to reconcile the reorganization imperatives of a Chapter 11 debtor with the

collective bargaining interests of organized employees.  It was enacted in 1984 in

response to *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 526 (1984), in which the

Supreme Court held that a debtor could reject a collective bargaining agreement as an

executory contract under Bankruptcy Code § 365(a) by showing that the agreement

"burdens the estate, and that after careful scrutiny, the equities balance in favor of

rejecting the labor contract." Congress, overruling *Bildisco* in part, provided that

collective bargaining agreements would not be subject to the general provisions of § 365,

and it laid down certain procedural and substantive prerequisites to a debtor's rejection of

a collective bargaining agreement. These prerequisites, set forth in § 1113, are aimed at

facilitating consensual modifications to collective bargaining agreements but include

finite time periods in recognition of the fact that indefinite delay can doom a Chapter 11

reorganization.

As part of this expedited negotiation process, § 1113(b) requires a debtor to

provide its union with proposed modifications to a collective bargaining agreement prior

to filing an application to reject the agreement. The proposed modifications must (i) be

based on the most complete and reliable information available, (ii) be necessary to permit

the debtor's reorganization, and (iii) assure that all affected parties are treated fairly and

equitably. 11 U.S.C. § 1113(b). Additionally, the debtor must provide the union with the

relevant information underlying the proposed modifications and bargain in good faith.[13]

In turn, § 1113(c) provides that rejection is appropriate if (i) the debtor satisfies the

---

[13] Section 1113(b) provides in pertinent part:

> (1) Subsequent to filing a petition and prior to filing an application seeking rejection of a
> collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section
> "trustee" shall include a debtor in possession), shall—
>    (A) make a proposal to the authorized representative of the employees covered by such
>    agreement, based on the most complete and reliable information available at the time of such
>    proposal, which provides for those necessary modifications in the employees benefits and
>    protections that are necessary to permit the reorganization of the debtor and assures that all
>    creditors, the debtor and all of the affected parties are treated fairly and equitably; and
>    (B) provide, subject to subsection (d)(3), the representative of the employees with such
>    relevant information as is necessary to evaluate the proposal.
>
> (2) During the period beginning on the date of the making of a proposal provided for in paragraph
> (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet,
> at reasonable times, with the authorized representative to confer in good faith in attempting to
> reach mutually satisfactory modifications of such agreement.

requirements of § 1113(b)(1), (ii) the union refuses to agree to the debtor's proposed

modifications without good cause, and (iii) the balance of the equities clearly weighs in

favor of rejection.[14]   The debtor bears the burden of persuasion in making the three

substantive showings under § 1113(c).  *In re Sheet Metal Workers' Int'l Ass'n, Local 9 v.*

*Mile Hi Metal Sys., Inc. (In re Mile Hi Metal Sys., Inc.)*, 899 F.2d 887, 891-92 (10th Cir.

1990).

### 1.   Necessity

The most fundamental requirement for rejection of a collective bargaining

agreement is that the rejection must be "necessary."  Under § 1113(b)(1)(A), a debtor

seeking to reject a collective bargaining agreement must show not only that the

agreement is "burdensome" but that the rejection is "necessary" to permit the

reorganization of the debtor.  In *Truck Drivers Local 807 v. Carey Transp.*, 816 F.2d 82,

90 (2d Cir. 1987), the Second Circuit held that "the necessity requirement places on the

debtor the burden of proving that its proposal is made in good faith, and that it contains

necessary, but not absolutely minimal, changes that will enable the debtor to complete the

reorganization successfully."  In developing this standard, the Second Circuit specifically

rejected the Third Circuit's narrower construction of § 1113 in *Wheeling-Pittsburgh Steel*

*v. United Steelworkers*, 791 F.2d 1074, 1088-89 (3d Cir. 1986), where that Court

construed the term "necessary" to encompass only those modifications essential to the

---

[14] Section 1113(c) provides in pertinent part:

> The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that--
> (1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);
> (2) the authorized representative of the employees has refused to accept such proposal without good cause; and
> (3) the balance of the equities clearly favors rejection of such agreement.

debtor's short-term survival or necessary to prevent liquidation. *Carey Transp.*, 816 F.2d

at 89. The *Carey Transp.* Court explained that the term "necessary" could not be

synonymous with "essential" or "bare minimum" because if a debtor were constrained to

propose only the most minimal changes to a collective bargaining agreement, it would

have no room to engage in the good faith negotiations required by § 1113. *Id.*; see also

*Royal Composing Room, Inc.*, 848 F.2d 345, 348 (2d Cir. 1988). Rather, a debtor's

proposed modifications are considered necessary if they have a significant impact on the

debtor's operations and are required for the debtor to successfully reorganize and

compete in the marketplace upon emergence from Chapter 11. *Id.*; see also *Int'l Union,

United Auto., Aerospace and Agric. Implement Workers of Am., UAW v. Gatke Corp.*,

151 B.R. 211, 213 (N.D. Ind. 1991) (the "Second Circuit's longer term focus, which

encompasses the ultimate success of reorganization rather than merely the avoidance of

immediate liquidation, is more consistent with the statute"); *Mile Hi Metal Sys.*, 899 F.2d

at 892-93; *In re Walway Co.*, 69 B.R. 967, 973 (Bankr. E.D. Mich. 1987).

