**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

**THE DEBTORS RESERVE THE RIGHT TO AMEND THIS DISCLOSURE STATEMENT AT ANY TIME PRIOR TO THE DISCLOSURE STATEMENT HEARING**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| --------------------------------------------------------------- x | **Chapter 11** |
| **In re:** : | |
| : | **Case No. 05-17930 (ALG)** |
| : | |
| **NORTHWEST AIRLINES CORPORATION,** | **Jointly Administered** |
| **NWA FUEL SERVICES CORPORATION,** : | |
| **NORTHWEST AIRLINES HOLDINGS CORPORATION,** : | |
| **NWA INC.,** : | |
| **NORTHWEST AEROSPACE TRAINING CORPORATION,** : | |
| **NORTHWEST AIRLINES, INC.,** | |
| **NWA AIRCRAFT FINANCE, INC.,** : | |
| **MLT INC.,** | |
| **COMPASS AIRLINES, INC. F/K/A NORTHWEST AIRLINES** : | |
| **CARGO, INC.,** : | |
| **NWA RETAIL SALES INC.,** | |
| **MONTANA ENTERPRISES, INC.,** : | |
| **AIRCRAFT FOREIGN SALES, INC.,** | |
| **NW RED BARON LLC, AND** : | |
| **NWA WORLDCLUB, INC.** | |
| : | |
| **Debtors.** | |
| : | |
| --------------------------------------------------------------- | |

**DISCLOSURE STATEMENT WITH RESPECT TO**
**DEBTORS' FIRST AMENDED JOINT AND CONSOLIDATED**
**PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Bruce R. Zirinsky (BZ 2990)
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666

Mark C. Ellenberg (ME 6927)
CADWALADER, WICKERSHAM & TAFT LLP
1201 F St. N.W., Suite 1100
Washington, DC 20004
Telephone:  (202) 862-2200
Facsimile:  (202) 862-2400

Dated:   March 30, 2007

USActive 7789030.13

## SUMMARY OF THE PLAN OF REORGANIZATION

**A.    Introduction**.

Northwest Airlines Corporation ("NWA Corp.") and its subsidiaries (collectively the "Debtors" or "Northwest") are soliciting votes from their unsecured creditors for the acceptance of their Plan of Reorganization.  The Plan will permit Northwest to continue in business on a sound economic footing and will maximize recoveries for all creditors by preserving the going concern value of Northwest.  *Please refer to the attached Glossary for definitions of terms used in this Disclosure Statement.*

Under the Plan, Allowed administrative, priority and secured claims are unimpaired and will be satisfied in full.  The acceptance of the Plan by holders of these Claims is not required and Northwest is not soliciting their votes.

Holders of General Unsecured Claims are impaired under the Plan and are entitled to vote.  Northwest is asking that all holders of General Unsecured Claims vote to accept the Plan.

Under the Plan, holders of Allowed General Unsecured Claims against any of the Debtors other than Northwest Airlines, Inc., NWA Corp., Northwest Airlines Holdings Corporation, and NWA Inc. (the "Consolidated Debtors") will receive payment in full, in Cash, without interest.  Holders of Allowed General Unsecured Claims against the Consolidated Debtors of $20,000 or less, or who elect to reduce their Allowed General Unsecured Claims to $20,000, will also receive payment in full, in Cash, without interest.

Holders of all other Allowed General Unsecured Claims against the Consolidated Debtors will receive shares of New Common Stock of NWA Corp. in exchange for their Claims, and Eligible Holders will also be entitled to subscribe for additional shares of New Common Stock of NWA Corp. pursuant to the underwritten Rights Offering more fully described in this Disclosure Statement. Please refer to section V.D. for a discussion of the Rights Offering.

The substantive consolidation of the Consolidated Debtors will eliminate claims based on a guaranty of a Consolidated Debtor of the primary obligation of another Consolidated Debtor.  However, holders of Allowed General Unsecured Claims against one of the Consolidated Debtors who also hold a guaranty from another Consolidated Debtor will be entitled to receive additional shares of New Common Stock of NWA Corp. as compensation for the impact of the consolidation.

Based on the current estimates of the Reorganized Debtors' value, and the current estimates of General Unsecured Claims that will ultimately be Allowed, holders of Allowed General Unsecured Claims will receive New Common Stock having a value between 66% and 83% of their Allowed Claims, with a midpoint estimate of 74%.  Holders of Allowed General Unsecured Claims who also have a guaranty from a Consolidated Debtor will receive additional shares of New Common Stock having a value between 6% and 8% of their guaranty, with a midpoint estimate at 7%, bringing the estimated overall recovery for such holders to 72%-91%, with a midpoint estimate of 81%.

Under the Plan, 225,788,536 shares of New Common Stock will be issued to holders of Allowed General Unsecured Claims against the Consolidated Debtors, 8,622,772, shares of New Common Stock will be issued to holders of Allowed General Unsecured Claims against the Consolidated Debtors who also hold a guaranty from a Consolidated Debtor, and 23,611,111 shares of New Common Stock will be sold pursuant to the Rights Offering.  In addition, the Rights Offering Sponsor will purchase

directly 4,166,667 shares of New Common Stock.  Please refer to section V.G. for a discussion of the New Common Stock.  Please refer to section IX.E for a discussion of the management equity plan.

Shareholders of NWA Corp. will receive no distributions under the Plan and their outstanding stock will be cancelled.  Accordingly, shareholders of NWA Corp. are deemed to reject the Plan and are not entitled to vote.

The Plan provides for the substantive consolidation of the Consolidated Debtors and treatment of Claims against each Consolidated Debtor as Claims against a single Consolidated Debtor.  Claims against each other Debtor are treated separately under the Plan.

The following table summarizes the treatment accorded creditors and other shareholders of Northwest under the Plan.

| Class | Description | Treatment | Entitled to Vote | Amount of Claim(s) | Estimated Recovery |
|---|---|---|---|---|---|
| | Administrative Expense Claims | Payment in full (or as otherwise agreed). | No | Ordinary course | 100% |
| | Compensation of Professionals Claims | Payment in full (or as otherwise agreed). | No | $42,285,000 | 100% |
| | Priority Tax Claims | Payment in full on the Effective Date or over six years from the date of assessment of the tax with interest or payment as otherwise agreed. | No | $66,834,000 | 100% |
| | DIP Claims | Payment in full/conversion to Exit Facility. | No | $1,225,000,000 | 100% |
| 1A 2A 3A 4A 5A 6A 7A 8A 9A 10A 11A | Priority Non-Tax Claims | Payment in full. | No | Not Material | 100% 100% 100% 100% 100% 100% 100% 100% 100% 100% 100% |
| 1B-1 | 1110(a) Aircraft Secured Claims | The maturity will be reinstated as such maturity existed before default and paid in accordance with the terms of the applicable loan agreements.  Claimants will retain security interests and are unimpaired by the Plan. | No | $2,539,460,000 | 100% |
| 1B-2 | Restructured Aircraft Secured Claims | The Claims in this Class will be treated in accordance with the applicable restructuring agreement and the Final Order that approved such agreement and are unimpaired by the Plan. | No | $1,422,041,000 | 100% |

| Class | Description | Treatment | Entitled to Vote | Amount of Claim(s) | Estimated Recovery |
|---|---|---|---|---|---|
| 1B-3 | N301US and N303US Aircraft Secured Claims | The maturity of Claims will be reinstated as such maturity existed before default, the Debtors will cure such default and pay the balance of the Claims in accordance with the terms of the applicable loan agreements. Claimants will retain security interests and are unimpaired by the Plan. | No | 9,285,000 | 100% |
| 1C 3B | Other Secured Claims | The treatment of each Other Secured Claim is set forth in Schedule 4.5 attached to the Plan. | No | $263,922,000 $124,218,000 | 100% 100% |
| 1D | General Unsecured Claims Consolidated Debtors | (i) Pro Rata share of New Common Stock For Distribution to Creditors and (ii), if the Eligible Holder elected to participate in the Rights Offering, the right to purchase its Rights Offering Pro Rata Share of the New Common Stock For Distribution Pursuant to Rights Offering. In addition, each holder who also holds a guaranty from one or more Consolidated Debtors with respect to its claim will receive, as compensation for the impact of the substantive consolidation its share of the New Common Stock For Distribution to Creditors With a Guaranty. | Yes | $8,750,000,000 – $9,500,000,000 | 66% -83% midpoint estimate of 74% |
| 2B 3C 4B 5B 6B 7B 8B 9B 10B 11B | General Unsecured Claims Non-Consolidated Debtors | Full payment in Cash. | Yes | $53,000 $67,000 $5,605,000 $0 $0 $0 $0 $0 $0 $0 | 100% 100% 100% 100% 100% 100% 100% 100% 100% 100% |
| 1E | Convenience Class Claims | Full payment in Cash. | Yes | $14,974,000[1] | 100% |
| 1F 2C 3D 4C 6C 9C 11C | Intercompany Claims | $1.00 | Yes | $548,144,000 $2,044,000 $0 $0 $640,000 $0 $64,952,000 | N/A |
| 1G 2D 3E | Equity Interests in Debtors Other than | Unimpaired. | No | | N/A |

---

[1] This number does not reflect potential Claims held by General Unsecured Creditors who make the Convenience Class Election, as further discussed in section V.C.

| Class | Description | Treatment | Entitled to Vote | Amount of Claim(s) | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|--------------------|
| 4D 5C 6D 7C 8C 9D 10C 11D | NWA Corp. | | | | |
| 1H | Preferred Stock Interests in NWA Corp. | Cancellation of Equity Interests and no distribution. | No | | 0% |
| 1I | Common Stock Interests in NWA Corp. | Cancellation of Equity Interests and no distribution. | No | | 0% |

**B.      Rights Offering**.

As part of the Plan, Northwest will raise $750 million in new capital through the sale of additional common stock.  This will include (i) the offer and sale of 23,611,111 shares of New Common Stock pursuant to a Rights Offering, representing $637.5 million of the total amount of capital to be raised; and (ii) the sale of 4,166,667 additional shares to the Rights Offering Sponsor, representing $112.5 million of the total amount of capital to be raised.  The Plan gives certain unsecured creditors (the "Eligible Holders") with an Allowed General Unsecured Claim against the Consolidated Debtors as of the Subscription Rights Record Date the right to purchase at least its Rights Offering Pro Rata Share of the additional common stock in the Rights Offering.  Such Eligible Holders have the right, but not the obligation, to participate in the Rights Offering.  The Rights Offering will also allow each Eligible Holder to subscribe for common stock not purchased by other Eligible Holders by electing to subscribe for up to 200% of such Eligible Holder's initial Rights Offering common share allotment.

The Rights Offering will commence on the Subscription Commencement Date, which is a Business Day approved by the Bankruptcy Court pursuant to the Debtors' Solicitation Procedures Motion.  The Rights Offering shall expire on the Rights Offering Expiration Date, which will be approximately 28 days after the Subscription Commencement Date (a period to be coterminous with the solicitation period).  Each Eligible Holder of a Class 1D General Unsecured Claim intending to participate in the Rights Offering must affirmatively elect to exercise its Subscription Right(s) on or prior to the Rights Offering Expiration Date.  Eligible Holders electing to subscribe for additional shares pursuant to the oversubscription rights described above must indicate that amount of shares in the appropriate place on the Subscription Form and pay for such additional shares in the same manner as the shares purchased pursuant to the Subscription Right are paid for.

A form for the exercise of the right to purchase common stock pursuant to the Rights Offering will be sent in addition to the ballot for Eligible Holders of Allowed Class 1D General Unsecured Claims.  If you received this form, and you want to purchase additional stock, you must return the filled out form and full payment for the new stock by the Rights Offering Expiration Date.

After the Rights Offering Expiration Date, the shares in respect of unexercised Subscription Rights shall be acquired by the Rights Offering Sponsor pursuant to a Rights Offering Sponsor Agreement in the form attached as Exhibit A to the Plan.  The Rights Offering Sponsor is JPMorgan Securities Inc.  This stand-by commitment and additional equity investment guarantees that all of the common stock will be purchased and that Reorganized Northwest will receive the full $750 million of new capital.  Under the Rights Offering Sponsor Agreement, the Debtors retain the right to seek up to an additional $150 million

private equity investment. The Debtors have not entered into an agreement to raise an additional private equity investment. A self-styled ad hoc committee of certain Claims holders (the "ACC") believes that an additional equity issuance would further dilute the recoveries available to unsecured creditors. The ACC further believes that any need for additional capital should come from an upsized rights offering available to all unsecured creditors. The Debtors disagree with each of the ACC's contentions.

**C.    Exit Financing**.

        The Plan contemplates that Northwest will convert the existing debtor in possession financing facility into an exit financing facility. This conversion is expressly provided for in the debtor in possession financing facility documentation. Upon conversion, the exit financing facility would consist of a $175 million revolving credit facility including a $75 million sub-limit letter of credit facility and a $1.050 billion term loan, each with a maturity date of August 21, 2013. The terms and conditions associated with the exit facility were approved by the Bankruptcy Court on August 8, 2006 when the debtor in possession financing facility was put in place. The Plan also provides Northwest the option to elect alternative exit financing, or amend the existing facility from time to time with appropriate consents, should comparable or more attractive financing become available on better terms.

**D.    Voting on the Plan and Subscribing to the Rights Offering**.

        Holders of unsecured Claims are impaired under the Plan and are entitled to vote. Northwest is asking that all holders of unsecured Claims vote for the acceptance of the Plan. Because the Allowed Claims against Northwest will exceed the value of its assets, it is anticipated that creditors will not receive full recoveries on their Claims. In addition, stockholders of NWA Corp. will not receive any recovery. Stockholders of NWA Corp. will be deemed to have rejected the Plan and their votes are not being solicited. A copy of the Plan is attached as Exhibit A to this Disclosure Statement.

        This Disclosure Statement provides the information needed to make an informed decision whether to accept or reject the Plan and whether to subscribe under the Rights Offering. Not everyone is entitled to vote or to subscribe. If you are entitled to vote, a ballot form will be included in this package. If a ballot is not included, you are not entitled to vote. If you are entitled to subscribe, a Subscription Form will be included in this package. If a Subscription Form is not included, you are not entitled to subscribe. Please note that if there is any inconsistency between the Plan and the descriptions in the Disclosure Statement, the terms of the Plan will govern. This Disclosure Statement and the Plan are the only materials creditors should rely upon to determine whether to accept or reject the Plan.

> The *last day* to vote to accept or reject the Plan is May 7, 2007. To be counted, your ballot must be actually *received* by the Balloting Agent by this date.
>
> The *record date* for determining which creditors may vote on the Plan is March 29, 2007.
>
> Recommendation: The Debtors and the Creditors Committee urge creditors to vote to accept the Plan.

If you are entitled to subscribe to additional shares of New Common Stock under the Rights Offering, you must exercise your rights in the following manner and within the following time period and deadlines:

> **The *last day* to exercise the Subscription Rights is May 7, 2007.  To exercise the Subscription Rights, (i) you must return a duly completed Subscription Form to the Subscription Agent so that such form is actually *received* by the Subscription Agent on or before this date; and (ii) you must pay the Subscription Purchase Price on or before this date, either by wire transfer to the Subscription Agent in accordance with the wire instructions set forth on the Subscription Form or by bank or cashier's check delivered to the Subscription Agent along with the Subscription Form.  If you are electing to subscribe for additional shares you must indicate that amount of shares in the appropriate place on the Subscription Form and pay for such additional shares in the same manner as described above.**
>
> **The *record date* for determining which creditors may exercise the Subscription Rights is March 29, 2007.**

Copies of this Disclosure Statement are available upon request made to the Balloting Agent, at the following address:

> **Balloting Agent**
> Overnight or Hand/Delivery
> Bankruptcy Services LLC
> 757 Third Avenue, Third Floor
> New York, New York, 10017
> Tel: (866) 715-0768
> Fax: (646) 282-2501
>
> First Class Mail:
> c/o Bankruptcy Services, LLC
> FDR Station
> PO Box 5014
> New York, NY 10150-5014
>
> Attn: Northwest

Only actual votes will be counted.  A failure to return a ballot will not be counted either as a vote for or against the Plan.  Any improperly completed or late ballot will not be counted.  Any Ballot that indicates both an acceptance and rejection of the Plan will be deemed a vote to accept the Plan.  If no votes to accept or reject the Plan are received with respect to a particular class, the class will be deemed to have voted to accept the Plan.  If a creditor casts more than one Ballot voting the same claim or interest before the Voting Deadline, the latest dated Ballot received before the Voting Deadline will be deemed to reflect the voter's intent and thus to supersede any prior Ballots.  Creditors must vote all of their claims within a particular class with respect to a particular Debtor under the Plan either to accept or reject the Plan and may not split their votes within a particular class; thus, a Ballot (or a group of Ballots) within a particular class of a particular Debtor received from a single creditor that partially rejects and partially accepts the Plan will be deemed to have voted to accept the Plan.

**E.    Disclosure Statement Enclosures**.

        Accompanying this Disclosure Statement are copies of: (i) the Plan (Exhibit A); (ii) Northwest's liquidation analysis (Exhibit B); (iii) the Court's order approving this Disclosure Statement (Exhibit C); (iv) the notice of the time for filing acceptances or rejections of the Plan, the date and time of the hearing to consider confirmation of the Plan and for filing objections to confirmation of the Plan (Exhibit D); (v) the notice of the time for the exercise of rights to subscribe for additional common stock in Reorganized NWA Corp. (Exhibit E); (vi) overview of the business plan (Exhibit F.1); (vii) financial projections (Exhibit F.2); and (vii) a summary of unsecured claims Allowed in the Chapter 11 Cases (Exhibit G).  In addition, those parties eligible to vote will receive a ballot for voting on the Plan.  Those parties eligible to exercise Subscription Rights will receive a form for exercising Subscription Rights in addition to a ballot for voting on the Plan.

**F.    Disclaimer**.

        **The Bankruptcy Court's approval of this Disclosure Statement does not constitute either a guaranty of the accuracy of the information contained herein or an endorsement of the Plan by the Bankruptcy Court.  This Disclosure Statement, along with any letter from the Creditors Committee, is the only document authorized by the Bankruptcy Court to be used in connection with the solicitation of votes accepting the Plan.  No representations other than those explicitly set forth in this Disclosure Statement are authorized concerning Northwest, including the prospects of its reorganized business, the value of its assets, or the Claims of its creditors.  The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and for purposes of exercising Subscription Rights and may not be relied upon for any other purposes.**

        **This Disclosure Statement contains summaries of certain provisions of the Plan, certain statutory provisions, certain documents related to the Plan, certain events in the case and certain financial information.  Although Northwest believes that the Disclosure Statement and related document summaries are fair and accurate, they are qualified to the extent that they do not set forth the entire text of the Plan, such documents or any statutory provisions.  The terms of the Plan govern in the event of any inconsistency with this Disclosure Statement.  All exhibits to the Disclosure Statement are incorporated into and are a part of this Disclosure Statement as if set forth in full herein.  The statements contained in this Disclosure Statement are made as of the date hereof, unless otherwise specified, and Northwest disclaims any obligation to update any such statements after the hearing on the approval of the Disclosure Statement.**

        **Safe harbor statement under the Private Securities Litigation Reform Act of 1995: All forward-looking statements contained herein or otherwise made by Northwest involve material risks and uncertainties and are subject to change based on numerous factors, including factors that are beyond Northwest's control.  Accordingly, Northwest's future performance and financial results may differ materially from those expressed or implied in any such forward-looking statements.  Such factors include, but are not limited to, those described in this Disclosure Statement.  Northwest does not undertake to publicly update or revise its forward-looking statements even if experience or future changes make it clear that any projected results expressed or implied therein will not be realized.**

        **This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules Of Bankruptcy Procedure and is not necessarily in accordance with federal or state securities laws or other similar laws.  Neither the offer of New Common Stock nor the Rights Offering to holders of certain classes of Claims has been registered under the Securities Act of 1933, as amended, (the "Securities Act") or similar state securities or "blue sky" laws.  The offers and issuances are being made in reliance on the exemption**

**from registration specified in section 1145 of the Bankruptcy Code. None of the stock to be issued on the Effective Date or pursuant to the Rights Offering has been approved or disapproved by the Securities and Exchange Commission or by any state securities commission or similar public, governmental, or regulatory authority, and neither the Securities and Exchange Commission nor any such state authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or upon the merits of the Plan. Any representation to the contrary is a criminal offense. Persons or entities trading in or otherwise purchasing, selling or transferring securities of Northwest should evaluate this Disclosure Statement and the Plan in light of the purposes for which they were prepared.**

**Except as otherwise specifically noted, the financial information contained herein has not been audited by a certified public accountant and has not necessarily been prepared in accordance with generally accepted accounting principles.**

**All parties in interest are encouraged to read the entire Disclosure Statement carefully, including the Plan and other exhibits, before deciding to vote either to accept or reject the Plan or to exercise rights to acquire additional shares pursuant to the Rights Offering. Holders of Claims should, however, not construe the contents of this Disclosure Statement as providing any legal, business, financial, or tax advice and should consult with their own advisors.**

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE PLAN OF REORGANIZATION ........................................................................ i

    A.    Introduction. ................................................................................................. i
    B.    Rights Offering. ............................................................................................ iv
    C.    Exit Financing. ............................................................................................. v
    D.    Voting on the Plan and Subscribing to the Rights Offering. ............................ v
    E.    Disclosure Statement Enclosures. .................................................................. vii
    F.    Disclaimer. ................................................................................................... vii

I.    Introduction ........................................................................................................... 1

II.    Business Description And Reasons For Chapter 11 ................................................. 1

    A.    The Debtors' Businesses. ............................................................................... 1
        1.    Operations and Route Network. ......................................................... 2
            (a)    Domestic System. ................................................................ 2
            (b)    International System. ........................................................... 3
            (c)    Alliances. ........................................................................... 3
            (d)    Regional Partnerships. ........................................................ 4
            (e)    Cargo. ................................................................................. 5
        2.    Other Travel Related Activities. ......................................................... 6
        3.    Employees. ......................................................................................... 6
        4.    Regulation. ......................................................................................... 6
    B.    Prepetition Indebtedness. ............................................................................... 8
        1.    The Senior Lender Agreement. ........................................................... 8
        2.    Enhanced Equipment Trust Certificates. .............................................. 9
        3.    Private Aircraft Financing. .................................................................. 9
        4.    Unsecured Notes. ............................................................................... 9
    C.    Events Leading up to the Chapter 11 Cases. .................................................... 10
    D.    Pending Litigation & Other Legal Matters. ..................................................... 11
        1.    The Chase Action. .............................................................................. 11
        2.    The Spirit Action. ............................................................................... 11
        3.    The Series C Preferred Stock Actions. ................................................ 11
        4.    Other Legal Issues. ............................................................................ 12

III.    Significant Events During the Chapter 11 Cases .................................................... 12

    A.    Filing and First Day Orders. ........................................................................... 12
    B.    Appointment of the Creditors Committee. ...................................................... 13
    C.    Postpetition Financing. .................................................................................. 14
        1.    DIP Credit and Exit Facility Agreement. ............................................ 14
        2.    U.S. Bank LC Facilities. .................................................................... 16
    D.    Section 1110(a) Agreements, Section 1110(b) Agreements and Aircraft Adequate
        Protection Stipulations. ................................................................................. 16
    E.    Fleet Restructuring. ....................................................................................... 17
        1.    Airbus. .............................................................................................. 17

2.    United Technologies Corporation.................................................................. 17
3.    General Electric Company and Affiliates. .................................................... 18
      (a)    General Electric Capital Corporation and Affiliates.......................... 18
      (b)    General Electric Company and Safran................................................ 19
4.    SAAB.............................................................................................................. 19
5.    AVRO 146-RJ85A Fleet Restructuring. ...................................................... 19
6.    CRJ Fleet Restructuring. ............................................................................... 20
7.    Embraer 175 Purchase Agreement................................................................ 21
8.    Boeing and Rolls-Royce. .............................................................................. 21
9.    Refinancing from Citigroup for up to 13 Airbus Aircraft............................. 22
10.   Defeasement of Trust 1 Debt. ....................................................................... 22
11.   1996-1 EETC Restructuring. ......................................................................... 23
12.   2000-1 EETC Restructuring. ......................................................................... 23
13.   1999-1 EETC Restructuring. ......................................................................... 24
14.   Retirement of DC-10 Aircraft. ...................................................................... 24
F.    Regional Airline Partnerships. ............................................................................... 24
      1.    Mesaba. .......................................................................................................... 25
      2.    Pinnacle.......................................................................................................... 25
      3.    Compass.......................................................................................................... 25
G.    Management Contracts. ........................................................................................... 25
H.    Labor Issues. ........................................................................................................... 26
I.    Claims Process and Bar Date.................................................................................. 26
      1.    Schedules and Statements.............................................................................. 26
      2.    Bar Date For Filing Proofs of Claim.............................................................. 26
J.    Omnibus Claims Objections. .................................................................................. 26
K.    Assumption of Significant Non-Aircraft Executory Contracts............................... 27
L.    Recharacterization and Rejection of Special Facilities Lease Obligations............. 27
      1.    Series 2001A and Series 2005A Bonds, and the Minneapolis-St. Paul
            Metropolitan Airports Commission. .............................................................. 27
      2.    Series 1995 Special Airport Facilities Revenue Refunding Bonds relating
            to Detroit Metropolitan Wayne County Airport. ........................................... 28
      3.    New York City Industrial Development Agency Special Facility
            Revenue Bonds 1997 ..................................................................................... 30
M.    Exclusivity. ............................................................................................................. 31
N.    Request for Equity Committee................................................................................. 31

IV.   Labor Issues ...................................................................................................................... 32

A.    Modification of Existing CBAs. ............................................................................. 32
B.    Retiree Medical Benefits......................................................................................... 34
C.    Pension Plan Issues. ................................................................................................ 35

V.    Treatment Of Creditors And Shareholders Under The Plan ............................................. 36

A.    Substantive Consolidation. ..................................................................................... 37
B.    Summary of Classification and Treatment.............................................................. 38
      1.    Classification by Debtor. ................................................................................ 38
      2.    Treatment of Claims by Class......................................................................... 39
C.    Description of the Classes For the Debtors.............................................................. 42
      1.    Priority Non-Tax Claims ................................................................................ 42
      2.    1110(a) Aircraft Secured Claims .................................................................... 42
      3.    Restructured Aircraft Secured Claims ............................................................ 42

|  |  | 4. | N301US and N303US Aircraft Secured Claims | 43 |
|  |  | 5. | Other Secured Claims | 43 |
|  |  | 6. | General Unsecured Claims | 44 |
|  |  |  | (a) | General Unsecured Claims – Consolidated Debtors | 44 |
|  |  |  | (b) | General Unsecured Claim – Non-Consolidated Debtors | 45 |
|  |  | 7. | Convenience Class Claims | 45 |
|  |  | 8. | Intercompany Claims | 45 |
|  |  | 9. | Equity Interests in Debtors Other than NWA Corp. | 45 |
|  |  | 10. | Preferred Stock Interests in NWA Corp. (Class 1H). | 45 |
|  |  | 11. | Common Stock Interests in NWA Corp. | 46 |
|  | D. | The Rights Offering. | 46 |
|  |  | 1. | Subscription Rights. | 46 |
|  |  | 2. | Subscription Period. | 46 |
|  |  | 3. | Exercise of Subscription Rights. | 46 |
|  |  | 4. | Oversubscription Rights. | 47 |
|  |  | 5. | Undersubscription. | 47 |
|  |  | 6. | Purchased Shares. | 48 |
|  |  | 7. | Rights Offering Sponsor Agreement. | 48 |
|  |  | 8. | Syndication Agreement. | 48 |
|  |  | 9. | Transfer of Subscription Rights; Revocation. | 48 |
|  |  | 10. | Withdrawal of Rights Offering. | 48 |
|  |  | 11. | Limitation on Acquisition of Shares. | 49 |
|  | E. | Private Equity Investment | 49 |
|  | F. | Restructuring Transactions. | 49 |
|  | G. | New Common Stock to Be Issued or Authorized Under the Plan. | 50 |
|  | H. | Administrative Expenses. | 50 |
|  |  | 1. | Administrative Expenses. | 50 |
|  |  | 2. | Priority Tax Claims. | 51 |
|  |  | 3. | Debtor in Possession Financing. | 51 |
|  |  | 4. | Postpetition Aircraft Purchase and Lease Obligations. | 52 |
|  |  | 5. | Claims Arising Under the Rights Offering Sponsor Agreement. | 52 |
|  |  | 6. | Satisfaction of Exit Conditions under A330 Financing Indentures. | 52 |
|  |  | 7. | Satisfaction of Conditions Under ISDA Master Agreements. | 52 |
|  |  | 8. | Fees and Expenses of Professionals. | 52 |
|  |  | 9. | Indenture Trustee Fees. | 53 |
|  |  | 10. | Management Contracts. | 53 |
|  | I. | Securities Law Matters. | 53 |
|  |  | 1. | Issuance and Resale of New Securities Under the Plan. | 53 |
|  |  | 2. | Listing of New Common Stock. | 55 |
|  |  | 3. | Registration Rights. | 55 |
|  | J. | Reservation of "Cram Down" Rights. | 55 |
| VI. | Voting Procedures And Requirements | 55 |
|  | A. | Vote Required for Acceptance by a Class. | 56 |
|  | B. | Classes Deemed to Accept or Reject. | 56 |
|  | C. | Voting. | 56 |
| VII. | Financial Information, Projections, And Valuation Analysis | 57 |
|  | A. | Overview of Business Plan | 57 |
|  | B. | Projections. | 57 |

C.    Reorganization Valuation Analysis. ...................................................................... 57
    1.    Scope of Valuation Performed. ................................................................... 57
    2.    Estimated Pre-Money Equity Value. .......................................................... 58
    3.    Baseline Valuation. ..................................................................................... 58
        (a)    Comparable Company Analysis. ...................................................... 59
        (b)    Discounted Cash Flow Analyses. ..................................................... 59
    4.    Unsecured Creditors Hypothetical Recovery Values. .................................. 60
    5.    Possible Adjustments to Baseline Valuation Range. ................................... 61
    6.    Certain Factors Affecting Valuation. .......................................................... 61
        (a)    Factors Biasing Current Market Valuation Higher. ......................... 61
        (b)    Factors Potentially Causing Lower Market Valuation in the
              Future. .............................................................................................. 61
    7.    Limitations to Valuation Analyses ............................................................. 62

VIII.    Governance Of Reorganized Northwest ...................................................................... 64

A.    Boards of Directors. ............................................................................................. 64
B.    Senior Management. ............................................................................................. 65
C.    Corporate Governance and Anti-Takeover Provisions. ....................................... 65
    1.    Anti-Takeover Effects of Provisions of Delaware Law. .............................. 65
    2.    Authorized but Unissued Preferred Stock ................................................... 66
    3.    Removal of Directors; Vacancies. ............................................................... 66
    4.    Limitation on Calling Special Meetings of Stockholders. ........................... 66
    5.    Advance Notice Requirements for Stockholder Proposals and Director
        Nominations. ................................................................................................ 66
    6.    No Stockholder Action by Written Consent. ............................................... 66
    7.    Supermajority Provisions. ........................................................................... 66
    8.    Stockholder Rights Plan .............................................................................. 67

IX.    Other Aspects Of The Plan ......................................................................................... 68

A.    Distributions. ....................................................................................................... 68
    1.    Distributions Through Agents. .................................................................... 68
    2.    Timing and Conditions of Distributions. .................................................... 69
        (a)    Date of Distributions. ...................................................................... 69
        (b)    Initial Distributions. ........................................................................ 69
        (c)    Subsequent Distributions. ................................................................ 69
        (d)    Distribution Reserve. ....................................................................... 70
        (e)    Surrender of Certain Securities Necessary for Distribution. ........... 70
        (f)    Fractional Shares. ............................................................................ 70
        (g)    Fractional Rights. ............................................................................ 71
    3.    Procedures For Treating Disputed Claims Under the Plan. ........................ 71
        (a)    Disputed Claims. ............................................................................. 71
        (b)    Objections to Claims. ...................................................................... 71
B.    Treatment Of Executory Contracts And Unexpired Leases. ................................ 71
    1.    Contracts and Leases Not Expressly Rejected Are Assumed. ..................... 71
    2.    Restructured Collective Bargaining Agreements. ........................................ 72
    3.    Management Agreements. ............................................................................ 72
    4.    Employee-Related Agreements. ................................................................... 72
    5.    Cure of Defaults. ......................................................................................... 72
    6.    Rejection Claims. ........................................................................................ 72
C.    Effect Of Confirmation. ....................................................................................... 72

      1.      Discharge of Claims against the Debtors and Termination of Equity
Interests in NWA Corp. ................................................................... 72

      2.      Indemnification. ........................................................................ 73

      3.      Exculpation. ............................................................................. 73

D.      Releases. ................................................................................... 73

E.      Management Equity Plan. ......................................................................... 74

      1.      Awards Expected to be Granted upon Emergence from Bankruptcy. ............... 75

      2.      Administration. ......................................................................... 75

      3.      Shares. ..................................................................................... 76

      4.      Participation. ............................................................................ 76

      5.      Awards Under the Management Equity Plan. ...................................... 76

            (a)      Stock Options. ....................................................... 76

            (b)      Stock Appreciation Rights. ..................................... 77

            (c)      Restricted Stock. .................................................... 77

            (d)      Other Stock-Based Awards. ..................................... 77

            (e)      Performance-Based Awards. .................................... 77

      6.      Non-Transferability. ................................................................. 77

      7.      Termination of Employment; Acceleration. ....................................... 78

      8.      Amendment. ............................................................................. 78

F.      Non-Contract Employee Compensation Program. ..................................... 78

G.      Committees. .............................................................................. 79

H.      Miscellaneous Provisions. ............................................................... 79

X.      Certain Factors To Be Considered ............................................................... 80

A.      Certain Bankruptcy Considerations. ...................................................... 80

B.      Risks Relating to the Plan Securities. .................................................... 80

      1.      Variances from Projections. ........................................................ 80

      2.      Significant Holders. .................................................................. 80

      3.      Lack of Trading Market. ............................................................ 81

      4.      Dividend Policies. ..................................................................... 81

      5.      Restrictions on Transfer. ............................................................ 81

C.      Risks Associated with the Businesses and the Airline Industry. ................... 81

      1.      The airline industry is intensely competitive. .................................. 81

      2.      Approval of the Northwest's Plan of Reorganization is at risk. ........... 82

      3.      A strike or other form of self-help by the flight attendants could have a
material adverse effect on Northwest. ............................................ 82

      4.      Northwest's degree of leverage may limit its financial and operating
activities. ................................................................................ 83

      5.      The Covenants in the Debtors' Exit Facility may restrict the Reorganized
Debtors' activities and will require them to satisfy certain  financial tests. ........ 83

      6.      Changes in government regulations could increase our operating costs
and limit Northwest's ability to conduct its business. ....................... 83

      7.      Northwest is vulnerable to increases in aircraft fuel costs. .................. 83

      8.      Northwest's insurance costs have increased substantially and further
increases could harm our business. ............................................... 84

      9.      Northwest is exposed to foreign currency exchange rate fluctuations. ........ 84

      10.     Northwest is exposed to changes in interest rates. ............................ 84

      11.     Due to industry seasonality, operating results for any interim periods are
not necessarily indicative of those for the entire year. ....................... 84

XI.   Confirmation Of The Plan ............................................................................................... 85

      A.   Confirmation Hearing. ...................................................................................... 85
      B.   General Requirements of Section 1129. ............................................................ 85
      C.   Best Interests Tests. .......................................................................................... 87
      D.   Feasibility.......................................................................................................... 87
      E.   Section 1129(b). ................................................................................................ 87
           1.   No Unfair Discrimination. ......................................................................... 87
           2.   Fair and Equitable Test. ............................................................................. 87

XII.  Certain U.S. Federal Income Tax Consequences Of The Plan ...................................... 88

      A.   Tax Consequences to the Debtors...................................................................... 89
           1.   The Cancellation of Debt............................................................................ 89
           2.   Limitations on Loss Carryforwards and Other Tax Benefits...................... 90
                (a)   General Section 382 Limitation. ....................................................... 90
                (b)   Built-In Gains and Losses. ............................................................... 91
                (c)   Special Bankruptcy Exception.......................................................... 91
                (d)   Avoiding a Second Ownership Change and Trading Limitations. ......... 92
           3.   Alternative Minimum Tax. .......................................................................... 93
           4.   Implementation of the Restructuring Transactions...................................... 93
      B.   Consequences to Holders of Certain Claims...................................................... 94
           1.   Consequences to Holders of Claims That Do Not Constitute Securities
                for U.S. Federal Income Tax Purposes or That Receive Solely Cash In
                Exchange for Their Claim........................................................................... 94
           2.   Consequences to Holders of Claims that Constitute Securities of NWA
                Corp. for U.S. Federal Income Tax Purposes. ............................................ 95
           3.   Consequences to Holders of Claims that are Employees or other Service
                Providers. .................................................................................................. 96
           4.   Consequences to Holders of Claims Against a Debtor Other Than NWA
                Corp. .......................................................................................................... 97
           5.   Tax Treatment of the Exercise or Lapse of Subscription Rights. ............... 97
           6.   Distributions in Discharge of Accrued but Unpaid Interest......................... 97
           7.   Recapture of Gain on Subsequent Disposition of New Common Stock........ 98
           8.   Ownership and Disposition of New Common Stock..................................... 98
                (a)   Dividends. ........................................................................................ 98
                (b)   Gain or Loss on Disposition of New Common Stock.......................... 99
           9.   Holders of Aircraft Secured Claims or Other Secured Claims. ................... 99
      C.   Information Reporting and Withholding. ............................................................ 99

XIII. Conclusion ..................................................................................................................... 100

# I.

## Introduction

Northwest Airlines Corporation ("NWA Corp.") and its subsidiaries (collectively the "Debtors" or "Northwest") are soliciting votes from their unsecured creditors for the acceptance of their Plan of Reorganization.  The Plan will permit Northwest to continue in business on a sound economic footing and will maximize recoveries for all creditors by preserving the going concern value of Northwest.

This Disclosure Statement sets forth certain information regarding the Debtors' pre-petition history, significant events that have occurred during the Chapter 11 Cases and the reorganization and anticipated post-reorganization operations and financing of the Reorganized Debtors.  This Disclosure Statement also describes the terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the securities to be issued under the Plan and the manner in which distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims eligible to vote must follow for their votes to be counted.

**For a summary of the Plan, please see section V. hereof.  For a discussion of certain factors to be considered prior to voting, please see section X. hereof.**

**This Disclosure Statement contains summaries of certain provisions of the Plan, certain statutory provisions, certain documents related to the Plan, certain events in the Debtors' Chapter 11 Cases and certain financial information.  Although the Debtors believe that such summaries are fair and accurate, such summaries are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions.  Factual information contained in this Disclosure Statement has been provided by the Debtors' management except where otherwise specifically noted.**

# II.

## Business Description And Reasons For Chapter 11

A.    **The Debtors' Businesses**.

Northwest operates one of the world's largest airlines and is engaged in the business of transporting passengers and cargo.  Northwest began operations in 1926.  Northwest's business focuses on the operation of a global airline network through strategic assets that include:

- domestic hubs at Detroit, Minneapolis/St. Paul and Memphis;

- an extensive Pacific route system with a hub in Tokyo;

- a transatlantic joint venture with KLM Royal Dutch Airlines ("KLM"), which operates through a hub in Amsterdam;

- a domestic and international alliance with Continental Airlines, Inc. ("Continental") and Delta Air Lines, Inc. ("Delta");

- membership in SkyTeam, a global airline alliance with KLM, Continental, Delta, Air France, Alitalia, Aeroméxico, CSA Czech Airlines, Korean Air and Aeroflot;

- agreements with three domestic regional carriers, including Pinnacle Airlines, Inc. ("Pinnacle") and Mesaba Aviation, Inc. ("Mesaba"), each of which operates as Northwest Airlink, and Compass Airlines, Inc. ("Compass"), a wholly owned subsidiary, which will operate as a Northwest Airlink carrier.

- a cargo business that operates 12 dedicated freighter aircraft through hubs in Anchorage and Tokyo.

For the fiscal year ended December 31, 2006, Northwest had operating revenues of $12.568 billion. As of December 31, 2006, Northwest had approximately 30,000 full time equivalent employees, and operated a fleet of 372 aircraft and directly served (together with its regional carriers operating a fleet of 190 aircraft) more than 240 destinations in 26 countries in North America, Asia and Europe. Northwest and its SkyTeam alliance and other travel partners provide a global network to over 900 cities in more than 160 countries on six continents. As of the date of this Disclosure Statement, the Debtors' mainline fleet jets in operating service were in excess of 350.

As of December 31, 2006, Northwest's assets, as reflected in its unaudited consolidated financial statements, were $13.2 billion. As of December 31, 2006, NWA Corp. had approximately 87,350,660 shares of common stock issued and outstanding. As of December 31, 2006, there were 3,357 registered holders. NWA Corp.'s common stock ceased trading on the Nasdaq National Market on September 26, 2005 and now trades in the "over-the-counter" market under the symbol NWACQ.PK.

The following is a brief description of Northwest's operations. Additional information concerning the Debtors' chapter 11 restructuring may be located through the Debtors' restructuring website at: http://www.nwa-restructuring.com.

1.    *Operations and Route Network.*

Northwest and its Northwest Airlink carriers operate substantial domestic and international route networks and directly serve more than 240 destinations in 26 countries in North America, Asia and Europe.

(a)    *Domestic System.*

Northwest operates its domestic system through its hubs at Detroit, Minneapolis/St. Paul and Memphis.

*Detroit.* Detroit is the ninth largest origination/destination hub in the United States. Northwest and its Northwest Airlink carriers together serve over 150 destinations from Detroit. For the six months ended June 30, 2006, Northwest enplaned 56% of originating passengers from Detroit, while the next largest competitor enplaned 13%.

*Minneapolis/St. Paul.* Minneapolis/St. Paul is the eighth largest origination/destination hub in the United States. Northwest and its Northwest Airlink carriers together serve over 160 destinations from Minneapolis/St. Paul. For the six months ended June 30, 2006, Northwest enplaned 61% of originating passengers from Minneapolis/St. Paul, while the next largest competitor enplaned 13%.

*Memphis.* Memphis is the seventeenth largest origination/destination hub in the United States. Northwest and its Northwest Airlink carriers together serve 90 destinations from Memphis. For the six months ended June 30, 2006, Northwest enplaned 60% of originating passengers from Memphis, while the next largest competitor enplaned 12%.

*Other Domestic System Operations.* Domestic "non-hub" operations include service to as many as 16 destinations from Indianapolis, service from several heartland cities to New York, Washington D.C. and Florida destinations, and service from several west coast gateway cities to Hawaii.

    (b)    *International System.*

Northwest operates international flights to the Pacific and/or the Atlantic regions from its Detroit, Minneapolis/St. Paul and Memphis hubs, as well as from gateway cities such as Boston, Honolulu, Los Angeles, San Francisco, Seattle and Portland.

*Pacific.* Northwest has served the Pacific market since 1947 and has one of the world's largest Pacific route networks. Northwest's Pacific operations are concentrated at Narita International Airport in Tokyo, where it has 376 permanent weekly takeoffs and landings ("slots") as of December 31, 2006, the most for any non-Japanese carrier. As a result of a 1952 United States– Japan bilateral aviation agreement, Northwest has the right to operate unlimited frequencies between any point in the United States and Japan as well as extensive "fifth freedom" rights. Fifth freedom rights allow Northwest to operate service from any gateway in Japan to points beyond Japan and to carry Japanese originating passengers. Northwest and United Airlines, Inc. ("United") are the only United States passenger carriers that have fifth freedom rights from Japan. Northwest uses these slots and rights to operate a network linking seven gateways and twelve Asian destinations via Tokyo. The Asian destinations served via Tokyo are Bangkok, Beijing, Busan, Guam, Guangzhou, Hong Kong, Manila, Nagoya, Saipan, Seoul, Shanghai, and Singapore. Additionally, Northwest flies nonstop between Detroit and Osaka and Nagoya, and uses its fifth freedom rights to fly beyond Osaka to Taipei and beyond Nagoya to Manila.

*Atlantic.* Northwest and KLM operate an extensive transatlantic network pursuant to a commercial and operational joint venture. This joint venture benefits from having antitrust immunity, which allows for coordinated pricing, scheduling, product development and marketing. In 1992, the United States and the Netherlands entered into an "open-skies" bilateral aviation treaty, which authorizes the airlines of each country to provide international air transportation between any U.S.-Netherlands city pair and to operate connecting service to destinations in other countries. Northwest and KLM operate joint service between Amsterdam and 17 cities in the U.S., Canada and Mexico, as well as between Amsterdam and India. Codesharing between Northwest and KLM has been implemented on flights to 59 European, 7 Middle Eastern, 13 African, 5 Asian and 176 United States cities. Codesharing is an agreement whereby an airline's flights can be marketed under the two-letter designator code of another airline, thereby allowing the two carriers to provide joint service with one aircraft. After September 2007, the joint venture can be terminated on three years' notice. In May 2004, Air France acquired KLM, and KLM and Air France became wholly-owned subsidiaries of a new holding company.

    (c)    *Alliances.*

In addition to its transatlantic joint venture with KLM, Northwest has strengthened its network through other alliance partnerships. Long-term alliances are a cost-effective way for Northwest to enter markets that it would not be able to serve alone. Alliance relationships can include codesharing, reciprocal frequent flyer programs, "through" luggage check-in, reciprocal airport lounge access, joint marketing, sharing of airport facilities and joint procurement of certain goods and services.

Since 1998, Northwest and Continental have been in a domestic and international commercial alliance that connects the two carriers' networks and includes extensive codesharing, frequent flyer program reciprocity and other cooperative marketing programs. The alliance agreement has a term through 2025.

In August 2002, Northwest entered into a commercial alliance agreement with Continental and Delta. This agreement is designed to connect the three carriers' domestic and international networks and provides for codesharing, reciprocity of frequent flyer programs, airport club use and other cooperative marketing programs. The combined network has increased Northwest's presence in the South, East and Mountain West regions of the U.S., as well as in Latin America. The alliance agreement has a term through June 12, 2013; after that date, it continues in effect until terminated on not less than 12 months notice.

In September 2004, Northwest, together with KLM and Continental, joined the global SkyTeam Alliance. The addition of Northwest, KLM and Continental made SkyTeam the world's second largest airline alliance. The ten members of the SkyTeam alliance, Northwest, KLM, Continental, Delta, Air France, Alitalia, Aeroméxico, CSA Czech Airlines, Korean Air and Aeroflot, currently serve over 372 million passengers annually with more than 14,600 daily departures to 728 destinations in 133 countries. Northwest customers are now able to accrue and redeem frequent flyer miles in their WorldPerks accounts and enjoy travel on any flight operated by a SkyTeam Alliance member. This alliance affords customers the benefits and service options when traveling on multiple airlines while being treated similarly to a customer traveling on a single airline. The alliance agreement has a term through June 12, 2012, and if not terminated on that date, continues in effect for 5 more years.

Northwest also has domestic frequent flyer and codesharing agreements with several other airlines including Alaska Airlines, Horizon Air, Hawaiian Airlines, American Eagle, Gulfstream International Airlines, and Big Sky Airlines. In Central America, Northwest has a frequent flyer agreement with Copa Airlines. In the Pacific, Northwest has frequent flyer agreements with Malaysia Airlines, Japan Airlines, Jet Airways of India, Garuda Indonesia, Cebu Pacific Airlines, Air Tahiti Nui, and China Southern. In the Atlantic, in addition to its extensive relationship with KLM, Northwest has frequent flyer agreements with KLM Cityhopper, Air Europa, Kenya Airways and Malev Hungarian Airlines.

Northwest and its SkyTeam Alliance and other travel partners currently provide a global network to over 900 cities in more than 160 countries on six continents.

(d)     *Regional Partnerships.*

Northwest has airline services agreements with three regional carriers: Pinnacle, Mesaba and Compass. Pursuant to the airline service agreements, these regional carriers are required to operate their flights under the Northwest "NW" code and operate as Northwest Airlink. The purpose of these airline services agreements is to provide service to small cities and more frequent service to larger cities, increasing connecting traffic at Northwest's domestic hubs. The business terms of these agreements involve capacity purchase arrangements. Under these arrangements, Northwest controls the scheduling, pricing, reservations, ticketing and seat inventories for Pinnacle and Mesaba flights. Northwest is generally entitled to all ticket, cargo and mail revenues associated with these flights. The regional carriers are paid based on operations for certain expenses and receive reimbursement for other expenses.

*Pinnacle.* Pinnacle is the operator of 139 of Northwest's fleet of CRJ200 aircraft. Northwest owns 11.4% of the common stock of Pinnacle Airlines Corp., the holding company of Pinnacle. The Pinnacle Airlines Corp. common stock had a market value of $41.9 million and a book

value of $11.8 million as of December 31, 2006. See the discussion in section III.F. for further information with respect to the Debtors' relationship with Pinnacle.

*Mesaba.* Mesaba, a wholly-owned subsidiary of MAIR Holdings, Inc. ("MAIR"), is the operator of 49 SAAB turbo-prop aircraft and 1 CRJ200 aircraft. On October 13, 2005, Mesaba filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota (Case No. 05-39258 (GFK)). In accordance with the provisions of the Bankruptcy Code, Mesaba continues to operate its business as a debtor-in-possession. As of December 31, 2006, the Debtors owned 27.5% of MAIR's common stock. The market value of this investment as of December 31, 2006, was $40.6 million and the book value was $19.8 million. Northwest has entered into an agreement to acquire Mesaba and has announced its intention, subject to consummation of the transaction, to have Mesaba operate 36 76-seat CRJ900 Bombardier aircraft, which are currently on order. See the discussion in section III.F. for further information with respect to the Debtors' relationship with Mesaba.

*Compass.* In 2006, Northwest established Compass to operate as a Northwest Airlink carrier. Compass is an indirect subsidiary of NWA Corp. When Compass commences flight operations, which is expected to occur later in 2007, it initially will operate a 50-seat CRJ200 aircraft. Thereafter, Northwest expects to place up to 36 76-seat Embraer 175 aircraft, which are currently on order, at Compass to be operated by Compass under an airline services agreement with Northwest.

(e)    *Cargo.*

Northwest is the largest cargo carrier among United States passenger airlines based on revenue, and the only one to operate a dedicated freighter fleet. In 2006, cargo accounted for 7.5% of Northwest's operating revenues, with approximately 77% of its cargo revenues resulting from cargo originating in or destined for Asia. Through its cargo hubs in Anchorage and Tokyo, Northwest serves most major air freight markets between the United States and Asia with a fleet of 12 Boeing 747-200 freighter aircraft. In addition to revenues earned from the dedicated freighter fleet, Northwest also generates cargo revenues in domestic and international markets through the use of cargo space on its passenger aircraft.

In 2004, the United States and the People's Republic of China agreed to a series of amendments to the 1980 United States – China Air Transport Agreement. The amendments provide for a significant expansion of air services between the two countries. On September 3, 2004, the Department of Transportation (the "DOT") awarded Northwest six additional United States – China all-cargo frequencies, which Northwest is using for freighter service to Shanghai, via its cargo hubs in Anchorage and Tokyo. Additionally, on February 22, 2005, the DOT awarded Northwest three additional United States – China all-cargo frequencies which became available on March 25, 2006. Northwest used these frequencies to expand cargo service to Guangzhou via the Tokyo hub. On August 24, 2006, the DOT awarded Northwest four additional United States – China all-cargo frequencies that will become available on March 25, 2007.

Effective September 30, 2005, Northwest joined SkyTeam Cargo. SkyTeam Cargo is the largest global airline cargo alliance. The eight members of SkyTeam Cargo, Northwest, Aeroméxico Cargo, Air France Cargo, Delta Air Logistics, Korean Air Cargo, Alitalia Cargo, CSA Cargo, and KLM Cargo, currently serve more than 900 cities in more than 229 countries. This alliance offers customers a consistent standard of performance, quality and detailed attention to service.

2.    *Other Travel Related Activities.*

*MLT Inc.*  MLT Inc. ("MLT"), an indirect wholly-owned subsidiary of NWA Corp., is among the largest vacation wholesale companies in the United States.  MLT develops and markets Worry-Free Vacations that include air transportation, hotel accommodations and car rentals.  In addition to its Worry-Free Vacations charter programs, MLT markets and supports Northwest's WorldVacations travel packages to destinations throughout the United States, Canada, Mexico, the Caribbean, Europe and Asia, primarily on Northwest.  These vacation programs, in addition to providing a competitive and quality tour product, increase the sale of Northwest services and promote and support new and existing Northwest destinations.  In 2006, MLT had $495 million in operating revenues.

*Frequent Flyer Program.*  Northwest operates a frequent flyer loyalty program known as "WorldPerks."  WorldPerks is designed to retain and increase traveler loyalty by offering incentives for their continued patronage.  Under the WorldPerks program, miles are earned by flying on Northwest or its alliance partners and by using the services of program partners for such things as credit card use, hotel stays, car rentals and other activities.  Northwest sells mileage credits to the program partners.  WorldPerks members accumulate mileage in their accounts and later redeem mileage for free or upgraded travel on Northwest and other participating airlines.  WorldPerks members that achieve certain mileage thresholds also receive enhanced service benefits from Northwest like special service lines, advance flight boarding and upgrades.

3.    *Employees.*

As of December 31, 2006, Northwest had approximately 30,000 full time equivalent employees.  Approximately 85% of Northwest's employees are represented by unions.  The unions currently representing Northwest's domestic employees are ALPA, the AFA, the IAM, AMFA, ATSA, NAMA and TWU.  Included in the number for full time equivalent employees are approximately 1,900 foreign national employees, working primarily in Asia.  Collective bargaining agreements with other unions are in place for the majority of these foreign national employees.

Prior to the filing, salary and benefit costs were Northwest's largest operating expense and reducing these expenses by approximately $1.4 billion per year has been a major goal of Northwest's restructuring plan.

For a detailed description of Northwest's labor contracts, including status of union negotiations and contract amendments, please see section IV below.

4.    *Regulation.*

Northwest is subject to various federal, international and local laws and regulations governing, among other things, aviation security, environmental matters, baggage liability, consumer protection and labor relations.

While the Airline Deregulation Act of 1978, as amended, eliminated domestic economic regulation of passenger and freight air transportation in many regards, the industry, nevertheless, remains regulated in a number of areas.  The DOT has jurisdiction over international route authorities and various consumer protection matters, such as advertising, denied boarding compensation, baggage liability and access for persons with disabilities.  Northwest is subject to regulations of the DOT and the Federal Aviation Administration (the "FAA") because it holds certificates of public convenience and necessity, air carrier operating certificates and other authority granted by those agencies.  The FAA regulates flight operations, including air space control and aircraft standards, maintenance, ground facilities, transportation of hazardous materials and other technical matters.  The Department of Justice (the "DOJ")

has jurisdiction over airline competition matters, including mergers and acquisitions, under federal antitrust laws. The Transportation Security Administration (the "TSA") regulates airline and airport security. Other federal agencies have jurisdiction over postal operations, use of radio facilities by aircraft and certain other aspects of Northwest's operations.

Northwest is also subject to federal labor regulation through The Railway Labor Act (the "RLA"). The RLA governs the labor relations of employers and employees engaged in the airline industry. Comprehensive provisions are set forth in the RLA establishing the right of airline employees to organize and bargain collectively along craft or class lines and imposing a duty upon air carriers and their employees to exert every reasonable effort to make and maintain collective bargaining agreements. The RLA contains detailed procedures that must be exhausted before a lawful work stoppage may occur. Pursuant to the RLA, Northwest has collective bargaining agreements with six domestic unions representing nine separate employee groups. Northwest has implemented contract terms for its flight attendants pursuant to the process established by section 1113 of the Bankruptcy Code. In addition, Northwest has agreements with four unions representing its employees in countries throughout Asia. These agreements are not subject to the RLA, although Northwest is subject to local labor laws.

Northwest is also subject to FAA jurisdiction pertaining to aircraft maintenance and operations, including equipment, dispatch, communications, training, flight personnel and other matters affecting air safety. To ensure compliance with its regulations, the FAA requires all United States airlines to obtain operating, airworthiness and other certificates, which are subject to suspension or revocation for cause.

Under FAA regulations, Northwest has established, and the FAA has approved, maintenance programs for all aircraft operated by Northwest. These programs provide for the ongoing maintenance of Northwest's aircraft, ranging from frequent routine inspections to major overhauls. Northwest's aircraft require various levels of maintenance or "checks" and periodically undergo complete overhauls. Maintenance programs are monitored closely by the FAA, with FAA representatives routinely present at Northwest's maintenance facilities. The FAA issues Airworthiness Directives (the "ADs"), which mandate changes to an air carrier's maintenance program. These ADs (which include requirements for structural modifications to certain aircraft) are issued to ensure that the nation's transport aircraft fleet remains airworthy. Northwest is currently, and expects to remain, in compliance with all applicable requirements under all ADs and the FAA approved maintenance programs.

A combination of FAA and Occupational Safety and Health Administration regulations on both the federal and state levels apply to all of Northwest's ground-based operations in the United States.

Northwest is also subject to regulation under various environmental laws and regulations, including the Clean Air Act, the Clean Water Act and Comprehensive Environmental Response, Compensation and Liability Act of 1980. In addition, many state and local governments have adopted environmental laws and regulations to which Northwest's operations are subject. Environmental laws and regulations are administered by numerous federal and state agencies.

In November 2005, the Environmental Protection Agency (the "EPA") issued a rule implementing the aircraft emissions standards previously approved by the International Civil Aviation Organization, of which the United States is a member. Following issuance of the EPA rule, a lawsuit was filed in the United States Court of Appeals for the District of Columbia Circuit on behalf of state and local air regulators against the EPA challenging its rule regulating aircraft emissions on the grounds that the international emissions standards codified by the EPA rule are not stringent enough. Northwest believes it is in compliance with the emissions standards that were codified by the EPA rule.

Northwest, along with other airlines, has been identified as a potential responsible party at various environmental sites.  Management believes that Northwest's share of liability for the cost of the remediation of these sites, if any, will not have a material adverse effect on Northwest's financial condition.

**B.    Prepetition Indebtedness**.

Northwest had significant prepetition indebtedness.  As of September 14, 2005, Northwest had indebtedness and other obligations of approximately $13.5 billion consisting of long term debt, capital lease obligations, and the present value of off-balance sheet aircraft leases.  This indebtedness included the following:

| Secured Debt | Collateral | Balance ($ millions) |
|---|---|---|
| Bank Credit Facility | Pacific routes & 53 aircraft | 975 |
| Enhanced Equipment Trust Certificates ("EETCs") | 88 Aircraft | 2,256 |
| Private Aircraft Mortgages | 92 Aircraft | 2,961 |
| Manufacturer Term Loans | Aircraft, spare engines, and spare parts | 470 |
| Facility Financings | Various buildings, land, and equipment | 228 |
| Other | Land, buildings, and ground equipment | 377 |
| **Total Secured Debt** | | **7,267** |
| Present Value of Aircraft Leases | 309 Aircraft | 4,587 |
| Unsecured Notes | | 1,688 |
| **Total Indebtedness** | | **13,542** |

In addition to the obligations described above, Northwest has other debts and liabilities, including ordinary course payables, litigation claims and obligations under executory contracts, leases and pension obligations.  Subsequent to the Commencement Date, significant additional obligations that are treated as prepetition debt have been created.  For a further explanation of these obligations please refer to Exhibit G.

1.    *The Senior Lender Agreement.*

As of September 14, 2005, Northwest's bank credit facility consisted of that certain Second Amended and Restated Credit and Guarantee Agreement, dated as of April 15, 2005, among Northwest Airlines as borrower, NWA Corp., Northwest Airlines Holdings Corporation and NWA Inc. as guarantors, JPMorgan Chase Bank, NA as administrative agent, ABN Amro Bank NV as agent, Deutsche Bank Securities Inc. and Calyon New York Branch as syndication agent, Citicorp USA, Inc., as documentation agent, and U.S. Bank as co-documentation agent, and the several banks and financial institutions from time to time parties thereto (the "Senior Lender Agreement").  The aggregate outstanding principal amount of term loans provided under this agreement was $975 million and the facility was comprised of three tranches bearing different interest rates with different principal amortization periods.  The term loans were secured by Northwest's Pacific route system and 53 aircraft.

See section III.C. for a discussion of the Debtors' refinancing of the Senior Lender Agreement and entry into a replacement debtor-in-possession financing facility.

2.      *Enhanced Equipment Trust Certificates.*

As of September 14, 2005, Northwest had financed or refinanced 88 aircraft and leased 73 aircraft using enhanced equipment trust certificates (the "EETCs"). Approximately $2.3 billion of equipment notes underlying pass-through trust certificates issued for 88 aircraft were direct obligations of Northwest. Interest on the pass-through trust certificates is payable semi-annually or quarterly. If a leveraged lease is obtained for any aircraft, under which the aircraft would be acquired, then sold and leased back to Northwest, the debt associated with the aircraft becomes part of the lease and is not counted as a direct obligation of Northwest. Northwest has restructured much of its EETC debt during the Chapter 11 Cases, as described in section III.E.11-13. below.

3.      *Private Aircraft Financing.*

Northwest has financed a large portion of its fleet through private financing arrangements. These financings take many forms, including manufacturer financing, bank debt, private leveraged leases, German leveraged leases (the "GLLs"), Canadian government financing, among others. The largest private secured aircraft creditors of owned aircraft include Airbus, GE, Pratt & Whitney, KfW, Boeing, Bank of Scotland, and PK AirFinance.

As of September 14, 2005, approximately $2.96 billion of secured loans issued for approximately 92 aircraft were direct obligations of Northwest. In addition, as of September 14, 2005, Northwest had 309 aircraft under leases with various owner participants including leveraged leases with public EETC debt. The present value of the off-balance sheet obligations under aircraft leases totaled $4.6 billion. See section III.E for a discussion of the Debtors' fleet restructuring during the Chapter 11 Cases.

4.      *Unsecured Notes.*

As of the Commencement Date, Northwest had eight issuances of unsecured notes outstanding, totaling approximately $1.69 billion. These were:

| Issue and Indenture | Outstanding Principal |
| --- | --- |
| 10% Notes due 2009, issued as of January, 2004 under Indenture dated as of March 1, 1997 | $300,000,000 |
| 9.875% Notes due 2007, issued as of March, 2002, under Indenture dated as of March 1, 1997 | $300,000,000 |
| 8.875% Notes due 2006, issued as of May 2001, under Indenture dated as of March 1, 1997 | $270,027,000 |
| 9.5% Notes due 2039, issued as of August 1999, under Indenture dated as of March 1, 1997 | $142,500,000 |
| 7.875% Notes due 2008, issued as of March 1998, under Indenture dated as of March 1, 1997 | $200,000,000 |
| 8.70% Notes due 2007, issued as of March 1997 under Indenture dated as of March 1, 1997 | $100,000,000 |
| 6.625% Convertible Notes due 2023, issued 2003 under Indenture dated as of May 20, 2003 | $150,000,000 |
| 7.625% Convertible Notes due 2023, issued 2003 under Indenture dated as of November 4, 2003 | $225,000,000 |

**C.**     **Events Leading up to the Chapter 11 Cases**.

Beginning in 2001 and continuing through 2005, the U.S. airline industry suffered a substantial reduction in revenues, both on an absolute basis and relative to historical trends.  U.S. industry revenues as reported by the Air Transport Association of America for the period 2000 through 2005 were $86,214,463,000, $74,414,297,000, $68,178,678,000, $68,333,321,000, $74,389,345,000 and $80,692,061,000, respectively.  The decline in industry revenues during this period was the result of a combination of factors, including the terrorist attacks of September 11, 2001, an economic recession, the war in Iraq, and SARS, among others.  As a result, Northwest and other legacy carriers incurred significant operating losses during the period.  From January 2001 through June 30, 2005, legacy carriers, as a group, reported losses of almost $35 billion and their long-term debt increased from $26 billion to almost $56 billion as of June 30, 2005.  For the same period, Northwest reported losses of $3.6 billion and its long-term debt increased from $4.0 billion to $9.0 billion.

During this same period, a permanent structural difference in the industry environment took place that contributed to the overall industry revenue decline.  The rapid growth of low cost airlines has had a profound impact on industry revenues.  Using the advantage of low unit costs, driven in large part by lower labor costs, these carriers are able to operate profitably while offering substantially lower fares.  By targeting such fares at business passengers, in particular, these carriers are shifting the demand of historically profitable travelers away from larger and more established airlines.  Low cost carriers now transport approximately 30% of all domestic U.S. passengers, compared to less than 10% a decade ago.  They now compete for, and thus influence industry pricing on, approximately 75% of all domestic U.S. passenger ticket sales.  Moreover, as a result of their better financial performance, low cost carriers possess the resources necessary to increase their market share and currently have large numbers of aircraft on order to continue their expansion.

The effect of the competitive changes brought by low cost carriers was amplified by a change in the airline ticket distribution system.  While internet travel Web sites have driven significant distribution cost savings for airlines, such sites have also allowed consumers to become more efficient at finding lower fare alternatives than in the past by providing them with more powerful pricing information.  The increased price consciousness of both business and leisure travelers, as well as the growth in new distribution channels, has further motivated airlines to price aggressively to gain market share advantages.

During this period, Northwest attempted to lower its operating costs – both labor and non-labor.  However, Northwest's efforts to restructure its operations to cope with the radical changes in the airline industry were significantly complicated by the enormous increase in the price of jet fuel in 2004 and 2005.  In 2003, Northwest's fuel expense was $1.6 billion; in 2004, Northwest's fuel expense increased to $2.2 billion; and in 2005, it increased to $3.1 billion (almost doubling in two years).

Northwest attempted to avoid bankruptcy through a voluntary restructuring of its businesses.  However, as losses mounted, fuel prices continued to increase, and Northwest did not reach agreements with its unions that met its saving targets, bankruptcy ultimately became unavoidable.  The Debtors have used the provisions of the Bankruptcy Code to reorganize their businesses on a sustainable basis.  The chapter 11 process has allowed the Debtors to realize three major goals essential to their transformation: first, a competitive cost structure, based on reductions in both labor and non-labor costs; second, a resizing and optimization of the Debtors' fleet to better serve Northwest's markets and third, a restructuring and recapitalization of the Debtors' balance sheet.

**D.    Pending Litigation & Other Legal Matters**.

1.    *The Chase Action.*

In October 1996, an antitrust class action, *Chase v. Northwest Airlines and Airline Reporting Corporation* (the "Chase Action") was filed against Northwest, among other airlines, in the United States District Court for the Eastern District of Michigan.  The action purported to be brought on behalf of a class defined as all persons who purchased tickets on certain routes into Northwest's hubs at Detroit, Minneapolis/St. Paul and Memphis from October 11, 1992 to the present.  The complaint alleged that Northwest's imposition of restrictions prohibiting the sale of "hidden city" tickets constitutes monopolization in violation of the Sherman Act.  The complaint sought injunctive relief, unspecified damages for the class, and costs and attorneys' fees.

The attorneys for the plaintiff in the Chase Action filed three additional class actions in the same court against other airlines and Northwest with parallel allegations similar to those in Chase, including allegations that the defendant airlines conspired to deter hidden city ticketing.  These cases are: *Keystone Business Machines, Inc. v. U.S. Airways and Northwest Airlines* (U.S. D.C. Eastern District of Michigan, Civ. Action No. 99-72474), *BLT Contracting, Inc. v. U.S. Airways, Northwest Airlines and the Airline Reporting Corporation* (U.S. D.C. Eastern District of Michigan, Civ. Action No. 99-72988), and *Volk and Nitrogenous Industries Corp. v. U.S. Airways, Northwest Airlines, Delta Air Lines, and the Airline Reporting Corporation* (U.S. D.C. Eastern District of Michigan, Civ. Action No. 99-72987) .  All three actions were assigned to the judge in the Chase Action.  On August 21, 2006, the plaintiffs voluntarily dismissed the litigation against Northwest and the other defendants and on August 25, 2006 the plaintiffs withdrew their proof of claim.

2.    *The Spirit Action.*

In March 2000, *Spirit Airlines v. Northwest Airlines* (the "Spirit Action") was filed against Northwest in the United States District Court for the Eastern District of Michigan ("Michigan District Court") alleging that Northwest had monopolized, or attempted to monopolize, air transportation service between Detroit and Philadelphia and between Detroit and Boston in 1996 by engaging in predatory pricing and other actions to exclude Spirit Airlines, Inc. from those markets.  Northwest believes the case to be without merit and intends to defend against the claim.  On March 31, 2003, the court granted Northwest's motion for summary judgment.  In October 2005, the Bankruptcy Court approved a stipulation to lift the stay for the limited purpose of permitting the Sixth Circuit to issue its opinion.  On November 9, 2005, the Sixth Circuit issued a decision reversing the trial court's grant of summary judgment in favor of Northwest.  Northwest then filed a petition for *en banc* reconsideration before the Sixth Circuit.  On April 13, 2006, the Sixth Circuit denied Northwest's request for *en banc* review.  On October 2, 2006, the Supreme Court denied Northwest's petition for certiorari.  The case was remanded to the Michigan District Court and continues to be stayed due to the Debtors' bankruptcy filing.

3.    *The Series C Preferred Stock Actions.*

In June 2003, the International Brotherhood of Teamsters (the "IBT") and certain related parties commenced litigation against NWA Corp. in New York state court, *International Brotherhood of Teamsters, Local 2000 et al. v. Northwest Airlines Corporation* (New York Sup. Ct., Case No. 601742/03).  In August 2003, the IAM and a related party also commenced litigation against NWA Corp. in New York state court,  *International Association of Machinists and Aerospace Workers et al. v. Northwest Airlines Corporation* (New York Sup. Ct., Case No. 602476/03) (together with the IBT's action, the "Series C Preferred Stock Actions").  Both lawsuits challenged NWA Corp.'s decision not to purchase its Series C Preferred Stock and sought to compel NWA Corp. to repurchase the Series C Preferred Stock that had been put to NWA Corp.  On March 24, 2005, the court ruled that NWA Corp.

had breached the arrangements related to the Series C Preferred Stock, and indicated that a trial on damages would be necessary. On August 24, 2005, NWA Corp. and the plaintiffs reached an agreement, among other things, to cancel the trial on damages and to establish the amount of damages owed to employees represented by the plaintiffs should the trial court's liability determination be upheld (nearly $277 million). The agreement also established the procedural process for NWA Corp. to appeal the trial court's liability judgment and to seek a stay of enforcement of the judgment. The plaintiffs also agreed not to take any action to enforce the judgment unless and until the New York State Appellate Division denies NWA Corp.'s motion to stay enforcement of the judgment. The case continues to be stayed due to the Debtors' bankruptcy filing.

        4.     *Other Legal Issues.*

        The Debtors are also party to various other legal actions which are incidental to the operation of their businesses. The Debtors believe that the outcome of the proceedings to which they are currently a party (including those described above) will not have a material adverse effect on the Debtors' financial position.

**III.**

**Significant Events During the Chapter 11 Cases**

**A.**     **Filing and First Day Orders**.

        On September 14, 2005, NWA Corp. and twelve of its subsidiaries filed their petitions under chapter 11 of the Bankruptcy Code. NWA Aircraft Finance, Inc., an indirect subsidiary of NWA Corp., filed its petition under chapter 11 on September 30, 2005. In connection with the filing of the Chapter 11 Cases, the Bankruptcy Court approved certain orders designed to minimize the disruption of the Debtors' business operations and to facilitate their reorganization.

- *Case Administration Orders.* These orders: (i) authorized joint administration of the Chapter 11 Cases; (ii) authorized the Debtors to operate their businesses and implement the automatic stay; (iii) established interim compensation procedures for professionals (this order was entered on October 19, 2005); (iv) granted an extension of the time to file the Debtors' schedules and statements; (v) approved notice procedures and authorized email service; and (vi) established notification and hearing procedures for trading in claims and equity securities during the pendency of the cases (a final order was entered on October 28, 2005).

- *Payments Authorized on Account of Certain Prepetition Claims.* The Bankruptcy Court authorized the payment of prepetition: (i) employee wages, salaries, benefits and other obligations in the ordinary course of business; (ii) amounts to foreign vendors, service providers and governments; (iii) amounts related to fuel supply, distribution, and storage contracts; (iv) amounts to certain outside mechanics, shippers and maintenance providers holding mechanics, materialmen's or similar liens or interests (a final order was entered October 7, 2005); (v) obligations under interline traffic agreements, industry agreements and related clearinghouse agreements pending assumption (a final order authorizing the assumption of such agreements was entered on October 7, 2005) and frequent flyer obligations to other airlines and certain obligations to other airlines that are settled through airline clearinghouses.

- *Business Operations.* The Bankruptcy Court authorized the Debtors to: (i) maintain their existing bank accounts and operate their Cash management system substantially as it existed prior to the Commencement Date; (ii) continue utilizing their prepetition investment guidelines and to continue performance under and provide credit support under hedging and derivative contracts (a final order was entered on October 7, 2005); (iii) provide adequate assurance to utility companies and establish procedures for determining requests for additional adequate assurance (an order was entered October 4, 2005); (iv) honor prepetition customer service programs, including the Debtors' frequent flyer miles program, and to otherwise maintain such programs in the ordinary course of business; (v) grant administrative expense status to undisputed obligations arising from the postpetition delivery of goods ordered prepetition and make payment on such claims in the ordinary course of business; and (vi) assume certain contracts related to credit card processing agreements and continue letter of credit facilities with U.S. Bank National Association (a final order was entered on October 7, 2005).

**B.    Appointment of the Creditors Committee**.

On September 30, 2005, the United States Trustee for the Southern District of New York, pursuant to its authority under section 1102 of the Bankruptcy Code, appointed a statutory committee of creditors (the "Creditors Committee") in the Debtors' Chapter 11 Cases.

Since that appointment, the Debtors have consulted with the Creditors Committee on all matters material to the administration of the Chapter 11 Cases. The Debtors have also discussed their business operations with the Creditors Committee and its financial advisors and have sought concurrence of the Creditors Committee for actions and transactions outside of the ordinary course of business. The Creditors Committee has participated actively in reviewing the Debtors' business operations, operating performance and business plan.

The Creditors Committee consists of the following nine members.

Pension Benefit Guaranty Corporation
1200 K Street, N.W.
Washington, D.C. 20005

HSBC Bank USA, National Association
as Indenture Trustee
452 Fifth Avenue
New York, NY 10018-2706

AVSA, S.A.R.L. (Airbus)
2 rond point Maurice Bellonte
31707 Biagnac CEDEX France

Bombardier, Inc.
400 Cote-Vertu Road West
Dorval-Quebec H4S 1Y9

Air Line Pilots Association, International
C/O NWA MEC Office
7900 International Drive, Suite 875
Bloomington, MN 55425

International Association of Machinists and
Aerospace Workers AFL-CIO
9000 Machinists Place
Upper Marlboro, MD 20772

General Electric Company
c/o GE Commercial Aviation Services LLC
201 High Ridge Road, 1st Floor
Stamford, CT 06927-4900

Sky Chefs, Inc.
6191 North State Highway 161
Irving, TX 75038

U.S. Bank National Association,
as Indenture Trustee
Corporate Trust Services
60 Livingston Avenue, Third Floor
St. Paul, MN 55107-2292

The Creditors Committee retained the following advisors:

| Counsel | Financial Advisor |
| --- | --- |
| Otterbourg, Steindler, Houston & Rosen, P.C.<br>230 Park Avenue<br>New York, NY 10169 | Lazard Freres & Co.<br>30 Rockefeller Plaza<br>New York, New York 10020 |
| | Financial Advisor |
| | FTI Consulting, Inc.<br>3 Times Square<br>11th Floor New York 10036 |

**C.     Postpetition Financing**.

        This section discusses certain postpetition financings the Debtors have entered into during the Chapter 11 Cases.  Please refer to section III.E. below for a discussion of additional postpetition financings the Debtors have entered into in connection with certain fleet restructuring agreements.

        1.     *DIP Credit and Exit Facility Agreement.*

        The DIP Credit and Exit Facility Agreement is the Super Priority Debtor In Possession And Exit Credit And Guarantee Agreement, dated as of August 21, 2006, among Northwest Airlines, as Borrower, NWA Corp., Northwest Airlines Holdings Corporation and NWA Inc., as Guarantors, and Citicorp USA, Inc., as Administrative Agent (the "DIP Agent"), JP Morgan Chase Bank, N.A., as Syndication Agent, Deutsche Bank Trust Company Americas, as Documentation Agent, Morgan Stanley Senior Funding, Inc., as Co-Syndication Agent, Calyon New York Branch, as Co-Documentation Agent, U.S. Bank National Association, as Agent, Citigroup Global Markets Inc, J.P. Morgan Securities Inc., as Joint Lead Arrangers and Joint Book Runners for the DIP Facilities, Citigroup Global Markets Inc., Deutsche Bank Securities Inc., as Joint Lead Arrangers and Joint Book Runners for the Exit Facilities, Morgan Stanley Senior Funding, Inc., as Co-Arranger, and Calyon New York Branch, as Co-Arranger and the several lenders from time to time parties thereto (collectively, the "DIP Lenders").  The Debtors entered into the DIP Credit and Exit Facility Agreement to insure sufficient liquidity to fund the expenses associated with their Chapter 11 Cases and to take advantage of lower interest rates and more competitive market terms.

        The lenders under the DIP Credit and Exit Facility Agreement agreed to provide a total credit facility of up to $1.225 billion, with a $75 million sublimit for letters of credit.  The seven-year DIP Credit and Exit Facility Agreement includes a two-year commitment of DIP financing and a commitment for a minimum of five years of exit financing.  Thus, at the option of the Debtors, the facility will not be repaid on the Effective Date, but rather will convert to exit financing subject to the satisfaction of certain conditions precedent set forth therein.

Claims of the DIP Agent and the DIP Lenders against the Debtors are accorded superpriority administrative expense status in each of the Debtors' Chapter 11 Cases. That is, they are to be paid before any other obligations of the Debtors, including administrative expenses and other Claims entitled to priority under the Bankruptcy Code.

The entire amount of the revolver portion of the facility is required to be fully drawn during the bankruptcy cases. The entire $1.225 billion has been drawn and remains outstanding under the DIP Credit and Exit Facility Agreement. The proceeds of the term loans were used by Northwest to pay all amounts outstanding under the Senior Lender Agreement, other than certain disputed amounts. Northwest used the remaining net proceeds from the financing for working capital and other general corporate purposes.

Borrowings under the DIP Credit and Exit Facility Agreement bear interest at 2.50% per annum plus the current LIBOR as quoted by the DIP Agent for interest periods of one, two, three or six months (at the borrower's option), payable at the end of the relevant interest period, but in any event at least quarterly. The interest rate credit spread is subject to a potential increase of up to an additional 50-100 basis points if certain minimum thresholds of the facility's credit rating and/or the ratio of debt outstanding under the DIP Credit and Exit Facility Agreement to the appraised value of the collateral are not met.

The DIP Credit and Exit Facility Agreement is secured by first priority liens on Northwest's Pacific route system. The DIP Credit and Exit Facility Agreement primes certain liens of U.S. Bank, National Association and, initially, the Pension Benefit Guaranty Corporation ("PBGC"). Subsequent to closing on the DIP Credit and Exit Facility Agreement, the third lien held by the PBGC was released, upon Bankruptcy Court approval on February 5, 2007.

The DIP Credit and Exit Facility Agreement provides a carve out from liens and superpriority Claims granted in the DIP Credit and Exit Facility Agreement in the event of the occurrence and during the continuance of an Event of Default for (i) the payment of allowed professional fees and disbursements incurred by professionals retained by the Debtors and the Creditors Committee in an aggregate amount not to exceed $30 million; and (ii) fees pursuant to 28 U.S.C. § 1930 and any fees payable to the clerk of the Bankruptcy Court.

On July 18, 2006, the Debtors filed their Motion For Order Under 11 U.S.C. §§ 105, 362, 363 And 364 And 507(b)(I) Authorizing Debtors to Obtain Secured Postpetition Financing on a Super-Priority Secured and Priming Basis, (II) Authorizing Debtors to Replace or Provide Cash Collateral for $150 Million of Prepetition Secured Obligations with U.S. Bank, (III) Finding that No Pre-Payment Fee is Payable In Respect of the Payment in Full of the Debtors' $975 Million Prepetition Secured Credit Facilities with J.P. Morgan Chase Bank, N.A. and Escrowing Disputed Interest Amounts, (IV) Authorizing Debtors to File Supplemental Documents Under Seal, and (V) Granting Related Relief (Docket No. 3092) (the "DIP Motion").

On August 2, 2006, JPMorgan Chase Bank, NA ("JPMorgan"), the administrative agent under the Senior Lender Agreement (described in section II.B. above), filed an objection on behalf of the senior lenders under the agreement to the Debtors' DIP Motion (Docket No. 3198) arguing that, in addition to repayment, the Debtors owed a pre-payment fee and interest at the default rate. On August 8, 2006, the Bankruptcy Court entered an order approving the DIP Motion and reserving the objections of JPMorgan and requiring the Debtors to fund a segregated account for the full amount of JPMorgan's objections (the "DIP Order"). Thereafter, the Debtors settled their disputes with JPMorgan regarding disputed amounts allegedly owed under the Senior Lender Agreement, and on November 21, 2006, the Bankruptcy Court entered an order approving the settlement.

Pursuant to the DIP Order, the Debtors were authorized to make indefeasible payment in full of the amounts due under the Senior Lender Agreement and effect the termination of all commitments thereunder and the termination of all liens securing the obligations thereunder.

2.     *U.S. Bank LC Facilities.*

In the normal course of their business operations, the Debtors are required to provide letters of credit to secure the payment or performance of certain obligations.  U.S. Bank National Association ("U.S. Bank") provides three letter of credit facilities to the Debtors for these purposes; (i) a $98 million letter of credit facility, under which letters of credit are used primarily to secure obligations under workers compensation policies; (ii) a $40 million letter of credit facility, under which letters of credit are used mostly to secure obligations under workers compensation policies; and (ii) a $55 million letter of credit facility provided to MLT Inc. and NWA Inc., under which letters of credit are used exclusively for the purpose of satisfying certain DOT requirements for airline charter operators.

On January 6, 2006, the Debtors filed a motion with the Bankruptcy Court seeking authorization to extend the $40 million letter of credit facility with U.S. Bank and increase its size by an additional $40 million.  On January 31, 2006, the Bankruptcy Court entered an order approving the increase and extension of the $40 million letter of credit facility.

On March 28, 2006 the Debtors filed a motion seeking an extension of the $98 million letter of credit facility and the $55 million letter of credit facility until May 31, 2007.  On April 12, 2006, the Bankruptcy Court entered an order approving the extension.

**D.     Section 1110(a) Agreements, Section 1110(b) Agreements and Aircraft Adequate Protection Stipulations**.

At the Commencement Date, the Debtors' fleet consisted of approximately 700 aircraft (including 236 regional aircraft operated by Northwest Airlink partners).  Many of the aircraft, and related pieces of aircraft equipment, were subject to leases or security agreements covered by section 1110 of the Bankruptcy Code.  Section 1110 terminates the automatic stay, and lets lessor and lenders take possession of aircraft and aircraft equipment, on the 60th day after a bankruptcy case commences, unless the debtor either agrees to perform all future obligations under the applicable agreements and to cure existing defaults or enters into agreements with the relevant lessors and lenders to extend the 60-day period.  Both agreements to perform obligations and cure defaults and agreements to extend the 60-day period are subject to the approval of the Bankruptcy Court.

On October 31, 2005, the Debtors filed a motion seeking to establish procedures authorizing them, subject to subsequent court approval, (a) to agree to perform obligations and cure defaults pursuant to section 1110(a) of the Bankruptcy Code; and (b) to enter into agreements to extend the 60-day period specified in section 1110(a) pursuant to section 1110(b) of the Bankruptcy Code.  On November 10, 2005, the Court entered an order granting the motion, and additionally authorizing the Debtors to enter into agreements to provide adequate protection with respect to interests in aircraft equipment in lieu of agreements pursuant to section 1110(b) (the "1110 Procedures Order").  In accordance with the 1110 Procedures Order, and in order to address the fleet-related issues raised by section 1110, on November 14, 2005, the Debtors agreed to perform the obligations required under section 1110(a) with respect to 280 aircraft in their fleet and with respect to each of the spare engines leased by the Debtors.  On that date and from time to time thereafter during their Chapter 11 Cases, the Debtors also entered into agreements with aircraft lenders/lessors with respect to numerous other aircraft in the Debtors' fleet to extend the 60-day period in section 1110(a).  The Debtors also entered into a number of section 1110(b) extension agreements and adequate protection agreements, with the intention

of restructuring the obligations associated with the covered aircraft and aircraft equipment.  The results of these restructuring efforts are described below.

### E.    Fleet Restructuring.

As of the Commencement Date, the market values of many of the Debtors' aircraft had declined substantially since the aircraft were originally leased or financed.  Consequently, the Debtors were paying above market costs for many of their aircraft.  The Debtors analyzed their route structure and aircraft fleet, the projected demand for air travel, maintenance requirements, labor costs, operating costs and other business goals and objectives.  Based on this analysis, the Debtors developed a plan to rationalize costs relating to aircraft lease and debt obligations and to match their aircraft fleet to future operating needs.  Bringing the ongoing ownership cost for their aircraft in line with current market values has been a central element of the Debtors' restructuring efforts.

Since the Commencement Date, the Debtors have restructured the leases or financings relating to approximately 330 aircraft.  As of December 31, 2006, the Debtors have also rejected and abandoned or otherwise removed from their operating fleet approximately 71 aircraft.  The Debtors have sought to restructure or reject obligations representing approximately 50% of their fleet count and substantially completed approximately $400 million in annual aircraft ownership reductions, including interest, rent and depreciation expense.  The fleet restructuring has also contributed to the significant deleveraging of the Debtors' balance sheet.  Of the $9.8 billion in aircraft debt and lease obligations as of the Commencement Date, approximately $2.5 billion has been eliminated.  The Debtors' fleet restructuring efforts have resulted in substantial savings to the Debtors, enabling the Debtors to meet their restructuring goals.  Some of the more significant agreements for the restructuring of the fleet implemented by the Debtors during the Chapter 11 Cases are described below.

1.    *Airbus.*

On December 7, 2005, the Debtors filed a motion with the Court seeking authorization for Northwest Airlines to obtain postpetition financing from Airbus and to grant security interests and liens with respect thereto, assume certain amended sublease and aircraft purchase agreements and implement all other aspects of a Restructuring Term Sheet with Airbus S.A.S., AVSA, S.A.R.L., Airbus North America Customer Services, Inc., Airbus Leasing IV, Inc., Airbus Financial Services and Airbus Finance Company Ltd. (collectively, "Airbus"), dated December 7, 2005.  On December 22, 2005, the Bankruptcy Court entered an order granting the motion.

Under the terms of the agreement, Northwest Airlines (i) took delivery of 2 new A319 aircraft that were scheduled for delivery in the fourth quarter of 2005; (ii) deferred and obtained rights to cancel A319 and A320 aircraft on order, (iii) restructured pre-delivery payment obligations associated with those aircraft; (iv) maintained its order for 14 A330 aircraft, preserving financing commitments from Airbus on the aircraft; (v) reduced to market cost the lease rate on ten A320s; and (vi) maintained a favorable rate on a term loan secured by various aircraft and spare parts.  The settlement did not liquidate the unsecured claim against Northwest Airlines' estate.

2.    *United Technologies Corporation.*

On December 7, 2005, in conjunction with the Airbus restructuring, the Debtors filed a motion with the Court seeking authorization for Northwest Airlines to obtain secured debtor-in-possession financing from UT Finance Corporation and to enter into and perform obligations under a term sheet entered into with United Technologies Corporation, acting through its Pratt & Whitney Division ("Pratt"), UTN676NW (II), Inc. ("UT-OP"), and UT Finance Corporation ("UTF" and, collectively, "UTC") dated December 7, 2005, for the restructuring and assumption of certain lease and finance agreements.  On December 22, 2005, the Bankruptcy Court entered an order granting the motion.

At September 14, 2005, Northwest Airlines and UTC (and related parties, including co-lenders and trustees) were parties to mortgages and other financing agreements with respect to certain Airbus aircraft powered by Pratt engines, and a certain lease, pursuant to which Northwest Airlines leased one Boeing 747 aircraft from UTC.  In order to further its reorganization efforts, Northwest Airlines negotiated with UTC to restructure these agreements.  The negotiations resulted in the parties entering into the term sheet, which provides for Northwest Airlines' assumption of the Boeing 747 lease and modification of the financing agreements with respect to seven (7) aircraft.  The term sheet allows Northwest Airlines to (i) resolve certain existing issues and claims among the parties; (ii) obtain favorable postpetition financing from UTC that will enable it to finance the purchase of four A330 aircraft from Airbus, which are necessary to satisfy its fleet needs; (iii) receive from UTC a Fleet Introductory Assistance payment, net of certain agreed offsets between the parties; (iv) receive from UTF a Restructuring Payment in exchange for Northwest Airlines' satisfaction of its obligations under the Term Sheet; and (v) have the option to terminate the financing with respect to any of the aircraft, upon the occurrence of certain termination events, including the event that the number of aircraft in Northwest Airlines' fleet falls below certain thresholds (with UTF entitled, under such circumstances, to a limited administrative claim).  UTF was allowed a general unsecured claim against the estate of Northwest Airlines in the amount of the restructuring payment plus the agreed reduction in the outstanding principal balance of the loans relating to two aircraft.

3.    *General Electric Company and Affiliates.*

During their Chapter 11 Cases, the Debtors entered into a total of five restructuring agreements with General Electric Company and/or its affiliates (collectively, "GE") for the restructuring of leases or financings relating to a total of 110 aircraft in the Debtors' fleet.  Four restructurings are described immediately below, and the fifth is described in the discussion of the restructuring of the Debtors' CRJ fleet.

(a)    *General Electric Capital Corporation and Affiliates.*

On December 12, 2005, Northwest Airlines filed a motion to implement a restructuring agreement with General Electric Capital Corporation regarding nine Airbus A320-212 aircraft.  Concurrently therewith, Northwest Airlines filed a motion to implement a restructuring agreement with Aircraft Services Corporation regarding a Boeing 757-200 aircraft.  On December 22, 2005, the Bankruptcy Court entered orders granting the motions.

Pursuant to the restructuring agreements, Northwest Airlines entered into amendments to the prepetition leases for each of the Airbus A320 and Boeing 757 aircraft that allow Northwest Airlines to continue operating the aircraft, both during the pendency of the Chapter 11 Cases and upon Northwest Airlines' emergence from bankruptcy, at substantially reduced rental rates and otherwise on terms and conditions favorable to Northwest Airlines' estate.  Unsecured claims totaling $128,478,607 in respect of the restructurings have been allowed against Northwest Airlines' estate.

On October 5, 2006, as part of its motion to approve restructuring agreements involving GE relating to its CRJ fleet, Northwest Airlines sought to implement certain restructuring transactions and agreements with an affiliate of GE regarding loans on select Airbus A330 aircraft.  On October 26, 2006, the Bankruptcy Court entered an order granting the motion.  Pursuant to the restructuring agreement, Northwest Airlines entered into amendments to the prepetition financings for each of the Airbus A330 aircraft which provided it significant benefits from GE upon the pre-payment of the A330 loans.  GE was allowed general unsecured claims against the estate of Northwest in the amount of the agreed reduction in the outstanding principal balance of the loans relating to the aircraft.

(b)    *General Electric Company and Safran.*

On January 20, 2006, Northwest Airlines filed a motion to implement certain restructuring transactions and agreements with General Electric Company and Safran regarding a term loan from GE, seven Airbus A320-200 aircraft, and one Airbus A319-100 aircraft. On January 31, 2006, the Bankruptcy Court entered an order granting the motion.

The restructuring of each of the financing arrangements and the engine purchase agreements provide Northwest Airlines substantial reductions in principal of the indebtedness relating to the aircraft, deferrals of principal payments with respect to other aircraft and the term loan, and deferral of progress payments with respect to purchase of the engines. The reductions in principal of the indebtedness relating to the aircraft, or amounts paid by GE and Safran to the lender(s) to effect the reductions in principal, together with any other deficiency suffered by GE and Safran as a result of such reductions, constitute general unsecured claims of GE and Safran.

4.    *SAAB.*

On January 20, 2006, the Debtors filed a motion to authorize Northwest Airlines to implement certain transactions, including entry into amended leases, regarding 49 Saab model 340B+ aircraft leased by Northwest Airlines and subleased to regional carrier Mesaba, which operates the aircraft on behalf of Northwest Airlines. On January 31, 2006, the Bankruptcy Court entered an order granting the motion.

By the motion, the Debtors sought approval of a Restructuring of Leases and Subleases for Saab Aircraft dated January 12, 2006, among the Debtor, Fairbrook Leasing, Inc. and Lambert Leasing, Inc. The head leases for the Saab aircraft were above market, and the duration of the leases did not match Northwest Airlines' current business plan. Northwest Airlines renegotiated the leases to bring their costs in line with market, to reduce the basic term of the leases with options to renew, and to modify other terms favorably for Northwest Airlines. This restructuring provided significant savings over the life of the leases, as well as flexibility for Northwest Airlines to adjust its fleet of regional aircraft in the future according to market conditions or business needs. The settlement did not liquidate the unsecured claim against Northwest Airlines' estate.

5.    *AVRO 146-RJ85A Fleet Restructuring.*

On February 24, 2006, the Debtors filed a motion seeking approval of a lease restructuring agreement with respect to ten British Aerospace AVRO 146-RJ85A ("AVRO") regional jet aircraft leased by Northwest Airlines. On March 7, 2006, the Bankruptcy Court entered an order granting the motion. In addition, on June 23, 2006, the Debtors filed a motion seeking authorization to enter into an adequate protection stipulation with respect to thirteen AVRO aircraft owned or leased by Northwest Airlines in the Northwest 1999-3 EETC Transaction. On July 6, 2006, the Bankruptcy Court entered an order granting the motion.

The aircraft at issue in the motions were subleased to a regional carrier, Mesaba, which at the time operated the aircraft on the Debtors' behalf. The Debtors' costs for the aircraft under the leases and financings were above market, and the aircraft no longer fit into the Debtors' long term fleet or business plans. Accordingly, the Debtors negotiated agreements to shorten lease terms and to schedule the return of the aircraft consistent with the Debtors' fleet plan, bring the costs for the aircraft, until such return, in line with market rates. The agreements also settled all claims for administrative expense or adequate protection for the Debtors' postpetition use of the aircraft in accordance with the terms of the agreement. As part of this restructuring, Northwest Airlines and BAE Systems plc and BAE Systems (Operations) Limited also entered into an agreement which provides for the termination of Northwest Airlines' rights and obligations under certain long term manufacturer support agreements. The Debtors

also negotiated corresponding agreements with Mesaba so that Mesaba's use and return obligations were consistent with the Debtors' obligations. The agreements provided significant savings for the Debtors, and contributed to bringing the Debtors' fleet of regional aircraft in line with the Debtors' long term fleet and business plans. In respect of the thirteen AVRO aircraft owned or leased by Northwest Airlines in the Northwest 1999-3 EETC Transaction, the Debtors have agreed, subject to Court approval, to allow general unsecured claims totaling $131,481,099.95 against each of the bankruptcy estates of Northwest Airlines and NWA Corp. as guarantor. No unsecured claim in respect of the agreement approved March 7, 2006 has been settled.

6. *CRJ Fleet Restructuring.*

On October 5, 2006, the Debtors filed a motion seeking authorization for NWA Corp. and Northwest Airlines to implement certain restructuring agreements and transactions with General Electric Capital Corporation and certain of its affiliates ("GECC"), Export Development Canada ("EDC"), Her Majesty in Right of Canada ("HMRC") and Bombardier Inc. ("Bombardier") regarding the Debtors' fleet of Bombardier CRJ200/440 aircraft, to purchase new Bombardier CRJ900 aircraft, and to obtain secured financing in connection therewith (the "CRJ Agreements"). On October 26, 2006, the Bankruptcy Court entered an order granting the motion.

The CRJ Agreements represent a global, integrated restructuring of the Debtors' CRJ fleet, which, as of September 14, 2005, consisted of 141 aircraft. The leases for 55 GECC owned aircraft were restructured to reflect lower rent. The leases for 54 aircraft owned by various participants will be subject to restructuring payments from EDC (including 15 leases previously rejected by Northwest Airlines). The leases for 32 other CRJ aircraft were not modified. Additionally, the CRJ Agreements provided for (i) assumption of CRJ leases by the Debtors; (ii) reinstatement of leases for fifteen CRJ aircraft that were previously rejected by the Debtors; (iii) extinguishment of certain subsidy obligations owed to Northwest by Bombardier; (iv) purchase from Bombardier of a minimum of 36 Bombardier Canadair Regional Jet CRJ900 aircraft, with financing provided or arranged by Bombardier and EDC in connection with such purchases; (v) assumption of an existing purchase agreement with Bombardier as it relates to 87 CRJ aircraft that have been delivered to the Debtors, and rejection of the existing purchase agreement as it relates to 13 CRJ aircraft that have not been delivered; (vi) allowance of certain prepetition general unsecured claims; (vii) payment by Northwest of certain fees and expenses of GECC, EDC and Bombardier incurred in connection with the CRJ Agreements; and (viii) modification of the procedures applicable to the trading of certain claims by EDC.

The Debtors' interrelated agreements with GECC, EDC, HMRC and Bombardier provide for the restructuring of the leases and financing arrangements relating to the CRJ aircraft, resulting in substantial savings over the existing leases. At the same time, the CRJ Agreements provide favorable terms for the Debtors' purchase and financing of a number of new CRJ900 aircraft that are necessary for the Debtors' future fleet and business plans. The 76-seat CRJ900 regional jets offer attractive economics for the Debtors on numerous routes and growth opportunities for the Debtors in critical domestic markets. The new 76-seat aircraft will replace other less efficient regional aircraft in the Debtors' fleet, expand the markets that the Debtors may profitably serve, and will allow the Debtors to upgrade, where appropriate, 50-seat markets that can support 76-seat aircraft. The agreements also provided for the rejection of an existing purchase agreement for the purchase of 13 additional CRJ200/440 aircraft that are not needed by the Debtors, while preserving the Debtors' rights to credits, warranties, and other product support, without offset, in respect of 87 CRJ aircraft that have been delivered under the purchase agreement. The agreements also settled claims resulting from the modification of existing leases and financings, certain claims related to prior restructurings involving GECC previously approved by the Bankruptcy Court, and claims related to the leases for fifteen CRJ aircraft that were previously rejected in the Chapter 11 Cases. EDC was allowed a general unsecured claim against the estate of Northwest Airlines in the aggregate amount of $295,000,000 in respect of the amended leases for CRJ aircraft with respect to which GE is

owner participant. EDC was also allowed a general unsecured claim against the estate of Northwest Airlines in the aggregate amount of $75,711,113.49 in respect of (i) certain restructuring payments to be made by EDC to Northwest Airlines under the restructuring agreements and (ii) certain rental obligations not paid under the leases for the fifteen CRJ aircraft that had been previously rejected by Northwest Airlines. In addition, Bombardier was entitled to a general unsecured claim against Northwest Airlines' estate in respect of the rejection of the existing purchase agreement as it relates to the 13 CRJ aircraft that have not been delivered, which the Debtors have agreed, subject to Court approval, to allow in the amount of $33,503,000.

       7.   *Embraer 175 Purchase Agreement.*

On October 5, 2006, the Debtors filed a motion seeking authorization for NWA Corp. and Northwest Airlines to purchase a minimum of 36 new Embraer 175 aircraft from Empresa Brasileira de Aeronautica S.A. ("Embraer"), to obtain secured financing from Embraer in connection with the new aircraft purchases, and to purchase ten spare engines from General Electric Company. On October 26, 2006, the Bankruptcy Court entered an order granting the motion.

The Debtors determined that acquiring large regional jet aircraft is critical to their future fleet and business plans. The 76-seat Embraer 175 regional jets offer attractive economics for the Debtors on numerous routes and growth opportunities for the Debtors in critical domestic markets. The new 76-seat aircraft replace other less efficient regional aircraft in the Debtors' fleet, expand the markets that the Debtors may profitably serve, and allow the Debtors to upgrade, where appropriate, 50-seat markets that can support 76-seat aircraft. The purchase agreement with Embraer, together with the Debtors' purchase agreement with Bombardier described above, will fill the Debtors' large regional jet needs. The Debtors also obtained financing commitments from Embraer for the aircraft purchases with favorable financing terms, and entered into an agreement with General Electric Company for the delivery of necessary spare engines that may be used with either the Embraer 175 or Bombardier CRJ900 aircraft.

       8.   *Boeing and Rolls-Royce.*

On October 19, 2006, the Debtors filed a motion seeking authorization for Northwest Airlines to obtain postpetition financing from Boeing and to grant security interests and liens with respect thereto, use cash collateral to repay certain prepetition loans, amend and perform under certain prepetition loans, assume an aircraft purchase agreement, settle claims, and implement all other aspects of an agreement with The Boeing Company and Boeing Capital Loan Corporation (together, "Boeing"). On November 8, 2006, the Bankruptcy Court entered an order granting the motion.

Northwest Airlines and Boeing are parties to certain prepetition finance and security agreements, including (i) a revolving credit facility secured by certain credit card, passenger and cargo receivables (the "AR Loan"); (ii) a loan secured by common stock in Pinnacle and Mesaba (the "Stock Loan"); and (iii) a loan secured by aircraft, spare parts and spare engines (the "Equipment Loan"). Northwest Airlines and Boeing are also parties to agreements for the purchase of a number of Boeing model 787 aircraft (the "787 Aircraft"). Under the restructuring agreement with Boeing, Northwest Airlines (i) used pre-petition cash collateral from pre-petition accounts receivable to pre-pay the AR Loan and Stock Loan and obtain a release of excess cash collateral and the Stock Loan collateral; (ii) modified the existing AR Loan documents to, among other things, reduce the facility size to the amount previously drawn under the facility and permit future draws secured by new receivables; (iii) amended the terms of certain cross-collateralized prepetition loans and certain other prepetition loans from Boeing; (iv) agreed to perform obligations under prepetition loans, as amended; (v) assumed agreements for the purchase of Boeing model 787 aircraft (including related engines) and related agreements, and obtained Boeing's affirmation of its commitment to facilitate such acquisitions by Northwest through financing; (vi) obtained consideration from Boeing to enhance the operational performance of other Boeing equipment; and (vii) settled Boeing's claims against Northwest Airlines' estate. The agreement with Boeing allows

Northwest Airlines to acquire new aircraft that are necessary for its future operations and business plan, free excess cash collateral securing prepetition loans, amend certain loan agreements to reduce the debt outstanding and/or provide other benefits for the estate, and enhance the operating capabilities of a number of other Boeing aircraft currently in the fleet.  Boeing's claim for goods and services provided prepetition by Boeing was allowed as a general unsecured claim against Northwest Airlines' estate in the amount of $1,354,800.19, and Boeing was also allowed a general unsecured claim against Northwest Airlines' estate in the amount of the reduction of the outstanding principal of certain loans as provided in the agreement.

The new 787 Aircraft are to be equipped with Rolls-Royce engines, and concurrently with the motion for approval of the agreement with Boeing, Northwest Airlines filed a motion for approval of an agreement with Rolls-Royce that included, among other things, (i) amendment of agreements with Rolls-Royce for support and maintenance of Rolls-Royce engines for Boeing 787 aircraft, and Northwest Airlines' assumption of such agreements, as amended; (ii) Rolls-Royce's facilitation of postpetition financing for Northwest Airlines for predelivery payments required on Boeing 787 aircraft; and (iii) Rolls-Royce's affirmation of its commitments to facilitate Northwest Airlines' acquisition of 787 aircraft and related spare engines following Northwest Airlines' exit from bankruptcy. The agreement with Rolls-Royce addresses the treatment in Northwest Airlines' bankruptcy case of each prepetition agreement between Northwest Airlines and Rolls-Royce and, together with Northwest Airlines' agreement with Boeing, will preserve the arrangements among Northwest Airlines, Rolls-Royce and Boeing to facilitate the acquisition of Boeing 787 aircraft that are necessary for Northwest Airlines' long term fleet and business plans.  On November 8, 2006, the Bankruptcy Court entered an order granting the motion.

         9.   *Refinancing from Citigroup for up to 13 Airbus Aircraft.*

On November 6, 2006, Northwest Airlines filed a motion for authority to (i) obtain postpetition financing of up to $778,760,000 on a secured and subordinated superpriority basis arranged by Citigroup Global Markets Inc.; and (ii) in connection therewith, use proceeds to finance and  refinance 11 Airbus A330, 1 A319 and 1 A320 aircraft.  On November 21, 2006, the Bankruptcy Court entered an order granting the motion.

The new loans, which closed on December 22, 2006, will provide savings to Northwest Airlines over the existing loans and financing commitments that the new loans replaced.  The new postpetition credit facility will continue beyond Northwest Airlines' emergence from bankruptcy provided certain conditions are satisfied.

        10.  *Defeasance of Trust 1 Debt.*

On November 2, 2005, the Debtors filed a motion to defease secured debt and execute related transactions with regard to NWA Trust No. 1 (the "Defeasance Motion").  On November 10, 2005, the Bankruptcy Court entered an order granting the motion.

In March 1994, Northwest Airlines consummated a financing transaction in which six Boeing 747-200 and four Boeing 757 aircraft were sold to an owner trust, NWA Trust No. 1 ("Trust 1") of which Debtor NWA Aircraft Finance, Inc. ("Aircraft Finance"), an indirect subsidiary of NWA Corp., is the sole equity participant.  A portion of the purchase price was financed through the issuance of $177 million of 8.26% Class A Senior Aircraft Notes and $66 million of 9.36% Class B Subordinated Aircraft Notes.  The aircraft were simultaneously leased back to Northwest Airlines.  The notes were payable semi-annually from rental payments made by Northwest Airlines under the lease of the aircraft and were secured by the aircraft subject to the lease as well as the lease itself.  Aircraft Finance was the owner participant in this leveraged-lease transaction.

By the Defeasement Motion, Northwest Airlines purchased from its co-debtor, Aircraft Finance, Aircraft Finance's beneficial interest in Trust 1 for approximately $36.9 million. Aircraft Finance then transmitted the funds received from Northwest Airlines and $5.5 million of retained cash to the Trust 1 owner trustee to defease the remaining debt of Trust 1. Northwest Airlines terminated Trust 1 and took title to the assets of Trust 1, free and clear of liens and encumbrances. Finally, Northwest Airlines and Trust 1 terminated the lease agreement pursuant to which Northwest had been leasing the ten aircraft.

11. *1996-1 EETC Restructuring.*

On January 20, 2006, Northwest Airlines filed a motion to implement certain restructuring transactions, including rejection of existing leases and entry into new leases with respect to aircraft subject to the 1996-1 EETC transaction. On February 16, 2006, the Bankruptcy Court entered an order granting the motion.

By the motion, Northwest Airlines sought to implement a Restructuring of Financing for Aircraft Subject to Northwest 1996-1 EETC Transaction, dated January 20, 2006, among Northwest Airlines, U.S. Bank National Association, as Indenture Trustee and Subordination Agent, and U.S. Bank Trust National Association, as Pass Through Trustee. The motion related to eleven Boeing 747 and 757 aircraft. The existing leases for the aircraft were above market and Northwest Airlines negotiated new leases for the aircraft to bring their costs in line with market, and to modify other terms from the existing leases favorably for Northwest Airlines. This restructuring provided significant savings over the life of the new leases, and settled a number of claims and disputes between the parties, including claims for adequate protection with respect to the aircraft. An unsecured claim in the amount of $480 million was allowed against each of the bankruptcy estates of Northwest Airlines and NWA Corp. as guarantor in respect of the restructuring.

12. *2000-1 EETC Restructuring.*

On February 24, 2006, the Debtors filed a motion to authorize Northwest Airlines to implement certain restructuring transactions and agreements, including the purchase of secured notes, relating to six Boeing 757 aircraft subject to the Northwest 2000-1 EETC Transaction. On March 13, 2006, the Bankruptcy Court entered an order granting the motion.

By the motion, Northwest Airlines sought approval of a term sheet among Northwest Airlines, MBIA Insurance Corporation ("MBIA") as Controlling Party, and U.S. Bank National Association as Indenture Trustee and as Subordination Agent (the "2000-1 EETC Parties") and entitled "Northwest Airlines, Inc./Purchase Of Secured Certificates Relating To Six Boeing 757-251 Aircraft Subject To Northwest 2000-1 EETC Transaction," dated February 24, 2006. The agreement provided that Northwest Airlines would purchase the indebtedness relating to all six aircraft for an aggregate purchase price favorable to the estate. This restructuring allowed Northwest Airlines to terminate the financings relating to each of the aircraft at a substantial discount from the current outstanding amount of the indebtedness, resulting in substantial savings for the estate. The term sheet also settled other claims and disputes between the parties. The Debtors have agreed, subject to Court approval, to allow a general unsecured claim in the amount of approximately $80 million against Northwest Airlines' estate in respect of the transaction.

On February 2, 2007, the Debtors filed a motion for an order authorizing NWA Corp. and Northwest Airlines to implement certain restructuring transactions and agreements relating to the Northwest 2000-1 EETC Class G Equipment Notes, and to settle certain claims. By the motion, the Debtors are seeking to implement a term sheet among the 2000-1 EETC Parties and entitled "Northwest Airlines, Inc. / Restructuring Of Series G Secured Certificates Relating To Airbus A319-114 Aircraft Subject To Northwest 2000-1 EETC Transaction / Summary Of Terms And Conditions," dated

January 12, 2007.  On February 20, 2007, the Bankruptcy Court entered an order granting the motion. Northwest Airlines owns each of the thirteen aircraft at issue in the motion, subject to security interests granted in connection with the Debtors' 2000-1 EETC transaction. NWA Corp. guaranteed Northwest Airlines' obligations with respect to the aircraft. The Debtors have negotiated with MBIA to reduce the interest rate of the series G equipment notes in the 2000-1 EETC relating to all thirteen aircraft, resulting in substantial savings for the estate, and to amend the prepayment provisions of the notes favorably for the Debtors. The agreement will also settle certain existing claims between the parties.

13. *1999-1 EETC Restructuring.*

On March 17, 2006, the Debtors filed a motion seeking authorization for NWA Corp. and Northwest Airlines to reject certain existing EETC leases and enter into new leases with respect to four Boeing 747 aircraft subject to the Northwest 1999-1 EETC Transaction.  On April 13, 2006, the Bankruptcy Court entered an order granting the motion.

By the motion, the Debtors sought approval to enter into the Restructuring of Financing for Aircraft Subject to Northwest 1999-1 EETC Transaction Agreement, dated March 17, 2006, agreement among Northwest Airlines, U.S. Bank National Association, as Indenture Trustee and Subordination Agent, and U.S. Bank Trust National Association, as Pass Through Trustee.  The agreement provided that Northwest Airlines would reject the existing prepetition leases and enter into new leases for the operation of four Boeing B747-451 aircraft.  The agreement also provided for the allowance of general unsecured claims against the estate of Northwest Airlines.  The EETC restructuring provided significant savings and settled a number of potential claims and disputes between the parties, including claims for postpetition use of the aircraft and for rejection of the existing leases as part of the restructuring.  An unsecured claim in the amount of $284.9 million was allowed against each of the bankruptcy estates of Northwest Airlines and NWA Corp. as guarantor in respect of the restructuring.

14. *Retirement of DC-10 Aircraft.*

Upon analysis of their fleet, the Debtors determined that it was in the best interests of their estates to retire their fleet of DC-10 aircraft.  These aircraft were being replaced by more fuel-efficient aircraft and no longer fit into the Debtors' fleet plan.  After marketing their DC-10-30 aircraft to numerous parties, the Debtors found that in the current market, most potential purchasers of DC-10s are interested in purchasing the aircraft only for parts.  After extensive negotiation and marketing, Northwest Airlines entered into purchase and sale agreements with Omni and ATA, who intended to fly most of the aircraft.  The Debtors believe the agreements represent the best deals that could be obtained for the aircraft, particularly because the operating aircraft were sold as flying aircraft.  The sale also relieved the estate of continuing maintenance, storage and other costs associated with the aircraft.

On June 30, 2006, the Debtors filed a motion seeking authorization for Northwest Airlines to sell six DC-10 aircraft to Omni Air International, Inc. ("Omni").  On July 10, 2006, the Bankruptcy Court entered an order granting the motion.  On December 4, 2006, the Debtors filed a motion seeking authorization for Northwest Airlines to sell nine DC-10 aircraft/airframes to ATA Airlines, Inc. ("ATA").  On December 14, 2006, the Bankruptcy Court entered an order granting the motion.

## F.     **Regional Airline Partnerships**.

As discussed above, Northwest has airline services agreements with three regional carriers: Pinnacle, Mesaba and Compass, pursuant to which these regional carriers are required to operate their flights under the Northwest "NW" code and operate as Northwest Airlink.

1.     *Mesaba.*

Mesaba is the operator of 49 SAAB turbo-prop aircraft and 1 CRJ200 aircraft.  On January 22, 2007, Northwest Airlines entered into a Stock Purchase and Reorganization Agreement (the "SPRA") with Mesaba pursuant to which Northwest Airlines will acquire all the equity interests in an entity resulting from a bankruptcy plan of reorganization of Mesaba.  The principal consideration in such acquisition will consist of the Mesaba bankruptcy estate having an allowed general unsecured claim in Northwest's bankruptcy case in an amount equal to $145 million and Northwest Airlines having an allowed general unsecured claim in Mesaba's bankruptcy case in an amount equal to $7.3 million.

On January 22, 2007, Northwest Airlines and MAIR entered into a Stock Purchase Agreement (the "SPA"), pursuant to which (a) Northwest Airlines will sell to MAIR all 5,657,113 shares of MAIR Common Stock that Northwest Airlines owns for an aggregate purchase price of approximately $35.4 million; (b) Northwest Airlines' warrant to purchase 4,112,500 shares of the MAIR Common Stock will be cancelled; (c) MAIR has consented to and fully supports the Mesaba bankruptcy plan of reorganization and the transactions contemplated by the SPRA; and (d) if the transactions contemplated by the SPA are consummated, upon consummation of the transactions contemplated by the SPRA, Northwest Airlines will assign its claim in Mesaba's bankruptcy case to MAIR.

On February 2, 2007, the Debtors filed motions seeking approval of both transactions.  On February 27, 2007, the Bankruptcy Court entered orders granting these motions.  Subject to the closing of these transactions, Northwest has announced its intention to have Mesaba operate 36 76-seat CRJ900 Bombardier aircraft.

2.     *Pinnacle.*

Pinnacle is the operator of 139 of Northwest's fleet of CRJ200 aircraft.  On December 21, 2006, the Debtors filed a motion for entry into an amended airline services agreement (the "Amended Pinnacle ASA") and related agreements with Pinnacle.  On January 11, 2007, the Bankruptcy Court entered an order granting the motion.

Pursuant to the Amended Pinnacle ASA and related agreements, Pinnacle will continue to provide regional airline services.  By the motion, Pinnacle and Northwest Airlines agreed that any plan of reorganization proposed by Northwest that contemplates that Northwest will remain in the passenger air transportation business would provide for the assumption of the Amended Pinnacle ASA.  In connection with such assumption, Northwest Airlines granted an allowed general unsecured claim of $377.5 million, subject to adjustments, to Pinnacle in full and final satisfaction of any and all claims filed against the Debtors by Pinnacle and in satisfaction of any cure obligations upon the assumption of the Amended Pinnacle ASA.

3.     *Compass.*

In 2006, Northwest established Compass to operate as a Northwest Airlink carrier.  Compass is an indirect subsidiary of NWA Corp.  When Compass commences flight operations, which is expected to occur later in 2007, it initially will operate a 50-seat CRJ200 aircraft.  Thereafter, Northwest expects to place up to 36 76-seat Embraer 175 aircraft, which are currently on order, at Compass to be operated by Compass under an airline services agreement with Northwest.

**G.     Management Contracts**.

On October 20, 2006, the Debtors filed a motion seeking authorization to assume thirty-six prepetition, executory management employment contracts and to enter into five new

management employment contracts for officers promoted during the pendency of the Chapter 11 Cases. On November 21, 2006, the Bankruptcy Court entered an order finding that the contracts were enforceable against the estate of Northwest Airlines and authorizing the Debtors to assume the contracts upon confirmation of a plan of reorganization.

The contracts govern the employment of Northwest's forty-one officer employees, including its Chief Executive Officer, four Executive Vice Presidents, nine Senior Vice Presidents and twenty-seven Vice Presidents. In the event of a liquidation of the Debtors' estates, the contracts do not give rise to any administrative expense, except for amounts accrued or earned prior to the termination of an officer's employment. As a condition of the order, each of the officers' rights, if any, to terminate his or her employment, or exercise any other remedy under their respective agreement based upon the reduction in management compensation and benefits implemented by Northwest to date, was waived. These contracts are listed on Schedule 8.3 to the Plan.

**H.    Labor Issues**.

For a detailed description of Northwest's negotiations with its unions and the status of its various labor contracts see section IV. below.

**I.    Claims Process and Bar Date**.

1.    *Schedules and Statements.*

On May 1, 2006, each of the Debtors filed with the Bankruptcy Court their Schedules Of Assets And Liabilities and Schedule Of Executory Contracts And Unexpired Leases. On June 15, 2006, each of the Debtors filed their Statements of Financial Affairs (collectively, as may be amended, the "Schedules").

2.    *Bar Date For Filing Proofs of Claim.*

By order dated May 19, 2006 (as amended on May 22, 2006 and supplemented by orders dated June 19, 2006 and August 31, 2006), the Bankruptcy Court fixed August 16, 2006, at 5:00 p.m., as the last date and time by which proofs of claim could be filed in the Debtors' bankruptcy cases. In accordance with the order fixing the bar date, on or about June 3, 2006, notices of the bar date were mailed to all creditors listed on the schedules of assets and liabilities. In addition, consistent with that order, the Debtors published notice of the bar date in USA Today, The Wall Street Journal (National Edition), The New York Times (National Edition), the Detroit Free Press, the Minneapolis Star Tribune, the Memphis Commercial Appeal, the Asahi Shimbun (Japan), De Telegraaf (Amsterdam), the Financial Times and the International Herald Tribune.

**J.    Omnibus Claims Objections**.

Over 12,000 proofs of claim were filed. The dollar amount of all Claims filed against the Debtors totals approximately $129 billion. On August 18, 2006, the Debtors filed a motion seeking to establish procedures for objecting to and settling claims. An order granting this motion was entered on September 13, 2006.

Pursuant to the Court approved procedures, the Debtors commenced objecting to certain categories of unsecured Claims by filing the Debtors' First Omnibus (Tier I) Objection To Proofs Of Claim on October 11, 2006. To date, the Bankruptcy Court has approved the expungement of 1,022 Claims in the aggregate amount of approximately $4.8 billion in connection with omnibus Claims objections. To date, all of the omnibus objections which have been decided by the Bankruptcy Court

have been granted, except where the Debtors have agreed to continue, withdraw or resolve an objection as to a particular party.  The Debtors have also filed objections to specific Claims.

**K.      Assumption of Significant Non-Aircraft Executory Contracts**.

Since the Commencement Date, the Debtors have assumed, or have agreed to assume upon the effective date of a plan of reorganization, various significant contracts.  Apart from those assumed contracts previously discussed in section III.E. on Fleet Restructuring and section III.F on Regional Airline Partnerships, these include credit card processing agreements with U.S. Bank and American Express Travel Related Services Company, Inc.  Additional contracts assumed or to be assumed include: (i) a loan agreement and certain ground leases relating to real estate property in Tokyo, Japan; (ii) an insurance agreement with Continental Airlines, Inc.; (iii) agreements relating to frequent flyer miles with MCI Communications Services, Inc., formerly known as MCI WorldCom Communications, Inc.; (iv) an agreement with Microsoft Licensing, GP to provide Northwest Airlines with various Microsoft products, including software licenses, maintenance and upgrades; (v) a service agreement with Aeronautical Radio, Inc. to provide the Debtors with aeronautical communications services; and (vi) an interline agreement with LAX TWO CORP.  The Debtors have also assumed agreements with each of their global distribution system providers, including Worldspan, L.P., Orbitz, LLC, Galileo International LLC and Galileo Nederland, B.V, G2 Switchworks, Corp. and Amadeus IT Group, S.A.  In connection with certain of these agreements, the Debtors have resolved the counterparty's claims against the estates.

**L.      Recharacterization and Rejection of Special Facilities Lease Obligations.**

1.      *Series 2001A and Series 2005A Bonds, and the Minneapolis-St. Paul Metropolitan Airports Commission.*

As of January 1, 1999, Northwest Airlines and the MAC entered into the Airline Operating Agreement and Terminal Building Lease Minneapolis-St. Paul International Airport (the "MAC Terminal Lease"). Pursuant to the MAC Terminal Lease, Northwest Airlines leases property, including terminal space, aircraft parking positions and baggage claim areas from the MAC at the Airport. Northwest Airlines and the MAC are also parties to various other agreements pursuant to which Northwest obtains the right to use and/or occupy various facilities, including maintenance hangars, office space, a de-icing facility and certain other facilities at the Minneapolis-St. Paul International Airport.  On or about June 26, 2001, the MAC issued the Series 2001A and Series 2001B Bonds.  The Series 2001A Bonds were issued in the aggregate original principal amount of $111,355,000 and bear interest at 7.00% (the "Series 2001A Bonds").  The Series 2001B Bonds were issued in the aggregate original principal amount of $25,000,000 and bore interest at 6.50% (the "Series 2001B Bonds").  On or about January 12, 2005, Northwest refinanced and defeased the Series 2001B Bonds through another MAC bond issuance in the aggregate original principal amount of $26,500,000, which bear interest at 7.375% (the "Series 2005A Bonds" and, together with the Series 2001A Bonds, the "Bonds").  The Bonds were issued under a Trust Indenture dated as of June 1, 2001 between the MAC and Wells Fargo Bank Minnesota, National Association ("Wells Fargo").  Manufacturers and Traders Trust Company ("M&T") succeeded Wells Fargo as trustee of the Bonds.  The Bonds, which mature on April 1, 2025, were issued to finance the acquisition, construction, expansion, installation and equipping of certain capital improvements by Northwest Airlines at the Airport that, in most cases, are attached to and located on premises presently being leased by Northwest Airlines pursuant to the MAC Terminal Lease and the Other MAC Agreements (the "MSP Projects").

Northwest Airlines' rights and obligations arise from a Special Facilities Lease dated as of June 1, 2001, as amended by a First Amendment to Special Facilities Lease dated as of January 1, 2005, between Northwest and the MAC (together, the "Facilities Lease").  Northwest issued a

guaranty in favor of M&T, as trustee, with respect to Northwest Airlines' obligations in connection with the Facilities Lease.

On March 23, 2006, Northwest Airlines commenced an adversary proceeding against the M&T, as Trustee of the Series 2001A and Series 2005A Bonds, and against the Minneapolis-St. Paul Metropolitan Airports Commission (Case No. 06-01374), in which Northwest Airlines sought a declaration that the transactions pursuant to which Northwest Airlines obtained financing for the MSP Projects should be treated in Northwest Airlines' bankruptcy case as a borrowing by Northwest Airlines and not as a "true lease" subject to section 365(d)(3) of the Bankruptcy Code. Northwest also sought a judgment avoiding a post-petition payment made by Northwest Airlines under the Facilities Lease and ordering that such payment be returned to Northwest Airlines. Since the Commencement Date, Northwest Airlines has deposited all post-petition obligations with respect to the Facilities Lease into a segregated account.

In addition, Northwest takes the position in the litigation that (i) the MAC's claim with respect to the Facilities Lease constitutes, to the extent allowed, a pre-petition unsecured claim; and (ii) the MAC is not entitled to exercise any rights or remedies under the Facilities Lease that could not be exercised by a creditor holding only a general unsecured pre-petition claim against a debtor. The Debtors thus believe that any claims held by M&T or by MAC in relation to the Series 2001A and Series 2005A Bonds will be General Unsecured Claims against the Consolidated Debtors.

M&T has argued that the Facilities Lease is a true lease, and that the Debtors must therefore comply with section 365 of the Bankruptcy Code and pay the post-petition lease obligations until the Series 2001A and Series 2005A Bonds have been repaid in full. In the event the Bankruptcy Court were to order that the Facilities Lease is a true lease, the Debtors would continue to comply with their obligations under section 365 of the Bankruptcy Code with respect to the Facilities Lease, or they may elect to reject the Facilities Lease pursuant to section 365 of the Bankruptcy Code.

In the alternative, M&T has argued that, to the extent the Facilities Lease is treated as a disguised financing for purposes of the Bankruptcy Code, M&T's claims would be secured based upon the governing documents and upon a theory of equitable liens and/or mortgages. The Debtors believe there is no legal merit to this position. In the event the Bankruptcy Court characterizes the Facilities Lease as a secured financing, any claims held by M&T or by MAC in relation to the Series 2001A and Series 2005A Bonds will be Other Secured Claims against the Consolidated Debtors. The rights of M&T to elect treatment under section 1111(b) of the Bankruptcy Code will be preserved until the Voting Deadline.

This litigation is ongoing.

2.      *Series 1995 Special Airport Facilities Revenue Refunding Bonds relating to Detroit Metropolitan Wayne County Airport.*

Northwest is the lessee under a Special Facilities Lease covering terminal improvements, a flight kitchen, and certain fuel system components, all located at Detroit Metropolitan Wayne County Airport. The terminal became obsolete. It has been torn down and replaced with a new, state-of-the-art facility. Accordingly, Northwest intends to replace the flight kitchen and fuel components and to reject the Special Facilities Lease. The rents under the Special Facilities Lease were pledged to collateralize the repayment of certain bonds issued by the County of Wayne, Michigan

On November 22, 2006, Northwest Airlines commenced an adversary proceeding against U.S. Bank, National Association, solely in its capacity as Trustee (the "Detroit Trustee") with respect to the Special Airport Facilities Revenue Refunding Bonds (Northwest Airlines, Inc., Facilities), Series 1995

(the "Refunding Bonds") relating to Detroit Metropolitan Wayne County Airport (the "Detroit Airport"). The complaint seeks a declaration that (i) if Northwest Airlines rejects the Special Facilities Lease and related Fuel Farm Lease and Pipe Line Right of Way dated April 22, 1991, (A) the Detroit Trustee (by compelling the Wayne County Airport Authority (the "Airport Authority") to act, or otherwise) may not evict Northwest Airlines from certain existing non-bond funded fuel components, and (B) the Detroit Trustee (by compelling the Airport Authority to act, or otherwise) may not re-let such existing non-bond funded fuel components to a third party; (ii) in operating the Detroit Airport, the Airport Authority does not owe the Detroit Trustee any fiduciary duty in making decisions regarding its entry into agreements with the Debtor, and (iii) no provision in the Refunding Bond documents restricts the right of the Airport Authority and Northwest Airlines to enter into a ground lease for the existing non-bond funded fuel system components and a ground lease and associated documentation to allow Northwest Airlines to construct new improvements for the storage and transportation of jet fuel at the Detroit Airport and the Airport Authority or Northwest Airlines may do so without violating any obligation either may have to the Detroit Trustee. The Detroit Trustee filed certain counterclaims against Northwest Airlines and the Airport Authority.

On December 28, 2006, the Debtors filed a motion seeking authority for Northwest to enter into a new lease with the Airport Authority to build replacement fuel facilities. On January 11, 2007, the Bankruptcy Court entered an order granting the motion, provided that such order did not affect any of the parties' rights and remedies in the adversary proceeding. This litigation is ongoing.

On March 2, 2007, the Debtors filed a motion to approve a settlement agreement (the "Detroit Settlement Agreement") among the Debtors, the Detroit Trustee, and the Airport Authority. The motion is scheduled for hearing on May 8, 2007.

The Detroit Settlement Agreement represents a comprehensive, integrated resolution of disputes among the parties with respect to their respective obligations related to the Refunding Bonds and the leases and other agreements related thereto. In addition to resolving the complex litigation pending before the Bankruptcy Court (and the potential for appeals related thereto), the Detroit Settlement Agreement provides that the Detroit Trustee, in its capacity as trustee of the Refunding Bonds, will receive consideration from the Debtors as described below, the Debtors will avoid the need to construct facilities to replace those leased to them pursuant to the Special Facilities Lease or related ground leases because they will continue to have the right to occupy and use those facilities and will be relieved of all future payments (except for nominal amounts to be paid to the Airport Authority), and the parties will exchange mutual releases.

The Detroit Trustee will be allowed (i) a General Unsecured Claim against Northwest Airlines in the amount of $49,000,000 on account of the Amended and Restated Special Facilities Lease, dated November 15, 1995 between the Airport Authority, as successor to the County of Wayne, Michigan, and Northwest Airlines (the "Special Facilities Lease"); (ii) a General Unsecured Claim against NWA Corp. in the amount of $17,000,000 with respect to a guarantee of the primary obligation of Northwest Airlines; and (iii) to retain all Special Facilities Charges (as defined in the Special Facilities Lease) previously paid to it together with any other amounts held by the Detroit Trustee pursuant to Airport Bond Ordinance No. 330 and to be paid the Special Facilities Charges specified in the Special Facilities Lease. The Trustee will be entitled, from and after the Effective Date, to apply and distribute these payments in accordance with the terms of Airport Bond Ordinance No. 330 and to make distributions to holders of the Refunding Bonds therefrom.

The Detroit Settlement Agreement resulted from a lengthy negotiation and settlement process, involving the Debtors, the Airport Authority, the Detroit Trustee and holders of more than 48% of the outstanding principal amount of the Refunding Bonds. The Debtors determined, in the exercise of their sound business judgment, that the Detroit Settlement Agreement is in the best interests of the

Debtors' estates and, under the circumstances, the Debtors also believe that the Detroit Settlement Agreement represents a fair and reasonable result for the holders of the Refunding Bonds and the Airport Authority.

On February 28, 2007, the Debtors filed a Stipulation Regarding Voting And Participation In Rights Offering With Respect To Holders Of Special Airport Facilities Revenue Refunding Bonds (Northwest Airlines, Inc., Facilities) Series 1995, setting forth negotiated procedures for participation in voting and the Rights Offering (the "DTW Stipulation"). On March 16, 2007, Citigroup Global Markets Inc. ("CGMI") filed an objection to the DTW Stipulation.

CGMI asserts that the Detroit Settlement Agreement inadequately compensates holders of the Refunding Bonds for their claims, and that the Detroit Settlement Agreement cannot be approved because the Detroit Trustee has no authority to reduce the claim of any bondholder without the bondholders' consent.

3.    *New York City Industrial Development Agency Special Facility Revenue Bonds 1997*

On December 28, 2005, the Debtors filed a notice of rejection (the "JFK Notice"), pursuant to the Bankruptcy Court's Final Order, entered December 15, 2005, approving procedures for the rejection of Leases and Contracts from time to time in furtherance of the Debtors' reorganization efforts, of the agreements relating to the Northwest Airlines occupancy of cargo facilities at John F. Kennedy International Airport, including a special facilities lease between Northwest Airlines and the New York City Industrial Development Agency (the "NYCIDA").

On January 10, 2006, the Bankruptcy Court approved a stipulation between the Debtors and the Port Authority which provided that the rejection of the Port Authority Lease was effective January 16, 2006 at 12:01 a.m. Separately, on January 6, 2006, the Bank of New York, as successor to United States Trust Company of New York under an Indenture of Trust, dated June 1, 1997 (the "Successor Trustee"), with the NYCIDA pursuant to which the New York City Industrial Development Agency Special Facility Revenue Bonds (1997 Northwest Airlines, Inc. Project) were issued, filed a Response to the JFK Notice.[2]

The Successor Trustee has asserted claims against the Debtors for the full amount of the principal of the Bonds and under a related guarantee issued by NWA Corp. and Northwest Airlines The Debtors objected to these claims on March 16, 2006. The Debtors believe that to the extent the Successor Trustee has any valid claims against the estates, such claims should be capped pursuant to section 502(b)(6) of the Bankruptcy Code. The Debtors also believe that under the Plan, the Claims are within Class 1D and the guarantee eliminated. The Debtors also believe that the Successor Trustee's claim that

_____

[2] Paragraph 3 of the Response provides as follows:

> The Successor Trustee takes no position on the rejection by the Debtors of the Leases and Contracts to which it is party or which have been assigned to it, while expressly reserving all of its rights and claims under those Leases and Contracts, the Indenture and other agreements to which the Debtors are parties and under the Guaranty Agreement pursuant to which the Successor Trustee will assert claims against Northwest Airlines, Inc. and Northwest Airlines Corporation for the full amount of the Guaranteed Obligations as defined therein, including the principal of the Bonds, interest thereon, rental payments under the Lease and all other obligations of the Lessee under the terms of the Lease Agreement and the Tax Regulatory Agreement.

the lease should be recharacterized is barred by res judicata and the applicable New York six year statute of limitation.

The Successor Trustee believes that the NYCIDA special facilities lease is appropriately characterized as a secured lease financing, not a "true lease" subject to the cap of Section 502(b)(6) of the Bankruptcy Code, and that in any event it has direct claims under a guarantee issued by the Debtors for repayment of the Bonds that would survive any reduction of lease damages.  The Successor Trustee disputes the Debtors' position that their arguments regarding characterization of the claims are insulated from challenge either on statute of limitations or res judicata grounds.

**M.    Exclusivity**.

On December 30, 2005, the Debtors filed a motion with the Court seeking an extension of the periods within which they can exclusively file a chapter 11 plan (the "Exclusive Filing Period"), and solicit acceptances thereof (the "Exclusive Solicitation Period", and, together with the Exclusive Filing Period, the "Exclusive Periods"), for an additional 180 days through July 13, 2006 and September 12, 2006, respectively, without prejudice to their right to seek additional extensions thereof.  On January 10, 2006, the Bankruptcy Court entered an order granting the extension of the Exclusive Periods. Subsequent orders have been entered extending the Exclusive Periods through January 16, 2007 and March 16, 2007, respectively.

On January 12, 2007, the Debtors filed the Plan.  Also on January 12, 2007, the Bankruptcy Court entered an order granting the Debtors' ex parte application for an extension of their time to file their Disclosure Statement until February 15, 2007.

On March 23, 2007, the Bankruptcy Court entered an order extending the Debtors' Exclusive Solicitation Period until June 29, 2007.

**N.    Request for Equity Committee**.

On or about November 22, 2006, certain equity holders of the Debtors requested by letter that the United States Trustee appoint a committee of equity security holders.  By letters dated December 26, 2006, the United States Trustee denied this request.  On January 11, 2007, an ad hoc committee of equity security holders (the "AHC") filed a motion in the Bankruptcy Court seeking to compel the United States Trustee to appoint an equity committee.  The Debtors filed an memorandum of law in opposition to this motion on February 20, 2007.  On February 28, 2007, the AHC elected to withdraw their motion.

On February 9, 2007, the Debtors filed a motion for (i) an order imposing civil contempt sanctions on the AHC and awarding attorney's fees and costs to the Debtors, (ii) a protective order pursuant to Rules 26(c) and 45(c)(3) of the Federal Rules of Civil Procedure, and (iii) an order compelling the AHC to file a Verified Statement Pursuant to Bankruptcy Rule 2019(a) (the "Protective Order Motion").  At the February 14, 2007 hearing on the Protective Order Motion, the Court granted the Debtors' request to quash the third party subpoenas and barred the AHC from serving any discovery request on any of the third parties in connection with the Equity Committee Motion without first obtaining an order from the Court.  On February 26, 2007, the Court issued a Memorandum of Opinion and Order with respect to the Rule 2019 issue in which it compelled the AHC to comply with Rule 2019 and file a statement thereunder within three business days.  Specifically, the Court held that the AHC was required to disclose the amounts of claims or interests owned by each member of the AHC, including the times the interests were acquired, the amounts paid, and any sales or other disposition.

On March 1, 2007, the AHC filed a motion seeking leave to file their Rule 2019 statement under seal.  On March 7, 2007, the Court held a hearing on the AHC's motion to file their Rule

2019 statement under seal and took the matter under advisement. On March 9, 2007, the Court issued a Memorandum of Opinion and Order denying the AHC's motion to file the Rule 2019 statement under seal and directed the AHC to file their Rule 2019 disclosure statement within three business days.

By letter dated March 13, 2007, the AHC requested that the Bankruptcy Court stay its Memorandum of Opinion and Order denying the AHC's motion to file the Rule 2019 statement under seal pending appeal. The Bankruptcy Court denied this request. On March 21, 2007, the AHC filed an amended verified statement pursuant to Bankruptcy Rule 2019.

On March 6, 2007, the AHC filed a motion seeking the appointment of an examiner pursuant to section 1104(c) of the Bankruptcy Code. On March 27, 2007, the Bankruptcy Court ordered the appointment of an examiner pursuant to section 1104(c) of the Bankruptcy Code. The Bankruptcy Court stated that "there is no evidence that an examiner is needed because the debtors have done something wrong or that there is probable cause that they have done so." Tr. March 27, 2007 at p. 242. Rather, the examiner was appointed because the Bankruptcy Court interpreted the language of section 1104(c) of the Bankruptcy Code to provide that appointment of an examiner is mandatory in large cases. The examiner's duties will be limited to determining "whether the debtors, including their professionals, have used customary and appropriate processes and procedures to value their assets and businesses for purposes of section 1129(b) of the Bankruptcy Code or, on the contrary, have employed improper processes and procedures in order to arrive at a materially reduced valuation of their assets and businesses for purposes of section 1129 of the Bankruptcy Code." Tr. March 27, 2007 at p. 241-42. Further, the Bankruptcy Court emphasized that the examiner must complete its duties within the time already scheduled by the Bankruptcy Court for the Debtors to proceed with confirmation of the Plan.

**IV.**

**Labor Issues**

**A.**      **Modification of Existing CBAs**.

One of the primary goals of the Debtors' restructuring was to attain a competitive labor cost structure. The Debtors sought to reduce their labor costs per year by approximately $1.4 billion. During the Chapter 11 Cases, the Debtors reached ratified collective bargaining agreements (the "CBAs") with ALPA, the IAM, the ATSA, the TWU, and the NAMA, which were implemented on or before August 1, 2006. Two rounds of salaried and management employee pay and benefit cuts have also been achieved and implemented. In addition, Northwest imposed contract terms on its technicians represented by AMFA in August 2005 and, under section 1113(c) of the Bankruptcy Code, implemented contract terms for its flight attendants represented by the AFA on July 31, 2006. As a result of the foregoing, the Debtors believe they have achieved their $1.4 billion cost savings objective.

On November 6, 2006, Northwest reached a ratified agreement with AMFA to end the labor dispute with the airline's technicians. The agreement maintains the necessary annual labor cost savings from AMFA-represented employees.

Section 1113(c) of the Bankruptcy Code permits a debtor to move to reject its CBAs if the debtor first satisfies a number of statutorily prescribed substantive and procedural prerequisites and obtains the Bankruptcy Court's approval of the rejection or the expiration of the statutorily prescribed time period. After bargaining in good faith and sharing relevant information with its unions, a debtor makes proposals to modify its existing CBAs based on the most complete and reliable information available at the time. The proposed modifications must be necessary to permit the reorganization of a debtor and must provide that all the affected parties are treated fairly and equitably. Ultimately, rejection

of the CBAs is appropriate if the unions refuse to agree to a debtor's necessary proposal "without good cause" and the Bankruptcy Court determines that the balance of the equities favors rejection. In October 2005, the Debtors commenced section 1113(c) proceedings with ALPA, the IAM, and the Professional Flight Attendants Association ("PFAA") and, as described above, subsequently reached consensual agreement with ALPA and the IAM.

       With respect to the Debtors' flight attendants, the Debtors reached a tentative consensual agreement on a new contract with their flight attendants represented by the PFAA on March 1, 2006 (the "March TA"). On June 6, 2006, the PFAA announced that its flight attendants failed to ratify the tentative agreement. As a result of the flight attendants' failure to ratify this agreement, the Debtors requested a ruling from the Bankruptcy Court on their section 1113(c) motion to reject their existing flight attendant labor agreement and to permit the Debtors to impose new contract terms. On June 29, 2006, the Bankruptcy Court granted the Debtors' section 1113(c) motion to reject its contract with the flight attendants and authorized the Debtors to implement the terms of the March TA; however, the Bankruptcy Court stayed implementation of the order until July 17, 2006.

       Following the Bankruptcy Court's June 29, 2006 ruling, the Debtors and the PFAA commenced negotiations to reach a new agreement. On July 6, 2006, the Debtors' flight attendants voted to change their union representation from the PFAA to the AFA. Subsequently, the Debtors and the AFA continued negotiations to reach a new agreement, and on July 17, 2006, the parties announced that they reached a tentative consensual agreement (the "July TA"). On July 31, 2006, the AFA announced that its members failed to approve the July TA. As a result of the flight attendants' failure to ratify the July TA, and in accordance with the Bankruptcy Court's previous authorization, effective July 31, 2006, the Debtors implemented new contract terms and conditions for their flight attendants, consistent with the terms and conditions of the March TA.

       On July 31, 2006, the AFA provided the Debtors with a 15-day notice of its intent to strike or engage in other work actions, including CHAOS (Create Havoc Around Our System). In response, on August 1, 2006, the Debtors filed a motion with the Bankruptcy Court seeking to obtain an injunction against such activities. The AFA subsequently extended the strike deadline by 10 days to August 25, 2006, in response to terrorist threats against air travel to and within the United States. On August 17, 2006, the Bankruptcy Court denied the Debtors' request for an injunction. On August 18, 2006, the Debtors filed an appeal of the Bankruptcy Court's decision with the United States District Court for the Southern District of New York (the "U.S. District Court"). On August 25, 2006, the U.S. District Court issued an injunction pending appeal that temporarily prevented any work action by the AFA while the court considered the Debtors' appeal. The U.S. District Court reversed the Bankruptcy Court's decision on September 15, 2006, and granted the Debtors' request for a preliminary injunction to prevent a threatened strike or work action by the AFA. Subsequently, the AFA appealed the U.S. District Court's ruling to the U.S. Second Circuit Court of Appeals. In addition, the Debtors are currently in mediated negotiations with the AFA and representatives of the National Mediation Board (the "NMB"). The AFA has requested that it be released from further negotiations by the NMB; to date, the NMB has not granted this request. A strike or other form of self-help could have a material adverse effect on the Debtors. On March 29, 2007, the U.S. Second Circuit Court of Appeals affirmed the grant of preliminary injunction by the U.S. District Court.

       On January 18, 2007, the Debtors filed an objection to claims filed by the AFA in excess of $1 billion. These claims are based on the rejection of the flight attendant collective bargaining agreement pursuant to section 1113 of the Bankruptcy Code, and on several other grounds. Thereafter, on February 12, 2007, the AFA filed a motion with the Bankruptcy Court seeking reconsideration of the Bankruptcy Court's decision to grant the Debtors' section 1113(c) motion to reject the Debtors' collective bargaining agreement with the flight attendants. The Debtors filed an objection to the motion on the grounds that the AFA did not meet the legal tests for reconsideration, and the Bankruptcy Court held a

hearing on the motion on March 8, 2007.  On March 21, 2007, the Bankruptcy Court heard the Debtors' objection to AFA's claims.  The Bankruptcy Court has reserved decision on both matters.

**B.    Retiree Medical Benefits**.

On November 17, 2005, the Court appointed a Committee of Retired Employees (the "Retiree Committee") to represent the interests of the Debtors' retired employees.

As originally appointed, the Retiree Committee consisted of the following seven members:

O.V. Delle-Femine
National Director
Aircraft Mechanics Fraternal
Association
67 Water Street - Suite 208
La Conia, NH 03246

Robert B. DePace
Former President/Directing General Chair
International Association of Machinist &
Aerospace Workers
2510 Lexington Avenue South
Mendota Heights, MN 55120

Guy Meek
Former President
Professional Flight Attendants
Association
8101 34th Avenue South B Second Floor
Bloomington, MN 55425

William W. Cameron
Pilot Retiree
1920 Drew Avenue South
Minneapolis, MN 55416

Arlo Bertsch
Member
Transport Workers Union of America
8024 Town Line Avenue S
Bloomington, MN 55438

Paul C. Peyron
Republic Airlines Retiree
456 Sierra Leaf Circle
Reno, Nevada 89511

William D. Slattery
Non-Union Retiree
21955 Minnetonka Blvd, #5
Excelsior, MN 55331

On December 1, 2005, the Bankruptcy Court entered an order amending the Retiree Committee by adding two additional members and changing the Republic Airlines Retiree representative. The Retiree Committee currently consists of the following nine members.

Barbara Allison-Boldenow
Flight Attendant Retiree
70 North Shore Drive
Orono, MN  55359

Marvin Sandrin
IAM Retiree
728 W. Fifth Street
Red Wing, MN  55066
Mendota Heights, MN 55120

Arlo T. Bertsch
TWU Retiree
407 F Avenue
P.O. Box 264
Eureka, SD  57437

William Slattery
Non-Union Retiree
21955 Minnetonka Blvd., #5
Excelsior, MN  55331

William Cameron
Pilot Retiree
Suite 750
601 Carlson Parkway
Minnetonka, MN  55305

Robert Kohls
Republic Retiree
663 East Crystal Lake Road
Burnsville, MN  55306

O. Delle-Femine
AMFA Representative
Aircraft Mechanics Fraternal Association
Suite 208
67 Water Street
LaConia, NH  03246

The Retiree Committee has retained the following advisors:

Counsel

Jenner & Block LLP
One IBM Plaza
Chicago, Illinois 60611

Financial Advisor

Kroll Zolfo Cooper LLC
101 Eisenhower Parkway
Roseland, NJ 07068

Actuarial Consultants

The Segal Company
1920 N. Street, NW, Suite 400
Washington D.C. 20036

The Debtors have engaged in negotiations with the Retiree Committee in an attempt to reach a mutual agreement on the restructuring of the Debtors' retiree liabilities.  The Debtors' goal is to revise the terms on which medical benefits are made available to both active employees and current retirees to bring the costs and levels of such benefits in line with competitors.

The Debtors were unable to reach a consensual agreement with the Retiree Committee to modify their existing retiree benefits.  Thus, on December 16, 2005, the Debtors filed with the Bankruptcy Court an Application To Modify Retiree Benefits Pursuant To 11 U.S.C. § 1114(f) and (g).  Discussions with the Retiree Committee are ongoing.

**C.      Pension Plan Issues**.

Northwest has several noncontributory pension plans covering substantially all of its employees.  As of December 31, 2005, Northwest's pension plans were underfunded, as measured under the provisions of SFAS No. 87.  Projected benefit obligations under the pension plans totaled $9.25 billion, approximately $3.82 billion in excess of the fair value of plan assets.

By letters dated April 15, 2003, the Internal Revenue Service granted Northwest certain conditional waivers (the "Conditional Waivers") of the minimum funding standard for the plan year beginning January 1, 2003 with respect to the Northwest Airlines Pension Plan for Salaried Employees, Plan No. 001, EIN 41-0449230 and the Northwest Airlines Pension Plan for Contract Employees, Plan No. 004, EIN 41-0449230 (collectively, referred to herein as the "Pension Plans").

In order to secure its obligations under such Conditional Waivers, Northwest, pursuant to (i) the certain Payment Agreement dated as of July 25, 2003 (the "Payment Agreement"), between Northwest and The Pension Benefit Guaranty Corporation (the "PBGC") and (ii) the certain Security

Documents, as defined in the Payment Agreement, granted PBGC for itself, and on behalf of the Pension Plans, liens on certain assets of Northwest (including domestic and foreign slots, international routes, aircraft and engines). The security interest in the bank collateral pool was junior to the secured bank term loan described above in section II.B. and a facility provided by US Bank, but was a first priority security interest with respect to other aircraft and slots.

As of the Commencement Date, Northwest was indebted and liable to the Pension Plans with respect to such Conditional Waivers, in the aggregate principal amount of approximately $371 million, plus all accrued but unpaid interest thereon and any fees, expenses, or other charges reimbursable under the terms of the Payment Agreement and/or the Security Documents.

On April 27, 2006, and later on August 9, 2006, the Bankruptcy Court approved stipulations between the Debtors and the PBGC granting adequate protection for the Conditional Waivers under the Payment Agreement Dated as of July 25, 2003, and Certain Related Security Agreements. Pursuant to these stipulations, Northwest agreed to pay in cash to the Pension Plans interest payments, each covering a 30-day period, payable in arrears at the non-default rate of interest of 8.5% per annum provided in the Payment Agreement, with such interest payments to be calculated on the full outstanding principal amount (excluding the amount of any accrued interest, fees or other charges) to be applied against the outstanding interest owed under the Payment Agreement and the Security Documents, and to reimburse the PBGC for reasonable fees and out of pocket expenses.

Pursuant to the amended collective bargaining agreements the Debtors have entered into, the Debtors have "frozen" accrued benefits under their underfunded defined benefit plans, thereby preserving all vested benefits for current and future retirees.

The Pension Protection Act of 2006 ("2006 Pension Act") was signed into law on August 17, 2006. The 2006 Pension Act allows commercial airlines to elect special funding rules for defined benefit plans that are frozen. The unfunded liability for a frozen defined benefit plan may be amortized over a fixed 17-year period. The unfunded liability is defined as the actuarial liability calculated using an 8.85% interest rate minus the fair market value of plan assets. Northwest elected the special funding rules for frozen defined benefit plans under the 2006 Pension Act effective October 1, 2006.

Further, due to the election, the PBGC no longer has a secured claim against the Debtors for the Conditional Waivers. Accordingly, on January 12, 2007, the Debtors filed a stipulation to resolve all Claims filed by the PBGC. Pursuant to the stipulation, the Debtors agreed to pay unpaid premiums relating to the Pilot Plan, as well as certain fees and interests. The PBGC agreed to release its liens, and withdrew the remainder of its Claims (subject in some cases to reinstatement should the Debtors attempt to terminate their pension plans.) The Bankruptcy Court approved this stipulation on February 5, 2007.

The Plan neither terminates nor impairs the Pension Plans. Similarly, the Plan does not affect Northwest's future funding obligations under the 2006 Pension Act.

## V.

## Treatment Of Creditors And Shareholders Under The Plan

The Plan governs the treatment of Claims against and Equity Interests in the Debtors in the Chapter 11 Cases. The Plan is premised upon the substantive consolidation of the Consolidated Debtors and the separate treatment of each other Debtor under the Plan. The table in section V.B. below summarizes the treatment under the Plan for each Class.

**A.    Substantive Consolidation**.

Under the Plan, the Consolidated Debtors are substantively consolidated for all purposes and actions associated with consummation of the Plan, including, without limitation, for purposes of voting and confirmation.  On and after the Effective Date, (a) all assets and liabilities of the Consolidated Debtors shall be treated as though they were merged into the Northwest Airlines estate solely for purposes of the Plan, (b) no distributions shall be made under the Plan on account of Equity Interests between and among any of the Consolidated Debtors, (c) for all purposes associated with Confirmation, including, without limitation, for purposes of tallying acceptances and rejections of the Plan, the estates of the Consolidated Debtors shall be deemed to be one consolidated estate for Northwest Airlines, and (d) each and every Claim filed or to be filed in the Chapter 11 Cases of the Consolidated Debtors, shall be deemed filed against the Consolidated Debtors, and shall be Claims against and obligations of the Consolidated Debtors.  As a result of the consolidation, any guaranty by one or more Consolidated Debtors of the obligations of another Consolidated Debtor will be eliminated, except as it relates to guarantees arising under the secured aircraft financings described in Section 2.2, Section 4.2, Section 4.3 and Section 4.4 of the Plan or any guarantees related to leases which are assumed, but each holder of an Allowed Unsecured Claim against a Consolidated Debtor who also has a guaranty from another Consolidated Debtor shall be compensated for the elimination of the guaranty, such that the substantive consolidation will not result in unfair treatment to creditors who relied on guarantees.

Substantive consolidation shall not affect: (a) the legal and organizational structure of the Consolidated Debtors; (b) pre and post-Commencement Date guarantees, liens, and security interests that are required to be maintained (i) pursuant to any Postpetition Aircraft Purchase and Lease Obligation, (ii) under the Bankruptcy Code or in connection with contracts or leases that were entered into during the Chapter 11 Cases or executory contracts or unexpired leases that have been or will be assumed, or (iii) pursuant to the Plan; (c) Intercompany Claims and Equity Interests between and among the Consolidated Debtors; and (d) distributions from any insurance policies or proceeds of such policies.

Notwithstanding the foregoing, each Debtor will pay its quarterly fees under section 1930 of chapter 123 of title 28 of the United States Code until a final decree is entered in the applicable bankruptcy case.

The Debtors will file a motion to approve substantive consolidation upon notice and a hearing prior to the Confirmation Hearing.

In the event that the Bankruptcy Court does not approve substantive consolidation of the Consolidated Debtors, the Debtors reserve the right to request confirmation and consummation of the Plan.  The Debtors also reserve the right to request confirmation and consummation of the Plan if the Bankruptcy Court approves the substantive consolidation of some, but not all, of the Consolidated Debtors.

In the event that the Bankruptcy Court does not order substantive consolidation of the Consolidated Debtors, then: (a) nothing in the Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that one of the Debtors is subject to or liable for any Claim against any other Debtor; (b) Claims against multiple Debtors shall be treated as separate Claims with respect to each Debtor's estate for all purposes (including, without limitation, distributions and voting), and such Claims shall be administered as provided in the Plan; and (c) the Debtors shall not, nor shall they be required to, resolicit votes with respect to the Plan, nor will the failure of the Bankruptcy Court to approve substantive consolidation of the Consolidated Debtors materially alter the economics of the distributions set forth in the Plan.  In the event that the Bankruptcy Court does not order substantive consolidation, the Plan shall be deemed to provide for fourteen subplans of reorganization.  A vote to accept the Plan shall also be deemed a vote to accept a separate plan for each of the Consolidated Debtors against whom you hold your

claim in the event that the Bankruptcy Court denies approval of the substantive consolidation of the Consolidated Debtors; provided that the treatment of the claim being voted would not be materially different in the absence of substantive consolidation.

**B.      Summary of Classification and Treatment**.

     1.      *Classification by Debtor.*

       The following table identifies the Classes of Claims at the Consolidated Debtors and each other Non-Consolidated Debtor.

| Debtor | Classification of Claims |
|---|---|
| Consolidated Debtors | Class 1A Priority Non-Tax Claims: 1B-1 1110(a) Aircraft Secured Claims<br>Class 1B-2 Restructured Aircraft Secured Claims<br>Class 1B-3 N301US and N303US Aircraft Secured Claims<br>Class 1C Other Secured Claims<br>Class 1D General Unsecured Claims<br>Class 1E Convenience Class Claims<br>Class 1F Intercompany Claims<br>Class 1G Equity Interests in Consolidated Debtors Other than NWA Corp.<br>Class 1H Preferred Stock Interests in NWA Corp.<br>Class 1I Common Stock Interests in NWA Corp. |
| NWA Fuel Services Corporation | Class 2A Priority Non-Tax Claims<br>Class 2B General Unsecured Claims<br>Class 2C Intercompany Claims<br>Class 2D Equity Interests in NWA Fuel Services Corporation |
| Northwest Aerospace Training Corporation | Class 3A Priority Non-Tax Claims<br>Class 3B Other Secured Claims<br>Class 3C General Unsecured Claims<br>Class 3D Intercompany Claims<br>Class 3E Equity Interests in Northwest Aerospace Training Corporation |
| MLT Inc. | Class 4A Priority Non-Tax Claims<br>Class 4B General Unsecured Claims<br>Class 4C Intercompany Claims<br>Class 4D Equity Interests in MLT Inc. |
| Compass Airlines, Inc. f/k/a Northwest Airlines Cargo, Inc. | Class 5A Priority Non-Tax Claims<br>Class 5B General Unsecured Claims<br>Class 5C Equity Interests in Compass Airlines, Inc. f/k/a Northwest Airlines Cargo, Inc. |
| NWA Retail Sales Inc. | Class 6A Priority Non-Tax Claims<br>Class 6B General Unsecured Claims<br>Class 6C Intercompany Claims<br>Class 6D Equity Interests in NWA Retail Sales Inc. |
| Montana Enterprises, Inc. | Class 7A Priority Non-Tax Claims<br>Class 7B General Unsecured Claims<br>Class 7C Equity Interests in Montana Enterprises, Inc. |
| NW Red Baron | Class 8A Priority Non-Tax Claims |

| LLC | Class 8B General Unsecured Claims |
| | Class 8C Equity Interests in NW Red Baron LLC |
| Aircraft Foreign Sales, Inc. | Class 9A Priority Non-Tax Claims |
| | Class 9B General Unsecured Claims |
| | Class 9C Intercompany Claims |
| | Class 9D Equity Interests in Aircraft Foreign Sales, Inc. |
| NWA Worldclub, Inc. | Class 10A Priority Non-Tax Claims |
| | Class 10B General Unsecured Claims |
| | Class 10C Equity Interests in NWA Worldclub, Inc. |
| NWA Aircraft Finance, Inc. | Class 11A Priority Non-Tax Claims |
| | Class 11B General Unsecured Claims |
| | Class 11C Intercompany Claims |
| | Class 11D Equity Interests in NWA Aircraft Finance, Inc. |

2.    *Treatment of Claims by Class.*

The following table explains the division of the Claims against and Equity Interests in the Consolidated Debtors and each of the Non-Consolidated Debtors into Classes and summarizes the treatment for each Class. The table also identifies which Classes are entitled to vote on the Plan, based on rules set forth in the Bankruptcy Code. Finally, the table indicates an estimated recovery for each Class.

**There are various uncertainties and other risks related to the Debtors' businesses, including those listed below, that make it difficult to determine a precise value for the Debtors and the securities to be distributed under the Plan. The recoveries described in the following table represent the Debtors' best estimates of those values given the information available at this time. These estimates do not predict the potential trading prices for securities issued under the Plan.** The Debtors believe that the material risks and uncertainties that could affect the outlook of an airline operating in a global economy include, among others, the ability of Northwest to continue as a going concern, the ability of Northwest to obtain and maintain any necessary financing for operations and other purposes, the ability of Northwest to maintain adequate liquidity, the price and availability of jet fuel, the ability of Northwest to obtain and maintain normal terms with vendors and service providers, Northwest's ability to maintain contracts that are critical to its operations, the ability of Northwest to realize assets and satisfy liabilities without substantial adjustments and/or changes in ownership, the ability of Northwest to operate pursuant to the terms of its financing facilities (particularly the related financial covenants), the ability of Northwest to attract, motivate and/or retain key executives and employees, the future level of air travel demand, Northwest's future passenger traffic and yields, the airline industry pricing environment, increased costs for security, the cost and availability of aviation insurance coverage and war risk coverage, the general economic condition of the United States and other regions of the world, the war in Iraq, the possibility of additional terrorist attacks or the fear of such attacks, concerns about SARS, Avian flu or other influenza or contagious illnesses, labor strikes, work disruptions, labor negotiations both at other carriers and Northwest, low cost carrier expansion, capacity decisions of other carriers, actions of the U.S. and foreign governments, foreign currency exchange rate fluctuations, inflation and other factors discussed herein.

Unless otherwise specified, the information in the following table and in the sections below are based on calculations as of February 1, 2007. The estimation of recoveries makes the following assumptions:

- The Effective Date is assumed to occur on June 1, 2007. The Projections assume an Effective Date of July 1, 2007, but this would not cause a material difference in either the valuation or the Projections.

- The estimated Pre-Money Equity Value of the Reorganized Debtors will range from approximately $6.45 billion to $7.55 billion, with a mid-point of $7.0 billion. – See the valuation discussion in section VII.C.

- The estimated aggregate amount of Allowed General Unsecured Claims against the Debtors is in the range of $8.75-9.5 billion – For further discussion of Allowed General Unsecured Claims see Exhibit G to the Disclosure Statement.

| Class | Description | Treatment | Entitled to Vote | Amount of Claim(s) | Estimated Recovery |
|---|---|---|---|---|---|
| | Administrative Expense Claims | Payment in full (or as otherwise agreed). | No | Ordinary course | 100% |
| | Compensation of Professionals Claims | Payment in full (or as otherwise agreed). | No | $42,285,000 | 100% |
| | Priority Tax Claims | Payment in full on the Effective Date or over six years from the date of assessment of the tax with interest or payment as otherwise agreed. | No | $66,834,000 | 100% |
| | DIP Claims | Payment in full/conversion to Exit Facility. | No | $1,225,000,000 | 100% |
| 1A 2A 3A 4A 5A 6A 7A 8A 9A 10A 11A | Priority Non-Tax Claims | Payment in full. | No | Not Material | 100% 100% 100% 100% 100% 100% 100% 100% 100% 100% 100% |
| 1B-1 | 1110(a) Aircraft Secured Claims | The maturity will be reinstated as such maturity existed before default and paid in accordance with the terms of the applicable loan agreements. Claimants will retain security interests and are unimpaired by the Plan. | No | $2,539,460,000 | 100% |
| 1B-2 | Restructured Aircraft Secured Claims | The Claims in this Class will be treated in accordance with the applicable restructuring agreement and the Final Order that approved such agreement and are unimpaired by the Plan. | No | $1,422,041,000 | 100% |
| 1B-3 | N301US and N303US Aircraft Secured Claims | The maturity of Claims will be reinstated as such maturity existed before default, the Debtors will cure such default and pay the balance of the Claims in accordance with the terms of the applicable loan agreements. Claimants will retain security interests and are unimpaired by the Plan. | No | 9,285,000 | 100% |
| 1C 3B | Other Secured Claims | The treatment of each Other Secured Claim is set forth in Schedule 4.5 attached to the Plan. | No | $263,922,000 $124,218,000 | 100% 100% |
| 1D | General | (i) Pro Rata share of New Common | Yes | $8,750,000,000 – | 66% -83% |

| Class | Description | Treatment | Entitled to Vote | Amount of Claim(s) | Estimated Recovery |
|---|---|---|---|---|---|
|  | Unsecured Claims Consolidated Debtors | Stock For Distribution to Creditors and (ii), if the Eligible Holder elected to participate in the Rights Offering, the right to purchase its Rights Offering Pro Rata Share of the New Common Stock For Distribution Pursuant to Rights Offering. In addition, each holder who also holds a guaranty from one or more Consolidated Debtors with respect to its claim will receive, as compensation for the impact of the substantive consolidation its share of the New Common Stock For Distribution to Creditors With a Guaranty. |  | $9,500,000,000 | midpoint estimate of 74% |
| 2B 3C 4B 5B 6B 7B 8B 9B 10B 11B | General Unsecured Claims Non-Consolidated Debtors | Full payment in Cash. | Yes | $53,000 $67,000 $5,605,000 $0 $0 $0 $0 $0 $0 $0 | 100% 100% 100% 100% 100% 100% 100% 100% 100% 100% |
| 1E | Convenience Class Claims | Full payment in Cash. | Yes | $14,974,000[3] | 100% |
| 1F 2C 3D 4C 6C 9C 11C | Intercompany Claims | $1.00 | Yes | $548,144,000 $2,044,000 $0 $0 $640,000 $0 $64,952,000 | N/A |
| 1G 2D 3E 4D 5C 6D 7C 8C 9D 10C 11D | Equity Interests in Debtors Other than NWA Corp. | Unimpaired. | No |  | N/A |
| 1H | Preferred Stock Interests in NWA Corp. | Cancellation of Equity Interests and no distribution. | No |  | 0% |

---

[3] This number does not reflect potential Claims held by General Unsecured Creditors who make the Convenience Class Election, as further discussed in section V.C.

| Class | Description | Treatment | Entitled to Vote | Amount of Claim(s) | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|--------------------|
| 1I | Common Stock Interests in NWA Corp. | Cancellation of Equity Interests and no distribution. | No | | 0% |

**C.      Description of the Classes For the Debtors**.

Unless otherwise indicated, the characteristics and amount of the Claims or Equity Interests in the following Classes are based on the books and records of the Debtors.

1.      *Priority Non-Tax Claims (Class 1A, 2A, 3A, 4A, 5A, 6A, 7A, 8A, 9A, 10A, 11A).*

The Claims in Class A are the types identified in section 507(a) of the Bankruptcy Code that are entitled to priority in payment (other than Administrative Expense Claims and Priority Tax Claims).  For the Debtors, these Claims relate primarily to prepetition wages and employee benefit plan contributions that had not been paid as of the Commencement Date.  Most of these Claims have already been paid by the Debtors pursuant to an order entered by the Bankruptcy Court on the Commencement Date.  The Debtors estimate that there are no Allowed Claims in these Classes.

Classes 1A, 2A, 3A, 4A, 5A, 6A, 7A, 8A, 9A, 10A, 11A are unimpaired and not entitled to vote.

2.      *1110(a) Aircraft Secured Claims (Class 1B-1)*

This Class includes Aircraft Secured Claims relating to Aircraft Equipment as to which the Debtors agreed under section 1110(a) of the Bankruptcy Code to perform all obligations under the applicable loan agreements.  The Claims in this class are set forth in Schedule 4.2 to the Plan.  In full settlement, satisfaction, release and discharge of such Claims, the maturity of such Claims will be reinstated as such maturity existed before default in accordance with section 1124(2)(B) of the Bankruptcy Code and paid in accordance with the terms of the applicable loan agreements.  The Claimants will retain their security interests on the Aircraft Equipment which secure their respective claims.

Such payments as are necessary to bring the reinstated obligations current shall be made on the Effective Date, or as soon thereafter as reasonably practicable.  Any dispute with respect to amounts payable under the reinstated debt, including, without limitation, disputes as to default interest, fees and expenses, will be determined by the Bankruptcy Court, and the amounts payable, if any, as so determined, shall be made promptly after the determination by the Bankruptcy Court.

Class 1B-1 is unimpaired and not entitled to vote.

3.      *Restructured Aircraft Secured Claims (Class 1B-2).*

The Claims in this Class consist of Aircraft Secured Claims as to which the Debtors and the claimants have agreed to a reduced and restructured Secured Claim and as to which the Bankruptcy Court has entered a Final Order approving the restructuring.  The Claims in this Class are set forth in Schedule 4.3 to the Plan.  In full settlement, satisfaction, release and discharge of such Claims and in accordance with section 1124(2) of the Bankruptcy Code, the Claims in this Class will be treated in accordance with the applicable restructuring agreement and the Final Order that approved such agreement and are unimpaired by the Plan.

To the extent that there are any Bankruptcy Court approved unsecured Claims granted in connection with the Restructured Aircraft Secured Claims, such Claims are treated as Class 1D General Unsecured Claims under the Plan.

Class 1B-2 is unimpaired and not entitled to vote.

4.      *N301US and N303US Aircraft Secured Claims (Class 1B-3) (Unimpaired/Not Entitled to Vote).*

The Claims in this Class consist of Aircraft Secured Claims relating to airframes bearing FAA Registration numbers N301US and N303US and related Aircraft Equipment.  On the Effective Date, in accordance with section 1124(2) of the Bankruptcy Code and in full settlement, satisfaction, release and discharge of such Claims, the maturity of such Claims with respect to N301US and N303US will be reinstated as such maturity existed before default, cure any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, and pay the balance of the Claims in accordance with the terms of the applicable loan agreements.  The claimants will retain their respective security interests on the Aircraft Equipment securing the Claims.

Such payments as are necessary to bring the reinstated obligations current shall be made on the Effective Date, or as soon thereafter as reasonably practicable.  Any dispute with respect to amounts payable under the reinstated debt, including, without limitation, disputes as to default interest, fees and expenses, will be determined by the Bankruptcy Court, and the amounts payable, if any, as so determined, shall be made promptly after the determination by the Bankruptcy Court.

Class 1B-3 is unimpaired and not entitled to vote.

5.      *Other Secured Claims (Class 1C, 3B).*

The Claims in these Classes consist of miscellaneous creditors secured under equipment leases (other than Aircraft Equipment), mechanics and tax liens, setoff, security deposits or similar Claims.  The Debtors estimate that there are approximately $264 million and $124 million of Allowed Claims in Classes 1C and 3B, respectively.

The Claims in each of these Classes and the treatment of each claim is set forth in Schedule 4.5 to the Plan.  At the option of the Reorganized Debtors, the Debtors will (a) pay these secured Claims in Cash in an amount equal to (i) the unpaid amount of the Allowed Other Secured Claim; or the proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in the Allowed Other Secured Claim; (b) surrender the collateral securing such Allowed Other Secured Claim; (c) issue a note with periodic Cash payments having a present value equal to the amount of the Allowed Other Secured Claim; (d) allow for treatment that leaves unaltered the legal, equitable and contractual rights to which the holder of such Allowed Other Secured Claim is entitled; or (e) provide such other distribution as necessary to satisfy the requirements of the Bankruptcy Code or as agreed to by the Debtors and the claimholder.

Any Claim in Classes 1C or 3B that the Debtors choose to pay in Cash will be paid by the Debtors or the Reorganized Debtors on the Effective Date or as soon as practicable thereafter.  To the extent the Claim of a creditor exceeds the value of the collateral in which it has an interest, such excess will become part of Class 1D or Class 3B (General Unsecured Claims).  To the extent a secured Claim accrues interest under applicable local law and the holder of such Claim is entitled to interest based on the value of the collateral, such secured Claim will include interest.

Classes 1C and 3B are unimpaired and not entitled to vote to accept or reject the Plan.

6.      *General Unsecured Claims (Class 1D, 2B, 3C, 4B, 5B, 6B, 7B, 8B, 9B, 10B, 11B).*

The Claims in these Classes include the Claims of certain aircraft lessors, of fuel suppliers and other vendors, of airports with prepetition rent Claims or Claims based on rejection of leases, union Claims, prepetition personal injury, prepetition wrongful death, employment litigation, and property damage claims, to the extent not covered by insurance, parties to contracts with the Debtors that are being rejected, claims based on guarantees, and other General Unsecured Claims.  The Debtors estimate that, on completion of the claims resolution process, the aggregate amount of Allowed Claims in this Class will be reduced to between $8.75 and $9.5 billion (for further explanation see Exhibit G to the Disclosure Statement).  In addition, the Debtors estimate that there will be Allowed Claims based on a guaranty of approximately $3.6 billion.

(a)      *General Unsecured Claims – Consolidated Debtors Class 1D.*

On the Effective Date, or as soon as reasonably practicable thereafter, each holder of an Allowed General Unsecured Claim against the Consolidated Debtors will receive, in full settlement, satisfaction, release and discharge of its Claim, (i) its Pro Rata share of the New Common Stock For Distribution to Creditors; and (ii), if the Eligible Holder elected to participate in the Rights Offering, the right to purchase its Rights Offering Pro Rata Share of the New Common Stock For Distribution Pursuant to Rights Offering.

Except as otherwise provided in the Plan, the substantive consolidation of the Consolidated Debtors will eliminate any guarantees by any Consolidated Debtor of the direct or indirect obligation of another Consolidated Debtor; provided, however, each holder of an Allowed Class 1D Claim who also holds a guaranty from one or more Consolidated Debtors related to such claim will receive, in addition to the distribution prescribed in the immediately preceding paragraph, as compensation for the impact of the consolidation, its share of the New Common Stock For Distribution to Creditors With a Guaranty, determined by multiplying the number of shares of New Common Stock For Distribution to Creditors With a Guaranty by the Allocation Fraction for such holder.  If a direct or indirect obligation of Northwest Airlines was guaranteed by more than one of the other Consolidated Debtors, the holder will be treated as if it had only a single guaranty.

The reference to "indirect" obligations in the foregoing paragraph is expressly intended to include guarantees of municipal bonds repaid through lease obligations of Northwest Airlines.  The treatment of such guarantees under the Plan is consistent with the treatment the guaranty would have received if the substantive consolidation did not occur.

To the extent that a General Unsecured Claim against the Consolidated Debtors is a Subordinated Claim, the holder will not receive a distribution of either New Common Stock For Distributions to Creditors or New Common Stock For Distribution Pursuant to Rights Offering unless and until each holder of an Allowed Claim in Class 1D that possesses a senior right to payment receives New Common Stock For Distributions to Creditors of a value equal to its Allowed Claim amount, plus any applicable interest thereon.

Pursuant to the Convenience Class Election, a holder of a General Unsecured Claim of $20,000 or more may elect to have such Claim treated as a Convenience Class Claim by making the Convenience Class Election on the Ballot provided for voting on the Plan within the time fixed by the Bankruptcy Court for completing and returning such Ballot.  By making such Convenience Class Election, a holder of a General Unsecured Claim of $20,000 or more is agreeing to accept $20,000 in Cash in full satisfaction, discharge and release of such Claim.

Class 1D is impaired and entitled to vote on the Plan.

(b)    *General Unsecured Claim – Non-Consolidated Debtors* (*Class 2B, 3C, 4B, 5B, 6B, 7B, 8B, 9B, 10B, 11B).*

On the Effective Date, or as soon as reasonably practicable thereafter, each holder of an Allowed General Unsecured Claim in Classes 2B, 3C, 4B, 5B, 6B, 7B, 8B, 9B, 10B and 11B will receive, in full settlement, satisfaction, release and discharge of its Claim, full payment in Cash.

To the extent that a holder of an Allowed General Unsecured Claim in Classes 2B, 3C, 4B, 5B, 6B, 7B, 8B, 9B, 10B and 11B filed a proof of Claim on the same debt against a Consolidated Debtor, the proof of Claim against the Consolidated Debtor is deemed expunged without further action by any party.

Classes 2B, 3C, 4B, 5B, 6B, 7B, 8B, 9B, 10B and 11B are impaired and entitled to vote on the Plan.

7.    *Convenience Class Claims (Class 1E).*

On the Effective Date, or as soon as reasonably practicable thereafter, each holder of an Allowed Convenience Class Claim will receive in full settlement, satisfaction, release and discharge of its Claim, full payment in Cash.

On the Effective Date, if the holder of a General Unsecured Claim against the Consolidated Debtors for more than $20,000 has made the Convenience Class Election on the Ballot provided for voting on this Plan within the time fixed by the Bankruptcy Court for completing and returning such Ballot, then that holder will accept $20,000 in Cash in full satisfaction, discharge and release of such Claim.

Class 1E is impaired and entitled to vote on the Plan.

8.    *Intercompany Claims (Class 1F, 2C, 3D, 4C, 6C, 9C, 11C).*

Each holder of an Intercompany Claim in Classes 1F, 2C, 3D, 4C, 6C, 9C, 11C will receive, in full settlement, satisfaction, release and discharge of each Claim, $1.00 on the Effective Date, or as soon as reasonably practicable thereafter.

Classes 1F, 2C, 3D, 4C, 6C, 9C and 11C are impaired and entitled to vote on the Plan.

9.    *Equity Interests in Debtors Other than NWA Corp. (Class 1G, 2D, 3E, 4D, 5C, 6D, 7C, 8C, 9D, 10C, 11D).*

All Equity Interests in Classes 1G, 2D, 3E, 4D, 5C, 6D, 7C, 8C, 9D, 10C and 11D are unimpaired under the Plan.  Such Equity Interests are not entitled to vote on the Plan.

10.    *Preferred Stock Interests in NWA Corp. (Class 1H).*

All Preferred Stock Interests will be deemed cancelled as of the Effective Date, and each holder of a Preferred Stock Interest will neither receive nor retain any property on account of such Preferred Stock Interest under the Plan.

Class 1H is impaired and deemed to reject the Plan.

11.      *Common Stock Interests in NWA Corp. (Class 1I).*

All Common Stock Interests will be deemed cancelled as of the Effective Date, and each holder of a Common Stock Interest will neither receive nor retain any property or interest in property on account of such Common Stock Interest under the Plan.

Class 1I is impaired and deemed to reject the Plan.

**D.      The Rights Offering**.

NWA Corp., Northwest Airlines, as Guarantor, and JPMorgan Securities Inc., as the Rights Offering Sponsor, have entered into the Rights Offering Sponsor Agreement.  Pursuant to the Rights Offering Sponsor Agreement, NWA Corp. has agreed to sell 27,777,778 shares of its New Common Stock, of which 23,611,111 shares will be offered in the Rights Offering (representing $637,500,000) and 4,166,667 additional shares of New Common Stock will be purchased directly by the Rights Offering Sponsor (representing $112,500,000).  The closing date of the Rights Offering shall be the Effective Date of the Plan.

On February 15, 2007, the Debtors filed a motion to approve the Rights Offering Sponsor Agreement.  On March 27, 2007, the Bankruptcy Court approved the Rights Offering Sponsor Agreement.

1.      *Subscription Rights.*

Pursuant to the Rights Offering, each Eligible Holder of an Allowed Class 1D Claim as of the Subscription Rights Record Date and any holder of a Class 1D Claim which subsequently becomes an Eligible Holder pursuant to the Subscription Procedure Motion will be offered Subscription Rights to purchase up to its Rights Offering Pro Rata Share of 23,611,111 shares of New Common Stock for Distribution Pursuant to Rights Offering at the Subscription Purchase Price of $27.00 per Share.  The closing date of the Rights Offering shall be the Effective Date of the Plan.  If the Rights Offering is not consummated by June 30, 2007, the Rights Offering Sponsor Agreement is terminable, and, if terminated, the Rights Offering Sponsor shall have no further obligations thereunder.

2.      *Subscription Period.*

The Rights Offering will commence on the Subscription Commencement Date and will end on the Rights Offering Expiration Date, which shall be approximately 28 days after the Subscription Commencement Date.

3.      *Exercise of Subscription Rights.*

In order to exercise the Subscription Rights, each Eligible Holder of an Allowed Claim in Class 1D must (a) return a duly completed Subscription Form to the Subscription Agent so that such form is received by the Subscription Agent on or before the Rights Offering Expiration Date; and (b) pay an amount equal to the full Subscription Purchase Price of the number of shares of New Common Stock elected to be purchased by such Eligible Holder by wire transfer or bank or cashier's check delivered to the Subscription Agent with the Subscription Form on or before the Rights Offering Expiration Date, or, in the case of securities held through a bank or brokerage firm, send the Subscription Form to the bank or brokerage firm (or follow such firm's directions with respect to submitting subscription instructions to the firm) with enough time for the bank or brokerage firm to effect the subscription through The Depository Trust Company on or before the Rights Offering Expiration Date.  If the Subscription Agent for any reason does not receive from a given Eligible Holder both a timely and duly completed Subscription Form and

timely payment of such holder's Subscription Purchase Price, such Eligible Holder will be deemed to have relinquished and waived its right to participate in the Rights Offering.

4.       *Oversubscription Rights.*

The Subscription Form will permit each Eligible Holder of an Allowed Class 1D Claim to subscribe for additional shares of New Common Stock at the Subscription Purchase Price up to an amount equal to 200% of the Eligible Holder's Rights Offering Pro Rata Share of the shares of New Common Stock for Distribution Pursuant to Rights Offering. Eligible Holders electing to subscribe for additional shares must indicate the amount of shares in the appropriate place on the Subscription Form and pay for such additional shares in the same manner as the shares purchased pursuant to the Subscription Rights. All exercises of Subscription Rights will be subject to proration in the event that the total number of shares sought to be purchased upon exercise of the Subscription Rights, including any oversubscriptions, exceeds the number of shares available for purchase pursuant to the Rights Offering, as follows:

(a) In the event of an Excess Primary Exercise, the number of Subscription Rights that shall be deemed to have been validly and effectively exercised by each exercising Eligible Holder of Subscription Rights (assuming that all other requirements for validly and effective exercise shall have been satisfied) shall be determined by (i) multiplying the total number of shares available pursuant to the Rights Offering by a fraction, the numerator of which shall be such exercising Eligible Holder's Allowed Claim for purposes of participating in the Rights Offering and the denominator of which shall be the total amount of all Allowed Claims for purposes of participating in the Rights Offering of all exercising Eligible Holders (for the denominator, with adjustment for any Allowed Claims of those Eligible Holders who become an Eligible Holder after the Subscription Rights Record Date in accordance with the Solicitation Procedures Motion), and (ii) eliminating any resulting fractions by rounding down to the next whole number, to the extent necessary;

(b) If the number of shares sought to be purchased upon exercise of Subscription Rights that have otherwise been validly and effectively exercised, including any oversubscriptions, exceeds the number of shares available for purchase pursuant to the Rights Offering other than as a result of an Excess Primary Exercise, (i) all Subscription Rights that have otherwise been validly and effectively exercised pursuant to primary exercise shall be deemed to have been validly and effectively exercised; and (ii) the number of Subscription Rights that shall be deemed to have been validly and effectively exercised by any Eligible Holder of Subscription Rights pursuant to an oversubscription (assuming that all other requirements for valid and effective exercise shall have been satisfied) shall be determined by (1) multiplying the aggregate number of shares available for purchase under Subscription Rights that were not validly and effectively exercised pursuant to primary exercises by a fraction, the numerator of which shall be the number of Subscription Rights exercised by such Eligible Holder pursuant to an oversubscription and the denominator of which shall be the number of oversubscription Subscription Rights exercised by all Eligible Holders exercising oversubscription Subscription Rights; and (2) eliminating any resulting fractions by rounding down to the next whole number, to the extent necessary.

5.       *Undersubscription.*

In the event that all the New Common Stock reserved for the Rights Offering is not purchased by creditors with Subscription Rights or by creditors who have exercised their oversubscription rights, the Rights Offering Sponsor will purchase on the closing date of the Rights Offering, for the Subscription Purchase Price per share, a number of shares of New Common Stock equal to the number of shares of New Common Stock for Distribution Pursuant to Rights Offering minus the number of shares of New Common Stock for Distribution Pursuant to Rights Offering subscribed for on or before the Rights

Offering Expiration Date, including shares subscribed for pursuant to oversubscription rights (such shares in the aggregate, the "Unsubscribed Shares").

6.    *Purchased Shares.*

In addition to its purchase of the Unsubscribed Shares, the Rights Offering Sponsor will purchase on the closing date of the Rights Offering, for the Subscription Purchase Price per share, 4,166,667 additional shares of New Common Stock

7.    *Rights Offering Sponsor Agreement.*

The Debtors will pay to the Rights Offering Sponsor a backstop fee of $20,625,000 on the first Business Day after the tenth day after the entry of the order approving the Rights Offering Sponsor Agreement.  The Debtors will also reimburse or pay, as the case may be, the out-of-pocket expenses reasonably incurred by the Rights Offering Sponsor with respect to the Rights Offering, including the filing fee, if any, required by the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and expenses related thereto and all Bankruptcy Court and other judicial and regulatory proceedings related to such transactions, including all reasonable attorneys fees and expenses and reasonable fees of specified counsel and expenses of any other professionals retained by the Rights Offering Sponsor with the approval of the Debtors.

The Rights Offering Sponsor Agreement will terminate automatically if certain conditions are not met, including if the transactions contemplated by the Rights Offering Sponsor Agreement have not occurred by June 30, 2007.  The Rights Offering Sponsor may terminate the Rights Offering Sponsor Agreement if certain conditions have not been met, including if the backstop fee has not been paid by the first Business Day after the tenth day following the entry of the order.

8.    *Syndication Agreement.*

In connection with the Rights Offering Sponsor Agreement, certain parties (the "Ultimate Purchasers") and the Rights Offering Sponsor have entered into a syndication agreement, pursuant to which the Ultimate Purchasers will agree to purchase from the Rights Offering Sponsor certain Unsubscribed Shares and Purchased Shares purchased by the Rights Offering Sponsor.  The syndicate will not include any person or entity that is a competitor of the Company.  The Debtors will also reimburse or pay, as the case may be, the out-of-pocket expenses reasonably incurred by the Ultimate Purchasers with respect to the Rights Offering, including the filing fee, if any, required by the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and expenses related thereto and all Bankruptcy Court and other judicial and regulatory proceedings related to such transactions, including all reasonable attorneys fees and expenses and reasonable fees of specified counsel and expenses of any other professionals retained by the Ultimate Purchasers with the approval of the Debtors.

9.    *Transfer of Subscription Rights; Revocation.*

The Subscription Rights may not be sold, transferred, or assigned except with the express written consent of the Debtors.  Once a holder of Subscription Rights has properly exercised its Subscription Rights, such exercise will be irrevocable.

10.    *Withdrawal of Rights Offering.*

The Debtors may, after consultation with the Creditors Committee, withdraw the Rights Offering.

11.      *Limitation on Acquisition of Shares.*

Unless the Debtors in consultation with the Creditors Committee agree to such acquisition, a claimant exercising its Subscription Rights (an "Exercising Claimant") may not acquire New Common Stock for Distribution Pursuant to Rights Offering if, and to the extent, as a result of such acquisition for the purposes of Section 382 of the Internal Revenue Code, any person or entity (i) who would not otherwise be treated as owning more than 4.95% of the New Common Stock outstanding at the time of delivery of New Common Stock for Distribution Pursuant to Rights Offering would be so treated as a result of such acquisition; or (ii) who would otherwise be treated as owning more than 4.95% of the New Common Stock outstanding at the time of delivery of New Common Stock for Distribution Pursuant to Rights Offering would be treated as owning a greater percentage of shares of New Common Stock as a result of such acquisition.

Notwithstanding the foregoing, in the event the Rights Offering Sponsor is obligated to purchase a number of Unsubscribed Shares and Purchased Shares which would cause its ownership interest in NWA Corp. (including the shares of New Common Stock, if any, received by the Rights Offering Sponsor, in any capacity, pursuant to the Plan), as determined for the purposes of Section 382 of the Internal Revenue Code, to exceed 4.95% of the total number of shares of New Common Stock to be outstanding on the Closing Date, NWA Corp. will either reduce the Rights Offering Sponsor's purchase obligation such that its ownership of New Common Stock would not exceed 4.95% or permit the Rights Offering Sponsor to purchase shares in excess of 4.95% to comply with its purchase obligation; provided that in the latter case, the board of directors of NWA Corp. will waive all restrictions contemplated by Section 5.7 of the Plan on the Rights Offering Sponsor's ability to dispose of any Unsubscribed Shares owned by it.  Likewise, the restrictions would be waived if any of the Ultimate Investors purchasing New Common Stock under the Syndication Agreement would be required to purchase shares which could cause its ownership of the New Common Stock to exceed 4.95%.

The Subscription Purchase Price paid by an Exercising Claimant will be refunded, without interest, in each case as soon as reasonably practicable after the Effective Date, if and to the extent that any limitation specified in the Plan (including in Section 9.13 to the Plan) or in Exhibit A to the Plan would operate to disallow acquisition of New Common Stock for Distribution Pursuant to Rights Offering by such Exercising Claimant.  Likewise, if the Subscription Purchase Price is returned in whole or part to an Exercising Claimant for any other reason, no interest will be paid on the returned amount.

## E.      Private Equity Investment

The Debtors retain the right to raise $150 million in private equity investment upon terms and conditions to be approved by the Bankruptcy Court upon notice and a hearing.

## F.      Restructuring Transactions.

On the Effective Date, but subsequent to the cancellation and discharge of all Claims, (i) Northwest Airlines Holdings Corporation will merge into NWA Inc., with NWA Inc. being the surviving entity, and (ii) thereafter, NWA Inc. will merge into Northwest Airlines, with Northwest Airlines being the surviving entity (the "Downstream Mergers").

In addition to the Downstream Mergers, on or as of the Effective Date or as soon thereafter as practicable, within the discretion of the Debtors, and without further motion to or order of the Bankruptcy Court, the Debtors may, notwithstanding any other transactions described in Section 5.15 of the Plan, (i) merge, dissolve, transfer assets, or otherwise consolidate any of the Debtors in furtherance of the Plan or (ii) engage in any other transaction in furtherance of the Plan, in consultation with the Post-Effective Date Committee; provided, however that the Debtors shall have no obligation to consult with

the Creditors Committee or Post-Effective Date Committee with respect to the Downstream Mergers. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the stockholders or directors of any of the Debtors, or the Reorganized Debtors.

**G.        New Common Stock to Be Issued or Authorized Under the Plan**.

        Reorganized NWA Corp. will issue 262,189,086 shares of New Common Stock on the Effective Date pursuant to the Plan.  Of the total New Common Stock issued pursuant to the Plan, 225,788,536 shares of New Common Stock will be issued to holders of Allowed General Unsecured Claims against the Consolidated Debtors, 8,622,772, shares of New Common Stock will be issued to holders of Allowed General Unsecured Claims against the Consolidated Debtors who also hold a guaranty from a Consolidated Debtor, and 23,611,111 shares of New Common Stock will be sold pursuant to the Rights Offering.  The Rights Offering Sponsor will purchase directly 4,166,667 shares of New Common Stock.  In addition, 21,333,248 shares will be reserved for issuance under the Management Equity Plan (and awards with respect to approximately 15,228,248 shares are expected to be granted in connection with the Debtors' emergence as described below in section IX.E.).  After the issuances pursuant to the Plan and the issuances and reservation for awards made under the Management Equity Plan, approximately 123,000,000 shares of New Common Stock will be authorized but unissued.

        As a condition of closing of the Rights Offering Sponsor Agreement, Reorganized NWA Corp. is required to cause the shares of its New Common Stock to be listed on the New York Stock Exchange or to qualify for listing on the Nasdaq National Market.

**H.        Administrative Expenses**.

        1.        *Administrative Expenses.*

        In order to confirm the Plan, Allowed Administrative Expense Claims, and Allowed Priority Tax Claims must be paid in full or in a manner otherwise agreeable to the holders of those Claims.  Administrative expenses are the actual and necessary costs and expenses of the Debtors' Chapter 11 Cases.  Those expenses include, but are not limited to, postpetition salaries and other benefits for employees, postpetition rent for facilities and offices, amounts owed to vendors providing goods and services during the Chapter 11 Cases and tax obligations incurred after the commencement of the Chapter 11 Cases, including interest, if applicable, under relevant state law.  Other administrative expenses include the actual, reasonable, and necessary professional fees and expenses of the professionals retained by the Debtors and the Creditors Committee, the obligations outstanding under the Debtors' debtor in possession financing agreements (if not converted into an Exit Financing Facility), personal injury Claims, tort claims or other similar litigation claims arising *after* the Commencement Date, once liquidated, to the extent not covered by insurance.  Postpetition personal injury Claims covered by insurance, once liquidated, will be satisfied in the ordinary course of the Debtors' businesses through applicable insurance coverage.  The Debtors do not expect to pay any amounts with respect to postpetition personal injury Claims on or prior to the Effective Date.  Notwithstanding any of the foregoing, Administrative Expense Claims does not include any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code.  Such statutory fees are governed by section 14.1 of the Plan, and shall be paid on and after the Effective Date, and thereafter as may be required until entry of a final decree with respect to each of the Debtors.

        Consistent with the requirements of the Bankruptcy Code, the Plan generally provides for Allowed Administrative Expense Claims to be paid in full on the later of the Effective Date, or as soon as reasonably practicable thereafter, and the first Business Day after the date that is thirty (30) days after the date such Administrative Expense Claim becomes Allowed, except with regard to the Excluded Allowed Administrative Expense Claims, which may be paid by the Debtors in accordance with the past practice

of the Debtors and the terms of the agreements governing such obligations, without the necessity to file a proof of claim.

A notice setting forth the Administrative Expense Claim Bar Date will be (i) filed on the Bankruptcy Court's docket and (ii) posted on the Debtors' case information website at http://www.nwa-restructuring.com/.  Further notice of the Administrative Expense Claim Bar Date will be provided as may be directed by the Bankruptcy Court.  All requests for payment of an Administrative Expense Claim that accrued on or before the Effective Date other than the Excluded Allowed Administrative Expense Claims must be filed with the Claims Agent and served on counsel for the Debtors by the Administrative Claim Bar Date.  Except as to Excluded Allowed Administrative Expense Claims, any requests for payment of Administrative Expense Claims that are not properly filed and served by the Administrative Expense Claim Bar Date shall not appear on the register of claims maintained by the Claims Agent and shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors or any action by the Bankruptcy Court.  Notwithstanding the foregoing, any claims accruing post-petition under an assumed collective bargaining agreement or imposed terms, whether ordinary course claims or grievances, will go forward in the ordinary course of business and thus are not subject to the Administrative Expense Claim Bar Date or the provisions of this paragraph.

The Reorganized Debtors, in their sole and absolute discretion, may settle Administrative Expense Claims in the ordinary course of business without further Bankruptcy Court approval.  The Debtors shall have the right to object to any Administrative Expense Claim within 180 days after the Claims Objection Deadline, subject to extensions from time to time by the Bankruptcy Court, with the consent of the Post-Effective Date Committee.  Unless the Debtors or the Reorganized Debtors object to a timely-filed and properly served Administrative Expense Claim, such Administrative Expense Claim will be deemed allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Expense Claim should be allowed and, if so, in what amount.

Personal injury Claims, tort Claims or other similar litigation Claims arising after the Commencement Date are not subject to the discharge injunction and may be liquidated in the ordinary course of business without further order of the Bankruptcy Court.  Personal injury claimants, tort claimants or other similar litigation claimants whose Claims arose after the Commencement Date will not be required to file an application for an Administrative Expense Claim and will not be subject to any deadline to file applications for administrative expenses.

2.      *Priority Tax Claims.*

Unless otherwise agreed with a holder of an Allowed Priority Tax Claim, the Debtors, in their sole discretion, may choose whether Allowed Priority Tax Claims will be paid in Cash either: (1) in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest from the Effective Date at a fixed annual rate equal to five percent (5%) over a period not exceeding six (6) years after the date of assessment of such Allowed Priority Tax Claim; or (2) in full on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim. The Debtors reserve the right to prepay, without penalty, at any time under option (1) above.

3.      *Debtor in Possession Financing.*

The Debtors are party to the DIP Credit and Exit Facility Agreement, as described above in section III.C.  The Debtors estimate that there will be approximately $1.225 billion outstanding under the DIP Credit and Exit Facility Agreement on the Effective Date and approximately $75 million of

outstanding letters of credit. At the option of the Debtors, the DIP Credit and Exit Facility Agreement includes a commitment for five years of exit financing. It is currently anticipated that the Debtors will exercise the option to convert the facility to an exit financing facility. Accordingly, the facility will not be repaid on the Effective Date, but rather will convert to exit financing at the option of the Debtors upon the satisfaction of certain conditions precedent. The liens in favor of the lenders will remain in place, and the Debtors will comply with all requirements of the DIP Credit and Exit Facility Agreement. The Debtors retain the option of obtaining an alternative exit facility, after consultation with the Creditors Committee, if one becomes available on more favorable terms.

4.    *Postpetition Aircraft Purchase and Lease Obligations.*

The Postpetition Aircraft Purchase and Lease Obligations will become obligations of the Reorganized Debtors or their successors, if applicable, on the Effective Date. The foregoing sentence will be specifically limited with respect to each Postpetition Aircraft Purchase and Lease Obligation by the express terms of the agreement pursuant to which such Postpetition Aircraft Purchase and Lease Obligation arises, and nothing contained in the Plan, the Disclosure Statement for the Plan or the Confirmation Order will be deemed to limit or otherwise affect the terms thereof. The Final Orders approving Postpetition Aircraft Purchase and Lease Obligations are set forth in Schedule 2.2 to the Plan.

5.    *Claims Arising Under the Rights Offering Sponsor Agreement.*

The Reorganized Debtors (or their successors)shall assume all obligations under the Rights Offering Sponsor Agreement and the registration rights agreement being executed in connection therewith, and such obligations will survive against the Reorganized Debtors (or their successors), in accordance with the terms and conditions of the Rights Offering Sponsor Agreement and the registration rights agreement being executed in connection therewith.

6.    *Satisfaction of Exit Conditions under A330 Financing Indentures.*

The Secured Obligations under the A330 Financing Indentures will become obligations of the Reorganized Northwest Airlines or its successor, if applicable, on the Effective Date, and the security interests in the collateral securing the respective Secured Obligations will remain in place and continue to survive against the Reorganized Northwest Airlines.

7.    *Satisfaction of Conditions Under ISDA Master Agreements.*

The obligations under all ISDA Master Agreements (i.e., those agreements applicable to currency, fuel, and interest rate derivative transactions) entered into by the Debtors, specifically including the JPM ISDA Master Agreement, will become obligations of the Reorganized Northwest Airlines or its successor, if applicable, on the Effective Date, and Reorganized Northwest Airlines shall continue to pay all obligations thereunder in accordance with the agreements.

8.    *Fees and Expenses of Professionals.*

As of December 31, 2006, the Debtors have paid the various retained professionals in their chapter 11 cases an aggregate of approximately $54 million since the Commencement Date. The Debtors estimate that various professionals will file fee applications subsequent to December 31, 2006 for approximately $43 million, assuming the effective date of the Plan is June 1, 2007.

Pursuant to the Order Establishing Procedures For Interim Compensation and Reimbursement Of Expenses For Professionals And Committee Members, dated October 19, 2005 (the "Interim Compensation Order"), the Debtors were instructed to withhold, for all professionals, 20% of

each professionals monthly fees (the "Holdback"). Pursuant to later procedures instituted by the Court, the Debtors were instructed to withhold the Holdback until the end of the Chapter 11 Cases.[4] Accordingly, in connection with the confirmation of a Plan, the Debtors' professionals and the professionals retained by the Creditors Committee will each be filing a final fee application for approval and payment of the Holdback. The Debtors currently estimate that the Holdback outstanding is in the amount of $13 million as of December 31, 2006.

9.    *Indenture Trustee Fees.*

The Debtors shall pay the reasonable fees and expenses under the Indentures in Cash on the Effective Date, as agreed to by the parties or as other ordered by the Bankruptcy Court, subject to each Indenture Trustee's reservation of their rights under applicable law to maintain any rights or liens it may have for fees, costs and expenses under the Indentures.

10.    *Management Contracts.*

On October 20, 2006, the Debtors filed a motion seeking authorization to assume thirty-six prepetition, executory management employment contracts and to enter into five new management employment contracts for officers promoted during the pendency of these cases. On November 21 2006, the Bankruptcy Court entered an order finding that the contracts were enforceable against the estate of Northwest Airlines and authorizing the Debtors to assume the contracts upon confirmation of a plan of reorganization.

The contracts govern the employment of Northwest's forty-one officer employees, including its Chief Executive Officer, four Executive Vice Presidents, nine Senior Vice Presidents and twenty-seven Vice Presidents. The order did not change the terms of the prepetition agreements, but, rather, simply made these agreements enforceable against the Debtors. In the event of a liquidation of the Debtors' estates, the contracts do not give rise to any administrative expense, except for amounts accrued or earned prior to the termination of an officer's employment. As a condition of the order, each of the officers' rights, if any, to terminate his or her employment, or exercise any other remedy under their respective agreement based upon the reduction in management compensation and benefits implemented by Northwest to date, was waived. These contracts are set forth on Schedule 8.3 to the Plan.

**I.    Securities Law Matters**.

Holders of Allowed General Unsecured Claims against the Consolidated Debtors may receive securities pursuant to the Plan. Section 1145 of the Bankruptcy Code provides certain exemptions from the securities registration requirements of federal and state securities laws with respect to the distribution of securities under a plan.

1.    *Issuance and Resale of New Securities Under the Plan.*

Section 1145(a)(i) of the Bankruptcy Code generally exempts from registration under the Securities Act of 1933 (the "Securities Act") the offer or sale of a debtor's securities under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or an equity interest in, such debtor, or if such securities are offered or sold principally in such exchange and partly for cash. In addition, in the case of rights so issued under a chapter 11 plan, section 1145(a)(2) also generally exempts the issuance of stock issued upon exercise of such rights. In reliance upon this exemption, the New Common Stock to be issued in respect of Claims and the exercise of the Subscription Rights by Eligible

---

[4] There is no holdback for Dorsey & Whitney LLP due to a flat discount this firm provides to the Debtors.

Holders of Allowed Claims in Class 1D as provided in the Plan will be exempt from the registration requirements of the Securities Act and of any state securities laws. In general, offers and sales of securities made in reliance on the exemption afforded under section 1145(a) of the Bankruptcy Code are deemed to be made in a public offering. Accordingly, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to an exemption provided by section 4(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in the Bankruptcy Code. In addition, such securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim other than in ordinary trading transactions, or (b) offers to sell securities issued under a plan for the holders of such securities, or (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution of such securities, or (d) is a control person of the issuer of the securities or other issuer of the securities within the meaning of Section 2(11) of the Securities Act. The legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns at least ten percent (10%) of the securities of a reorganized debtor may be presumed to be a "control person."

Notwithstanding the foregoing, statutory underwriters may be able to sell their securities pursuant to the resale limitations of Rule 144 promulgated under the Securities Act. Rule 144 would, in effect, permit the resale of securities received by statutory underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144.

Whether any particular person would be deemed to be an "underwriter" with respect to any security issued under the Plan would depend upon the facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular person receiving distributions under the Plan would be an "underwriter" with respect to any security issued under the Plan; and the Debtors recommend that potential recipients of securities pursuant to the Plan consult their own counsel concerning whether they may freely trade such securities.

The Rights Offering Sponsor may also receive shares of New Common Stock. Reorganized NWA Corp. will rely on Section 4(2) of the Securities Act and, to the extent applicable, Regulation D promulgated thereunder, and Section 18 of the Securities Act with respect to state securities law or Blue Sky Laws to exempt the offering, sale and issuance of New Common Stock to the Rights Offering Sponsor. Section 4(2) exempts from the registration requirements of the Securities Act any offering by an issuer not involving any public offering. Regulation D similarly exempts from the registration requirements of the Securities Act any offerings by an issuer of securities to "accredited investors," as such term is defined under Regulation D, and to other qualified investors.

Under the Rights Offering Sponsor Agreement, NWA Corp. has agreed to file a resale registration statement for the Rights Offering Sponsor and the Ultimate Purchasers and to use its commercially reasonable efforts to cause such registration statement to be effective by June 30, 2007.

2.    *Listing of New Common Stock.*

As a condition of closing of the Rights Offering Sponsor Agreement, Reorganized NWA Corp. is required to cause the shares of its New Common Stock to be listed on the New York Stock Exchange or to qualify for listing on Nasdaq National Market.

3.    *Registration Rights.*

The Rights Offering Sponsor Agreement provides for the execution of a registration rights agreement to be entered into between Reorganized NWA Corp. and the Rights Offering Sponsor, and any Ultimate Purchaser.

## J.    Reservation of "Cram Down" Rights.

The Bankruptcy Code permits the Bankruptcy Court to confirm a chapter 11 plan over the dissent of any class of claims or equity interests as long as the standards in section 1129(b) are met. This power to confirm a plan over dissenting classes – often referred to as "cram down" – is an important part of the reorganization process. It assures that no single group (or multiple groups) of claims or interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in the case.

The Debtors each reserve the right to seek confirmation of the Plan, notwithstanding the rejection of the Plan by any Class entitled to vote. In the event a Class votes to reject the Plan, the Debtors will request the Bankruptcy Court to rule that the Plan meets the requirements specified in section 1129(b) of the Bankruptcy Code with respect to such Class. The Debtors will also seek such a ruling with respect to each Class that is deemed to reject the Plan.

## VI.

## Voting Procedures And Requirements

Detailed voting instructions are provided with the ballot accompanying this Disclosure Statement. For purposes of the Plan, the following Classes are the only ones entitled to vote.

| Class | Description |
|-------|-------------|
| **1D** | **General Unsecured Claims** |
| **2B** | **General Unsecured Claims** |
| **3C** | **General Unsecured Claims** |
| **4B** | **General Unsecured Claims** |
| **5B** | **General Unsecured Claims** |
| **6B** | **General Unsecured Claims** |
| **7B** | **General Unsecured Claims** |
| **8B** | **General Unsecured Claims** |
| **9B** | **General Unsecured Claims** |
| **10B** | **General Unsecured Claims** |
| **11B** | **General Unsecured Claims** |

| | |
|---|---|
| **1E** | **Convenience Class Claims** |
| **1F** | **Intercompany Claims** |
| **2C** | **Intercompany Claims** |
| **3D** | **Intercompany Claims** |
| **4C** | **Intercompany Claims** |
| **6C** | **Intercompany Claims** |
| **9C** | **Intercompany Claims** |
| **11C** | **Intercompany Claims** |

If your Claim is not in one of these Classes, you are not entitled to vote on the Plan and you will not receive a ballot with this Disclosure Statement. If your Claim is in one of these Classes, you should read your ballot and follow the listed instructions carefully. Please use only the ballot that accompanies this Disclosure Statement.

---

**IF YOU HAVE ANY QUESTIONS CONCERNING THE BALLOT, YOU MAY CONTACT THE BALLOTING AGENT AT THE TELEPHONE NUMBER BELOW:**

**(866) 715-0768**

---

**A.      Vote Required for Acceptance by a Class**.

Under the Bankruptcy Code, acceptance of a plan by a class of claims is determined by calculating the number and the amount of claims voting to accept, based on the actual total allowed claims voting. Acceptance requires an affirmative vote of more than one-half of the total allowed claims voting and two-thirds in amount of the total allowed claims voting.

**B.      Classes Deemed to Accept or Reject**.

Under the Bankruptcy Code, creditors or interest holders that are unimpaired by the Plan are deemed to accept the Plan. Similarly, creditors or interest holders that are not entitled to receive property under the Plan are deemed not to have accepted the Plan. Based on this standard, for example, the holders of Priority Non-Tax Claims are deemed to accept the Plan. Shareholders of NWA Corp., by contrast, are not receiving any property and are therefore deemed not to have accepted the Plan. For a summary of the Classes entitled to vote, see the charts in the beginning Summary, V.B. and VI.

**C.      Voting**.

In order for your vote to be counted, your vote must be actually ***received*** by the Balloting Agent at the following address before the Voting Deadline of 5:00 p.m., Eastern Time, on May 7, 2007:

> **Balloting Agent:**
> Overnight/Hand Delivery
> Bankruptcy Services, LLC
> 757 Third Avenue
> 3rd Floor
> New York, NY 10017
>
> First Class Mail:
> c/o Bankruptcy Services, LLC
> FDR Station
> PO Box 5014
> New York, NY 10150-5014
>
> Attn: Northwest

If the instructions on your ballot require you to return the ballot to your bank, broker, or other nominee, or to their agent, you must deliver your ballot to them in sufficient time for them to process it and return it to the Balloting Agent before the Voting Deadline. If a ballot is damaged or lost, you may contact the Debtors' Balloting Agent at the number set forth above. Any ballot that is executed and returned but which does not indicate an acceptance or rejection of the Plan will not be counted.

## VII.

### Financial Information, Projections, And Valuation Analysis

**A.    Overview of Business Plan**

An overview of the business plan for Northwest is attached as Exhibit F.1 to the Disclosure Statement.

**B.    Projections**.

Projected pro forma balance sheets and projected financial performance (the "Projections") for Northwest are attached as Exhibit F.2 to the Disclosure Statement.

**C.    Reorganization Valuation Analysis**.

1.    *Scope of Valuation Performed.*

The Debtors directed Seabury Securities LLC, the broker-dealer affiliate of Seabury Group LLC (Seabury Securities LLC and Seabury Group LLC collectively "Seabury"), as the Debtors' financial advisor, to prepare a valuation analysis of the Reorganized Debtors upon emergence from bankruptcy. Specifically, the equity valuation was developed for purposes of (i) evaluating the recoveries of holders of unsecured claims; (ii) evaluating whether the Plan met the so-called "best interests test" under section 1129(a)(7) of the Bankruptcy Code; and (iii) establishing a reasonable estimate of the initial stockholders' equity value for fresh-start accounting reporting purposes. In preparing its analysis, Seabury has, among other matters, done the following: (i) reviewed certain recent financial statements of the Debtors; (ii) reviewed certain financial projections prepared by the Debtors' senior management for the operations of the Reorganized Debtors for the years 2007 through 2010 that are attached to the Disclosure Statement as Exhibit F.2 (the "Projections"); (iii) reviewed the assumptions underlying such Projections; (iv) considered the feedback received from potential investors contacted during the equity

raise process; (v) prepared a discounted cash flow analysis of the business on a "going-concern" basis; (vi) considered the current and historical market values of publicly traded companies that are reasonably comparable to the Debtors; (vii) considered certain economic and industry information relevant to the business of the Reorganized Debtors; and (viii) discussed the current operations and prospects of the Debtors with the senior management of the Debtors.

      2.     *Estimated Pre-Money Equity Value.*

      Based on the analyses, reviews, discussions, considerations and assumptions, Seabury estimates that the pre-money equity value of the Debtors (the "Pre-Money Equity Value"), based upon the Debtor's Projections, is in the range of approximately $6.45 billion to $7.55 billion, with a mid-point of $7.0 billion (the "Baseline Valuation Range").

      The Baseline Valuation Range does not include $750 million assumed to be raised as part of the Rights Offering and the sale of the Purchased Shares nor does it reflect any adjustments for any equity allocated to management equity programs. As discussed below under "Possible Adjustments to Baseline Valuation Range", the Baseline Valuation Range and midpoint are lower than a pre-money equity value implied by current market prices for the Debtors' unsecured claims, including unsecured bonds. Those trading prices, applied to the lower end of the Debtors' estimates for guaranteed and unguaranteed claims, imply pre-money equity value of approximately $7.5 billion. However, since investors in the Debtors' unsecured bonds and unsecured claims have used a wide range of estimated levels for the likely Allowed Claims and Allowed Claims based on a guaranty, Seabury believes the implied market pre-money equity value for the Reorganized Debtors derived from such estimated claims levels ranges principally from $7.25-7.5 billion. In Seabury's view, the principal differences in valuation arise from investors' expectations that the Debtors may experience somewhat higher unit revenue performance and/or somewhat lower fuel costs than contained in the Projections. These factors are discussed in greater detail below under "Possible Adjustments to Baseline Valuation Range."

      3.     *Baseline Valuation.*

      Seabury's estimated valuation must be considered as a whole, and selecting just one methodology or portions of the analyses, without considering the analyses as a whole, could create a misleading or incomplete conclusion.

      The following is a brief summary of the financial analyses performed by Seabury to arrive at its estimated Baseline Valuation Range. Seabury relied primarily on the comparable company analysis (the "Comparable Company Analysis") and two variants of discounted cash flow analysis (the "Discounted Cash Flow Analysis" or the "DCF Analysis"), which were weighted 40% and 60%, respectively, in the calculation of Baseline Valuation Range of the Reorganized Debtors. The rationale for weighting the Discounted Cash Flow Analyses more as compared to the Comparable Company Analysis is that the Discounted Cash Flow Analysis better captures several important aspects of the Debtors' future financial performance including (i) the forecasted improvement in operating cash flow beyond 2007, (ii) anticipated capital expenditure requirements, and (iii) projected net operating loss tax shelter ("NOLs") and deductions arising from issuance of New Common Stock, beyond 2007. The Comparable Company Analysis, which is based on 2007 projected cash flow performance and adjusted net debt, solely relies on the Reorganized Debtors' forecasted performance for 2007.

**VALUATION SUMMARY**

| (in millions) | Low | Median | High |
|---|---|---|---|
| **EBITDAR Multiple** | **$6,194** | **$6,886** | **$7,578** |
| **DCF EBITDA Terminal Value** | **$6,846** | **$7,260** | **$7,695** |
| **DCF EBITDAR Terminal Value** | **$6,425** | **$6,910** | **$7,421** |
| | | | |
| **Weighted Average Pre-Money Value** | **$6,459** | **$7,005** | **$7,566** |
| **Seabury Baseline Valuation Range** | **$6,450** | **$7,000** | **$7,550** |

(a)    *Comparable Company Analysis.*

Comparable Company Analysis compares a company's financial statistics to those of other companies that have similar industry and growth profiles. The analysis is developed based on financial ratios and multiples of the Comparable Companies, which are then applied to the financial projections developed by the Debtors to arrive at an Enterprise Value. Seabury determined that the companies which most closely approximate the industry and financial profile of the Debtors are AMR Corporation, Continental Airlines, Inc., ("Continental"), UAL Corporation and US Airways Group, Inc. (the "Comparable Companies"). Using securities analysts' consensus estimates for 2007 earnings, and therefore estimated gross annual cash flow equal to the sum of earning before interest, taxes, depreciation, amortization and aircraft rent ("EBITDAR") for such Comparable Companies, Seabury estimated that such companies currently trade in a range of approximately 5.3x-6.3x EBITDAR capitalization multiples, with the peer group average at 5.6x. The Company with the highest market capitalization multiple currently is Continental at approximately 6.3x 2007 EBITDAR consensus estimates.

Using such industry analysis as a foundation, Seabury prepared its Comparable Company Analysis for the Reorganized Debtors based on an EBITDAR multiple range of 5.7x to 6.3x, with a midpoint at 6.0x. Those capitalization multiples were then applied against the Reorganized Debtors' projected 2007 EBITDAR performance to derive an adjusted enterprise valuation for the Reorganized Debtors and an implied equity value. Seabury believes this premium to the multiples for Comparable Companies is merited for a variety of reasons including, but not limited to, the Reorganized Debtors' expected relative position vis-a-vis the Comparable Companies with respect to (i) capital structure, (ii) unit labor costs, measured in a comparable stage-length adjusted basis, and (iii) length of time before labor agreements become amendable.

(b)    *Discounted Cash Flow Analyses.*

A DCF Analysis measures the projected multi-year, un-levered free cash flows which would be generated by the underlying business of the Reorganized Debtors. These amounts are then discounted back to the present using a discount rate equal to the estimated weighted average cost of capital ("WACC") of the Reorganized Debtors.

Seabury estimated that the appropriate WACC for the Reorganized Debtors is in the range of 11%-13%. The analysis measures the sum of the present value of the cash flows generated both (i) during the projection period beginning on June 30, 2007 through December 31, 2010 and (ii) beyond the projection period (the "Terminal Value"). The Terminal Value of a company can be estimated in several different ways, but Seabury deemed two different approaches to be most relevant: (i) EBITDAR terminal multiple approach using a 5.9x EBITDAR multiple (versus approximately a 5.8x average EBITDAR multiple for the Debtors in the 1995-2000 time period), and (ii) EBITDA multiple approach using a 5.5x EBITDA multiple (versus a 5.5x average EBITDA multiple for the Debtors in the 1995-2000 time period).

As an integral part of the DCF analyses, Seabury separately calculated the value of the consolidated NOL carryforwards. The Debtors have estimated that the Reorganized Debtors will have approximately $4.0 billion of NOLs as of December 31, 2007. This amount represents the net NOLs after reductions attributable to cancellation of debt provisions. Of that amount, approximately $2.7 billion will remain at the Debtors' disposal at the end of the projection period. The Debtors also estimate that the Reorganized Debtors will have approximately $1.4 billion of additional deductions relating to the distribution of stock pursuant to the Plan that would be available after the projection period, assuming all other elements of the Reorganized Debtors' Projections are met. Seabury estimated that the present value of such NOLs taking into account such additional deductions, discounted at the cost of equity to be in the range of 16%-20%, would be $740-870 million, as set forth in the table below.

### DISCOUNTED CASH FLOW ANALYSES

| (in millions) | Low | Median | High |
|---|---|---|---|
| **DCF EBITDA Terminal Value** | | | |
| **Total DCF Value** | **10,520** | **10,875** | **11,246** |
| **PV NOLs Discounted @ COE** | **743** | **802** | **866** |
| **Less Net Debt June 2007** | **(3,667)** | **(3,667)** | **(3,667)** |
| **Total Post-Money Value** | **7,596** | **8,010** | **8,445** |
| **Pre-Money Value** | **$6,846** | **$7,260** | **$7,695** |
| | | | |
| **DCF EBITDAR Terminal Value** | | | |
| **Total DCF Value** | **12,627** | **13,054** | **13,500** |
| **PV NOLs Discounted @ COE** | **743** | **802** | **866** |
| **Less Adj. Net Debt June 2007** | **(6,195)** | **(6,195)** | **(6,195)** |
| **Total Post-Money Value** | **7,175** | **7,660** | **8,171** |
| **Pre-Money Value** | **$6,425** | **$6,910** | **$7,421** |

4.      *Unsecured Creditors Hypothetical Recovery Values.*

The Debtors have estimated that the total Allowed General Unsecured Claims in Class 1-D will likely be in the range of $8.75-9.5 billion, although the Debtors have cautioned that such Allowed General Unsecured Claims may fall outside that range under certain conditions. This estimated range of Allowed General Unsecured Claims in Class 1-D is subject to significant uncertainties relating to the resolution of various Claims, including the resolution of contingent and unliquidated Claims, such as litigation Claims. Seabury has not independently verified the Debtors' estimate of the range of Allowed General Unsecured Claims.

Based on this range of estimated Allowed General Unsecured Claims in Class 1-D and the aforementioned range of $6.45-7.55 billion for the Baseline Valuation Range of the Reorganized Debtors, Seabury estimates the hypothetical recovery for Allowed General Unsecured Claims in Class 1-D to be in the range of 66%-83%, with a midpoint estimate of 74%, prior to giving effect to dilution associated with any management equity plan in the form of granted New Common Stock of the Reorganized Debtors or employee stock options covering such New Common Stock.

In addition, the holders of certain General Unsecured Claims against a Consolidated Debtor also have a guaranty of that claim from another Consolidated Debtor. As a means of compensating the holders of such guarantees for the impact of the substantive consolidation, the Plan provides that 8,622,772 shares of the New Common Stock of the Reorganized Debtors shall be set aside for such Allowed Claims based on a guaranty. Using the range of Allowed General Unsecured Claims

discussed above, and an estimated $3.6 billion of claims based on a guaranty, the incremental distribution of New Common Stock to guaranty holders is estimated to be approximately 6-8% per dollar of guaranty, with a midpoint estimate of 7%, and would result in such Allowed Claims based on a guaranty receiving estimated recoveries ranging from 72%-91%, with a midpoint estimate of 81%. As with the recovery estimates above, all such estimates are prior to any dilution associated with any management equity plan.

The Plan contemplates a Rights Offering to creditors and a direct purchase of shares by the Rights Offering Sponsor totaling $750 million. Since such equity investments will be at a buy-in price per share of New Common Stock within the valuation range, and in the aggregate represent a relatively small percentage of the total post-money value for the Reorganized Debtors, Seabury does not believe they will have a material impact on creditor recoveries.

5.     *Possible Adjustments to Baseline Valuation Range.*

As noted, the Projections are highly sensitive to certain assumptions made by management. In particular, the fuel price is a critical assumption. Based on the Reorganized Debtors' projected 2007 fuel consumption, a change of $0.01 per gallon of jet fuel would change fuel expense for the Debtors in 2007 by approximately $17.8 million per year. If there was no associated change in revenue, this would increase or decrease the Reorganized Debtors' 2007 EBITDAR by the same amount, and therefore, at the mid-point of the multiple range, increase or decrease the Comparable Company valuation for the Reorganized Debtors by approximately $107 million.

Similarly, the Debtors' earnings are very sensitive to any change in unit passenger revenue (also known as passenger revenue per available seat mile, or "PRASM"). For example, a 0.25% change in the Reorganized Debtors' 2007 system-wide PRASM would increase or decrease the Reorganized Debtors' 2007 EBITDAR by approximately $26.2 million, and in turn increase or decrease the Comparable Company valuation for the Reorganized Debtors at the midpoint of the multiple range, by approximately $157 million.

As discussed, the Reorganized Debtors are expected to have substantial NOLs at emergence. The value of such NOL carryforwards and deductions arising from issuance of New Common Stock is a material part of the valuation calculated using a DCF method. Seabury has valued the resulting cash flows at an assumed cost of equity. If these cash flows were discounted at the WACC, instead of the cost of equity, the DCF valuation would increase by approximately $200-230 million. Based on the DCF weighting in the summary valuation, Seabury's Baseline Valuation Range would increase by approximately $120-140 million.

6.     *Certain Factors Affecting Valuation.*

(a)     *Factors Biasing Current Market Valuation Higher.*

In preparing its valuation, Seabury notes the positive impact on its valuation range of Northwest's strong competitive position in the U.S. and Asia, its unique and valuable trans-Atlantic joint venture with KLM, its competitive labor costs as a result of its restructuring process, the fact that the terms of its labor contracts are longer than those of other major airlines, its competitive overall cost structure, its strengthened capital structure and reduced financing costs, and its experienced management team.

(b)     *Factors Potentially Causing Lower Market Valuation in the Future.*

On the other hand, there are numerous factors that could have a material adverse impact on the Projections. For example, like any airline, the Reorganized Debtors are subject to considerable

uncertainty with respect to their revenues, which are affected by the overall economy, competitive fare actions, fuel costs and other factors. Airlines are also particularly exposed to risks with respect to terrorism or infectious diseases, which could materially reduce revenue. Furthermore, the large aircraft order positions placed by U.S. low-cost carriers suggest that U.S. legacy carriers are likely to continue to be faced with substantial competitive pressures. The Debtors' Projections are also very susceptible to large moves in the price of oil, which ranged from $50 to $77 in the last 12 months and averaged approximately $64 in that time period (versus approximately $58-62 in the current market). This, coupled with the recent failed attempts for fare increases by most U.S. legacy carriers, could potentially have a material adverse effect on the Reorganized Debtors' projected profitability. The Reorganized Debtors also do not have a ratified collective bargaining agreement with their flight attendants. Under certain circumstances the flight attendants may be able to pursue job actions, including what they refer to as CHAOS. In addition, the joint venture with KLM, which provides a meaningful percentage of the profits of the Reorganized Debtors, by its terms remains in force without further action by either party; however, beginning in September 2007, either party may give written notice of termination to the either party, with the effective date of such termination being on the third anniversary of such notice.

The termination of such agreement could have a material adverse effect on the Reorganized Debtors. Any such factors could lead to a material under-performance by the Reorganized Debtors relative to that set forth in the Projections.

7.    *Limitations to Valuation Analyses.*

The estimates of value prepared by Seabury represent hypothetical reorganization values that were developed solely for the purposes described above. Such estimates of value reflect the application of various valuation techniques and do not purport to reflect or constitute appraisals of the actual market value that may be realized through the sale of the New Common Stock to be issued pursuant to the Plan. Similarly, the estimates of value do not necessarily reflect the values that may be realized if assets were sold in arms' length transactions between buyers and sellers.

The estimates of value are inherently subject to uncertainties and contingencies. The actual market price of the New Common Stock at the time of issuance will depend upon prevailing interest rates; market conditions; the conditions and prospects of the Reorganized Debtors; the initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and other factors that generally influence the prices of equity securities. The actual market price of the New Common Stock may be affected by the Debtors' performance during the pendency of the Chapter 11 Cases, changes in the outlook for competition, revenue and fuel costs, and by other factors that are not possible to predict with certainty. Many of the analytical assumptions upon which the valuation is based are beyond the control of the Reorganized Debtors, and there will be variations between such assumptions and the actual facts. These variations may be, and historically for the airline industry have been, material in nature.

Certain of the statements made herein are forward-looking and are based upon information available to Northwest on the date hereof. In connection with the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, Northwest is hereby identifying important factors that could cause actual results to differ materially from those contained in any forward-looking statement made by or on behalf of Northwest. Any such statement is qualified by reference to the following cautionary statements. Northwest believes that the material risks and uncertainties that could affect the outlook of an airline operating under chapter 11 and in a global economy include, among others, the ability of Northwest to continue as a going concern, to obtain and maintain any necessary financing for operations and other purposes, the ability of Northwest to maintain adequate liquidity, the ability of Northwest to absorb escalating fuel costs, Northwest's ability to obtain court approval with respect to motions in the chapter 11 proceedings prosecuted by it from time to time, the ability of Northwest to

develop, confirm and consummate a plan of reorganization with respect to its chapter 11 proceedings, risks associated with third parties seeking and obtaining court approval to terminate or shorten the exclusivity period for Northwest to propose and confirm a plan of reorganization, to appoint a chapter 11 trustee or to convert the cases to chapter 7 cases, the ability of Northwest to obtain and maintain normal terms with vendors and service providers, Northwest's ability to maintain contracts that are critical to its operations, the ability of Northwest to realize assets and satisfy liabilities without substantial adjustments and/or changes in ownership, the potential adverse impact of the chapter 11 proceedings on Northwest's liquidity or results of operations, the ability of Northwest to operate pursuant to the terms of its financing facilities (particularly the related financial covenants), the ability of Northwest to attract, motivate and/or retain key executives and associates, the future level of air travel demand, Northwest's future passenger traffic and yields, the airline industry pricing environment, increased costs for security, the cost and availability of aviation insurance coverage and war risk coverage, the general economic condition of the United States and other regions of the world, the price and availability of jet fuel, the war in Iraq, the possibility of additional terrorist attacks or the fear of such attacks, concerns about SARS, Avian flu or other influenza or contagious illnesses, labor strikes, work disruptions, labor negotiations both at other carriers and Northwest, low cost carrier expansion, capacity decisions of other carriers, actions of the U.S. and foreign governments, foreign currency exchange rate fluctuations, inflation and other factors discussed herein.

Developments in any of these areas, as well as other risks and uncertainties detailed from time to time in Northwest's Securities and Exchange Commission filings, could cause Northwest's results to differ from results that have been or may be projected by or on behalf of Northwest. Northwest undertakes no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. These statements deal with Northwest's expectations about the future and are subject to a number of factors that could cause actual results to differ materially from Northwest's expectations. All subsequent written or oral forward-looking statements attributable to Northwest, or persons acting on behalf of Northwest, are expressly qualified in their entirety by the factors described above.

In the event that the estimated value of the New Common Stock of the Reorganized Debtors is different than the subsequent actual trading market value of the New Common Stock after the Effective Date, the actual recoveries realized by one or more of the classes of holders of Allowed Unsecured Claims may be significantly higher or lower than estimated in the Disclosure Statement. Seabury assumed, without independent verification, the accuracy, completeness and fairness of the financial and other information that was available to it from public sources, as well as the Debtors' Projections provided to Seabury by the Debtors and attached as Exhibit F.2 to this Disclosure Statement.

Seabury assumed that the Reorganized Debtors' Projections have been reasonably prepared on a basis reflecting the best currently available estimates and judgment of the Debtors as to the future operating and financial performance of the Reorganized Debtors. Nothing came to the attention of Seabury to lead it to conclude that its reliance on the Projections, as described herein, was unreasonable.

Seabury's valuation of the Reorganized Debtors assumes that operating results contained in the Projections by the Debtors will be achieved in all material respects. No assurance can be given that the results set forth in the Projections will be achieved.

The valuation is not dependent on the value of the assets of the Reorganized Debtors, and Seabury did not verify any of the information it reviewed with respect to the values the Debtors have ascribed to certain categories of assets under "fresh start accounting" contained in the Projections.

In addition to the foregoing, Seabury relied upon the following assumptions: (i) the Debtors will continue as a going concern; (ii) the valuation range indicated for the value of the New

Common Stock of the Reorganized Debtors assumes the projected debt and equity capitalization, as estimated by the Debtors in the Projections attached upon emergence from bankruptcy; (iii) the Debtors emerge from bankruptcy on or about June 30, 2007; (iv) the Debtors will be able to obtain all future required financing and that no material asset sales will be required for liquidity purposes, and Seabury expressly does not make any representations as to whether the Debtors will obtain financing or as to the terms upon which the financings may be obtained; (v) the present executive management of the Debtors will continue following consummation of the Plan; and (vi) general financial and market conditions as of the Effective Date will not differ materially from the conditions prevailing as of the date of the Disclosure Statement.

Seabury does not make any representation or warranty with respect to the fairness of the terms of the Plan. The analyses performed by Seabury are not necessarily indicative of actual market values realizable by creditors or future results of the Reorganized Debtors, both of which may be significantly more or less favorable than suggested by such analyses.

**The summary set forth above does not purport to be a complete description of the analyses performed by Seabury. The preparation of a valuation estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances, all of which are not able to be described in a summary description. In performing its analyses, Seabury made numerous assumptions with respect to industry performance, business and economic conditions and other matters.**

**The analyses performed by Seabury are not necessarily indicative of actual values or future results, which may be significantly more or less favorable than suggested by such analyses, events and circumstances occurring subsequent to the date on which these valuation analyses were prepared may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect these analyses in a materially adverse or materially beneficial manner. Seabury, the Debtors and Reorganized Debtors do not intend to and do not undertake any obligation to update or otherwise revise the valuation analyses to reflect events or circumstances existing or arising after February 14, 2007 or to reflect the occurrence of unanticipated events. Therefore, the valuation analyses may not be relied upon as a guarantee or other assurance of the actual results that will occur. In deciding whether to vote to accept or reject the Plan, holders of Claims must make their own determinations as to the reasonableness of such assumptions and the reliability of the valuation analyses.**

## VIII.

### Governance Of Reorganized Northwest

A.    **Boards of Directors**.

The board of directors of each of the Reorganized Debtors will consist initially of the individuals to be listed in a plan supplement. The Debtors will use their best efforts to cause such plan supplement to be filed 20 days prior to the Voting Deadline, but in no event later than 10 days prior to the Voting Deadline.

In an effort to cooperatively determine the composition of the board of directors of the Reorganized Debtors, the Debtors and the Creditors Committee jointly retained the services of Russell Reynolds Associates ("RRA"), an executive search firm, to assist in identifying and screening potential

candidates to serve on the board of directors. It is anticipated that Douglas Steenland will be a member of the board.

Both the Creditors Committee and the Debtors will provide to RRA the resumes of other potential board candidates (which will include current members of the Debtors' board of directors) to supplement the search being conducted by RAA. In addition, pursuant to the collective bargaining agreement with ALPA, ALPA will have the right to designate one member of the board.

The parties participating in the board selection process are: (i) a three-member subcommittee representing the Creditors Committee, (ii) two significant independent creditors; and (iii) three representatives of the Debtors' current board of directors. Selections are made based upon consensus among these parties.

**B.    Senior Management**.

Douglas Steenland will be President and Chief Executive Officer of Reorganized Northwest. The officers of the Debtors immediately prior to the Effective Date will serve as the officers of the Reorganized Debtors on and after the Effective Date and in accordance with any employment and severance agreements with the Reorganized Debtors and applicable non-bankruptcy law.

**C.    Corporate Governance and Anti-Takeover Provisions**.

The Amended Bylaws and the Amended Certificate of Incorporation will be set forth in a plan supplement, respectively, and will be filed with the Court not later than 10 days prior to the Voting Deadline.

1.    *Anti-Takeover Effects of Provisions of Delaware Law.*

Reorganized NWA Corp. will be a Delaware corporation subject to Section 203 of the Delaware General Corporation Law ("DGCL"). Section 203 provides that, subject to certain exceptions specified in the law, a Delaware corporation shall not engage in certain "business combinations" with any "interested stockholder" for a three-year period after the date of the transaction in which the person became an interested stockholder unless:

- prior to such time, the corporation's board of directors approved either the business combination or the transaction that resulted in the stockholder becoming an interested stockholder;

- upon consummation of the transaction that resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the corporation's voting stock outstanding at the time the transaction commenced, excluding certain shares; or

- at or subsequent to that time, the business combination is approved by the corporation's board of directors and by the affirmative vote of holders of at least 66 2/3% of the outstanding voting stock that is not owned by the interested stockholder.

Generally, a "business combination" includes a merger, asset or stock sale or other transaction resulting in a financial benefit to the interested stockholder. Subject to certain exceptions, an "interested stockholder" is a person who, together with that person's affiliates and associates, owns, or within the previous three years did own, 15% or more of the corporation's voting stock.

2.       *Authorized but Unissued Preferred Stock.*

Under the terms of the Amended Certificate of Incorporation, the board of directors of Reorganized NWA Corp. may issue shares of authorized preferred stock without stockholder approval. These additional shares may be used for a variety of corporate purposes, including future public offerings, to raise additional capital or to facilitate acquisitions.  If Reorganized NWA Corp.'s board of directors decides to issue shares to persons supportive of current management, this could render more difficult or discourage an attempt to obtain control of the company by means of a merger, tender offer, proxy contest or otherwise.  Authorized but unissued shares also could be used to dilute the stock ownership of persons seeking to obtain control of the Reorganized NWA Corp.

3.       *Removal of Directors; Vacancies.*

The Amended Certificate of Incorporation will provide that sitting directors of Reorganized NWA Corp. may be removed with or without cause by a vote of holders of at least a majority of the stockholders entitled to vote, and any vacancy occurring in the board may be filled only by a majority of the directors then in office, even though less than a quorum.

4.       *Limitation on Calling Special Meetings of Stockholders.*

The DGCL allows the board of directors or officers, directors or stockholders authorized in a corporation's certificate of incorporation or bylaws to call special meetings of stockholders.  The Amended Certificate of Incorporation will provide that a special meeting of stockholders may be called only by the chairman of the board, and shall be called by the chairman at the request in writing of a majority of the board of Reorganized NWA Corp.  Business to be transacted at a special meeting will be limited by the Amended Bylaws to the purpose or purposes stated in the notice of the meeting.

5.       *Advance Notice Requirements for Stockholder Proposals and Director Nominations.*

The Amended Bylaws will provide that stockholders seeking to nominate candidates for election as directors or to bring business before an annual or special meeting of stockholders must provide timely notice of their proposal in writing to the corporate secretary.  Generally, to be timely, a stockholder's notice must be received at the principal executive offices of Reorganized NWA Corp. not less than ninety (90) days nor more than one hundred twenty (120) days prior to the first anniversary date of the previous year's annual meeting or, in the case of a special meeting, not more than one hundred twenty (120) days prior to such special meeting nor less than ninety (90) days prior to such special meeting or the tenth day following the day on which public announcement is first made of the date of the special meeting.

6.       *No Stockholder Action by Written Consent.*

The DGCL permits stockholder action by written consent unless otherwise provided by a corporation's certificate of incorporation.  The Amended Certificate of Incorporation will preclude stockholder action by written consent.

7.       *Supermajority Provisions.*

The DGCL provides generally that the affirmative vote of a majority of the outstanding shares then entitled to vote at an election of directors, voting together as a single class, is required to amend a corporation's certificate of incorporation or bylaws, unless the certificate of incorporation requires a greater percentage.  The Amended Certificate of Incorporation will provide that the following provisions in the Amended Certificate of Incorporation and Amended Bylaws may be amended only by a

vote of 66 2/3% or more of all of the outstanding shares of Reorganized NWA Corp.'s capital stock then entitled to vote:

- the prohibition on stockholder action by written consent;

- the ability to call a special meeting of stockholders being vested in the chairman of the board, including at the direction of the board of directors;

- provisions governing filling vacancies on the board;

- the advance notice requirements for stockholder proposals and director nominations; and

- the amendment provision requiring that the above provisions be amended only with a 66 2/3% supermajority vote.

In addition, subject to the foregoing, the Amended Certificate of Incorporation will grant the board of directors the authority to amend and repeal the bylaws without a stockholder vote in any manner not inconsistent with the laws of the State of Delaware or the Amended Certificate of Incorporation.

8.    *Stockholder Rights Plan.*

In conjunction with the issuance of common stock, Reorganized NWA Corp. plans to put in place a customary stockholder rights plan. The rights plan is intended to be substantially similar to the prepetition rights plan of NWA Corp. Under the rights plan, each share of common stock issued by Reorganized NWA Corp. will have a right attached to it which is exercisable upon the occurrence of certain events, for example if any person or group acquires beneficial ownership above a specified threshold of Reorganized NWA Corp.'s outstanding common stock or commences a tender or exchange offer that would result in such person or group acquiring beneficial ownership above that threshold of Reorganized NWA Corp.'s outstanding common stock. Once exercisable, the rights will entitle the stockholders (other than the acquiring person or group) to acquire common stock of Reorganized NWA Corp. (or in some cases, of the acquiring person) at a discount to the market price.

The ACC submits that the stockholders rights plan and many other provisions that restrict the Reorganized Debtors' ability to engage in certain transactions and the ability of holders of New Common Stock to take certain actions are inappropriate. The ACC's position is that these provisions limit the rights of the holders of New Common Stock, serve to entrench current management, and may adversely effect the trading market for and trading price of the New Common Stock. The ACC's position is that the combination of all of these entrenchment provisions, including the 4.95% trading restrictions described in section XII.A.2.d., would limit the ability of holders of New Common Stock to change the composition of the new Board after the Effective Date and may enable the new Board to retain control even if the holders of New Common Stock do not endorse such retention. The ACC's position is that many of these provisions are more properly considered by the board of directors of the Reorganized Debtors, rather than the outgoing board of directors who will be released under the Plan from any liability associated with the implementation of these provisions and any damages that may result. The ACC has requested that creditors that are entitled to vote on the Plan carefully consider the impact of these issues before casting their votes on the Plan.

The stockholder rights plan to be adopted is substantially similar to the stockholder rights plan adopted by in November 1995 to protect NWA Corp.'s stockholders in the event of certain unsolicited attempts to acquire control of Northwest.

The Board of Directors believes that the stockholder rights plan is strategically important to Northwest given that certain rights of Northwest to block a change in control of Continental Airlines are contingent upon there not occurring a change in control of Northwest. Northwest Airlines and Continental Airlines are parties to a long-term alliance agreement. In connection with the repurchase by Continental Airlines from Northwest of shares of Continental Airlines common stock previously acquired by the Company in 1998, Continental Airlines issued to the Company one share of its Series B Preferred Stock (the "Preferred Share"). The rights of the Preferred Share, which are set forth in the Certificate of Designations of the Series B Preferred Stock, include the right to block a transaction involving a change in control of Continental Airlines in certain circumstances. Northwest could lose these rights, however, if Northwest itself were to undergo a change in control. The stockholder rights plan is designed to enable Northwest to prevent a change in control on terms that Northwest has not fully negotiated and agreed to. Absent the stockholder rights plan, a change in control of Northwest could occur without the Board's consent, which could result in the unplanned-for loss of this important Continental Airlines blocking right.

With respect to the 4.95% trading restrictions referenced by the ACC as set forth above, the Debtors have included such provision solely to protect their NOL position.

A new board of directors will be in place as of the Effective Date. That board is free to reconsider and change the provisions to which the ACC objects.

## IX.

## Other Aspects Of The Plan

A.    **Distributions**.

One of the key concepts under the Bankruptcy Code is that only claims that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an "allowed" claim simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim, and the amount thereof, is in fact a valid obligation of the debtor. For an explanation of how Disputed Claims will be determined, see section IX.A.3 below.

1.    *Distributions Through Agents.*

All distributions under the Plan (other than distributions described in the next sentences) will be made by the applicable Debtors as Disbursing Agent or such other entity designated by the applicable Debtor as a Disbursing Agent on or after the Effective Date. Distributions to holders of DIP Claims arising under the DIP Credit & Exit Facility Agreement will be made through Citicorp USA Inc.

Any and all distributions made by or at the direction of indenture trustees (including the Indenture Trustees) to holders of General Unsecured Claims shall not be made to holders of Allowed General Unsecured Claims as of the Distribution Record Date but rather shall be effectuated through a mandatory exchange of the notes for distributions under this Plan as soon as reasonably practicable after the Effective Date in accordance with the applicable Indenture and the procedures of the Depository Trust Company or its nominee, Cede & Co. The provisions of this paragraph shall apply to distributions made by or at the direction of indenture trustees to holders of General Unsecured Claims under all other indentures and applicable municipal bond financings pursuant to which the Debtors have indirect payment obligations through special facilities leases; provided, that the record date for distributions to beneficial holders will be determined in accordance with the applicable indentures (and without regard to

the Distribution Record Date). All such distributions will be distributed to the applicable trustee and in no event will the Debtors make any payments directly to beneficial holders. The provisions of this paragraph shall not apply to any distribution being made on account of any of the Debtors' aircraft equipment financing transactions.

2.      *Timing and Conditions of Distributions.*

(a)      *Date of Distributions.*

Except as otherwise provided in the Plan, distributions on account of Allowed Claims will be made as set forth below.

(b)      *Initial Distributions.*

On the Effective Date, or as soon as reasonably practicable thereafter, the Disbursing Agent will distribute to the applicable agent and/or recordholder for the individual holders of the applicable Allowed Claims the New Common Stock For Distribution to Creditors allocable to Class 1D and the New Common Stock For Distribution Pursuant to Rights Offering purchased pursuant to the exercise of Subscription Rights. For the purpose of calculating the amount of New Common Stock For Distribution to Creditors to be initially distributed to holders of Allowed Claims in Class 1D, all Disputed Claims (excluding Subordinated Claims) in such class will be treated as though such Claims will be Allowed Claims in the amounts asserted, or as estimated by the Bankruptcy Court, as applicable.

If, prior to a Periodic Distribution Date, a Disputed Claim is allowed as provided for under the Plan in an amount that is less than the amount utilized by the Disbursing Agent, the excess New Common Stock for Distribution to Creditors that was reserved by the Disbursing Agent on account of such Claim will be distributed to holders of Allowed Class 1D Claims on a Pro Rata basis, on a subsequent Periodic Distribution Date. If a Disputed Claim is disallowed subsequent to the Effective Date, then the creditors within the class will receive Pro Rata, on a subsequent Periodic Distribution Date, the Catch-up Distribution that the holder of the Disputed Claim would have received if the claim had become an Allowed Claim.

(c)      *Subsequent Distributions.*

On the applicable Periodic Distribution Date, the Disbursing Agent will distribute to the applicable agent and/or recordholder for the individual holders of the applicable Allowed Claims, the New Common Stock For Distribution to Creditors allocable to Class 1D, until such time as all Disputed Claims have been resolved; *provided, however*, if the initial distribution of New Common Stock for Creditors allocable to Class 1D falls within the first 45 days of a quarter, then the next Periodic Distribution Date will be on the first Business Day following the close of such quarter. On an applicable Periodic Distribution Date, as determined by the Debtors, a holder of an Allowed Claim that ceased being a Disputed Claim subsequent to the Effective Date will receive a Catch-up Distribution. The Disbursing Agent may, in its sole discretion, establish a record date prior to each Periodic Distribution Date, such that only Claims Allowed as of the record date will participate in the distribution. Notwithstanding the foregoing, the Debtors reserve the right, to the extent they determine, in consultation with the Post-Effective Date Committee, that a distribution on any Periodic Distribution Date is uneconomical or unfeasible, or is otherwise unadvisable, to postpone a quarterly distribution until the next appropriate Periodic Distribution Date.

(d)      *Distribution Reserve*

For the purpose of calculating the Distribution Reserve, all Disputed Claims (excluding Subordinated Claims) in Class 1D will be treated as though such Claims will be Allowed Claims in the amounts asserted, or as estimated by the Bankruptcy Court, as applicable.  The Disbursing Agent also shall place in the Distribution Reserve any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the property initially withheld in the Distribution Reserve, to the extent that such property continues to be withheld in the Distribution Reserve at the time such distributions are made or such obligations arise.  The holder of a Claim shall not be entitled to receive or recover any amount in excess of the amount provided in the Distribution Reserve to pay such Claim.  The Disbursing Agent shall be deemed to have voted any New Common Stock held in the Distribution Reserve in the same proportion as all shares of New Common Stock that are not held in the Distribution Reserve.

After the Effective Date, the Debtors will publish a quarterly notice setting forth (i) the amount of Allowed Claims in each class to date; (ii) the remaining amount of Disputed Claims in each Class; (iii) the shares of New Common Stock reserved by the Debtors on account of such Disputed Claims.

(e)      *Surrender of Certain Securities Necessary for Distribution.*

Plans of reorganization generally require a holder of an instrument or security of a debtor to surrender such instrument or security prior to receiving a new instrument or security in exchange therefore under a plan of reorganization.  This rule avoids disputes regarding who is the proper recipient of instruments or securities under a plan of reorganization.

As a condition to receiving any distribution under the Plan, each holder of a certificated instrument or note must surrender such instrument or note held by it to the Disbursing Agent or its designee, unless such certificated instrument or note is being reinstated or being left unimpaired under the Plan.  Any holder of such instrument or note that fails to (i) surrender such instrument or note, or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Disbursing Agent and furnish a bond in form, substance and amount reasonably satisfactory to the Disbursing Agent before the first anniversary of the Effective Date, will be deemed to have forfeited all rights and Claims and may not participate in any distribution under the Plan.  Any distribution so forfeited will be distributed pro rata to the members of the Class.

Holders of Equity Interests in NWA Corp. will not be required to surrender such instruments or securities because they are not receiving a distribution under the Plan on account of such securities.  Except as otherwise required by the terms of the applicable transaction documents, holders of notes or instruments issued by parties that are not Debtors shall also not be required to surrender such instruments or securities.

(f)      *Fractional Shares.*

No fractional shares of New Common Stock or Cash in lieu thereof, will be distributed.  For purposes of all distributions other than the distribution on the Final Distribution Date, fractional shares of New Common Stock will be carried forward to the next applicable Periodic Distribution Date.  On the Final Distribution Date, fractional shares of New Common Stock will be rounded up or down to the nearest whole number or zero, as applicable.

(g)     *Fractional Rights.*

No Fractional Subscription Rights will be issued.  The number of shares of New Common Stock available for purchase by Exercising Claimants will be rounded down to the nearest share.  Any shares of New Common Stock not subscribed as a result of such rounding will be pooled and made available for oversubscription, and, if necessary, purchased by the Rights Offering Sponsor.

3.     *Procedures For Treating Disputed Claims Under the Plan.*

(a)     *Disputed Claims.*

A Disputed Claim is any Claim that is not an Allowed Claim.  Any Claim against any Debtor which has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed is an Allowed Claim.  Any timely filed, liquidated, non-contingent Claim as to which the time for objection permitted by the Plan has expired and no objection has been interposed is an Allowed Claim.  Any Claim expressly allowed by a Final Order, or agreed upon by the Debtors and the claimholder pursuant to the Settlement Procedures Order is an Allowed Claim.

(b)     *Objections to Claims.*

The Debtors or the Reorganized Debtors will be entitled to object to all Disputed Claims.  Any objections to Claims will be served and filed on or before the Claims Objection Deadline, which shall be one hundred eighty (180) days after the Effective Date (unless such day is not a Business Day, in which case such deadline shall be the next Business Day thereafter), as the same may be extended from time to time by the Bankruptcy Court, with the consent of the Post-Effective Date Committee, or as otherwise ordered by the Bankruptcy Court.

**B.     Treatment Of Executory Contracts And Unexpired Leases**.

1.     *Contracts and Leases Not Expressly Rejected Are Assumed.*

The Plan provides that all executory contracts and unexpired leases to which any of the Debtors are parties will be deemed assumed on the Effective Date except for an executory contract or unexpired lease that (i) has already been assumed or rejected pursuant to Final Order of the Bankruptcy Court; (ii) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts and Leases, to be filed in a plan supplement by three business days prior to the Voting Deadline, subject to the Debtors' right to amend such Schedule at any time prior to the Confirmation Date; (iii) is the subject of a separate motion to assume or reject filed under section 365 of the Bankruptcy Code by the Debtors prior to the Confirmation Date; or (iv) is an option or warrant to purchase common stock of any of the Debtors or right to convert any Equity Interest into common stock of any of the Debtors or to the extent such option, warrant, or conversion right is determined not to be an Equity Interest.

Notwithstanding anything in the foregoing to the contrary, with respect to any contract or lease which is subject to litigation or proceeding in which the characterization of an executory contract is an issue and that is pending as of the commencement of the Confirmation Hearing, the Debtors shall have 30 days after the entry of a Final Order resolving the litigation or proceeding to assume or reject such contract or lease.

2.       *Restructured Collective Bargaining Agreements.*

The restructured collective bargaining agreements set forth on Schedule 8.2 to the Plan will be deemed automatically assumed on the Effective Date.

3.       *Management Agreements.*

The management agreements set forth on Schedule 8.3 to the Plan will be deemed automatically assumed on the Effective Date.

4.       *Employee-Related Agreements.*

To the extent any Employee-Related Agreement as to which any of the Debtors is a party is an executory contract, such Employee-Related Agreement will be deemed automatically assumed on the Effective Date in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, subject to the Debtors' right to make future modifications pursuant to the terms of the Employee-Related Agreement, unless such Employee-Related Agreement (i) will have been previously assumed by the Debtors by Final Order of the Bankruptcy Court; (ii) is the subject of a motion to assume pending on or before the Effective Date; or (iii) is otherwise assumed pursuant to the terms of the Plan.

5.       *Cure of Defaults.*

Generally, if there has been a default (other than a default specified in section 365(b)(2) of the Bankruptcy Code) under an executory contract or unexpired lease, the debtor can assume the contract or lease only if the debtor cures the default. Accordingly, a condition to the assumption of an executory contract or unexpired lease is that any default under an executory contract or unexpired lease that is to be assumed will be cured in a manner consistent with the Bankruptcy Code as set forth below.

Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any executory contract or unexpired lease to be assumed pursuant to Sections 8.1, 8.2, 8.3 and 8.4 of the Plan, the Debtors will, within thirty days after the Confirmation Date, file and serve a pleading with the Bankruptcy Court listing the cure amounts of all executory contracts or unexpired leases to be assumed. The parties to such executory contracts or unexpired leases to be assumed by the Debtor will have fifteen days from service to object to the cure amounts listed by the Debtors. If there are any objections filed, and not otherwise resolved, the Bankruptcy Court will hold a hearing.

6.       *Rejection Claims.*

If an entity with a Claim for damages arising from the rejection of an executory contract or unexpired lease that is rejected pursuant to the Plan has not timely filed a proof of claim for such damages, that Claim will be barred and will not be enforceable against the Debtors unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtors on or before the applicable date as set forth in the Bar Date Order.

## C.      **Effect Of Confirmation**.

1.       *Discharge of Claims against the Debtors and Termination of Equity Interests in NWA Corp.*

Unless the Plan provides otherwise, confirmation of the Plan will discharge all existing Claims, of any kind, nature or description whatsoever against the Debtors, and terminate all Equity Interests in NWA Corp. All holders of existing Claims against and Equity Interests in NWA Corp. will

be enjoined from asserting against the Debtors, or any of their assets or properties, any other or further Claim or Equity Interest based upon any act or omission, transaction, or other activity that occurred prior to the Effective Date, whether or not such holder has filed a proof of claim or proof of equity interest. In addition, upon the Effective Date, each holder of a Claim against the Debtors or Equity Interest in NWA Corp. will be forever precluded and enjoined from prosecuting or asserting any discharged Claim against the Debtors or terminated Equity Interests in NWA Corp.

      2.    *Indemnification.*

      The Plan provides for the assumption and continuation any obligations of the Debtors pursuant to their corporate charters and bylaws or agreements entered into any time prior to the Effective Date, to indemnify past and current directors, officers, agents, trustees of employee benefit plans, and/or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such directors, officers, agents, trustees of employee benefit plans and/or employees, based upon any act or omission by such individuals shall not be discharged or impaired by confirmation of the Plan. Such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors pursuant to the Plan and shall continue as obligations of the Reorganized Debtors.

      3.    *Exculpation.*

      The Plan exculpates (a) the Debtors and the Reorganized Debtors, (b) the Creditors Committee, (c) any statutory committee, the members thereof appointed in the Chapter 11 Cases in their capacities as such, (d) the Rights Offering Sponsor, (e) the Ultimate Purchasers, (f) ALPA and the Northwest Airlines Master Executive Council of ALPA, (g) the IAM, (h) the ATSA, (i) NAMA, (j) the TWU, (k) AMFA (l) any Indenture Trustee, and (m) trustees of employee benefit plans, and each of their current or former members, officers, directors, committee members, employees, advisors, attorneys, accountants, actuaries, investment bankers, consultants, agents and other representatives from any liability to any holder of a Claim or Equity Interest for any act or omission (and in the case of any director, officer, agent or employee of any Debtor who was employed or otherwise serving in such capacity on the Confirmation Date, any claims against such Persons) in connection with, or arising out of, the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any of the Plan, or the property to be distributed under the Plan, the disclosure statement concerning the Plan, any contract, employee pension or other benefit plan, instrument, release or other agreement of document created, modified, amended, terminated or entered into in connection with either the Plan or any agreement between the Debtors and any Released Party, or any other act taken or omitted to be taken in connection with the Debtors' bankruptcy, except for willful misconduct or gross negligence.

**D.**    **Releases**.

      The Plan provides for a release, as of the Effective Date, of the current or former members, officers, directors, committee members, employees, advisors, attorneys, accountants, actuaries, investment bankers, consultants, agents and other representatives of the(a) the Debtors and the Reorganized Debtors, (b) the Creditors Committee, (c) any statutory committee, the members thereof appointed in the Chapter 11 Cases in their capacities as such, (d) the Rights Offering Sponsor, (e) the Ultimate Purchasers, (f) ALPA and the Northwest Airlines Master Executive Council of ALPA, (g) the IAM, (h) the ATSA, (i) NAMA, (j) the TWU, (k) AMFA (l) any Indenture Trustee, and (m) trustees of employee benefit plans from all claims against them in their capacity as representatives of the Debtors, the Creditors Committee, the Rights Offering Sponsor and Ultimate Purchasers, Indenture Trustees and the Debtors' unionized employees, except as otherwise provided in the Plan or the Confirmation Order.

Except with respect to distributions on account of Allowed Claims, if any, that any of the Released Parties may have against any of the Debtors' estates, or as otherwise provided in the Plan or Final Order of the Bankruptcy Court, the Plan provides that the Debtors shall release the Released Parties, and the Released Parties shall release each other, from any and all claims (as defined in section 101(5) of the Bankruptcy Code), obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that any Released Party is entitled to assert against any other Released Party, based in whole or in part upon any act or omission, transaction, agreement, event or occurrence taking place on or before the Effective Date in any way relating to any Debtor, the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any of the Plan, or the property to be distributed under the Plan, the disclosure statement concerning the Plan, any contract, employee pension or other benefit plan, instrument, release or other agreement or document created, modified, amended, terminated or entered into in connection with either the Plan or any agreement between the Debtors and any Released Party, or any other act taken or omitted to be taken in connection with the Debtors' bankruptcy, except for claims or causes of actions against any Released Party resulting from the willful misconduct or gross negligence of such Released Party.

Notwithstanding anything in the foregoing to the contrary, the Debtors reserve all rights and provide no release with respect to any claims or defenses relating to any litigation by or against any Indenture Trustee that remains pending as of the Effective Date.

As of the Effective Date, each defined benefit pension plan sponsored by Northwest Airlines shall remain in full force and effect. Notwithstanding anything to the contrary contained in the Plan or the Disclosure Statement, no Released Party shall be discharged, exculpated, or released on any claim, now existing or hereafter arising, under the Employee Retirement Income Security Act of 1974, as amended, with respect to any such plan, and there shall be no injunction against the assertion of any such claim.

The purpose of the release of the representatives of the other major constituencies in these cases, such as the Creditors Committee, the Rights Offering Sponsor, the Ultimate Purchasers, the Indenture Trustees and the representatives of the Debtors' unionized employees with whom they have collective bargaining agreements, is to protect individuals who have contributed to the restructuring process.

E.      **Management Equity Plan**.

As part of the Plan, NWA Corp. has proposed the adoption of the Management Equity Plan. The Management Equity Plan is a stock-based incentive compensation plan under which NWA Corp. may grant incentive and non-qualified stock options, stock appreciation rights, restricted stock and other stock-based awards to employees of NWA Corp. and its subsidiaries. The purpose of the Management Equity Plan is to motivate, attract and retain key employees of NWA Corp. and its subsidiaries, and to further the growth, development and financial success of NWA Corp. and its subsidiaries by aligning the personal interests of key employees through the ownership of shares and through other incentives, with those of NWA Corp. and NWA Corp.'s stockholders.

The Management Equity Plan will become effective as of the Effective Date and will remain in effect as long as any awards remain outstanding. No award may be granted under the Management Equity Plan after the tenth anniversary of the Effective Date, but the term of any award may extend beyond that date. The board of directors reserves the right to terminate the Management Equity Plan at any time without prejudice in any adverse way to the holders of any awards then outstanding. The aggregate number of shares of common stock of NWA Corp. reserved for issuance under the Management Equity Plan is 21,333,248, as may be adjusted for any stock dividend, stock split,

recapitalization, reorganization, merger or other subdivision or combination of the common stock. The number of shares reserved for issuance under the Management Equity Plan represents approximately 7.69% of the total number of shares expected to be distributed in connection with implementation of the Plan and reserved for issuance pursuant to the Plan. The shares to be reserved for issuance under the Management Equity Plan include the shares covered by awards expected to be granted in connection with NWA Corp.'s emergence from bankruptcy (described below) and an additional 2.2% of such shares to remain available for future awards granted pursuant to the Management Equity Plan. Participants awarded grants in connection with NWA Corp.'s emergence from bankruptcy will not be entitled to receive any additional grants for four years, except under special circumstances as may be determined by the board of directors of the Reorganized Debtors.

The Management Equity Plan will be included as a plan supplement, to be filed not less than 20 days prior to the voting deadline. The solicitation of votes on the Plan shall be deemed a solicitation of the holders of New Common Stock for approval of the Management Equity Plan. Entry of the order confirming the Plan shall constitute such approval, and the order confirming the Plan shall so provide. None of the members of senior management who will participate under the Management Equity Plan are receiving anything on account of their Equity Interests in the Debtors.

The Creditors Committee has approved the Management Equity Plan subject to disclosure of individual awards when made to the chief executive officer and the four most highly compensated named executive officers other than the chief executive officer. The Debtors have been advised by ALPA, the AFA and the IAM that each will oppose approval of the Management Equity Plan.

1.      *Awards Expected to be Granted upon Emergence from Bankruptcy.*

While no awards have yet been granted under the Management Equity Plan, the intention of the Compensation Committee of NWA Corp.'s Board of Directors (the "Compensation Committee") is to grant awards covering a total of 15,228,248 shares of common stock to approximately 5,200 salaried employees of Northwest Airlines in connection with NWA Corp.'s emergence from bankruptcy. This amount includes awards covering a total of 13,598,889 shares of common stock to be granted to approximately 400 salaried employees of Northwest Airlines at the director, managing director and officer levels, who are eligible to receive 4.9 percent of the equity in the reorganized company. Of the total of 13,598,889 shares of common stock, approximately 60% will be granted in the form of restricted stock, which will have a grant date value of approximately $232 million, assuming a $7.8 billion overall valuation for the company, and approximately 40% will be granted in the form of non-qualified stock options. The 13,598,889 share amount also includes awards covering a total of 1,629,359 shares of common stock to be granted to approximately 4,800 salaried employees below the director level, which will be granted in the form of restricted stock units.

The stock options will be granted in equal installments on the 10th, 20th and 30th trading days after the Effective Date and will have an option price equal to the fair market value of the common stock on the date of grant. All of the awards to be granted to salaried employees at the director, management director and officer level will vest or become exercisable in installments as follows: 12.5% of each award will vest on the date of grant of the award, 12.5% will vest six months thereafter and the remaining portion of the award will vest in installments of 18.75% each on the first, second, third and fourth anniversaries of the date of grant. In addition, the award agreement for these awards will provide that the employee will be obligated to re-pay to NWA Corp., in the event the employee terminates his or her employment with Northwest or the employee elects to retire within twelve months after the date of grant of the award, any proceeds received by the employee in connection with the vesting or exercise of the award. All of the awards to be granted to salaried employees below the director level will vest in full on the first anniversary of the Effective Date of the Plan.

2.    *Administration.*

The Management Equity Plan provides that it is to be administered by the Compensation Committee or such other committee of the board of directors (including, without limitation, the full board of directors) to which the board of directors has delegated power to act under or pursuant to the provisions of the Management Equity Plan.  The Compensation Committee has the authority to make awards under the Management Equity Plan and determine the terms and conditions of such awards, to interpret the Management Equity Plan and any awards granted under the Management Equity Plan, and to make all other determinations necessary or advisable for the administration of the Management Equity Plan.

3.    *Shares.*

If shares subject to an award under the Management Equity Plan cease to be subject to such award, or if shares awarded under the Management Equity Plan are forfeited, or otherwise terminate without a payment being made to the participant in the form of NWA Corp.'s common stock, such shares will again be available for future distribution under the Management Equity Plan.  In the event of certain changes in NWA Corp.'s structure affecting the common stock, the Compensation Committee may make appropriate adjustments in the number of shares which may be awarded, the number of shares covered by awards then outstanding under the Management Equity Plan and, where applicable, the option price of awards under the Management Equity Plan.

4.    *Participation.*

Awards may be made to any employee of NWA Corp. and its subsidiaries.  The number of participants participating in the Management Equity Plan will vary from year to year.  The Management Equity Plan imposes no limit on the number of participants, and does not specify the type or amount of awards, except that no participant may receive stock options, stock appreciation rights, restricted stock and/or other stock-based awards in any calendar year for an aggregate of more than 2,000,000 shares under the Management Equity Plan and no participant may receive performance-based awards not denominated in shares totaling more than $10,000,000 under the Management Equity Plan. Each award will be evidenced by a notice of award or other similar writing, which will specify the terms of the award, as determined by the Compensation Committee in its discretion, subject to the limitations of the Management Equity Plan.

5.    *Awards Under the Management Equity Plan.*

The Compensation Committee has the authority to grant the following type of awards under the Management Equity Plan: (1) stock options, (2) stock appreciation rights, (3) restricted stock, and/or (4) other stock-based awards including performance-based awards.  Each of these awards may be granted alone, in conjunction with, or in tandem with other awards under the Management Equity Plan and/or cash awards outside the Management Equity Plan.

(a)    *Stock Options.*

Incentive stock options and non-qualified stock options may be granted for such number of shares as the Compensation Committee shall determine, except that, as described above, no participant may be granted stock options, SARSs, restricted stock and/or other stock-based awards in any calendar year of NWA Corp. for more than one million shares.

Stock options are exercisable at such times and subject to such terms and conditions as the Compensation Committee determines and over a term (not in excess of 10 years) determined by the Compensation Committee.  The option price for any stock option is determined by the Compensation

Committee, but it may not be less than one hundred percent (100%) of the fair market value (as defined in the Management Equity Plan) of NWA Corp.'s common stock as of the date the stock option is granted. Payment of the option price may be in cash, or, to the extent authorized by the Compensation Committee, by delivery of common stock of NWA Corp. having a fair market value equal to the option price, delivery of irrevocable instructions to a financial institution pursuant to a cashless exercise program, or by the withholding of shares otherwise issuable upon exercise of the option.

(b)    *Stock Appreciation Rights.*

Stock appreciation rights ("SARs") may be granted independently of any stock option or in conjunction with all or part of a stock option and, if granted in tandem with a stock option, will be exercisable only when the underlying stock option is exercisable. Once a tandem SAR has been exercised, the portion of the stock option underlying the SAR terminates. SARs may not be exercisable later than 10 years after the date of grant. Upon exercise of an SAR, the participant will receive, at the discretion of the Compensation Committee, cash, common stock or a combination thereof, in an amount equal to the excess of the then fair market value of the stock over the option price, multiplied by the number of SARs being exercised.

(c)    *Restricted Stock.*

Restricted stock may be conditioned upon the attainment of specific performance goals or such other factors as the Compensation Committee may determine. The Compensation Committee determines the period during which restricted stock is subject to forfeiture. During the restriction period, the participant may not sell, transfer, pledge or assign the restricted stock.

(d)    *Other Stock-Based Awards.*

The Compensation Committee may also grant other types of awards that are valued, in whole or in part, by reference to or otherwise based on NWA Corp.'s common stock. Such awards will be made upon terms and conditions as the Compensation Committee may in its discretion provide.

(e)    *Performance-Based Awards.*

Certain awards under the Management Equity Plan may be granted in a manner that is deductible by NWA Corp. under Section 162(m) of the Internal Revenue Code ("Performance-Based Awards"). Such Performance-Based Awards will be based upon one or more of the following criteria: consolidated earnings before or after taxes (including earnings before interest, taxes, depreciation and amortization), net income, operating income, earnings per share, book value per share, return on shareholders' equity, expense management, return on investment, improvements in capital structure, profitability of an identifiable business unit or product, maintenance or improvement of profit margins, stock price, market share, revenues or sales, costs, cash flow, working capital, return on assets and total shareholder return, as well as other financial goals. With respect to Performance-Based Awards, (i) the Compensation Committee will establish in writing the objective performance-based goals applicable to a given period of service no later than 90 days after the commencement of such period of service (but in no event after 25% of such period has elapsed) and (ii) no awards will be payable to any participant for a given period of service until the Compensation Committee certifies that the objective performance goals (and any other material terms) applicable to such period have been satisfied.

6.    *Non-Transferability.*

Unless otherwise provided by the Compensation Committee, awards under the Management Equity Plan are non-transferable during the lifetime of the participants.

7.      *Termination of Employment; Acceleration.*

The Management Equity Plan provides that the Compensation Committee shall make provision for the exercisability of options and SARs and the disposition of restricted stock awards and other stock-based awards in the event of death, disability, retirement or other termination of employment of the participant and these provisions will be set forth in the agreement or other award documentation relating to awards granted under the Management Equity Plan.  The Compensation Committee may amend any stock option, SAR, restricted stock award or other stock based award to accelerate the exercise or vesting date.  The Management Equity Plan provides that, upon certain circumstances involving the termination of employment by NWA Corp., its subsidiary or affiliate of a participant in connection with certain defined change of control events, unvested stock options and SARs shall become immediately exercisable and all restrictions applicable to other stock awards shall be deemed to have been satisfied.

8.      *Amendment.*

The board of directors may, from time to time, in its discretion, amend the Management Equity Plan, in whole or in part, but no such amendment will be made which adversely affects the rights of a participant under any outstanding award without the consent of the affected participants, and no such amendment will be effective without the approval of the stockholders of NWA Corp. if such amendment seeks to increase the maximum number of shares as to which awards may be granted under the Management Equity Plan or change the maximum number of shares for which awards may be granted to any participant except in accordance with the provisions of the Management Equity Plan.

**F.      Non-Contract Employee Compensation Program.**

The Debtors shall adopt the Non-Contract Employee Compensation Program.  The solicitation of votes on the Plan shall be deemed a solicitation of the holders of New Common Stock for approval of the Non-Contract Employee Compensation Program.  Entry of the order confirming the Plan shall constitute such approval, and the order confirming the Plan shall so provide.

None of the members of senior management who will participate under the Management Equity Plan are participating in the Non-Contract Employee Compensation Program.  Pursuant to Section 12.1 of the Plan, the Management Claim will be withdrawn.

The Non-Contract Employee Compensation Program will consist, in total, of an award of $77.4 million of which 40% will be paid in cash and 60% in stock.  With regard to the cash portion of the program, amounts are payable upon emergence to employees below the director level.  Employees who leave within 12 months of emergence will be required to repay such amounts.  In addition, the 1,629,359 shares of New Common Stock to be issued under the Non-Contract Employee Compensation Program will in actuality be issued under the Management Equity Plan described above.  These shares will be restricted stock units with one year vesting issued at emergence for domestic employee or phantom units with one year vesting for international employees.

The amounts to be paid under the Non-Contract Employee Compensation Program were calculated by taking into account (a) domestic and international non-contract employees' compensation and benefit reductions agreed to as part of the 2004 Bridge Agreement reached between the Debtors and their pilots union, the Airline Pilots Association, International, and (b) domestic and international non-contract employees' compensation and benefit reductions agreed to as part of the section 1113 negotiation process in these Chapter 11 Cases, calculated in the same manner as the claims granted to the unions who agreed to and ratified modified collective bargaining agreements.  As part of this calculation, the Debtors excluded all officer, managing director and director level employees.  In order to reach the final dollar

amount, the Debtors then considered the estimated rate of recovery such parties would have received under the Plan, and reduced the calculated amount to account for such percentage.

The methodology for determining individual awards will be approved by the Compensation Committee.

## G.    Committees.

Effective on the Effective Date, the Creditors Committee, the Retiree Committee and any other committee appointed in the Chapter 11 Cases will dissolve automatically, whereupon their members, professionals, and agents will be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to applications for Professional Claims or reimbursement of expenses incurred as a member of the Creditors Committee or the Retiree Committee, duties under the Settlement Procedures Order, and any motions or other actions seeking enforcement or implementation of the provisions of this Plan or the Confirmation Order or pending appeals of Final Orders entered in the Chapter 11 Cases.

On the Effective Date, there shall be formed a Post-Effective Date Committee with its duties limited to the oversight of certain actions of the Reorganized Debtors, which actions shall remain the sole responsibility of the Reorganized Debtors, including: (a) overseeing the General Unsecured Claims' reconciliation and settlement process conducted by or on behalf of the Reorganized Debtors pursuant to the Settlement Procedures Order; (b) overseeing (i) the establishment (including the determination of the amount of New Common Stock to be withheld) and (ii) the maintenance of the Distribution Reserve; (c) overseeing the distributions to the holders of General Unsecured Claims under this Plan; (d) appearing before and being heard by the Bankruptcy Court and other Courts of competent jurisdiction in connection with the above limited duties; and (e) such other matters as may be agreed upon between the Reorganized Debtors and the Post-Effective Date Committee or specified in this Plan. The Post-Effective Date Committee shall consist of not less than three nor more than five members to be appointed by the Creditors' Committee and may adopt by-laws governing its conduct. For so long as the claims reconciliation process shall continue, the Reorganized Debtors shall make regular reports to the Post-Effective Date Committee as and when the Reorganized Debtors and the Post-Effective Date Committee may reasonably agree upon. The Post-Effective Date Committee may employ, without further order of the Court, professionals to assist it in carrying out its duties as limited above, including any professionals retained in these Reorganization Cases, and the Reorganized Debtors shall pay the reasonable costs and expenses of the Post-Effective Date Committee, including reasonable professional fees, in the ordinary course without further order of the Court. In the event that, on the Effective Date, an objection to any Claim by the Creditors Committee is pending, the Post-Effective Date Committee shall have the right to continue prosecution of such objection.

## H.    Miscellaneous Provisions.

The Plan contains provisions relating to the cancellations of existing securities, corporate actions, the disbursing agent, delivery of distributions, manner of payment, vesting of assets, binding effect, terms of injunctions or stays, injunction against interference with the Plan, payment of statutory fees, retiree benefits, dissolution of the Creditors Committee and the Retiree Committee (at an appropriate time after the Effective Date), recognition of guaranty rights, substantial consummation, compliance with tax requirements, severability, revocation and amendment of the Plan, governing law, and timing. For more information regarding these items, see the Plan attached hereto as Exhibit A.

**X.**

**Certain Factors To Be Considered**

**A.      Certain Bankruptcy Considerations**.

        Although the Debtors believe that the Plan satisfies all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes.  In addition, although each of the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.

        The Plan does not provide for any distribution to Classes 1H and I.  The Bankruptcy Code conclusively deems these Classes to have rejected the Plan.  Notwithstanding the fact that these Classes are deemed to have rejected the Plan, the Bankruptcy Court may confirm the Plan if at least one impaired Class votes to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such Class).  Thus, for the Plan to be confirmed, one of the impaired Classes must vote to accept the Plan.  As to each impaired Class that has not accepted the Plan, the Plan may be confirmed if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to these Classes.  Each of the Debtors believes that the Plan satisfies these requirements.  For more information, see section XI below.

**B.      Risks Relating to the Plan Securities**.

        1.      *Variances from Projections.*

        The projections included herein are "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Factors that could cause actual results to differ materially include, but are not limited to, the ability of Northwest to continue as a going concern, the ability of Northwest to obtain and maintain any necessary financing for operations and other purposes, the ability of Northwest to maintain adequate liquidity, the ability of Northwest to absorb escalating fuel costs, the ability of Northwest to obtain and maintain normal terms with vendors and service providers, Northwest's ability to maintain contracts that are critical to its operations, the ability of Northwest to realize assets and satisfy liabilities without substantial adjustments and/or changes in ownership, the ability of Northwest to operate pursuant to the terms of its financing facilities (particularly the related financial covenants), the ability of Northwest to attract, motivate and/or retain key executives and associates, the future level of air travel demand, Northwest's future passenger traffic and yields, the airline industry pricing environment, increased costs for security, the cost and availability of aviation insurance coverage and war risk coverage, the general economic condition of the United States and other regions of the world, the price and availability of jet fuel, the war in Iraq, the possibility of additional terrorist attacks or the fear of such attacks, concerns about SARS, Avian flu or other influenza or contagious illnesses, labor strikes, work disruptions, labor negotiations both at other carriers and Northwest , low cost carrier expansion, capacity decisions of other carriers, actions of the U.S. and foreign governments, foreign currency exchange rate fluctuations, inflation and other factors discussed herein.

        2.      *Significant Holders.*

        Under the Plan, certain holders of Allowed Claims may receive distributions of shares in Reorganized NWA Corp. representing in excess of five percent (5%) of the outstanding shares of New Common Stock.  If holders of a significant number of shares of Reorganized NWA Corp. were to act as a

group, such holders may be in a position to control the outcome of actions requiring shareholder approval, including the election of directors.

Further, the possibility that one or more of the holders of a number of shares of Reorganized NWA Corp. may determine to sell all or a large portion of their shares in a short period of time may adversely affect the market price of the stock of Reorganized NWA Corp.

    3.    *Lack of Trading Market.*

The stock issued under the Plan may not be listed on any exchange. There can be no assurance that an active trading market for the New Common Stock will develop. Accordingly, no assurance can be given that a holder of New Common Stock will be able to sell such securities in the future or as to the price at which any such sale may occur. If such markets were to exist, such securities could trade at prices higher or lower than the value ascribed to such securities herein depending upon many factors, including the prevailing interest rates, markets for similar securities, general economic and industry conditions, and the performance of, and investor expectations for, Reorganized NWA Corp.

    4.    *Dividend Policies.*

Because all of the respective Debtors' Cash flows will be used in the foreseeable future to make payments under the DIP Credit and Exit Facility Agreement and the restructured Postpetition Aircraft Purchase and Lease Obligations as provided for in Section 2.2 of the Plan, Reorganized NWA Corp. does not anticipate paying dividends on the New Common Stock in the near future.

    5.    *Restrictions on Transfer.*

Holders of securities issued pursuant to the Plan who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code, including holders who are deemed to be "affiliates" or "control persons" within the meaning of the Securities Act, will be unable freely to transfer or to sell their securities except pursuant to (a) "ordinary trading transactions" by a holder that is not an "issuer" within the meaning of section 1145(b), (b) an effective registration of such securities under the Securities Act and under equivalent state securities or "blue sky" laws, or (c) pursuant to the provisions of Rule 144 and Rule 144A under the Securities Act or another available exemption from registration requirements. For a more detailed description of these matters, see section V.I., above.

**C.    Risks Associated with the Businesses and the Airline Industry.**

    1.    *The airline industry is intensely competitive.*

The airline industry is intensely competitive. Northwest's competitors include other major domestic airlines as well as foreign, regional and new entrant airlines, some of which have more financial resources and/or lower cost structures than ours. In most of the Debtors' markets we compete with at least one of these carriers. Northwest's revenues are sensitive to numerous factors, and the actions of other carriers in the areas of pricing, scheduling and promotions can have a substantial adverse impact on our revenues.

Industry revenues are also impacted by growth of low cost airlines and the use of internet travel Web sites. Using the advantage of low unit costs, driven in large part by lower labor costs, low cost carriers and carriers who have achieved lower labor costs are able to operate profitably while offering substantially lower fares. Internet travel Web sites have driven significant distribution cost savings for airlines, but have also allowed consumers to become more efficient at finding lower fare alternatives than in the past by providing them with more powerful pricing information. Such factors become even more

significant in periods when the industry experiences large losses, as airlines under financial stress, or in bankruptcy, may institute pricing structures intended to protect market share, or raise cash quickly, irrespective of the impact to long-term profitability.

Global events have also significantly impacted airline industry revenue.  The war in Iraq depressed air travel, particularly on international routes.  The outbreak of Severe Acute Respiratory Syndrome ("SARS") sensitized passengers to the potential for air travel to facilitate the spread of contagious diseases.  An escalation of the war in Iraq, or another outbreak of SARS, Avian flu, or other influenza-type illness, if it were to persist for an extended period, could again materially affect the airline industry and Northwest by reducing revenues and impacting travel behavior.

2.    *Approval of the Northwest's Plan of Reorganization is at risk.*

In order to exit chapter 11 successfully, Northwest must propose, and obtain confirmation by the Bankruptcy Court of, a plan of reorganization that satisfies the requirements of the Bankruptcy Code.  The Plan must be voted on by holders of impaired claims, and must satisfy certain requirements of the Bankruptcy Code and, as noted above, be confirmed by the Bankruptcy Court.  Although the Debtors have filed their Plan for emergence from chapter 11, there can be no assurance that the Plan will be approved by claim holders or confirmed by the Bankruptcy Court.

3.    *A strike or other form of self-help by the flight attendants could have a material adverse effect on Northwest.*

Labor has always been a critical issue for major airlines, including Northwest. Approximately 85% of our employees are represented by unions.  Salary and benefit costs are our second largest operating expense and reducing these expenses by approximately $1.4 billion was a major goal of our restructuring plan.  In connection with its restructuring, Northwest has been successful in implementing new labor agreements with the majority of its labor groups including the Air Line Pilots Association, the International Association of Machinists and Aerospace Workers , the Aircraft Technical Support Association, the Transport Workers Union of America, the Northwest Airlines Meteorologists Association, and the Aircraft Mechanics Fraternal Association.

Northwest has not reached a consensual agreement with respect to its flight attendants, represented by Association of Flight Attendants-Communication Workers of America ("AFA-CWA"). For additional labor discussion, including background on the Company's collective bargaining negotiations with its flight attendants and legal actions taken by the flight attendants, please see section IV.  In accordance with the Bankruptcy Court's previous authorization, the Debtors' implemented new contract terms and conditions for its flight attendants.  Northwest is currently in mediated negotiations with the AFA-CWA and representatives of the National Mediation Board ("NMB").  The AFA-CWA has requested that it be released from further negotiations by the NMB; to date, the NMB has not granted this request.

Under the Railway Labor Act, an amendable labor contract continues in effect while the parties negotiate a new contract.  In addition to direct contract negotiations, the RLA also provides for mediation, potential arbitration of unresolved issues and a 30-day "cooling off" period after the end of which either party can resort to self-help.  The self-help remedies include, but are not limited to, a strike by the members of the labor union and the imposition of proposed contract amendments and in the event of a strike, the hiring of replacement workers by Northwest.

Northwest cannot predict at this time the outcome of their negotiations with the AFA-CWA or when the AFA-CWA may be released by the NMB.  A strike or other form of self-help by the flight attendants could have a material adverse effect on Northwest.

4.      *Northwest's degree of leverage may limit its financial and operating activities.*

The Debtors will have significant indebtedness even after the Plan is consummated. Further, their historical capital requirements have been significant and their future capital requirements could vary significantly and may be affected by general economic conditions, industry trends, performance, and many other factors that are not within their control. The Debtors cannot ensure that they will be able to obtain financing in the future. Even if the Plan is approved and consummated, the Debtors cannot ensure that they will not experience losses in the future. Their profitability and ability to generate cash flow will likely depend upon their ability to implement successfully their business strategy and meet or exceed the results forecasted in the Projections. However, the Debtors cannot ensure that they will be able to accomplish these results.

5.      *The Covenants in the Debtors' Exit Facility may restrict the Reorganized Debtors' activities and will require them to satisfy certain financial tests.*

The Debtors' Exit Facility will contain a number of covenants and other provisions that may restrict the Reorganized Debtors' ability to engage in various financing transactions and operating activities. The Exit Facility also will require the Reorganized Debtors to satisfy certain financial tests. The ability of the Reorganized Debtors to meet these financial covenants may be affected by events beyond their control. If the Reorganized Debtors default under any of these requirements, the lenders could declare all outstanding borrowings, accrued interest and fees to be due and payable. If that were to occur, there can be no assurance that the Reorganized Debtors would have sufficient liquidity to repay or refinance this indebtedness or any of their other debt.

6.      *Changes in government regulations could increase our operating costs and limit Northwest's ability to conduct its business.*

Airlines are subject to extensive regulatory requirements in the U.S. and internationally. In the last several years, Congress has passed laws, and the FAA has issued a number of maintenance directives and other operating regulations, that impose substantial costs on airlines. Additional laws, regulations, taxes and airport charges have been proposed from time to time that could significantly increase the cost of airline operations or reduce revenues. The ability of U.S. carriers to operate international routes is subject to change because the applicable arrangements between the U.S. and foreign governments may be amended from time to time, or because appropriate landing slots or facilities may not be available. Northwest cannot give assurance that laws or regulations enacted in the future will not adversely affect the industry.

7.      *Northwest is vulnerable to increases in aircraft fuel costs.*

Because fuel costs are a significant portion of our operating costs, substantial changes in fuel costs would materially affect our operating results. Fuel prices continue to be susceptible to, among other factors, political unrest in various parts of the world, Organization of Petroleum Exporting Countries ("OPEC") policy, the rapid growth of economies in China and India, the levels of inventory carried by industries, the amounts of reserves built by governments, disruptions to production and refining facilities and weather. In 2005 Hurricane Katrina and Hurricane Rita caused widespread disruption to oil production, refinery operations and pipeline capacity in portions of the U.S. Gulf Coast. As a result of these disruptions, the price of jet fuel increased significantly and the availability of jet fuel supplies were diminished during the fall of 2005. These and other factors that impact the global supply and demand for aircraft fuel may affect our financial performance due to its high sensitivity to fuel prices. A hypothetical 10% increase in the December 31, 2006 cost per gallon of fuel, assuming projected 2007 mainline and regional aircraft fuel usage, would result in an increase to aircraft fuel expenses of approximately $357 million in 2007. The Debtors' mainline fuel expense per available seat mile

increased from $2.99 per gallon to $3.43 per gallon, approximately 15%, from 2005 to 2006.  From time to time, the Debtors hedge future fuel purchases to protect against potential spikes in price.  However, these hedging strategies may not always be effective and can result in losses depending on price changes.  As of January 31, 2007, Northwest had hedged approximately 40% of its estimated 2007 fuel requirements.

8.    *Northwest's insurance costs have increased substantially and further increases could harm our business.*

Following September 11, 2001, aviation insurers significantly increased airline insurance premiums and reduced the maximum amount of coverage available to airlines for certain types of claims.  Northwest's total aviation and property insurance expenses were $48 million higher in 2006 than in 2000.  As a result of the Air Transportation Safety and System Stabilization Act ("Airline Stabilization Act"), the U.S. Homeland Security Act and the U.S. Emergency Wartime Supplemental Appropriations Act, the U.S. federal government assumes most war risk coverage.  However, following multiple extensions, this coverage is scheduled to expire on August 31, 2007.  While the government may again extend the period that it provides excess war risk coverage, there is no assurance that this will occur, or if it does, how long the extension will last or at what cost the coverage will be provided.  Should the government stop providing excess war risk coverage to the airline industry, it is expected that the premiums charged by aviation insurers for this coverage would be substantially higher than the premiums currently charged by the government and the maximum amount of coverage available would be reduced from that currently made available by the government.  Aviation insurers could further increase insurance premiums, and the availability of coverage could be reduced, in the event of a new terrorist attack or other events adversely affecting the airline industry.  Significant increases in insurance premiums could negatively impact Northwest's financial condition and results of operations.

9.    *Northwest is exposed to foreign currency exchange rate fluctuations.*

Northwest conducts a significant portion of its operations in foreign locations.  As a result, Northwest has operating revenues and, to a lesser extent, operating expenses, as well as assets and liabilities, denominated in foreign currencies, principally the Japanese yen.  Fluctuations in foreign currencies can significantly affect our operating performance and the value of our assets and liabilities located outside of the United States.  From time to time, Northwest uses financial instruments to hedge our exposure to the Japanese yen.  However, these hedging strategies may not always be effective.  As of December 31, 2006, Northwest has no forward contracts outstanding related to its anticipated 2007 yen-denominated sales.

10.    *Northwest is exposed to changes in interest rates.*

Northwest had $6.9 billion of debt and capital lease obligations that were accruing interest as of December 31, 2006 and $2.5 billion of total balance sheet cash, cash equivalents, and short term investments as of December 31, 2006.  Of this indebtedness, 67% bears interest at floating rates.  An increase in interest rates would have an overall negative impact on our earnings as increased interest expense would only be partially offset by increased interest income.

11.    *Due to industry seasonality, operating results for any interim periods are not necessarily indicative of those for the entire year.*

The airline industry is seasonal in nature.  Due to seasonal fluctuations, operating results for any interim period are not necessarily indicative of those for the entire year.  Northwest's second and third quarter operating results have historically been more favorable due to increased leisure travel on domestic and international routes during the summer months.

## XI.

### Confirmation Of The Plan

**A.      Confirmation Hearing**.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization.  The Confirmation Hearing is scheduled for 11:00 .a.m. (prevailing Eastern Time), on May 16, 2007 before the Honorable Judge Allan L. Gropper, United States Bankruptcy Judge, in Room 617, of the United States Bankruptcy Court, Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Any objections to the Plan must be in writing, and state the name and address of the objecting party and the nature of the claim or interest of such party, provide a concise statement of the basis for such objection or proposed modification, including, if applicable: the specific page number of the Plan to which the objection refers, the specific language proposed to be deleted, if a deletion is sought, a draft of the precise language that the objecting party proposes be added or substituted, and the reasons and statutory or other authority therefor and be filed, together with proof of service, and shall be served and filed, together with proof of service, with the Court so that they are received no later than 4:00 p.m., prevailing Eastern Time, on May 7, 2007 by 4:00 p.m. (a) the Clerk of the Court, One Bowling Green, New York, New York 10004-1408; (b) Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, New York 10281, Attention: Bruce R. Zirinsky, Esq. (Facsimile: 212-504-6666), counsel to the Debtors; (c) Otterbourg, Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, New York 10169, Attention: Scott L. Hazan, Esq. (Facsimile: 212- 682-6104), counsel to the Official Committee of Unsecured Creditors; (d) Jenner & Block LLP, One IBM Plaza, Chicago, Illinois 60611-7603, Attention: Catherine L. Steege, Esq. counsel to the Retiree Committee; (e) Latham & Watkins LLP, Sears Tower, Suite 5800, 223 South Wacker Drive, Chicago, Illinois 60606, Attention: Joe Athanas, Esq. (Facsimile: 312-993-9796), counsel to the Debtors' postpetition lenders; and (f) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attention: Brian Masumoto, Esq.

Objections to confirmation of the Plan are governed by Rule 9014 of the Federal Rules of Bankruptcy Procedure.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**B.      General Requirements of Section 1129**.

At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

1.      The Plan complies with the applicable provisions of the Bankruptcy Code.

2.      The Debtors have complied with the applicable provisions of the Bankruptcy Code.

3.      The Plan has been proposed in good faith and not by any means proscribed by law.

4.      Any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

5.      The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Debtors, affiliates of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider.

6.      With respect to each Class of Claims or Equity Interests, each holder of an impaired Claim or impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  See discussion of "Best Interests Test," below.

7.      Except to the extent that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each Class of Claims or Equity Interests has either accepted the Plan or is not impaired under the Plan.  Class IH (Preferred Stock Interests in NWA Corp.) and Class 1I (Common Stock Interests in NWA Corp.) are deemed to have rejected the Plan and thus the Plan can be confirmed only if the requirements of section 1129(b) of the Bankruptcy Code are met.

8.      Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims and Priority Non-Tax Claims will be paid in full on the Effective Date and that Priority Tax Claims will receive on account of such Claims deferred Cash payments, over a period not exceeding six years after the date of assessment of such Claims, of a value, as of the Effective Date, equal to the Allowed amount of such Claims.

9.      At least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

10.     Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.  See discussion of "Feasibility," below.

11.     The Plan provides for the continuation after the Effective Date of payment of all retiree benefits (as defined in section 1114 of the Bankruptcy Code), at the level

established pursuant to subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

## C.    Best Interests Tests.

As described above, the Bankruptcy Code requires that each holder of an impaired Claim or Equity Interest either (i) accept the Plan; or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the applicable Debtor was liquidated under chapter 7 of the Bankruptcy Code.

The Debtors' liquidation analysis is attached hereto as Exhibit B.  When the results of the liquidation analysis are compared to the distributions expected under the Plan, as set forth in VII.C., above, it is clear that every creditor and interest holder will receive at least as much under the Plan as such creditor or interest holder would in a chapter 7 liquidation.

## D.    Feasibility.

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors.  In connection with the development of the Plan and for the purpose of determining whether the Plan satisfies this feasibility standard, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared Projections, as described above.  Based on such Projections, the Debtors believe that the Reorganized Debtors will be able to make all payments required pursuant to the Plan and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

## E.    Section 1129(b).

The Bankruptcy Court may confirm a plan of reorganization over the rejection or deemed rejection of the plan by a class of claims or equity interests if the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

1.    *No Unfair Discrimination.*

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

2.    *Fair and Equitable Test.*

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards, depending on the type of claims or equity interests in such class:

- *Secured Creditors.*  Each holder of an impaired secured claim either (i) retains its liens on the property, to the extent of the amount of its allowed secured claim and receives deferred Cash payments having a value, as of the effective date, of at least the amount of such allowed claim; (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale; or (iii) receives the "indubitable equivalent" of its allowed secured claim.

- *Unsecured Creditors.* Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim; or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- *Equity Interests.* Either (i) each equity interest holder receives or retains under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such equity interest; and (b) the value of the equity interest; or (ii) the holders of equity interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan.

The Debtors believe that the Plan will satisfy the "fair and equitable" requirement notwithstanding that Classes 1H and 1I are deemed to reject the Plan because no class that is junior to such Classes will receive or retain any property on account of the Claims or Equity Interests in such Class.

## XII.

### Certain U.S. Federal Income Tax Consequences Of The Plan

The following discussion summarizes certain significant U.S. federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of Claims. This summary is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder, judicial decisions, and published rules and pronouncements of the Internal Revenue Service ("IRS") all as in effect on the date hereof. Due to the unsettled nature of several of the tax issues presented by the Plan, the differences among creditors in the nature of their Claims, and the possibility that future events, including amendments to the Tax Code, regulations thereunder or court decisions, could change the federal income tax consequences of the transactions, the tax consequences described below are only general descriptions that are subject to significant uncertainties. This discussion does not address the tax treatment of certain persons that may be subject to special treatment under the Tax Code (for example, foreign taxpayers, government authorities or agencies, broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, including qualified plans, persons holding an equity interest as part of an integrated constructive sale or straddle, and investors in pass-through entities), or any aspect of state, local or foreign taxation. In addition, this discussion does not address the U.S. federal income tax consequences to holders whose Claims are entitled to reinstatement or are otherwise unimpaired under the Plan (for example, holders of Priority Non-Tax Claims), holders whose Claims or equity interests are extinguished without a distribution (holders of Preferred Stock Interests and Common Stock Interests), or to secondary purchasers of New Common Stock or Subscription Rights. No opinion has been requested and the Debtors have not sought, nor do they intend to seek, a ruling from the IRS regarding the tax consequences of the Plan. Consequently, there can be no assurance that the treatment set forth below will be accepted by the IRS.

**Accordingly, the following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim. All holders of Claims are urged to consult their own tax advisors for the federal, state, local and other tax consequences applicable to them under the Plan.**

**<u>IRS Circular 230 Notice</u>: To ensure compliance with IRS Circular 230, holders of Claims are hereby notified that: (i) any discussion of federal tax issues contained or referred to in**

this disclosure statement is not intended or written to be used, and cannot be used, by holders of Claims for the purpose of avoiding penalties that may be imposed on them under federal, state or local tax laws, (ii) such discussion is written in connection with the promotion or marketing of the transactions or matters discussed herein, and (iii) holders of Claims should seek advice based on their particular circumstances from an independent tax advisor.

## A.    Tax Consequences to the Debtors.

NWA Corp. and its direct and indirect domestic corporate subsidiaries (the "NWA Group") file a U.S. consolidated federal income tax return. The NWA Group reported in its most recent Form 10-K, consolidated NOL carryforwards for federal income tax purposes of approximately $3.3 billion as of December 31, 2006. A substantial portion of these NOL carryforwards are attributable to Northwest Airlines. The amount of the NWA Group's losses and NOL carryforwards, and the potential application of any limitations with respect to such losses and NOL carryforwards, remain subject to examination by the IRS.

As discussed below, in connection with the implementation of the Plan, the amount of the NWA Group's NOL carryforwards may be significantly reduced, and the tax basis of NWA Group assets may be reduced. In addition, the NWA Group's subsequent utilization of any remaining losses and NOL carryforwards, and possibly certain other tax attributes, generally may be restricted following the Effective Date.

1.    *The Cancellation of Debt.*

As a result of the discharge of Claims pursuant to the Plan, the Debtors will realize substantial cancellation of debt income ("COD"). COD is the amount by which the discharged indebtedness (reduced by any unamortized discount) exceeds any consideration given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the canceled debt would have given rise to a tax deduction). A debtor will not, however, be required to include any COD in its gross income if the debtor is under the jurisdiction of a court in a Title 11 bankruptcy proceeding and the discharge of debt occurs pursuant to such proceeding. Instead, the Tax Code provides that a debtor in a bankruptcy proceeding must, subject to certain limitations, reduce its tax attributes (including, but not limited to, NOL carryforwards, current year NOLs, tax credits, and tax basis in assets) by the amount of the COD. To the extent the amount of COD exceeds the tax attributes available for reduction, any remaining COD is discharged with no further tax cost to the debtor.

In the context of a consolidated group of corporations, current law generally provides for a complex ordering mechanic in determining how the tax attributes of one member can be reduced by the COD of another member. Any reduction in tax attributes does not occur until after the determination of tax liability for the taxable year or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the debt is discharged. The NWA Group is entitled to elect to reduce the basis of depreciable property prior to any reduction in its NOLs or other tax attributes if such an election is advantageous.

The extent of such COD and resulting tax attribute reduction will depend, in part, on the value of the New Common Stock distributed. The extent to which NOLs (and certain tax credits) survive tax attribute reduction (and the extent of any basis reduction and potentially the identity of the assets whose basis is reduced) will depend upon the manner of applying the attribute reduction rules in the context of a consolidated group. In addition, to the extent the settlement of Claims generates tax deductions, the reduction of federal NOLs may be limited. The NWA Group anticipates that, taking these

factors into account, it will have substantial federal NOLs available following emergence, subject to the limitations discussed below.

To the extent that recourse debt is satisfied with the underlying collateral property, generally the debtor recognizes gain from the disposition of property based on an amount realized equal to the fair market value of such property over the debtor's basis in such property, with any balance of the debt in excess of the fair market value of the property (less any other consideration paid to discharge such debt) treated as COD. By contrast, to the extent that nonrecourse debt is satisfied with the underlying collateral property, generally the debtor recognizes gain from the disposition of property based on an amount realized equal to the nonrecourse debt balance over the debtor's tax basis in such property, as opposed to COD. The NWA Group is in negotiations with certain aircraft lessors and/or mortgagees with respect to the disposition or use of such aircraft. The NWA Group anticipates that, upon the disposition of certain aircraft, they will recognize gain that is taxable as ordinary income for U.S. federal income tax purposes. The NWA Group expects that it will have adequate NOLs to offset any such taxable gain.

2.    *Limitations on Loss Carryforwards and Other Tax Benefits.*

Following the implementation of the Plan, any remaining NOL and tax credit carryforwards and, possibly, certain other tax attributes of the NWA Group allocable to periods prior to the Effective Date (collectively, "pre-change losses") will be reduced or subject to limitation under section 382 of the Tax Code as a result of the change in ownership of Reorganized NWA Corp. Under section 382, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation. Such limitation also may apply to certain losses or deductions that are built-in (that is, attributable to periods prior to the Effective Date but not yet taken into account for federal income tax purposes) as of the date of the ownership change and that are subsequently recognized. The issuance of New Common Stock pursuant to the Plan will constitute an ownership change of Reorganized NWA Corp. for purposes of section 382.

(a)    *General Section 382 Limitation.*

In general, the annual limitation on the use of pre-change NOLs in any "post-change year" is equal to the product of (i) the fair market value of the loss corporation's outstanding stock (or in the case of a consolidated group, the common parent) immediately before the ownership change, and (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (4.18% for ownership changes occurring in March, 2007). As described in more detail below, if a loss corporation has a net unrealized built-in gain (generally, the excess, if any, of the aggregate fair market value of the corporation's assets over the aggregate tax basis of such assets), the annual limitation is increased by the amount of such built-in gains which are recognized during the five-year period following the ownership change. In addition, section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year.

In general, an ownership change occurs when the percentage of the corporation's stock owned by certain "5% shareholders" increases by more than 50 percentage points over the lowest percentage owned at any time during the applicable "testing period" (generally, the shorter of: (i) the three-year period preceding the testing date, or (ii) the period of time since the most recent ownership change of the corporation). A 5% shareholder for these purposes includes, generally, an individual or entity that directly or indirectly owns 5% or more of a corporation's stock during the relevant period, and may include one or more groups of shareholders that, in the aggregate, own less than 5% of the value of the corporation's stock. Under applicable Treasury regulations, an ownership change with respect to an affiliated group of corporations filing a consolidated return that have consolidated NOLs is generally

measured by changes in stock ownership of the parent corporation of the group. As noted, the issuance of the New Common Stock pursuant to the Plan will constitute an ownership change of the Reorganized NWA Corp., the common parent of the NWA Group, for purposes of section 382.

(b)    *Built-In Gains and Losses.*

Under section 382 of the Tax Code, if a loss corporation (or consolidated group) has a net unrealized built-in gain (generally, the excess, if any, of the aggregate fair market value of the corporation's assets over the aggregate tax basis of such assets on the ownership change date) at the time of an ownership change, any built-in gains recognized during the following five years (up to the amount of the original net built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its otherwise limited pre-change losses against such built-in gain income in addition to its regular annual allowance. Conversely, if a loss corporation (or consolidated group) has a net unrealized built-in loss (generally, the excess, if any, of the aggregate tax basis of the corporation's assets over the aggregate fair market value of such assets on the ownership change date) at the time of an ownership change (taking into account most assets and items of "built-in" income and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net built-in loss) generally would be treated as part of the pre-change losses that are subject to the annual limitation. Although the rule applicable to net unrealized built-in losses generally applies to consolidated groups on a consolidated basis, certain corporations that joined the consolidated group within the preceding five years may not be taken into account in the group computation of net unrealized built-in loss. Such corporations would nevertheless still be taken into account in determining whether the consolidated group has a net unrealized built-in gain. A loss corporation's (or consolidated group's) net unrealized built-in gain or loss generally will be deemed to be zero unless it is greater than the lesser of (i) $10 million, or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.

(c)    *Special Bankruptcy Exception.*

When an ownership change occurs pursuant to the implementation of a plan of reorganization under the Bankruptcy Code, the annual limitation may not apply if certain requirements are satisfied. Under section 382(l)(5) of the Tax Code, the annual limitation does not apply to an ownership change of a loss corporation that is under the jurisdiction of a bankruptcy court immediately before the change if the shareholders and qualified creditors of the loss corporation immediately before the ownership change own at least 50% of the loss corporation's stock by value and voting power after the ownership change.

If the exchanges contemplated by the Plan qualify under section 382(l)(5), and the NWA Group does not elect alternative treatment (as discussed below), the NWA Group would avoid the application of the annual limitation to their NOLs and recognized built-in losses, if any. However, section 382(l)(5) would require the NWA Group to reduce its NOLs (and possibly other tax attributes) by the amount of any deduction for interest it has claimed with respect to the indebtedness converted into stock for: (i) the three-year period preceding the taxable year of the ownership change, and (ii) the portion of the year of the ownership change prior to the Effective Date. Under section 382(l)(5), if a second ownership change occurs during the two-year period immediately following the Effective Date, the annual limitation after the second ownership change will be zero, and thus would preclude the future use of any pre-change losses existing at the time of the second ownership change. The determination of the application of section 382(l)(5) is highly fact specific and dependent on circumstances that are difficult to assess accurately, such as (a) the length of time a claimant held a Claim, (b) whether a Claim arose in the ordinary course of a claimant's business, (c) the value of New Common Stock received by a claimant, (d) which claimants qualify as creditors for purposes of section 382(l)(5) (for example, creditors of a parent or a subsidiary), (e) the percentage of New Common Stock held by a claimant post-reorganization,

and (f) whether any claimant actively participated in formulating the Plan and in doing so made it clear that its debt was not qualified debt.  In addition, the existing statutes, regulations, and case law are ambiguous with respect to the application of section 382(l)(5) to consolidated groups where indebtedness exists at both the parent and subsidiary levels.  At this time, the Debtors are not certain whether they will qualify for the special bankruptcy exception in section 382(l)(5).

Alternatively, if the NWA Group does not qualify under section 382(l)(5), or elects out of the application of such section, the NWA Group's annual limitation will be determined in accordance with section 382(l)(6) of the Tax Code.  Under this provision, the annual limitation is determined by reference to the net equity value of the Reorganized NWA Corp. stock immediately after the ownership change (rather than immediately before the ownership change) after giving effect to the discharge or other settlement of Claims.

The Debtors have not yet determined whether, if they qualify for the special rule under section 382(l)(5), they would rely on section 382(l)(5) or section 382(l)(6).  Any election to rely on section 382(l)(6) rather than section 382(l)(5) would have to be made in the NWA Group's U.S. federal income tax return for the taxable year in which the change of ownership occurs. Under a current IRS Notice, which is subject to change or revocation at any time, a corporation whose assets have a fair market value in excess of their tax basis (a "net unrealized built-in gain") is permitted to increase its annual limitation during the five year period immediately following the ownership change by an amount equal to the depreciation deductions that a hypothetical purchaser of the Debtors' assets would have been permitted to claim if it had acquired the Debtors' assets in taxable transactions.  While the Debtors have not completed a review of their assets, they may have a net unrealized built-in gain and if so, the hypothetical depreciation deductions with respect to their assets, following a deemed sale, may be significant.  If so, the ability of the Debtors to utilize their pre-change losses to offset their taxable income under section 382(l)(6) following the Effective Date may be significantly enhanced.

(d)      *Avoiding a Second Ownership Change and Trading Limitations.*

To avoid another ownership change after the Effective Date, the Reorganized NWA Corp.'s Amended Certificate of Incorporation will restrict the transfer of New Common Stock without the consent of the Reorganized NWA Corp. Board of Directors for 2 years after the Effective Date, subject to extension for up to 3 additional years if the Reorganized NWA Corp. Board of Directors determines in its reasonable discretion that such restrictions are necessary to preserve the value of the NWA Group's NOLs.  These restrictions generally will provide that any attempted transfer of New Common Stock prior to the expiration of the term of the transfer restrictions will be prohibited and void if such transfer would cause the transferee's ownership interest in Reorganized NWA Corp. (as determined for purposes of section 382 of the Tax Code) to increase to 4.95% or above, including an increase in a transferee's ownership interest from 4.95% or above to a greater ownership interest, except as may be otherwise agreed to by the Reorganized NWA Corp. Board of Directors or otherwise required by law with respect to certain qualified plans.  The Amended Certificate of Incorporation will also contain similar provisions restricting the ability of persons who are 5% shareholders for purposes of section 382 of the Tax Code to dispose of their shares without the consent of the Reorganized NWA Corp. Board of Directors during the term of the transfer restrictions.  In the case of any attempted transfer in violation of the transfer restrictions, the purported transferor will remain the owner of such transferred shares and Reorganized NWA Corp., as agent for the purported transferor, will be authorized to sell such securities to an eligible transferee that is not subject to the transfer restrictions.  The transfer restrictions will not apply to (x) certain transactions approved by the Board of Directors of Reorganized NWA Corp., including, but not limited to, a merger or consolidation, in which all holders of New Common Stock receive, or are offered the same opportunity to receive, cash or other consideration for all such New Common Stock, and upon the consummation of which the acquirer will own at least a majority of the outstanding shares of New

Common Stock; or (y) to the extent set forth in the Rights Offering Sponsor Agreement, to the Rights Offering Sponsor or Ultimate Purchasers.

The purpose of the transfer restrictions is to reduce the risk that a second change in the ownership of Reorganized NWA Corp. will occur that would cause the loss or reduction of U.S. federal income tax attributes of the Reorganized Debtors for purposes of sections 382 and 383 of the Tax Code. However, the implementation of the transfer restrictions also could have the effect of impeding an attempt to acquire a significant or controlling interest in Reorganized NWA Corp. and, as a practical matter, may make it difficult for a 5% shareholder to pledge its New Common Stock on margin.

Similar restrictions will be imposed on the acquisition of New Common Stock pursuant to the Rights Offering. See Section V.D.11. above.

The ACC's position is that these provisions may entrench management and adversely effect the trading market for, and trading price of, the New Common Stock. The ACC has requested that creditors that are entitled to vote on the Plan carefully consider the impact of these issues before casting their votes on the Plan. The Debtors disagree that these provisions entrench management. The provisions are clearly intended to protect against the loss of the valuable income tax attributes of the Reorganized Debtors. In addition, the Debtors believe that these provisions properly balance the interest of protecting the tax attributes against the possible impact on the market for the New Common Stock.

3.      *Alternative Minimum Tax.*

In general, an alternative minimum tax (the "AMT") is imposed on a corporation's U.S. alternative minimum taxable income at a 20% tax rate to the extent such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. For example, a corporation is generally not allowed to offset more than 90% of its taxable income for AMT purposes by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation (or consolidated group) undergoes an ownership change within the meaning of section 382 of the Tax Code and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's (or consolidated group's) aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the ownership change date. The IRS has taken the position that this provision would apply even if a corporation otherwise qualifies for, and avails itself of, the special bankruptcy provision to the annual limitation rules of section 382 discussed in the previous section.

Any AMT that a U.S. corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to AMT.

4.      *Implementation of the Restructuring Transactions.*

In connection with and pursuant to the implementation of the Plan, the Debtors may, in their discretion, undertake mergers, dissolutions, or consolidations of any of the Debtors or otherwise transfer assets between or among the Debtors or certain of their affiliates. The Debtors intend to effectuate any such Restructuring Transactions in a manner that minimizes adverse U.S. federal income tax consequences.

**B.**      **Consequences to Holders of Certain Claims**.

Pursuant to the Plan, holders of Allowed General Unsecured Claims against the Consolidated Debtors will receive shares of New Common Stock, and, if such holders are Eligible Holders, Subscription Rights, entitling them to subscribe for additional shares of New Common Stock, in satisfaction and discharge of their Claims; and holders of Convenience Class Claims and Allowed General Unsecured Claims against Non-Consolidated Debtors will receive Cash in satisfaction and discharge of their Claims.  Holders of Disputed Claims which are Allowed after the Subscription Expiration Date will not receive Subscription Rights.

The U.S. federal income tax consequences to a holder of a Claim arising from the Plan will vary depending upon, among other things, the type of consideration received by a holder, whether or not a Claim is an obligation classified as a security for U.S. federal income tax purposes and whether the Claim is against NWA Corp. or one of its affiliates.  The term "security" is not defined in the Tax Code, but it includes all stock and debt instruments to the extent the instruments, under all the facts and circumstances, are viewed as providing the holder with a proprietary interest in the issuer.  Generally, the most significant factor considered in determining whether a debt instrument is a security is the original term of that instrument.  Debt instruments with a weighted average maturity of 10 years or more from the date of issuance are highly likely to be treated as securities, debt instruments with a weighted average maturity of between 5 and 10 years are often treated as securities, and debt instruments with a weighted average maturity of 5 years or less are less likely to be treated as securities.  For purposes of the following discussion, no assumption has been made as to whether any Claims constitute securities of the Debtor.  Holders of Claims are urged to consult their tax advisors regarding the status of their Claims as securities for U.S. federal income tax purposes.

The following discussion may not apply to holders with Claims in more than one class relating to the same underlying obligation (such as where the underlying obligation serves as the basis for a primary Claim against one Debtor and a secondary liability Claim against another Debtor).  Such holders should consult their tax advisors regarding the effect of such dual status obligations on the federal income tax consequences of the Plan to them.

1.      *Consequences to Holders of Claims That Do Not Constitute Securities for U.S. Federal Income Tax Purposes or That Receive Solely Cash In Exchange for Their Claim.*

The receipt of solely Cash by a holder of a Convenience Class Claim or a holder of an Allowed General Unsecured Claim against a Non-Consolidated Debtor, and the receipt by a holder of an Allowed General Unsecured Claim against the Consolidated Debtors that does not constitute a security for U.S. federal income tax purposes of New Common Stock and, if such holder is an Eligible Holder, Subscription Rights, should be a fully taxable transaction.  Accordingly, a holder of such a Claim generally should recognize gain or loss in an amount equal to the difference between (i) the amount realized by the holder in satisfaction of its Claim (other than in respect of any Claim for accrued but unpaid interest, and excluding any portion required to be treated as imputed interest due to the post-Effective Date distribution of such consideration following the resolution of any Disputed Claims in the same class), and (ii) the holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest).  For a discussion of the U.S. federal income tax consequences to holders of any Claim for accrued but unpaid interest, see Section XII.B.6.  The amount realized by a holder should equal the sum of the amount of any Cash, the fair market value of any shares of New Common Stock, and the fair market value of any Subscription Rights received.

If a holder of a Claim receives additional distributions after the Effective Date as a result of any subsequently disallowed Disputed Claim or unclaimed distributions, a portion of such later distributions to the holder may constitute imputed interest.  In addition, it is possible that any loss or a

portion of any gain realized by such a holder may be deferred until the holder has received its final distribution. It is unclear whether a holder of such a Claim that receives, on account of the resolution of a Disputed Claim, a post-Effective Date Cash distribution attributable to previously paid dividends on New Common Stock should treat such Cash distribution as an additional amount realized on such holder's Claim or as a dividend. All holders of Claims should consult their tax advisors as to the tax consequences of the receipt of consideration after the Effective Date.

If a holder recognizes gain or loss in respect of its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss would depend on a number of factors, including (i) the tax status of the holder, (ii) whether the Claim constitutes a capital asset in the hands of the holder and how long such Claim has been held, (iii) whether the Claim was originally issued at a discount or was acquired at a market discount, and (iv) whether and to what extent the holder had previously claimed a bad debt deduction in respect of such Claim.

A holder that purchased its Claim from a prior holder at a discount to the then adjusted issue price of such Claim may be subject to the market discount rules of the Tax Code. Under those rules, assuming the holder has not made an election to amortize the market discount into income on a current basis, any gain recognized on the exchange of such Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

A holder's tax basis in any New Common Stock and any Subscription Rights received in satisfaction of an Allowed Claim that does not constitute a security generally should equal the fair market values of such New Common Stock and Subscription Rights. A holder's holding period for any New Common Stock and any Subscription Rights received in exchange for a non-security generally should begin the day following the issuance of such New Common Stock and Subscription Rights.

While the Debtors intend to treat the receipt of New Common Stock and any Subscription Rights in satisfaction of Claims described in this section against NWA Corp. subsidiaries as a fully taxable transaction, it is possible that the IRS may seek to treat such transaction as part of a non-recognition exchange under section 351 of the Tax Code. If the transaction were so treated, a holder would not be permitted to recognize any loss, but would be required to recognize any gain to the extent of the greater of (i) the fair market value of any Subscription Rights received and (ii) any accrued market discount. In such case, the holder's tax basis in its New Common Stock would generally equal its tax basis in the Claims surrendered, increased by the amount of gain recognized and decreased by the fair market value of any Subscription Rights received. In addition, the holder's holding period in the New Common Stock would generally include its holding period in its Claim, except that the holding period of any New Common Stock issued in respect of a Claim for accrued but unpaid interest would begin on the day following the receipt of such New Common Stock.

2.    *Consequences to Holders of Claims that Constitute Securities of NWA Corp. for U.S. Federal Income Tax Purposes.*

The surrender of an Allowed General Unsecured Claim that constitutes a security of NWA Corp. in exchange for New Common Stock and, if the holder of such Claim is an Eligible Holder, Subscription Rights should be treated as a recapitalization for U.S. federal income tax purposes. Accordingly, a holder of a Claim that constitutes a security of NWA Corp. for U.S. federal income tax purposes generally should not recognize any gain or loss upon such an exchange of its Claim.

To the extent that an Allowed General Unsecured Claim is exchanged in a recapitalization, any accrued market discount not recognized upon such exchange should carry over, on an allocable basis, to any New Common Stock and Subscription Rights received, such that any gain

recognized by the holder upon a subsequent disposition of such New Common Stock or Subscription Right would be treated as ordinary income to the extent of any accrued market discount not previously recognized.

   For a discussion of the U.S. federal income tax consequences of any Claim for accrued but unpaid interest, see section XII.B.6.

   A holder's aggregate tax basis in any New Common Stock and Subscription Rights received in satisfaction of a Claim that constitutes a security of NWA Corp. should equal the holder's aggregate adjusted tax basis in such Claim (including any Claim for accrued but unpaid interest, and excluding any portion required to be treated as imputed interest due to the post-Effective Date distribution of such consideration upon the resolution of Disputed Claims), increased by any interest income received in respect of such Claim, and decreased by any deductions claimed in respect of any previously accrued interest.  Such tax basis should be allocated between the New Common Stock and any Subscription Rights received based on their relative fair market values.  The holder's holding period for any New Common Stock and any Subscription Rights received in exchange for a security generally should include the holder's holding period for the Claim, except that the holding period of any New Common Stock and any Subscription Rights issued in respect of a Claim for accrued but unpaid interest would begin on the day following the receipt of such New Common Stock and Subscription Rights.

   While the Debtors intend to treat the receipt of New Common Stock and any Subscription Rights in satisfaction of a Claim that constitutes a security of NWA Corp. as a recapitalization, it is possible the IRS will seek to treat the transaction as part of a non-recognition exchange under section 351 of the Tax Code.  For a discussion of the tax consequences of such treatment, see section XII.B.1.

   3.  *Consequences to Holders of Claims that are Employees or other Service Providers.*

   Holders of General Unsecured Claims who are employees or former employees of a Debtor and certain service providers that received such Claims in connection with the performance of services generally should recognize ordinary taxable income upon receipt of New Common Stock in satisfaction of such Claims in an amount equal to the fair market value of such New Common Stock and, upon exercise of any Subscription Rights, in an amount equal to the fair market value of New Common Stock received in respect thereof over the amount paid for such New Common Stock.  Such income is currently subject to U.S. federal income tax at rates as high as 35%.  New Common Stock received by such employees, former employees and other service providers generally should have a tax basis equal to the fair market value of such New Common Stock and a holding period starting on the day following the receipt of such New Common Stock.

   Cash distributed to salaried employees of the Debtors pursuant to the Non-Contract Employee Compensation Program will be treated as compensation income at the time received by such employee.  Unless a timely section 83(b) election is filed by the employee, restricted New Common Stock received pursuant to the Non-Contract Employee Compensation Program or Management Equity Plan will not be includable as income until vested in which case the then fair market value of the Stock will be treated as compensation income.  Upon exercise of non-qualified stock options granted to employees pursuant to the Management Equity Plan, employees will be treated as receiving compensation income equal to the excess of the fair market value as of the exercise date of New Common Stock received upon exercise over the exercise price for such stock.

   The Debtors will generally withhold or require payment of federal, state and local income and payroll taxes with respect to distributions or later vesting of New Common Stock and Cash to employees and former employees of Northwest, including distributions of New Common Stock upon the exercise of Subscription Rights.  The mechanics and related arrangements that will be used to comply

with this withholding may result in delays in the distribution of such New Common Stock to employees and former employees.  Moreover, employees and former employees should be aware that the amount of such withholding may be more or less than such person's actual tax liability ultimately owed with respect to the receipt of such New Common Stock.

4.      *Consequences to Holders of Claims Against a Debtor Other Than NWA Corp.*

A holder of a Claim against a Debtor other than NWA Corp. should recognize gain or loss on any exchange of such Claim for New Common Stock and any Subscription Rights.  Although the Claim may constitute a security of the Debtor, the exchange for New Common Stock and any Subscription Rights should not qualify as a recapitalization because such Claim will be exchanged for equity in NWA Corp. rather than equity in the Debtor.  The tax consequences to a holder of a Claim against a Debtor other than NWA Corp. generally should be the same as those described in section XII.B.1 with regard to the exchange of Claims that are not securities.

5.      *Tax Treatment of the Exercise or Lapse of Subscription Rights.*

Except as discussed in section XII.B.3 with respect to employees, former employees, and certain service providers, a recipient of Subscription Rights generally should not recognize gain or loss upon the exercise of such rights.  The tax basis in the New Common Stock received upon exercise of the Subscription Rights should equal the sum of the holder's tax basis in the Subscription Rights and the amount paid for such New Common Stock.  The holding period in such New Common Stock received should commence the day following its acquisition.  Upon any lapse of Subscription Rights received in exchange for Claims, the holder generally should recognize a loss equal to its tax basis in the Subscription Rights.  In general, such loss should be a capital loss.

6.      *Distributions in Discharge of Accrued but Unpaid Interest.*

Pursuant to the Plan, distributions to any holder of a Claim will be allocated first to the original principal amount of such Claim as determined for U.S. federal income tax purposes, and any excess will be allocated to any portion of such Claim representing accrued original issue discount ("OID") or accrued but unpaid interest.  However, there is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.  Such allocation would not be applicable to bonds or other securities or instruments issued by parties that are not Debtors.

If and to the extent consideration is received by a holder of debt in satisfaction of accrued interest or OID, such amount generally will be taxable to the holder as interest income (if not previously included in the holder's gross income).  The holder's tax basis in any New Common Stock or Subscription Rights received in respect of such interest income generally should equal the fair market value of such New Common Stock and Subscription Rights received, and the holding period generally should begin the day after receipt of such New Common Stock or Subscription Rights.

A holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full.  By contrast, the IRS has privately ruled that a holder of a security, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID.  Accordingly, it is also unclear whether, by analogy, a holder of a Claim that does not constitute a security could be required to recognize a capital loss, rather than an ordinary loss, with respect to any previously included OID that is not paid in full.  Each Claim holder is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for U.S. federal income tax purposes.

7.      *Recapture of Gain on Subsequent Disposition of New Common Stock.*

Any gain recognized on a subsequent sale, exchange or other disposition of New Common Stock received in exchange for a Claim under the Plan should be treated as ordinary income to the extent of the sum of any (i) bad debt deductions or charges to bad debt reserves claimed with respect to such Claim, (ii) ordinary loss taken on the exchange of such Claim for such New Common Stock, and (iii) income not recognized due to the use of the cash method of tax accounting with respect to the Claim exchanged.

8.      *Ownership and Disposition of New Common Stock.*

(a)      *Dividends.*

If Reorganized NWA Corp. makes distributions with respect to New Common Stock, such distributions should be includible in the gross income of a holder as ordinary dividend income to the extent paid out of Reorganized NWA's current or accumulated earnings and profits, as determined for U.S. federal income tax purposes. Any portion of a distribution in excess of current or accumulated earnings and profits should be treated as a return of the holder's tax basis in its New Common Stock, and then as gain from the sale or exchange of the New Common Stock. Under current law, a maximum 15% U.S. federal income tax rate will, if certain requirements are met, apply to any dividends paid to a holder of New Common Stock that is a U.S. individual and that is included in the holder's income prior to January 1, 2011.

Distributions to corporate shareholders that constitute dividends for U.S. federal income tax purposes generally should qualify for the 70% dividends received deduction ("DRD"), which is available to corporate shareholders that own less than 20% of the voting power or value of the outstanding stock of the distributing corporation (other than certain preferred stock not applicable here). A corporate shareholder holding 20% or more of the distributing corporation (other than certain preferred stock not applicable here) may be eligible for an 80% DRD. No assurance can be given that the Debtors will have sufficient earnings and profits (as determined for U.S. federal income tax purposes) to cause any distributions to be eligible for a DRD. Dividend income that is not subject to regular U.S. federal income tax as a consequence of the DRD may be subject to the U.S. federal AMT.

The DRD is only available if certain holding periods and other taxable income requirements are satisfied. The length of time that a shareholder has held stock is reduced by any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or other similar transactions. Also, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the DRD may be disallowed. In addition, any dividend received by a corporation may also be subject to the extraordinary distribution provisions of the Tax Code.

(b)      *Gain or Loss on Disposition of New Common Stock.*

A holder of New Common Stock should recognize gain or loss on the sale, exchange or other disposition of such stock in an amount equal to the difference between such holder's amount realized on the sale and its tax basis in the stock sold.  A holder's amount realized should equal the amount of Cash and the fair market value of any property received in consideration of its stock.  Subject to the discussion set forth in section XII.B.7., generally, the gain or loss should be capital gain or loss if the holder holds the New Common Stock as a capital asset, and should be long-term capital gain or loss if the New Common Stock is held for more than one year at the time of disposition.  Capital loss can generally only be used to offset capital gain (individuals may also offset excess capital losses against up to $3,000 of ordinary income per tax year).  Under current law, long-term capital gain recognized by an individual U.S. holder prior to January 1, 2011 is subject to a maximum 15% U.S. federal income tax rate.

9.      *Holders of Aircraft Secured Claims or Other Secured Claims.*

A holder of an Aircraft Secured Claim (including Restructured Aircraft Secured Claims) or Other Secured Claim may recognize income, gain or loss for U.S. federal income tax purposes with respect to the settlement of such Claim, depending on whether the Claim is reinstated or, if not reinstated, on the outcome of negotiations with the Debtors.  A holder whose Aircraft Secured Claim or Other Secured Claim is reinstated pursuant to the Plan will not realize income, gain or loss unless either (i) such holder is treated as having received interest, damages or other income in connection with the reinstatement, or (ii) such reinstatement is considered a "significant modification" of the Claim.  Holders of Aircraft Secured Claims or Other Secured Claims should consult their own tax advisors to determine whether or not a significant modification has occurred and its impact to such holder.  A holder who receives Cash or other property in exchange for its Aircraft Secured Claim or Other Secured Claim pursuant to the Plan will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the amount of Cash or fair market value of the other property received in exchange for such holder's Claim, and (ii) the holder's adjusted tax basis in its Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim constitutes a capital asset in the hands of the holder, whether the Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim.  For a discussion of the U.S. federal income tax consequences of any Claim for accrued but unpaid interest, see section XII.B.6.  In addition, the market discount provisions summarized in section XII.B.1 may also apply.

**C.      Information Reporting and Withholding**.

All distributions to holders of Claims under the Plan are subject to any applicable withholding, including employment tax withholding.  Reorganized NWA Corp. may be required to withhold and sell on behalf of such holder an amount of New Common Stock sufficient to satisfy the withholding requirements, unless a holder makes other arrangements (such as remitting to Reorganized NWA Corp. directly the amount of such taxes owed).

Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable rate (currently 28%).  Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails to properly report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding.  Backup withholding is not an additional

tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds, or transfers that the IRS has designated as "listed transactions" or "transfers of interest."  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**The foregoing summary has been provided for information purposes only.  All holders of Claims are urged to consult their tax advisors concerning the federal, state, local, and foreign tax consequences attributable to the Plan.**

## XIII.

### Conclusion

The Debtors believe that the Plan is in the best interests of all of their creditors and equity holders and urge the holders of impaired Claims in Classes 1D, 2B, 3C, 4B, 5B, 6B, 7B, 8B, 9B, 10B, 11B and 1E to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received by the Balloting Agent not later than 4:00 p.m. (prevailing Eastern Time) on May 7, 2007.

Dated: March 30, 2007

Respectfully submitted,

NORTHWEST AIRLINES CORPORATION

By: _/s/ Michael L. Miller_____
     Name:  Michael L. Miller
     Title:  Authorized Officer

NWA FUEL SERVICES CORPORATION

By: _/s/ Michael L. Miller_____
     Name:  Michael L. Miller
     Title:  Authorized Officer

NORTHWEST AIRLINES HOLDINGS
CORPORATION


By: */s/ Michael L. Miller*
    Name:  Michael L. Miller
    Title:  Authorized Officer


NWA INC.


By: */s/ Michael L. Miller*
    Name:  Michael L. Miller
    Title:  Authorized Officer


NORTHWEST AEROSPACE TRAINING
CORPORATION


By: */s/ Michael L. Miller*
    Name:  Michael L. Miller
    Title:  Authorized Officer


NORTHWEST AIRLINES, INC.


By: */s/ Michael L. Miller*
    Name:  Michael L. Miller
    Title:  Authorized Officer NWA AIRCRAFT
    FINANCE, INC.


By: */s/ Michael L. Miller*
    Name:  Michael L. Miller
    Title:  Authorized Officer


COMPASS AIRLINES, INC. f/k/a NORTHWEST
AIRLINES CARGO, INC.


By: */s/ Michael L. Miller*
    Name:  Michael L. Miller
    Title:  Authorized Officer

NWA RETAIL SALES INC.


By: */s/ Michael L. Miller*
    Name:  Michael L. Miller
    Title:  Authorized Officer


AIRCRAFT FOREIGN SALES, INC.


By: */s/ Michael L. Miller*
    Name:  Michael L. Miller
    Title:  Authorized Officer


MONTANA ENTERPRISES, INC.


By: */s/ Michael L. Miller*
    Name:  Michael L. Miller
    Title:  Authorized Officer


NW RED BARON LLC


By: */s/ Michael L. Miller*
    Name:  Michael L. Miller
    Title:  Authorized Officer


NWA WORLDCLUB, INC.


By: */s/ Michael L. Miller*
    Name:  Michael L. Miller
    Title:  Authorized Officer


MLT INC.


By: */s/ Michael L. Miller*
    Name:  Michael L. Miller
    Title:  Authorized Officer

## GLOSSARY

| | |
|---|---|
| *1110(a) Aircraft Secured Claim* | An Aircraft Secured Claim relating to Aircraft Equipment as to which the Debtors agreed under section 1110(a) of the Bankruptcy Code to perform all obligations under the applicable loan agreements. |
| *A330 Financing Indentures* | The NW 2006-1 and 2006-2 Trust Indentures providing for the refinancing of certain Secured Obligations relating to A330 Aircraft Equipment, authorized by the Bankruptcy Court in Final Orders dated November 21, 2006 and December 21, 2006. |
| *Administrative Expense Claim* | Any right to payment, whether secured or unsecured, constituting a cost or expense of administration of any of the Chapter 11 Cases under sections 503(b), 507(a)(1) and 1114(e) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Debtors' estates, any actual and necessary costs and expenses of operating the Debtors' businesses, any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the Chapter 11 Cases including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services and any allowances of compensation and reimbursement of expenses to the extent allowed by Final Order under section 330 or 503 of the Bankruptcy Code. |
| *Administrative Expense Claim Bar Date* | Sixty calendar days after the Effective Date. |
| *Aircraft Equipment* | An aircraft, airframe, aircraft engine, propeller, appliance or spare part (including all records and documents relating to such equipment that are required, under the terms of the security agreement, lease, or conditional sale contract, to be surrendered or returned in connection with the surrender or return of such equipment) that is leased to, subject to a security interest granted by or conditionally sold to, one of the Debtors. |
| *Aircraft Secured Claim* | A Claim that is secured by a valid, duly perfected, non-avoidable security interest in the interest of a Debtor in Aircraft Equipment, to the extent of the value, as of the Effective Date or such other date as is established by the Bankruptcy Court, of such Claimholder's interest in the applicable Debtor's interest in such Aircraft Equipment, as determined by a Final Order of the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code or as otherwise agreed upon in writing by the Debtors and the Claimholder. |
| *Allocation Fraction* | With respect to a holder of an Allowed Class 1D Claim with respect to which there is a guaranty by one or more of the Consolidated Debtors of a primary obligation of another consolidated Debtor, a fraction, the numerator of which shall be the amount of such holder's Allowed Class 1D Claim with respect to which there is a guaranty, and the denominator of which shall be the aggregate amount of all Allowed Class 1D Claims with respect to which there are guarantees by another Consolidated Debtor. |

| | |
|---|---|
| *Allowed* | With reference to a Claim, (i) any Claim against any Debtor which has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed, (ii) any timely filed, liquidated, non-contingent Claim as to which the time for objection permitted by the Plan has expired and no objection has been interposed or (iii) any Claim expressly allowed by a Final Order or by agreement pursuant to the Settlement Procedures Order. |
| *AFA* | The Association of Flight Attendants-CWA. |
| *ALPA* | The Air Line Pilots Association, International. |
| *Amended Bylaws* | The Bylaws of Reorganized NWA Corp., as restated, substantially in the form to be set forth in a plan supplement. |
| *Amended Certificate of Incorporation* | The Certificate of Incorporation of Reorganized NWA Corp., as restated, substantially in the form to be set forth in a plan supplement. |
| *AMFA* | The Aircraft Mechanics Fraternal Association. |
| *ATSA* | The Aircraft Technical Support Association. |
| *Balloting Agent* | Bankruptcy Services, LLC.  See section I of this Disclosure Statement for contact information. |
| *Bankruptcy Code* | Title 11 of the United States Code, as applicable to the Chapter 11 Cases. |
| *Bankruptcy Court* | The United States Bankruptcy Court for the Southern District of New York. |
| *Bar Date Order* | The Final Order dated May 19, 2006, as amended May 22, 2006 (Docket Nos. 2594 & 2607), and any orders supplementing such Order, establishing the last date for filing proofs of claim against the Debtors' estates. |
| *Business Day* | Any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required to close by law or executive order. |
| *Cash* | Legal tender of the United States of America. |
| *Catch-up Distribution* | With respect to each holder of an Allowed Claim in Class 1D that was previous a Disputed Claim, the aggregate number of shares of New Common Stock For Distribution to Creditors that such holder would have received if its Claim had been an Allowed Claim on the Effective Date, together with such other consideration that would have been received as if the Claim had been Allowed as of the Effective Date and any subsequent Periodic Distribution Dates. |

| | |
|---|---|
| *Chapter 11 Cases* | The jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors in the United States District Court for the Southern District of New York and styled In *re Northwest Airlines Corp., et al., Case No. 05-17930 (ALG)*, (Jointly Administered). |
| *Claim* | Has the meaning set forth in section 101 of the Bankruptcy Code. |
| *Claims Agent* | Bankruptcy Services, LLC, which is located at 757 Third Avenue, Third Floor, New York, New York 10017 and was retained as the Debtors' claims, balloting and noticing agent in the Chapter 11 Cases pursuant to Bankruptcy Court Final Order dated November 16, 2005. |
| *Claims Objection Deadline* | The date that is on or before one hundred eighty (180) days after the Effective Date (unless such day is not a Business Day, in which case such deadline shall be the next Business Day thereafter), as the same may be extended from time to time by the Bankruptcy Court, with the consent of the Post-Effective Date Committee, or as otherwise ordered by the Bankruptcy Court. |
| *Class* | Any group of Claims or Equity Interests classified by the Plan pursuant to section 1122(a)(1) of the Bankruptcy Code. |
| *Commencement Date* | September 14, 2005, with respect to all of the Debtors other than NWA Aircraft Finance, Inc., and with respect to NWA Aircraft Finance, Inc., September 30, 2005. |
| *Common Stock Interests* | Equity Interests in NWA Corp. represented by Old NWA Corp. Common Shares. |
| *Confirmation Date* | The date on which the Clerk of the Bankruptcy Court enters the Confirmation Order. |
| *Confirmation Hearing* | The hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time. |
| *Confirmation Order* | The order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code. |
| *Consolidated Debtors or Consolidated Debtor* | Individually, any of the following entities, and collectively, NWA Corp., Northwest Airlines Holdings Corporation, NWA Inc. and Northwest Airlines. |
| *Convenience Class Claim* | A Claim, excluding a Claim for principal and interest based on a note issued under any indenture or municipal bond financing, against any of the Consolidated Debtors that otherwise would be a General Unsecured Claim that is (a) for $20,000 or less; or (b) for more than $20,000 if the holder of such Claim has agreed to reduce the amount of the Claim to $20,000 by making the Convenience Class Election on the Ballot provided for voting on the Plan within the time fixed by the Bankruptcy Court for completing and returning such Ballot to accept $20,000 in Cash in full satisfaction, discharge and release of such Claim. |

| | |
|---|---|
| *Convenience Class Election* | The election pursuant to which the holder of a General Unsecured Claim, excluding a Claim for principal and interest based on a note issued under any indenture or municipal bond financing, against any Consolidated Debtor in an amount greater than $20,000 timely elects to have its Claim reduced to $20,000 and treated as a Convenience Class Claim. |
| *Creditors Committee* | The statutory committee of general unsecured creditors appointed in the Debtors' Chapter 11 Cases. |
| *Debtor or Debtors* | Individually, any of the following entities and, collectively, Northwest Airlines Corporation, NWA Fuel Services Corporation, Northwest Airlines Holdings Corporation, NWA Inc., Northwest Airlines, Inc., Northwest Aerospace Training Corp., MLT Inc., Compass Airlines, Inc. f/k/a Northwest Airlines Cargo, Inc., NWA Retail Sales, Inc., Montana Enterprises, Inc., NW Red Baron LLC, Aircraft Foreign Sales, Inc., NWA WorldClub Inc., and NWA Aircraft Finance, Inc. |
| *Deficiency Claim* | That portion of a Claim secured by a lien on property in which the estate has an interest that is determined, pursuant to Section 506(a) of the Code or through agreement, to exceed the value of the claimant's interest in such property. |
| *DIP Claim* | The Administrative Expense Claim arising under the DIP Credit and Exit Facility Agreement. |
| *Disbursing Agent* | Any entity (including any applicable Debtor if its acts in such capacity) in its capacity as a disbursing agent under section 6.7 of the Plan. |
| *Disclosure Statement* | This document together with the annexed exhibits and schedules. |
| *Disputed Claim* | Any Claim that is not an allowed claim. |
| *Distribution Record Date* | Except with respect to securities to be cancelled under the Plan, which are governed by section 6.9 of the Plan, the date fixed as the "Distribution Record Date" by order of the Bankruptcy Court approving the Solicitation Procedures Motion. |
| *Distribution Reserve* | The reserve created pursuant to Section 6.6 of the Plan to hold property (including New Common Stock) for distribution to holders of General Unsecured Claims pending resolution of Disputed Claims. |
| *Downstream Mergers* | The mergers provided for in section 5.15 of the Plan. |
| *Effective Date* | A Business Day on or after the Confirmation Date selected by the Debtors on which (i) no stay of the Confirmation Order is in effect (ii) the conditions to the effectiveness of the Plan specified in Section 10 hereof have been satisfied or waived and (iii) the Debtors commence consummation of the Plan. |
| *Eligible Holder* | A holder of an Allowed Claim in Class 1D entitled to participate in the Rights Offering pursuant to the procedures set forth in the Debtors' Solicitation Procedures Motion. |

| | |
|---|---|
| *Employee-Related Agreements* | Those agreements between any of the Debtors and any of its employees or any entity acting on behalf of its employees. |
| *Equity Interest* | The interest of any holder of an equity security of any of the Debtors represented by any issued and outstanding shares of common or preferred stock or other instrument evidencing a present ownership interest in any of the Debtors, whether or not transferable, or any option, warrant or right, contractual or otherwise, to acquire any such interest. |
| *Equity Interests in Debtors Other than NWA Corp.* | Collectively, Equity Interests in Consolidated Debtors Other than NWA Corp., Equity Interests in NWA Fuel Services Corporation, Equity Interests in Northwest Aerospace Training Corporation, Equity Interests in MLT Inc., Equity Interests in Compass Airlines, Inc. f/k/a Northwest Airlines Cargo, Inc., Equity Interests in NWA Retail Sales Inc., Equity Interests in Montana Enterprises, Inc., Equity Interests in NW Red Baron LLC, Equity Interests in Aircraft Foreign Sales, Inc. and Equity Interests in NWA Worldclub, Inc. |
| *Excess Primary Exercise* | With respect to the exercise of Subscription Rights, the occurrence of the following event: the number of shares to be purchased upon exercise of Subscription Rights that have otherwise been validly and effectively exercised pursuant to primary exercise exceeds the number of shares available for purchase pursuant to the Rights Offering. |
| *Excluded Allowed Administrative Expense Claims* | Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as debtors in possession, or liabilities arising under loans or advances to or incurred by the Debtors, Postpetition Aircraft Purchase and Lease Obligations, or liabilities arising under the Rights Offering Sponsor Agreement and the registration rights agreement being entered into in connection therewith. |
| *Exercising Claimant* | Each holder of an Allowed Claim in Class 1D that exercises its rights to subscribe to purchase shares of New Common Stock For Distribution Pursuant to Rights Offering, as more fully described in this Disclosure Statement. |
| *Exit Facility* | The credit facility that will provide liquidity to the Reorganized Debtors. |
| *Final Distribution Date* | The date which is ninety days after all Disputed Claims have been resolved by Final Order. |

| | |
|---|---|
| *Final Order* | An order or judgment that has not been reversed, vacated or stayed and as to which (i) the time to appeal, to petition for a writ of *certiorari* or to move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for a writ of *certiorari* or motion for a new trial, reargument or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or the petition for a writ of *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order or judgment, and the time to take any further appeal, to petition for a writ of *certiorari* or to move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order to not be a Final Order. |
| *General Unsecured Claim* | A Claim against a Debtor that is not an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, an 1110(a) Aircraft Secured Claim, a Restructured Aircraft Secured Claim, an N301US and N303US Aircraft Secured Claim, an Other Secured Claim, an Insured Claim, an Intercompany Claim, or a Convenience Class Claim.  For the avoidance of doubt, the term General Unsecured Claim includes Deficiency Claims. |
| *IAM* | The International Association of Machinists and Aerospace Workers, District 143. |
| *Indentures* | Individually and collectively, (A) the Indenture (as supplemented) dated as of March 1, 1997 among Northwest Airlines, Holdings and U.S. Bank National Association, N.A. as successor to State Street Bank as Trustee, under which Northwest Airlines issued the following series of notes: (i) 10% Notes due 2009 in the aggregate principal amount of $300,000,000, (ii) 9.875% Notes due 2007 in the aggregate principal amount of $300,000,000, (iii) 8.875% Notes due 2006 in the aggregate principal amount of $300,000,000, (iv) 9.5% Notes due 2039 in the aggregate principal amount of $143,000,000, (v) 7.875% Notes due 2008 in the aggregate principal amount of $200,000,000 and (vi) 8.70% Notes due 2007 in the aggregate principal amount of $100,000,000; (B) the Indenture dated as of May 20, 2003 among NWA Corp., Northwest Airlines and U.S. Bank National Association, N.A. as Trustee, under which NWA Corp. issued the 6.625% Senior Convertible Notes due 2023 in the aggregate principal amount of $150,000,000; and (C) the Indenture dated as of November 4, 2003, among NWA Corp., Northwest Airlines and U.S. Bank National Association as Trustee, under which NWA Corp. issued 7.625% Convertible Senior Notes due 2023 in the aggregate principal amount of $225,000,000, and all documents and instruments relating thereto as such may have been amended, modified, supplemented or restated from time to time prior to the Commencement Date. |

| | |
|---|---|
| *Indenture Trustee* | Any of (A) HSBC Bank USA, National Association, as Successor Trustee, with respect to notes issued under the Indenture (as supplemented) dated as of March 1, 1997 among Northwest Airlines, Holdings and U.S. Bank National Association, N.A. as successor to State Street Bank as Trustee; (B) U.S. Bank National Association or U.S. Bank Trust National Association (including any and all of its affiliates) as Indenture Trustee, Pass-Through Trustee, Subordination Agent, Owner Trustee, Security Trustee, Collateral Trustee or other trust capacity.; (C) Law Debenture Company of New York as Successor Trustee to U.S. Bank National Association with respect to the Indenture dated as of November 4, 2003, under which NWA Corp. issued 7.625% Convertible Senior Notes, and the Indenture dated as of May 20, 2003 under which NWA Corp. issued 6.625% Senior Convertible Notes. |
| *Insured Claim* | Any Claim as to which there is valid and enforceable insurance coverage in an amount sufficient to fully satisfy and discharge such Claim. |
| *Intercompany Claim* | Any Claim held by a Debtor and/or Non-Debtor Affiliate against another Debtor and/or Non-Debtor Affiliate. |
| *ISDA Master Agreement* | Those agreements entered into by the Debtors using the industry standard form of master agreement developed by the International Swaps and Derivatives Association to govern "over-the-counter" derivative transactions. |
| *JPM ISDA Master Agreement* | The certain ISDA Master Agreement made and entered into by and between JPMorgan Chase Bank, N.A. and Northwest Airlines, as amended from time to time, including by that First Amendment to 2002 ISDA Master Agreement, dated October 4, 2006. |
| *Management Claim* | Claim No. 11196 against Northwest Airlines, Inc., filed in the amount of not less than $129,096,917.00, on behalf of current salaried employees of the Debtors in order to preserve such salaried employees' rights with respect to, as applicable, (a) such salaried employees' compensation and benefit reductions agreed to as part of the 2004 Bridge Agreement reached between the Debtors and their pilots union, the Airline Pilots Association, International, and (b) such salaried employees' compensation and benefit reductions agreed to as part of the section 1113 negotiation process in these Chapter 11 Cases, calculated in the same manner as the claims granted to the unions who agreed to and ratified modified collective bargaining agreements. |
| *Management Equity Plan* | The management equity plan for certain employees of Reorganized NWA Corp., as will be set forth in a plan supplement to be filed with the Bankruptcy Court not less than 20 days before the Voting Deadline. |
| *N301US and N303US Aircraft Secured Claim* | The respective Aircraft Secured Claim relating to either the airframe bearing FAA Registration tail number N301US and related Aircraft Equipment or the airframe bearing FAA Registration tail number N303US and related Aircraft Equipment. |

| | |
|---|---|
| *NAMA* | Northwest Airlines Meteorology Association. |
| *New Common Stock* | New shares of common stock of Reorganized NWA Corp., having a par value of 1 cent per share, to be authorized and issued pursuant to the Plan and the Amended Certificate of Incorporation. |
| *New Common Stock for Distribution to Creditors* | The portion of the New Common Stock to be distributed to holders of Allowed Class 1D Claims against the Consolidated Debtors and which shall equal 225,788,536 shares of the New Common Stock |
| *New Common Stock For Distribution to Creditors with a Guaranty* | 8,622,772 shares of the New Common Stock to be distributed to holders of Allowed Class 1D Claims against the Consolidated Debtors, which holders also hold guarantees of such claims by one or more of the other Consolidated Debtors. |
| *New Common Stock for Distribution Pursuant to Rights Offering* | 23,611,111 shares of the New Common Stock to be made available for purchase pursuant to the Rights Offering, as set forth in Section 9 of the Plan. |
| *New Common Stock for Purchased Shares* | 4,166,667 shares of New Common Stock to be purchased by the Rights Offering Sponsor as set forth in Section 9.6 of the Plan. |
| *New Common Stock Reserved for Issuance to Management* | 21,333,248 shares of New Common Stock to be reserved for issuance under the Management Equity Plan. |
| *NOLs* | Net Operating Losses, as that term is used in section 382 of the Internal Revenue Code. |
| *Non-Consolidated Debtors or Non-Consolidated Debtor* | Individually, any of the following entities, and collectively, NWA Fuel Services Corporation, Northwest Aerospace Training Corporation, MLT Inc., Compass Airlines, Inc. f/k/a Northwest Airlines Cargo, Inc., NWA Retail Sales Inc., Montana Enterprises, Inc., NW Red Baron LLC, Aircraft Foreign Sales, Inc., NWA Worldclub, Inc., and NWA Aircraft Finance, Inc. |
| *Non-Contract Employee Compensation Program* | The compensation program for domestic salaried and international employees. |
| *Non-Debtor Affiliates* | Northwest Airlines Charitable Foundation, Cardinal Insurance Co., Tomisato Shoji Hotel Business, Wings Finance Y.K., Win Win L.P., NWA Real Estate Holding Company LLC, Margoon Holding B.V. |
| *Northwest Airlines* | Northwest Airlines, Inc., a Minnesota corporation. |

| | |
|---|---|
| *NW 2006-1 and 2006-2 Trust Indentures* | (i) The Trust Indenture and Security Agreement [NW 2006-1 N851NW], dated as of December 22, 2006, among Northwest Airlines, Wells Fargo Bank Northwest, National Association, as Collateral Agent, Citibank, N.A., as Series A Administrative Agent, and Citibank, N.A., as Series B Administrative Agent (the "Agents"), (ii) the Trust Indenture and Security Agreement [NW 2006-1 N852NW], dated as of December 22, 2006, among Northwest Airlines and the Agents, (iii) the Trust Indenture and Security Agreement [NW 2006-1 N856NW], dated as of December 22, 2006, among Northwest and the Agents, (iv) the Trust Indenture and Security Agreement [NW 2006-1 N857NW], dated as of December 22, 2006, among Northwest Airlines and the Agents, (v) the Trust Indenture and Security Agreement [NW 2006-1 N860NW], dated as of December 22, 2006, among Northwest Airlines and the Agents, (vi) the Trust Indenture and Security Agreement [NW 2006-1 N861NW], dated as of December 22, 2006, among Northwest Airlines and the Agents, (vii) the Trust Indenture and Security Agreement [NW 2006-1 N806NW], dated as of December 22, 2006, among Northwest Airlines and the Agents, (viii) the Trust Indenture and Security Agreement [NW 2006-1 N807NW], dated as of December 22, 2006, among Northwest and the Agents, (ix) the Trust Indenture and Security Agreement [NW 2006-1 N812NW], dated as of December 22, 2006, among Northwest Airlines and the Agents, (x) the Trust Indenture and Security Agreement [NW 2006-1 N371NB], dated as of December 22, 2006, among Northwest Airlines and the Agents, (xi) the Trust Indenture and Security Agreement [NW 2006-1 N377NW], dated as of December 22, 2006, among Northwest and the Agents, (xii) the Trust Indenture and Security Agreement [NW 2006-1 N813NW], dated as of December 22, 2006, among Northwest Airlines and the Agents, and (xiii) the Trust Indenture and Security Agreement [NW 2006-2 N853NW], dated as of December 22, 2006, among Northwest Airlines and the Agents, in each case as it may from time to time be supplemented or amended as provided therein, including supplementing by a Trust Indenture Supplement pursuant thereto. |
| *NWA Corp.* | Northwest Airlines Corporation, a Delaware corporation. |
| *Old NWA Corp. Common Shares* | Any and all shares of NWA Corp. common stock issued and outstanding on the Commencement Date. |
| *Other Secured Claim* | Any secured claim against any of the Debtors not constituting a Restructured Aircraft Secured Claim, an 1110(a) Aircraft Secured Claim, or an N301US and N303US Aircraft Secured Claim or a Priority Tax Claim. |

| | |
|---|---|
| *Periodic Distribution Date* | The first (1st) Business Day that is after the close of one (1) full calendar quarter following the date of the initial Effective Date distributions, and, thereafter, on the first (1st) Business Day following the close of each full calendar quarter thereafter; *provided, however*, if the initial Effective Date distribution falls within the first 45 days of a quarter, then the first post-Effective Date Periodic Distribution Date will be on the first Business Day following the close of such quarter. |
| *Plan* | The Debtors' First Amended Joint and Consolidated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, as may be amended or supplemented, annexed as Exhibit A to this Disclosure Statement. |
| *Plan Securities* | The New Common Stock and the Subscription Rights. |
| *Post-Effective Date Committee* | The committee formed pursuant to Section 14.2 of the Plan. |
| *Postpetition Aircraft Purchase and Lease Obligation* | Those certain obligations arising pursuant to (a) postpetition agreements regarding Aircraft Equipment to be purchased by a Debtor and (b) postpetition agreements to restructure prepetition agreements relating to the purchase or lease of Aircraft Equipment by a Debtor; provided, however, that obligations under such postpetition agreements shall only be Postpetition Aircraft Purchase and Lease Obligations to the extent such agreements expressly state that obligations are to obligations of the Reorganized Debtor; and provided further that each such postpetition agreement shall have been approved by a Final Order of the Bankruptcy Court prior to the Effective Date. |
| *Priority Non-Tax Claim* | Any claim entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code. |
| *Priority Tax Claim* | Any Claim, whether secured or unsecured, entitled to priority under sections 502(i) and 507(a)(8) of the Bankruptcy Code. |
| *Pro Rata* | With respect to an Allowed Claim, the ratio of the amount of the Allowed Claim to the total amount of all Allowed Claims in the same Class. |
| *Purchased Shares* | The 4,166,667 additional shares of New Common Stock to be purchased by the Rights Offering Sponsor on the closing date of the Rights Offering for the Subscription Purchase Price. |

| | |
|---|---|
| *Released Party* | Each of (a) the Debtors and the Reorganized Debtors, (b) the Creditors Committee, (c) any statutory committee, the members thereof appointed in the Chapter 11 Cases in their capacities as such, (d) the Rights Offering Sponsor, (e) the Ultimate Purchasers, (f) the Air Line Pilots Association, International and the Northwest Airlines Master Executive Council of the Air Line Pilots Association, International, (g) the International Association of Machinists and Aerospace Workers, District 143, (h) the Aircraft Technical Support Association, (i) the Northwest Airlines Meteorology Association, (j) the Transport Workers Union of America, (k) Aircraft Mechanics Fraternal Association and (l) any Indenture Trustee, and each of their current or former members, officers, directors, committee members, employees, advisors, attorneys, accountants, actuaries, investment bankers, consultants, agents and other representatives. |
| *Reorganized Debtors or Reorganized Debtor* | Each of the Debtors, individually or collectively, on and after the Effective Date. |
| *Reorganized Northwest* | The Reorganized Debtors and Non-Debtor Affiliates |
| *Reorganized NWA Corp.* | Northwest Airlines Corporation, on and after the Effective Date. |
| *Restructured Aircraft Secured Claim* | An Aircraft Secured Claim as to which the Debtors and the claimants have agreed to a reduced and restructured Claim and as to which the Bankruptcy Court has entered a Final Order approving the restructuring. |
| *Retiree Committee* | The statutory committee of retired employees appointed in the Debtors' Chapter 11 Cases. |
| *Rights Offering* | The offering to Eligible Holders of Allowed Claims in Class 1D to subscribe to purchase shares of New Common Stock For Distribution Pursuant to Rights Offering. |
| *Rights Offering Expiration Date* | The final date by which an Eligible Holder of a Class 1D General Unsecured Claim may elect to subscribe to the Rights Offering, which is approximately 28 days after the Subscription Commencement Date. |
| *Rights Offering Pro Rata Share* | With respect to an Eligible Holder, the ratio of the amount of such Eligible Holder's Allowed Claim for purposes of participating in the Rights Offering to the total amount of all Allowed Claims for purposes of participating in the Rights Offering as of the Subscription Rights Record Date (without adjustment for any Allowed Claims of those Eligible Holders who become an Eligible Holder after such date in accordance with the Solicitation Procedures Motion). |
| *Rights Offering Sponsor* | J.P. Morgan Securities Inc. |

| | |
|---|---|
| *Rights Offering Sponsor Agreement* | The agreement between the Rights Offering Sponsor and the Debtors under which the Rights Offering Sponsor commits to purchase all the shares of New Common Stock For Distribution Pursuant to Rights Offering that are allotted to but not purchased by holders of Claims in the Rights Offering and 4,166,667 shares of New Common Stock.  The form of the Rights Offering Sponsor Agreement is attached as Exhibit A to the Plan. |
| *Settlement Procedures Order* | The Final Order dated September 13, 2006 (Docket No. 3546), establishing procedures for the Debtors to settle Claims filed against the estates. |
| *Solicitation Procedures Motion* | The Debtors' Motion For An Order Approving (I) An Ex- Parte Order (A) Scheduling Hearing To Consider Approval Of  Disclosure Statement And Approving Notice Procedures; (B) Scheduling Hearing On Plan Confirmation And Approving Notice Procedures; And (C) Establishing Deadline For Motions To Estimate For Purposes Of Rights Offering Participation; (II) An Order On Notice (A) Approving Disclosure Statement; (B) Establishing Solicitation Procedures; And (C) Fixing Distribution Record Date; And (III) An Order On Notice (A) Establishing Procedures For Participation In Rights Offering; And (B) Approving Subscription Form. |
| *Subordinated Claims* | Any Claim against a Debtor, whether secured or unsecured, for any fine, penalty, forfeiture, attorneys' fees (to the extent such attorneys' fees are punitive in nature), multiple, exemplary or punitive damages, or for any other amount that does not represent compensation for actual pecuniary loss suffered by the holder of such Claim, and all claims against any of the Debtors of the type described in section 510(b) of the Bankruptcy Code. |
| *Subscription Agent* | The person engaged by the Debtors to administer the Rights Offering. |
| *Subscription Commencement Date* | A Business Day approved by the Bankruptcy Court, pursuant to the Debtors' Solicitation Procedures Motion, on which the Rights Offering will commence. |
| *Subscription Form* | The form to be used by a valid holder of Subscription Rights to exercise such Subscription Rights. |
| *Subscription Purchase Price* | The purchase price set forth in the Subscription Form that each Eligible Holder of an Allowed Claim in Class 1D must pay in order to exercise its Subscription Rights and purchase the New Common Stock For Distribution Pursuant to Rights Offering pursuant to, and in accordance with, Section 9 of the Plan. |
| *Subscription Rights* | The rights to purchase the shares of New Common Stock For Distribution Pursuant to the Rights Offering.  Exercise of the Subscription Rights is governed by Section 9 of the Plan. |

| | |
|---|---|
| *Subscription Rights Record Date* | A Business Day approved by the Bankruptcy Court pursuant to the Debtors' Solicitation Procedures Motion on which the Eligible Holders of Class 1D Claims entitled to subscribe to the Rights Offering shall be determined. |
| *TWU* | Transport Workers Union of America. |
| *Ultimate Purchasers* | Those parties with which the Rights Offering Sponsor has entered into a syndication agreement, pursuant to which such parties will agree to purchase from the Rights Offering Sponsor or Reorganized NWA Corp. certain unsubscribed shares purchased by the Rights Offering Sponsor and Purchased Shares purchased by the Rights Offering Sponsor. |
| *Voting Deadline* | May 7, 2007, is the last date for the actual *receipt* of ballots to accept or reject the Plan. |
| *Voting Record Date* | A Business Day approved by the Bankruptcy Court pursuant to the Debtors' Solicitation Procedures Motion on which the holders of claims entitled to vote to accept or reject the Plan shall be determined. |