**UNITED STATES BANKRUPTCY COURT**          <u>NOT FOR PUBLICATION</u>
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
In re:

                                                            Chapter 11

NORTHWEST AIRLINES CORPORATION, *et al.*,


                                                            Case No. 05-17930 (ALG)

                              Reorganized Debtors.

------------------------------------------------------------------------x


### MEMORANDUM OF OPINION

A P P E A R A N C E S :

CADWALADER, WICKERSHAM & TAFT, LLP
Counsel for the Reorganized Debtors
   By:  Mark C. Ellenberg, Esq.
          Nathan A. Haynes, Esq.
One World Financial Center
New York, New York 10281

BINGHAM McCUTCHEN, LLP
Counsel for UBS AG, Stamford Branch
   By:  Joshua Dorchak, Esq.
          Patrick J. Trostle, Esq.
399 Park Avenue
New York, New York 10022


**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**


        Before the Court is the motion of secured creditor UBS AG ("UBS"), the

administrative agent on a loan made to the Debtors in connection with the financing of

one N301 aircraft (the "Aircraft"), for payment of fees, expenses and interest.  Relying on

§ 506(b) of the Bankruptcy Code and Rule 2016 of the Rules of Bankruptcy Procedure,

UBS requests the allowance of $414,368 incurred in connection with its representation by

Bingham McCutchen LLP ("Bingham") in the Debtors' chapter 11 cases.  The Debtors,

on the other hand, contend that their prior payment of $90,000 to UBS represented

adequate reimbursement for the legal services provided to it during the course of the case.

Additionally, UBS seeks the payment of default interest in the amount of $61,000,

which represents interest at the default rate on the entire outstanding principal amount of

the Aircraft debt during the case, based on the theory that the Debtors defaulted on the

loan when they failed to disclose damage to one of the Aircraft's engines.  The Debtors

contend that they are liable only for interest at the default rate on payments that were past

due during the course of the Chapter 11 cases, as opposed to the entire outstanding

principal of the loan.

For the reasons set forth hereafter, the motion is granted in part and denied in part.

**Legal Fees and Expenses**

Section 506(b) of the Bankruptcy Code provided, prior to the 2005 Amendments:

"To the extent that an allowed secured claim is secured by property the value of which,

after any recovery under subsection (c) of this section, is greater than the amount of such

claim, there shall be allowed to the holder of such claim, interest on such claim, and any

reasonable fees, costs, or charges provided for under the agreement under which such

claim arose."[1]  Both parties rely upon *In re PCH Associates*, 122 B.R. 181 (Bankr.

S.D.N.Y. 1990), for the standard for allowance of fees to a secured creditor under §

506(b).  As the Court held there, in determining whether a request by a secured creditor

for fees under § 506(b) is reasonable, a court should examine "whether the creditor's

belief was reasonable that the fees were necessary."  *Id.* at 202, citing *Chase Manhattan*

*Bank v. Wonder Corp. of America (In re Wonder Corp. of America)*, 82 B.R. 186, 190 (D.

---

[1] The version of the statute prior to the 2005 Amendments applies in this case, filed prior to the effective
date thereof.

Conn. 1988).  When making such determination, the court should consider the following

factors:

> (1)  whether the legal fees were authorized by the loan agreement;
> (2)  whether they were necessary to the promotion of the client's interest;
> (3)  whether they are permitted under applicable law;
> (4)  whether they are compatible with the policy underlying the Bankruptcy Code;
> (5)  whether the time spent is appropriate to the complexity of the task;
> (6)  whether the hourly rate is appropriate under applicable standards;
> (7)  whether the tasks were assigned to the fewest and least senior attorneys able to render the services in a competent and efficient manner;
> (8)  whether the fee should be adjusted to reflect duplicative services rendered by attorneys representing other parties with a common interest in the case; and
> (9)  whether the fee should be adjusted to reflect the court's observation of the nature of the case and the manner of its administration.

*In re PHC Assoc.*, 122 B.R.at 202-03, quoting *In re Wonder Corp. of America*, 72 B.R.

580, 588-89 (Bankr. D. Conn. 1987), *aff'd* 82 B.R. 186 (D. Conn. 1988).