 The Second Circuit has also held that a debtor need only make a showing as to the

overall necessity of the proposal, rather than prove that each element of the proposal is

necessary to reorganization. *Royal Composing Room*, 848 F.2d at 348. As the Court

reasoned in *Royal Composing Room*, requiring that each element of a proposal be

necessary would allow a union to defeat a rejection application by singling out an

element as unnecessary where it could be reasonably substituted with an alternative. *Id.*

Thus, in determining whether the debtor's proposed modifications are necessary, "a court

must focus on the total impact of the changes in the debtor's ability to reorganize, not on

whether any single proposed change will achieve that result." *In re Appletree Mkts., Inc.*,

155 B.R. 431, 440 (S.D. Tex. 1993); see also *In re Horsehead Indus., Inc.*, 300 B.R. 573,

584 (Bankr. S.D.N.Y. 2003) (proposed modifications to a collective bargaining

agreement must be viewed as a whole).

      Although necessary modifications to a collective bargaining agreement are

limited to "employees benefits and protections," they are not limited to wages alone.  11

U.S.C. § 1113(b)(1)(A).  A proposal may be deemed necessary for purposes of § 1113(b)

even if it includes non-economic modifications.  See *Carey Transp.*, 816 F.2d at 86

(approving rejection of collective bargaining agreements based on proposals including

changes in health and pension benefits, work rules, workers' compensation and disability,

and scheduling and assignment rules); see also *In re Maxwell Newspapers, Inc.*, 981 F.2d

85 (2d Cir. 1992) (guarantee of lifetime employment); *Royal Composing Room*, 848 F.2d

at 350 (seniority clause); *In re Century Brass Prods., Inc.*, 795 F.2d 265 (2d Cir. 1986)

(retiree welfare benefits); *Gatke Corp.*, 151 B.R. at 214 (transfer policies).  Courts have

frequently held that non-economic modifications that have a significant economic impact

on the debtor's financial operations can be necessary to the debtor's reorganization.  See

*In re Appletree Mkts., Inc.*, 155 B.R. 431, 441 (S.D. Tex. 1993) (approving proposal with

non-economic changes that were "intended to have a direct economic effect on [the

debtor's] ability to reorganize successfully by lowering its labor costs and improving its

level of customer service"); see also *In re Hoffman Bros. Packing Co.*, 173 B.R. 177,

187-88 (B.A.P. 9th Cir. 1994) (approving proposal with non-economic changes that

"related to the economic benefit of the debtor").

      With respect to the first requirement of § 1113, that changes to a labor agreement

be "necessary" to its reorganization, no party to these § 1113 proceedings contended that

the Debtors could reorganize if they continued to be liable to pay the wages and benefits

in their current collective bargaining agreements.  There was thus no real dispute that

some concessions were "necessary" within the meaning of § 1113(b).  If there was any

question, the evidence of record demonstrated overwhelmingly that the Debtors could not

survive under their present labor contracts.  The grim reality demonstrated at trial is that

the Debtors lost approximately $4 billion between 2001 and their Chapter 11 filing in the

third quarter of 2005, including a loss of $1.5 billion in 2005 alone.  At the time they

filed the Motion, the Debtors were losing approximately $4 to $5 million per day.  Even

assuming full implementation of the § 1113 proposals, the Debtors projected aggregate

losses in 2006 of $400 million (inclusive of bankruptcy-related restructuring costs).

        To cover their cumulative losses over the years, the Debtors borrowed

approximately $2.3 billion by pledging almost all available assets, and they raised

another $1.6 billion by selling non-essential assets.  It was not contested at the hearing

that the Debtors' further borrowing capacity is limited and that there is little or nothing

more to sell or to pledge.  Contributing to the losses is the fact that the Debtors' labor

costs have been the highest in the industry (a fact the Debtors stress).  Financially

dubious transactions, such as a leveraged buyout, also doubtless played a role (as PFAA

emphasizes).  In any event, as a result of losses and other factors, the Debtors' liquidity

has declined to very low levels by industry standards as well as by the standards of sound

management.