The first factor listed above is whether the legal fees were contractually

authorized.  UBS initially supported its motion by reference to § 5.2 of the Loan

Agreement, which provides, in relevant part

> the Company shall, on demand, pay or reimburse the Bank and the
> Collateral Agent for all transfer, documentary, stamp and similar taxes,
> and all recording and filing fees, payable in connection with, arising out of
> or in any way related to the execution, delivery and performance of this
> Agreement, the Indenture, the Secured Certificates or the making of the
> Loan, and all of the Bank's and the Collateral Agent's costs and expenses
> (including fees not exceeding $40,000 (arising out of the transactions
> contemplated by this Agreement and the Loan Agreement dated as of the
> date hereof between the Company and Barclays Bank PLC) and
> disbursements of legal counsel, aircraft appraisers and other experts
> employed or retained by the Bank and the Collateral Agent) incurred, and
> all payments made, and indemnify and hold the Bank and the Collateral
> Agent harmless from and against all losses suffered by the Bank and the
> Collateral Agent *in connection with, arising out of, or in any way related*
> *to the negotiation, preparation, execution and delivery of this Agreement*
> *and the Indenture and (whether or not executed) any waiver, amendment*

3

> *or consent hereunder or hereto.* Without limiting the foregoing, the
> Company shall be responsible for the initial and ongoing fees and
> expenses of the Collateral Agent. The Company's obligations under this
> Section 5.2 shall survive the repayment of the Loan and the Secured
> Certificates. (emphasis added)

After the Debtors pointed out that this language does not authorize payment of the fees

requested, as the fees do not relate to the negotiation of the original agreement or a

waiver, amendment or consent relating thereto, UBS changed course in its reply and cited

§ 4.7 of the Security Agreement and Indenture, which provides that

> The Company hereby agrees to indemnify the Collateral Agent, the
> Certificate Holders, . . . and any of its and of their . . . agents . . . for any
> and all liabilities, obligations, losses, . . . costs . . . in any way relating to
> or arising out of this Indenture, the Loan Agreement, the Secured
> Certificates, or any other documents contemplated hereby or referred to
> herein or the transactions contemplated hereby or the enforcement of any
> of the terms hereof . . . .

Since the fees and expenses requested were costs relating to enforcement of the Loan

Agreement, it appears uncontested that indemnification for reasonable fees is provided

for under the applicable documents.

After a determination that the legal fees are authorized under the applicable

agreement, "[t]he courts have used combinations of the remaining eight factors, which

often overlap, to determine whether the creditor reasonably believed the services were

necessary to protect its interest in the debtor's property." *In re PHC Assoc.*, 122 B.R. at

204, citing *United Merchants and Manufacturers, Inc. v. Equitable Life Assurance

Society of the United States*, 674 F.2d 134, 140 (2d Cir. 1982). "Services are generally

disallowed though they might not be prohibited by law, when they seem to serve no

legitimate purpose . . . The most common example is a fully-secured creditor's attempt to

obtain relief from the automatic stay when the secured claim is not under threat because

of the large equity cushion." *In re PHC Assoc.*, 122 B.R. at 204, citing *In re Wonder Corp.*, 72 B.R. at 591-92. *See also* the same Court's statement that "[t]he size of a creditor's equity cushion is an underlying factor in the reasonableness determination, and must be assessed when considering the above factors . . . If the equity cushion is large enough that there is no appreciable risk that a creditor will not be paid, courts will tend to view large fee claims as being exorbitant because there is no purpose in engaging in legal maneuvers." *Id.* at 202-03, citing *In re Wonder Corp.*, 72 B.R. at 580.

Upon careful review of the application and the attached time detail, the Court finds that the total amount sought should be substantially reduced, in part because much of the litigation constituted unnecessary "legal maneuvers." Equally important, in concluding that the requested fees and expenses are unreasonable, is the fact that there was substantial duplication of effort and the accrual of excess fees by multiple lawyers billing at partners' rates. Bingham has divided its $414,368 in fees into nine categories, and the Court will consider them *seriatim*.

The first item, "adequate protection matters," encompasses most of the litigation, and the total time charges accrued by the Bingham attorneys with respect to this category constituted $240,977.50, or more than half the total. Under the circumstances of this case, the charges are unreasonable. UBS was clearly oversecured, and this case is a good example of a situation where "the secured claim is not under threat because of the large equity cushion." *In re PHC Assoc.*, 122 B.R. at 204. The Court was well aware of the UBS litigation program at the time, and it took note of the extent of the litigation engaged in by the holder of the debt on this one aircraft compared to the debtholders on the hundreds of other aircraft leased by the Debtors.

In addition, the time records confirm the existence of unnecessary and duplicative work. Two partners from Hartford billing $600 to $700 per hour spent many hours duplicating each other's efforts and performing work that should have been assigned to junior lawyers. For example, on July 10, 2006, a partner billed eight hours at $605 per hour for attending a hearing at bankruptcy court, sending an "email to team" and "attention to discovery request and related matters." He took to court a counsel who billed for his time at $450 per hour and later reviewed developments with a partner who was billing at $700 per hour. Of the two partners whose time accrued throughout the representation, it appears that one was a litigator and one was not, but there is no evidence that the matters under consideration required the attention of either partner rather than the counsel who was assigned to the matter. Work performed by this large team included preparation for a trial that was never held and in any case was unlikely to be needed.