        There is thus no question on the record of these cases that rejection of the PFAA

collective bargaining agreement is "necessary" within the meaning of § 1113(b).  There is

also no issue on the record that concessions in the amount of the PFAA "ask" are

"necessary" as well. As discussed above, the Debtors did include a clear "ask" for each of its unions in its initial § 1113 proposal, and the Debtors have continued to insist upon those amounts as an aggregate concessionary target for each. ALPA initially objected to the amount of the "ask," but it eventually agreed to concessions that aggregated the amount the Debtors had sought. IAM did not contest the amount of its "ask" at trial and has similarly agreed to its share of the burden. Although it had earlier contended that concessions aggregating $143 million from the flight attendants would be sufficient, at trial PFAA also conceded the Debtors' "ask" of approximately $195 million in concessions. Counsel for PFAA stated in his opening statement, "As we've also recently submitted to the Court, we have provided the company with a proposal that we evaluate at $192 million. *So we are attempting to reach the ask that the company has put on the table.*" (Seham, Tr. 1.56 lines 15-18, emphasis added.) A member of the PFAA negotiating committee testified at the hearing on February 3, 2006 that the union's most recent proposal at that time contained concessions aggregating $194.9 million in value. (McNeely, Tr. 8.79 line 22 to 8.80 line 1; PFAA Ex. 71.) The Debtors contended that the concessions detailed on PFAA Ex. 71 could not be fairly valued at $194.9 million, and until agreement was reached on March 1, 2006, the parties continued to dispute how the concessions should be valued as well as how they should be allocated.[15] However, for purposes of the record on the issue of necessity, PFAA in effect conceded the issue by conceding the "ask."

Beyond that, there is no substantial evidence that the $195 million "ask" was unnecessary or that it was unreasonable or disproportionate to the concessions being

---

[15] There is no question that PFAA improperly overstated the value of some of its concessions, and that the Debtors' methodology undervalued some of the PFAA concessions, such as the calculation of the value of some work rule changes. Any valuation issues were resolved in the March 1 Agreement.

asked of the other parties.  The Debtors' aggregate "ask" to its unions, including the $195

million asked of the flight attendants, is an integral part of their business plan.  The

business plan, which is a projection of revenues and expenses through the year 2010,

targets a return to profitability in 2007 and a 6.5% pretax profit margin by 2010.  The

Debtors' witnesses, including independent consultants who have worked on many of the

major airline bankruptcies over the past two decades, opined that a 6.5% pretax profit by

2010 was reasonable in the industry and necessary in order to attract new investors and

allow the Debtors to exit Chapter 11.  In order to achieve this goal, the business plan

requires the reduction in costs that the Debtors have sought.  This includes, in addition to

the concessions of $195 million from the flight attendants and the concessions from the

other unions, approximately $700 million annually in non-labor cost savings – $400

million from fleet restructuring, $150 million from debt restructuring, and $150 million

from other non-labor cost savings.[16]  In addition, on top of these savings, the business

plan requires an additional $400 million in cost savings that have not yet been identified.

The Debtors also demonstrated at the hearing (without much dispute) that most

improvements will have to be derived from cost savings.  Thus, the Debtors showed that

their load factors (number of passengers per available seat) are approaching what is

considered the maximum in the industry.  They cannot rely on a revenue "premium"

because of factors that include the identity of their principal hub cities, Minneapolis and

Detroit.  As discussed below, the Debtors' efforts to introduce certain efficiencies into

---

[16] In addition to reducing fleet costs, the Debtors will have to expand their international fleet by introducing
new Boeing 787 aircraft and by expanding the use of the Airbus 330.  They demonstrated that they will
need to finance at least $6 billion in new aircraft acquisitions in the near term.  Adjusted for size, the
Debtors' proposed capital expenditures are three times the level that United Airlines ("United") projects in
its published five-year business plan.  This flows from the age and character of the Northwest fleet.  For
example, the Debtors' fleet of DC-9's (a type of aircraft no longer flown by any other legacy carrier) is
approaching the end of its service life and will have to be replaced.

their operations by revising the work rules or scope provisions in their collective

bargaining agreements have been met with the strongest union opposition.  Thus, most of

the restructuring can only be accomplished by a comprehensive reduction in costs,

including labor costs.

PFAA failed to challenge either the assumptions or the conclusions of the

Debtors' business plan.  (See Akins, Tr. 9.205 line 25 to 9.206 line 3.)  PFAA's expert

witness specifically agreed that a target of a 6.5% pretax profit margin was reasonable.

(Akins, Tr. 9.154 lines 2-6.)[17]  PFAA's expert testified that, in his view, the Debtors have

"sort of underestimated the robust atmosphere that's out there right now" and that an

increase in revenue per available seat mile would have a material affect on the Debtors'

bottom line.  (Akins, Tr. 9.209 line 24 to 9.210 line 1.)  He said, "My assessment would

be that Northwest is vastly undershooting the revenue RASM/PRASM increases that

people are seeing in the market."  (Akins, Tr. 9.209 lines 14-16.)[18]  But he prefaced this

view with the acknowledgement, "I think we just agreed that it's very hard to predict the

future."  (Akins, Tr. 9.209 lines 13-14.)  Neither his pretrial expert report and affidavit

nor his general trial testimony offered an alternative to the Debtors' business model.  It is

always possible that a business plan will prove unduly conservative, but on the record

there is no substantial evidence to counter the Debtors' showing that the business plan,

---

[17] ALPA's outside expert, from a well-known investment advisory firm, introduced a chart to demonstrate
that other carriers were able to raise money based on a lower ratio of net debt to EBITDAR, but the Debtors
demonstrated convincingly that the other carriers did not face the same obstacles and risks as Northwest,
which is targeting a need of $2.25 billion in exit financing, including $1 billion to refinance an existing
term loan and $1.25 billion in new liquidity.  For example, the Debtors' position differs from that of
United, which emerged from Chapter 11 in February 2006 with very substantial exit financing, all in the
form of debt.  United was able to rely on a pledge of $7 billion in collateral to its exit lenders, an alternative
that appears, at this time, to be unavailable to the Debtors.