Under the circumstances, in light of the unnecessary litigation, the duplication of effort, and the overuse of partner time, the Court will disallow 60% of the time billed by the two partners or $109,893. A third partner was brought in to assist (see, e.g., 6/16, "assist with adequate protection motion"; 6/20, same), and his $13,865 in time is eliminated altogether. That still leaves five associates or counsel plus 40% of the time of the two partners who worked on this matter and billings of $117,219.50, a handsome charge for a routine matter.

The second category identified by UBS consists of "matters relating to buyout or consensual restructuring of debt". All time was spent by the same two partners duplicating their work (*see*, *e.g.*, 6/27 "analysis of settlement proposal from NWA" by

one partner and "review and analysis of NWA proposal" by the other).  Under the

circumstances, 50% of the time or $9,091 is allowed.

The third and fourth categories are entitled "Matters relating to Debtors'

concealment of the removal of BER engine" and "Matters relating to transfer of liens to

the replacement engine."  Although the record does not support the characterization of

the Debtors' conduct as "concealment," and although partner time was overused, the

Court will allow the amounts in full ($28,369), as these were discrete tasks that required

lawyer time.

Nine lawyers, including several partners, spent $36,169 in additional time in

"General monitoring and case administration."  The time records, even when adequate in

detail to support an application for reimbursement, demonstrate that there was inordinate

partner time and inordinate time spent on routine matters, such as learning about the New

York court rules.  $10,000 is more than adequate to compensate for any necessary "case

administration."

The next category is entitled "Matters relating to proof of claim."  The same two

partners spent $15,729 doing this work.  Although the total charge seems excessive and

duplicates the charges of counsel for the Collateral Agent ($6,315.24) that the Debtors

have agreed to pay, based on a passage in the record of the hearing, the Court will accept

it.

One partner spent almost all of the $26,340.50 in time on "Cure calculation

matters," something that seemingly should not have required any substantial lawyer time

at all.  It required no partner time, and $7,500 seems to be a more than adequate charge.

7

The next category is "Matters relating to Plan of reorganization and claim treatment," billed at $22,904.  Much partner time was spent on general review of the Debtor's disclosure statement, plan and other filings, including other parties' objections thereto, most of which was unnecessary to the appropriate protection of this one oversecured creditor.  $5,000 would have been a reasonable charge.

The final category is "Matters relating to 506(b) application," the matter now before the Court, weighing in as of the date of the application at $25,697.  Although this matter is not made up predominately of partner time, the charges are unreasonable in light of the scope of the issues before the Court and the fact that the applicant has been only partially successful in its application.  The Court will award $10,000 for this item.

Time charges as set forth above aggregate $202,908.50, and rounding up, the Court finds that $203,000 would be a large but arguably reasonable charge for the legal services provided to UBS.  Costs and disbursements as requested by UBS are also awarded, and the Debtors have agreed to pay the Collateral Agent $6,315.24.  It is noted that the Debtors have argued, nevertheless, that the Court should allow only the amount they have already paid, $90,000, which were the legal fees charged by and paid to another aircraft creditor who was oversecured by an aircraft similar to the one at bar, the N303US.[2]  However, the Debtors have not adequately established that the other matter was sufficiently similar to justify imposing a cap on fees, nor is the Court inclined to eliminate all recovery for the adequate protection matters.

---

[2] At the hearing, Debtors' counsel argued that the two aircraft are "virtually identical . . . They both had a dead engine on the petition date.  And they were both, most importantly, non 1110 aircraft, which changes both the leverage involved and the timing involved with respect to these aircraft."  (Hr'g Tr. 44: 6-10, Aug. 15, 2007.)

8

**Default Interest**

Section 506(b) as applicable provides for the payment of postpetition interest on

an oversecured claim when provided for in the agreement under which the claim arose.

UBS cites § 2.1 of the Indenture, which states that interest is payable on the principal

amount of the loan "from the date hereof to but excluding the date due, at the Interest

Rate determined in accordance with the Indenture . . . and from the date due until paid at

the Default Rate."  Pursuant to § 1.1 of the Indenture, the Default Rate applies "to any

Interest Period during which a payment is due under any Secured Certificate but not paid

. . . ."  Section 10.2(a) of the Indenture further provides

> If an Event of Default shall have occurred and be continuing, then and in
> every such case the Collateral Agent may at any time, by written notice or
> notices to the Company, declare all the Secured Certificates to be due and
> payable.  Upon any such declaration, the unpaid principal of all Secured
> Certificates then outstanding, together with accrued but unpaid interest
> thereon and all other amounts due thereunder, hereunder and under the
> Loan Agreement shall immediately become due and payable without
> presentment, demand, protest or notice, all of which are hereby waived.

UBS asserts that it should be permitted default interest on the entire accelerated amount

of the debt even though it did not declare a default, because the Debtors allegedly

concealed a breach of the applicable loan documents which put it in default prior to the

filing of their chapter 11 cases.