[18] RASM is revenue per available seat mile.  PRASM is passenger revenue per available seat mile.

with all of its cost reductions, including the $195 million "ask" to the flight attendants, is "necessary" within the meaning of § 1113(b).

The Debtors have proved necessity under the Second Circuit's decision in *Carey Transp.*, which is governing, and it is likely that the Debtors would be able to satisfy the more stringent standard of the Third Circuit in *Wheeling-Pittsburgh* as well.

### 2. Complete and Reliable Information; Good Faith Bargaining

Section 1113 is also based on the premise that notwithstanding a Chapter 11 filing, there should be minimum interference with labor/management collective bargaining, and that the parties should be required to make every reasonable effort to reach a negotiated solution. A debtor must make its initial § 1113 proposal to labor "based on the most complete and reliable information available at the time of such proposal," and it must meet with the union's representatives at reasonable times and confer in good faith in attempting to reach a mutually satisfactory solution. 11 U.S.C. § 1113(b)(1)(A).

PFAA has never raised any serious issue with respect to the Debtors' compliance with these provisions. Its witnesses, at times, drew different conclusions from the financial information and projections provided by the Debtors, but they did not demonstrate that they were excluded from the "most complete and reliable information." Nor has there been any lack of face-to-face meetings and negotiations. The testimony is that the Debtors met with PFAA on an almost daily basis from the time the Motion was filed until agreement was reached on March 1, 2006.

At an early stage, the parties agreed that the strict time limits built into § 1113 should be varied in order to permit negotiations to continue and perhaps bear fruit. This

agreement had the Court's complete concurrence, as there was no dispute that the

Debtors would reap benefits from consensual resolutions with their unions.  However,

since a resolution has not been reached, despite a significant amount of time, and since a

decision must be rendered, it is worth noting that Congress, by inserting time limits into

the § 1113 process, recognized that a reorganization could be fatally hampered by labor

negotiations that dragged on without a result.

　　　　The parties also agreed that the § 1113 tests would be applied to the parties' final

§ 1113 proposals.  As noted above, they left the record open at the close of all testimony

for the express purpose of permitting additional negotiation and then the deliberate

submission of final, carefully constructed proposals.  This procedure is consistent with

many cases that have applied the § 1113 tests to proposals made during the course of trial

or even on appeal.  See, e.g., *In re Maxwell Newspapers*, 981 F.2d at 92, where the

Second Circuit based a § 1113 decision on an offer the debtor made to the union during

the course of the appeal.[19]

### 3.  Fair and Equitable Treatment

　　　　Congress imposed the further requirement in § 1113(b)(1) that all parties must be

treated fairly and equitably in connection with the rejection of a collective bargaining

agreement, recognizing that labor should not have to bear a disproportionate share of the

burden of saving a debtor.  The purpose of the fair and equitable requirement is to

"spread the burden of saving the company to every constituency while ensuring that all

sacrifice to a similar degree."  *Carey Transp*., 816 F.2d at 90 (quoting *Century Brass*, 795

---

[19] PFAA's new counsel (counsel was substituted after the trial was completed) appears to contend that the Court must limit its consideration to the offers made at the very outset of the negotiation process and prior to the filing of the Motion.  This is contrary to the express agreement of the parties in this case as well as the purpose of § 1113, which is to encourage continued negotiation between the parties.

F.2d at 273); see also *Wheeling-Pittsburgh*, 791 F.2d at 1091. However, it is not necessary for all affected parties to receive identical modifications, and concessions asked of various labor groups may reflect differences in the groups' wage and benefit levels. See *In re Allied Delivery System Co.*, 49 B.R. 700, 702-03 (Bankr. N. D. Ohio 1985). It is also appropriate for a court to consider a group's prepetition cost reductions in determining whether that group would "shoulder a proportional" share of the debtor's proposed cost reductions. See *Carey Transp.*, 816 F.2d at 90-91.[20]

Because it is often difficult to compare the differing sacrifices of parties in interest, courts apply a flexible approach in determining what constitutes "fair and equitable treatment." See *id.*; see also *In re Indiana Grocery Co.*, 136 B.R. 182, 194 (Bankr. S.D. Ind. 1990) ("[e]quity under § 1113 means fairness under the circumstances"); *Walway*, 69 B.R. at 974 (same). Thus, a debtor can meet the fair and equitable requirement of § 1113 by showing that its proposal treats the union fairly when compared with the burden imposed on other parties by the debtor's additional cost-cutting measures and the Chapter 11 process generally. *Carey Transp.*, 816 F.2d at 90.