 On this record, UBS has not supported the proposition that the Debtors incurred

liability when they replaced one engine with a similar engine or that any failure to

disclose would justify the imposition of default interest.  Neither UBS nor the Collateral

Agent called a default.  UBS' motion admits that the Indenture permitted the Debtors to

"cause a substitute engine to be subjected to the Lien of this Indenture . . ." (Motion, p. 6,

9

quoting from § 7.2(b) of the Indenture).[3]  Although UBS quibbles that the Debtors did

not act quickly enough and asserts that it would be inequitable to deny it default interest

on all of the debt, UBS identifies no harm or damage from the engine substitution, other

than legal fees.  As to this item, the Court has granted UBS' claim for legal fees, the

purpose of which UBS admits was "to ensure that the Debtor followed through with

providing appropriate documentation for the lenders' lien on the replacement engine."

(Reply, p. 4).

The Debtors argue that even if the debt had been accelerated, the plan of

reorganization reinstated the original maturity of the debt pursuant to § 1124(2) of the

Bankruptcy Code, and that under such circumstances courts limit the payment of interest

to the portions of a loan that came due during a case, and not on the entire accelerated

principal.  *See Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*,

314 F.3d 1070, 1074-75 (9th Cir. 2002); *In re Forest Hills Assoc.*, 40 B.R. 410, 414

(Bankr. S.D.N.Y. 1984), citing *In re Taddeo*, 685 F.2d 24 (2d Cir. 1982); *In re Manville*

*Forest Prods., Corp.*, 43 B.R. 293, 299 (Bankr. S.D.N.Y. 1984), *aff'd in part and rev'd in*

*part on other grounds*, 60 B.R. 403 (S.D.N.Y. 1986); *see also* 5 *Collier on Bankruptcy*, ¶

1124.03[7][a] (15th ed. rev. 2007).  A recent District Court decision questioned this

construction of § 1124(2) and, affirming the Bankruptcy Court, held that "[t]here is only

---

[3] It has long been the practice in the airline industry for engines to be swapped or substituted without the incurrence of any liability to the secured creditor. *See Sunstream Jet Express, Inc. v. Int'l Air Service Co., Ltd.*, 734 F.2d 1258, 1264 (7th Cir. 1984) ("According to testimony elicited by IASCO, it was common practice in the aircraft industry to place substitute engines on airframes and thus keep aircrafts in compliance with Federal regulations and 'airworthy' at all times."); *see also* Marvin E. Jacob and Steven Levitan, *In the Aftermath of Pan Am and Continental: Participating in Airline Workouts and Bankruptcies, in* 610 Practising Law Institute Commercial Law and Practice Course Handbook Series 83, 197 (March 25, 1992) ("It is customary in the airline industry to include in aircraft leases and financing documents provisions which permit an airline lessee to exchange engines or other parts through pooling or interchange agreements and to replace equipment which becomes destroyed, worn out, lost or damaged beyond repair with replacement or substitute parts.")

one statutory basis for denying a mortgagee's contractual right to interest at a default rate

– Section 506(b) of the Bankruptcy Code . . . ." *In re 139-141 Owners Corp.*, 313 B.R.

364, 368 (S.D.N.Y. 2004).  However, there is no need to apply § 1124(2) in this case.

Accepting the premise of *Owners Corp.,* the equitable considerations embodied in

§ 506(b) are sufficient to support disallowance of the additional interest requested by

UBS.  In *Owners Corp.*, the Bankruptcy Court had approved the request for default

interest in large part on the basis that "the facts do not justify the exercise of equitable

discretion by a court to nullify the secured creditor's contract right to interest at the

default rate . . . . The sole purpose of this bankruptcy filing was to nullify the secured

creditors' rights to default rate interest."  306 B.R. at 772-73.  Here, in addition to the

Debtors' right to substitute another engine, and the fact that a default was not called and

the debt was not accelerated prepetition, there is no question as to the insolvency of the

Debtors and the fact that the recovery of other creditors would be diminished by a grant

of default interest to UBS.  UBS argues that denial of default interest would reward the

Debtors' alleged concealment, but under the award authorized by this decision, the

Debtors will have compensated UBS appropriately for all of its losses in connection with

the engine, paying it the default rate of interest on those postpetition amounts that were

past due, providing a lien on a substitute engine, and paying its substantial legal fees in

connection with the engine substitution.

## CONCLUSION

For the reasons set forth above, UBS is awarded legal fees of $203,000 and costs

and disbursements of $4,095.75 pursuant to § 506(b) of the Bankruptcy Code.  Its request

11

for default interest on the entire principal of the debt is denied.  Debtors should settle an

appropriate order on five days' notice.

Dated: New York, New York
        November 9, 2007


                                        /s/ Allan L. Gropper
                                    UNITED STATES BANKRUPTCY JUDGE