It is significant that there was no contention during the § 1113 hearings that management was asking the flight attendants to bear a disproportionate share of the burden as compared to the other unions. As for the sacrifices by non-union personnel, PFAA contended that management should be asked to make larger sacrifices. The evidence, however, is that management base pay was cut up to 15% and cash compensation for officers was reduced by approximately 20% in December 2004. In December 2005 the Debtors instituted additional pay and benefit cuts for management to

---

[20] It is worth noting that PFAA did not agree to any concessions prior to the Chapter 11 filings. ALPA, on behalf of the pilots, agreed to interim wage and benefit concessions of $250 million in 2004.

achieve total payroll reductions of $73 million.  During the bankruptcy, there has been no

effort by these Debtors to institute a key employee retention plan or "KERP" for top-level

officers.[21]  PFAA contended that the Debtors have not cut executive-level compensation

enough, but no specifics were shown.[22]  Moreover, the Debtors' current attrition rates

cannot be maintained.[23]

Although it is too early in the case to determine the level of concessions or loss

that will be required of other constituencies in a plan of reorganization, the Debtors'

business plan targets an aggregate of $2.2 billion in annual cost reductions, including the

$1.361 billion in labor cost savings and $700 million of additional cost savings in the

non-labor area.[24]  Based on the business plan and the Debtors' need for a comprehensive

financial restructuring, there is no reason to believe that the unsecured creditors will not

be asked for huge concessions and that the position of the Debtors' current stockholders

is uncertain, at best.

PFAA demonstrated that there might have been mistakes in the past, citing as an

example a leveraged buyout in 1989 that increased the amount of Northwest's debt and

leveraged its balance sheet.  Nevertheless, although the parties to a labor negotiation

cannot be expected to forget a long and sometimes unhappy history, § 1113 recognizes

that Chapter 11 looks to the future and attempts to provide a basis for the reorganization

of a business.  Chapter 11 provides a debtor with the tools to avoid some of the results of

---

[21] This case was filed prior to the effective date of the 2005 Amendments to the Bankruptcy Code, and §
503(c), restricting KERPs, does not apply.

[22] The Debtors demonstrated that an exhibit through which PFAA purported to show that the Debtors' top
officers were paid more than the top officers of other airlines was incomplete and inaccurate.  (PFAA Ex.
69).

[23] The Debtors demonstrated that the overall management attrition rate in 2005 reached 15.5% and that, in
2005, 10 of 41 officers resigned.  By comparison, the attrition among active unionized groups was only
3.1% in 2005.  (Debtors' Ex. 52.)

[24] As mentioned above, the evidence at the hearing was that the Debtors need to find an additional $400
million in cost savings or revenue enhancements in order to meet the targets in the business plan.

the past, and the Debtors will have ample opportunity to use their avoidance and other

powers, if appropriate.  For purposes of the instant Motion, however, there is no showing

that the Debtors' proposals would treat PFAA unfairly compared to others affected by the

bankruptcy.

### 4.  Good Cause

After the requirements of § 1113(b) are met, § 1113(c)(2) conditions the rejection

of a collective bargaining agreement on a union's refusal to accept a debtor's proposal

"without good cause."  Although "good cause" is not defined in the Bankruptcy Code, it

is closely related to the requirements of § 1113(b)(1) described above, as well as the

requirement under § 1113(b)(2) that the parties negotiate in good faith.

> In terms of § 1113, the burden on the parties to negotiate is best analyzed
> under § 1113(c)(2), which permits rejection of the agreement only if the
> union has rejected the debtor's proposal without good cause.  If the union
> seeks to negotiate compromises that meet its needs while preserving the
> debtor's required savings, it would be unlikely that its rejection of the
> proposal could be found to be lacking good cause.  If, on the other hand,
> the union refuses to compromise, it is as unlikely it could be found to have
> acted with good cause.

*Royal Composing Room*, 848 F.2d at 349; see also *Horsehead Indus.*, 300 B.R. at 585.

The "good cause" and good faith requirements have been held to preclude

a debtor from simply offering a "take it or leave it" proposal.  *In re Delta Air*

*Lines*, 2006 Bankr. LEXIS 761, at *31-32 (Bankr. S.D.N.Y. Apr. 26, 2006); *In re*

*S.A. Mechanical, Inc.*, 51 B.R. 130, 132 (Bankr. D. Ariz. 1985).  A union may

also argue that any part of a proposal was "included by the employer in bad faith,

in an attempt to stalemate negotiations and allow it to obtain outright rejection

rather than a negotiated compromise."  *Royal Composing Room*, 848 F.2d 345,

348.  However, depending on the facts of the case, a debtor may not be obligated

to reduce the total amount of cost savings requested in its original proposal to

demonstrate good faith.  See *In re Indiana Grocery Co.*, 136 B.R. at 195-96.

There is no room, on the record of these cases, to contend that the Debtors

have insisted on terms in bad faith or in an effort to stalemate negotiations.  As

discussed above, the Debtors have consistently sought $195 million in value of

concessions from PFAA, but PFAA accepted this "ask" at the hearing and cannot

repudiate its position.  As for the proposition that the Debtors have attempted to

undermine negotiations by insisting on specific concessions, the Debtors have

consistently shown flexibility in the allocation of the concessions.  Among other

things, the Debtors retreated from their proposals with respect to the hiring of

foreign flight attendants in the face of virulent union opposition.  Although this

may not have made good business sense, it demonstrates good faith in the

negotiation process.[25]

Once a debtor establishes that its proposal is necessary, fair and in good

faith, the union must produce sufficient evidence to justify its refusal to accept the

debtor's proposal.  See *Carey Transp.*, 816 F.2d at 92; *Mile Hi Metal Sys.*, 899

F.2d at 892 n.6.  If a union demands provisions that are not economically feasible

and offers no alternatives that would permit the debtor to reorganize, the court

will find that the union acted without good cause.  *In re Maxwell Newspapers,*

---

[25] It is worth noting that the evidence on the record supports the Debtors' proposal to hire foreign flight
attendants as a matter of good business judgment.  The Debtors demonstrated that up to 63% of the
passengers on their important overseas routes between the United States and Japan and other Pacific
countries originate in Asia, that many are non-English speaking, and that their business is hampered by the
fact that many, if not most, of their flight attendants are unable to converse with passengers in their native
languages and have to rely on a single interpreter on each aircraft.  The hiring of foreign flight attendants
would not only reduce costs, but it would also allow the Debtors to attract and serve customers in a
segment of their business in which they compete with foreign airlines that appear to offer better language
capabilities.

*Inc.*, 981 F.2d 85 (2d Cir. 1992). On this record, there is no serious question that PFAA rejected the Debtors' last proposal without "good cause."

The union's rejection "without good cause" is evidenced by the fact that the union leadership agreed on March 1, 2006 to a new contract. The membership rejected the agreement that its leadership had negotiated, but § 1113 does not require ratification of an agreement. Section 1113(b)(1)(A) provides that a proposal be made to "the authorized representative of the employees covered by such agreement," and the question is whether the union, as the authorized representative of the flight attendants, has refused to accept such proposal without good cause. 11 U.S.C. § 1113(c)(2). In all cases, it is the position of the "authorized representative" that is critical. See *Horsehead Indus.*, 300 B.R. at 577-78, where the Court found a union's inability to ratify an agreement "tantamount to rejection of the Debtors' proposal without good cause."

PFAA argues that its agreement was "tentative" and/or subject to member ratification. However, unlike IAM, which initially agreed only to send the Debtors' last proposal to its membership units without recommendation, the PFAA leadership was, as far as the Court was aware, committed to the agreement its negotiating team had reached. As the Court understands the facts from the parties' most recent submissions, and as mentioned above, the union leadership gave the agreement little support. Whether the union leadership subverted its own agreement, as the Debtors suggest, or whether the leadership was required by its constitution to provide its membership with all points of view, as PFAA argues, is not determinative. The leadership's agreement to a deal on March 1 is telling for § 1113 purposes.

Even apart from the agreement of the leadership, the record contains ample evidence that the union did not have good cause to reject management's last offer. As discussed above, at the hearing PFAA expressly accepted the Debtors' $195 million "ask" in concessions relating to wages and work conditions. Once the level of concessions is set, the only remaining question is how to reach the target and the value of the components. The Debtors' March 1 Agreement reaches the target, and there is no evidence that the components are not properly valued. PFAA has failed to submit an alternative proposal that reaches the target and is based on similar values.

On the record as a whole, PFAA did not have good cause to reject management's proposal.

### 5. Balancing of the Equities

The final requirement, under § 1113(c)(3), is that the balance of the equities must clearly favor rejection of the agreement. Congress adopted this requirement as a codification of that portion of *Bildisco* that established an equitable standard for rejection of a collective bargaining agreement. See *Century Brass*, 795 F.2d at 273. The Second Circuit has directed courts to look at the following factors to determine whether the balance of the equities clearly favors rejection:

1.  the likelihood and consequences of liquidation if rejection is not permitted;

2.  the likely reduction in the value of creditors' claims if the bargaining agreement remains in force;

3.  the likelihood and consequences of a strike if the bargaining agreement is voided;

4.  the possibility and likely effect of any employee claims for breach of contract if rejection is approved;

28

5.  the cost-spreading abilities of the various parties, taking into account the number of employees covered by the bargaining agreement and how various employees' wages and benefits compare to those of others in the industry; and

6.  the good or bad faith of the parties in dealing with the debtor's financial dilemma.

*Carey Transp.*, 816 F.2d at 93 (citing *Bildisco*, 465 U.S. at 525-26).  Each of these factors should be viewed in context of a debtor's attempts to reorganize.  As the Supreme Court stated in *Bildisco*, bankruptcy courts "must focus on the ultimate goal of Chapter 11 …. The Bankruptcy Code does not authorize freewheeling consideration of every conceivable equity, but rather only how the equities relate to the success of the reorganization."  465 U.S. at 527; see also *Kentucky Truck*, 52 B.R. at 806 ("the primary question in a balancing test is the effect the rejection of the agreement will have on the debtor's prospects for reorganization").  It has also been stated that while a court must focus on the long-term health of the debtor when balancing the equities, it must also consider the employees affected by the debtor's proposed modifications and the policies of collective bargaining under labor law.  See Donald B. Smith and Richard A. Bales, *Reconciling Labor and Bankruptcy Law: The Application of 11 U.S.C. §1113*, 2001 L. Rev. M.S.U.-D.C.L. 1145, 1171-72 (2001).

The balance of the equities clearly favors rejection of the flight attendants' collective bargaining agreement.

As to the first and second factors identified by the Second Circuit, relating to the likelihood of liquidation absent rejection and the effect on creditors' claims, the Court has already found that revisions to the PFAA agreement and the Debtors' other collective bargaining agreements are "necessary" to prevent liquidation and preserve value.  The

Debtors cannot survive under the present agreements, and liquidation of this service

company would likely cost all employees (including the flight attendants) their jobs and

result in little or no recovery to creditors.

The third factor cited by the Second Circuit is the likelihood and consequences of

a strike if the bargaining agreement is voided.  The consequences of a strike would be

disastrous for the Debtors and all of their employees and creditors.  Nevertheless, as the

Court said in *In re Horsehead Industries*, 300 B.R. at 587,

> A strike is an inherent risk in every § 1113 motion, and in the end, it
> makes little difference if the Debtors are forced out of business because of
> a union strike or the continuing obligation to pay union benefits to avoid
> one. The unions may have the legal right to strike, but that does not mean
> that they must exercise that right.

Moreover, in this case, the Debtors assert that PFAA does not have a legal right to strike

under the Railway Labor Act in the event of rejection of the collective bargaining

agreement.  The Court does not have to reach that issue on this Motion; at a minimum,

the third factor does not change the balance of the equities in PFAA's favor.

The fourth factor set down by the Circuit Court is the possibility and likely effect

of employee claims for breach of contract if rejection is approved.  The March 1

Agreement included a "Bankruptcy Protection Letter," which contained certain

reservations of rights with respect to the filing of claims under certain circumstances.

The parties' rights are reserved on this issue, but it does not in any event change the

balance of the equities.[26]

---

[26] The Debtors' February Proposal provided PFAA with compensation in the form of participation in a
profit sharing plan.  The March 1 Agreement provided PFAA with participation in a similar profit sharing
plan, as well as an equity stake in the reorganized company in the event that another employee group was
afforded equity compensation.

The fifth factor that the Second Circuit weighs in considering the equities is the cost-spreading ability of the parties, taking into account the number of affected employees and how their wage levels compare to those of other companies in the industry. This factor requires an analysis on two levels.

With respect to the "cost-spreading" ability of the parties, it is obvious that cuts in wages and benefits affect employees deeply. Flight attendants have difficult jobs that involve substantial responsibility for their passengers' safety for which they are highly trained. There was no evidence on the record of the hearing that flight attendants are overpaid or that the pay cuts proposed by the Debtors will not be painful, but the cuts are commensurately painful for the other union members who ratified their new contracts. The Court would do the flight attendants and the Debtors' thousands of other employees no favor if it refused to grant the Debtors' § 1113 relief, and the Debtors joined the ranks of the many other airlines that have liquidated as a consequence of a Chapter 11 filing.

Moreover, PFAA has the ability to reduce the financial effect of a rejection of the collective bargaining agreement. In their most recent submission to the Court, the Debtors urge the Court to authorize them to put in effect the terms of their offer of February 22, 2006, which was the final offer that the union rejected before agreement was reached on March 1, 2006 – an agreement that could not be ratified. A principal difference between the proposals of February 22 and March 1 relates to the hiring of foreign flight attendants, and the February Proposal actually had smaller cuts in pay and benefits in reliance on the savings from hiring foreign flight attendants. The Debtors suggest that PFAA misread its membership goals when it substituted higher pay cuts and fewer foreign flight attendants for the Debtors' February Proposal. This is a matter

31

PFAA can take up in further negotiations, if it is so advised.  For purposes of this motion,

PFAA chose higher wage concessions as a substitute for the use of foreign flight

attendants and cannot fairly claim that the balance of the equities tilts in its favor because

the proposed wage cuts are so severe.

A second prong of the fifth factor compares the position of employees affected by

a § 1113 proposal with the wages and benefits of others in the industry.  There was

extensive evidence introduced by the parties as to wages and benefits in the airline

industry.  ALPA, in particular, took the position that the Debtors' proposed cuts were too

deep and that the Debtors were improperly attempting to lower their costs to match those

of low cost carriers, such as JetBlue, rather than the other legacy carriers, such as

United.[27]

There is no question that during prepetition negotiations with the unions, the

Debtors often used United as a point of comparison, and that after the Chapter 11 filings,

they increased the "ask" and then often used the US Airways/America West combination

as a point of comparison, as it has lower labor costs than United.  It may have been poor

negotiating tactics for the Debtors to change points of comparison, and it certainly

engendered ill will.  But the Debtors' business plan supported the increase in "ask," and

the Debtors established that their proposed wage levels were not materially lower than

those of United.[28]  Moreover, they also established that United's labor expenses are not

appropriate for Northwest.  Use of United's labor costs would result in a lower profit

_____

[27] At the time of the hearing, ALPA (unlike PFAA) had not accepted the Debtors' "ask," although it
eventually did so.
[28] The Debtors' January 17 proposal provided for a flight attendant pay scale above the scales of United,
US Airways and American West at all pay steps.  (Debtors' Ex. 69.)  The same proposal contained vacation
accruals that were somewhat lower than United and America West but higher than US Airways.  (Debtors'
Ex. 70.)  PFAA eventually agreed to lower pay and smaller vacation accruals, but only to buy the Debtors
out of their proposal relating to foreign flight attendants.

margin in each of the next five years, and the Debtors' pretax margins would be at levels

that would impede them from effectively accessing the capital markets and exiting

Chapter 11.  (Debtors' Ex. 46 and 93.)

The final factor cited by the Second Circuit in balancing the equities is the good

or bad faith of the parties in dealing with a debtor's financial dilemma.  For all of the

reasons discussed above, this factor also cuts in favor of the Debtors.  The Debtors have

faced up to economic reality.  PFAA alone among the unions has not.  On the basis of the

entire record, the equities clearly balance in favor of the Debtors.

### Relief Granted

For the reasons set forth above, the Debtors are entitled to an order authorizing

the rejection of their collective bargaining agreement with PFAA.  The Debtors seek, in

addition, authority to put in effect the terms set out in their offer of February 22, 2006, as

the final offer that PFAA rejected without good cause.  They argue that the compromise

position they took on March 1, 2006 was only for the purpose of reaching an agreement

with PFAA and that since the March 1 Agreement was not ratified, their willingness to

compromise beyond the February offer should effectively be nullified.

Section 1113 of the Bankruptcy Code requires collective bargaining between the

parties and directs a court to consider whether the debtor has made a good faith proposal

and whether the employees' authorized representative "has refused to accept such

proposal without good cause."  11 U.S.C. § 1113(c)(2).  The rejected proposal is the key

proposal for purposes of § 1113, and this is the proposal that presumably should be put in

effect if the union has rejected it without good cause.  In this case, this was the March 1

Agreement between the flight attendants' authorized representative and the Debtors.

33

Indeed, the Debtors cite the union's agreement to these terms as evidence that it rejected the proposal without "good cause."

It was also agreed by all parties during the long course of negotiation and litigation that if progress were made in the negotiations, it could not be undone – i.e., that if one issue were resolved, negotiations could not be reopened on that issue without good reason.  In *Maxwell Newspapers*, the Circuit Court conditioned its ruling "in debtor's favor … on the continuation of offers recently negotiated between the parties, represented to us in open court at the time of the oral argument …."  981 F.2d at 91-92.  The Court found that these were the "offers the debtor made to the union that were on the bargaining table" as of the date of oral argument and "are not now to be withdrawn."  *Id*. at 92.  This was the spirit in which negotiation progressed in this case with all of the unions and which has resulted (so far) in agreement with two of them.  This principle should not be changed now.

It is true, as the Debtors contend, that if a union can fall back upon a compromise that its membership rejects, it will have no incentive to get the membership to ratify an agreement as, at worst, the unratified agreement will be imposed on it.  This, however, is not a good enough reason to expunge the March 1 Agreement from the record of this case.  The goal is for the parties to reach a negotiated agreement, and it cannot be presumed (as the Debtors argue) that the March 1 terms are less acceptable to the union membership than those of February 22.  Obviously, bad faith on the part of any party can change the picture, but on the present record, it is terms of the March 1 Agreement that the Debtors will be authorized to implement.

The final issue is the question of further negotiation.  The Court notes that the parties have engaged in negotiations since the March 1 Agreement was rejected, and it urges that these negotiations continue.  The Debtors were able to agree on a new collective bargaining agreement with IAM after one of its units had rejected the first agreement, and that accord was promptly ratified by the union membership.  The best result for all concerned would be for a ratifiable agreement to be reached between the Debtors and the flight attendants.

Nevertheless, the prospect of further negotiations does not justify delay in the resolution of the motion before the Court.  As the Court said in *In re Horsehead Industries*, 300 B.R. at 588, "The parties should, of course, continue to negotiate, but in the interim, the Debtors must be permitted to reject…."  The Court will stay the effectiveness of any order of rejection for a period of fourteen days in order to allow for further negotiation.  During this period, the interim relief under § 1113(e), provided for in prior orders, shall remain in effect.  Unless real progress is made in the negotiations, however, any additional delay would be inappropriate, as it would fail to recognize the Debtors' financial plight and their need to move their Chapter 11 cases toward a conclusion, as well as the time limit that Congress included in § 1113 that has now been extended for many months and cannot be extended further without the Debtors' consent.

The Debtors are directed to settle an appropriate order on three days' notice.


Dated:  New York, New York
        June 29, 2006


              _____*/s/ Allan L. Gropper*_____
              UNITED STATES BANKRUPTCY JUDGE