**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x
In re:

                                                        Chapter 11

NORTHWEST AIRLINES CORPORATION, *et al.*,

                                                        Case No. 05-17930 (ALG)

                                Reorganized Debtors.
-----------------------------------------------------------------------x


## MEMORANDUM OF OPINION


A P P E A R A N C E S:

CADWALADER, WICKERSHAM & TAFT, LLP
Counsel for the Reorganized Debtors
   By:   Bruce R. Zirinsky, Esq.
           Gregory M. Petrick, Esq.
           Barry J. Dichter, Esq.
           Nathan A. Haynes, Esq.
One World Financial Center
New York, New York 10281

   By:   Mark C. Ellenberg, Esq.
           Douglas S. Mintz, Esq.
1201 F Street N.W., Suite 1100
Washington, D.C. 20004

MAYER BROWN LLP
Counsel for General Foods Credit Corporation
   By:   David F. Abbott, Esq.
           John M. Conlon, Esq.
           Andrew R. Taggart, Esq.
1675 Broadway
New York, New York 10019

   By:   John J. Voorhees Jr., Esq.
71 South Wacker Drive
Chicago, Illinois 60606

ALLEN & OVERY LLP
Counsel for BAE Systems (Funding One) Limited
  By:  Ken Coleman, Esq.
        Todd S. Fishman, Esq.
        Tania Ingman, Esq.
1221 Avenue of the Americas
New York, New York 10020

KAYE SCHOLER LLP
Counsel for AT&T Credit Holdings, Inc., as *amicus curiae*
  By:  Richard G. Smolev, Esq.
        Piper A. Brock, Esq.
425 Park Avenue
New York, New York 10022

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

      Before the Court is the objection of the reorganized debtors (collectively, the

"Debtors") and BAE Systems (Funding One) Limited ("BAE") to claim 3995 (the

"GFCC Claim") filed by General Foods Credit Corporation ("GFCC"). The issue raised

is whether GFCC, as the Owner Participant in a leveraged lease transaction, can recover

on tax indemnification agreements it entered into with one of the Debtors. The Debtors

and BAE contend that a clause in the applicable contracts relieves the Debtors of liability.

For the reasons set forth below, the objection to the GFCC proof of claim is overruled.[1]

---

[1] This decision is limited to the question whether the Debtors are liable for damages under the tax indemnification agreements. By consent of the parties all issues relating to quantum of damages were reserved for future determination, if necessary. The Debtors have also objected to the portion of the GFCC Claim seeking fees and expenses based upon Exhibit J to a Participation Agreement, also entered into by the parties, which is a general indemnity provision. The Court severs this portion of the Claim and will set it down for further proceedings once GFCC has provided further detail as to the amounts claimed.

**Background**

The Transactions

On September 28, 1999, First Security Bank, National Association ("FSB"), as

Lessor and Owner Trustee, and Northwest Airlines, Inc. ("Northwest"), as Lessee,

entered into Lease Agreements (collectively, the "Lease") with respect to five Avro

aircraft bearing the designations N513XJ through N517XJ (collectively, the "Aircraft").[2]

As the Owner Participant, GFCC (or its predecessor) was the equity investor and

provided the equity share of the acquisition price for each of the Aircraft through an

Owner Trust.  Each Lease set forth the terms on which Northwest would lease and use

the Aircraft and also the consequences of an early termination of the Lease.  It is

important for purposes of this decision that damages as a consequence of a termination of

the Leases were, as is apparently standard in aircraft financings, calculated on the basis of

the Stipulated Loss Value ("SLV") of the Aircraft.  SLV of an aircraft is an amount for

which a Lessee is liable under certain circumstances, such as loss of the aircraft or the

occurrence of an event of default.  *See Interface-Group Nevada, Inc. v. Trans World

Airlines, Inc.* (*In re TWA*), 145 F.3d 124, 134 (3d Cir. 1998); *Atel Fin. Corp. v. Quaker

Coal Co.*, 132 F.Supp.2d 1233, 1241 (N.D. Cal. 2001); *In re Delta Air Lines*, 370 B.R.

552, 555 (Bankr. S.D.N.Y. 2007).  SLV is ordinarily measured by multiplying an amount

that includes the original cost of an aircraft by a declining percentage set forth on a

schedule to the Lease.  It is not contested for purposes of this decision that SLV usually

declines over the life of a lease because, among other things, an aircraft depreciates in

value over time.

---

[2] The parties entered into separate operative documents for each of the Aircraft, each of which is
substantially similar.  Wells Fargo Bank Northwest, National Association is successor to FSB as Lessor and
Owner Trustee.

3

However, SLV is not based solely on the value of the aircraft at any given point of time. Importantly for purposes of this dispute, another component of SLV is the tax loss that will be suffered by the equity as a result of a loss of the aircraft or a default under the Lease and/or the subsequent foreclosure. A further component is the equity's return on investment. The record is not entirely clear as to why SLV includes payments for the equity except that SLV is a liquidated damages amount that represents damages payable by an insurer if a plane is lost. Since SLV contains factors for the benefit of the equity, the transaction documents contain a "waterfall" provision providing for the distribution of SLV to the debt and thereafter to pay certain costs and finally to the equity.[3] Thus, in theory, the debt is protected by being paid first and the equity is protected by the waterfall.

In the Leases in question, the debt was provided by BAE (or its predecessor) pursuant to a Trust Indenture and Security Agreement (the "Indenture Agreement"), between FSB, as Owner Trustee, and State Street Bank and Trust Company ("State Street Bank"), as Indenture Trustee for the holder of the debt (BAE).[4] There was also a Participation Agreement (the "Participation Agreement") with respect to each of the Aircraft, among Northwest, as Lessee, GFCC, as Owner Participant, Trident Jet (Dublin)

---

[3] The waterfall is set forth in § 3.03 of the Indenture and provides, generally, for payments to be made in the following order: (i) to reimburse the Indenture Trustee for the debt for certain costs; (ii) to reimburse the holders of Secured Certificates (the debt holders) amounts paid for indemnification costs; (iii) to pay to the holders of the Secured Certificates principal and interest and other amounts due on the debt; (iv) to pay certain expenses of the trustee for the equity; (v) to pay the "Special Equity Claim" as directed by the Owner Trustee; (vi) to pay a claim in the nature of a prepayment penalty based on early termination of any related swap agreement; and (vii) to pay any balance to the trustee for the equity. The Special Equity Claim is defined as SLV plus the unpaid Basic Rent that has accrued less the amount of principal and interest on the Secured Certificates and thus includes a factor for tax losses already embedded in SLV.

[4] U.S. Bank, National Association ("U.S. Bank") is successor to State Street Bank as Indenture Trustee for the holders of the secured debt.

Limited, as Loan Participant, FSB, as Owner Trustee, and State Street Bank as Indenture
Trustee.

Importantly for purposes of this Decision, Northwest and GFCC also entered into
a Tax Indemnity Agreement (the "TIA") with respect to each of the Aircraft.  Each TIA
committed Northwest as lessee of the Aircraft to use them in a fashion so as to permit
GFCC as Owner Participant to "claim for Federal income tax purposes modified
accelerated cost recovery deductions with respect to the Aircraft . . . ."[5]  If Northwest did
not use the Aircraft in such fashion and caused GFCC a tax "Loss," as defined,
Northwest would be required to indemnify GFCC.  The TIA thus committed Northwest,
among other things, to utilize the Aircraft in a manner that would allow GFCC to obtain
its anticipated tax benefits, which Northwest was not likely to be able to use on its own
behalf.  There is no dispute that the tax benefits that accrue to the equity participant in a
leveraged lease transaction are an important factor in the transaction and induce the
holder of the equity to make funding available to the lessee-user of the aircraft at a lower
cost than would otherwise be available in the market.

On September 14, 2005, approximately six years after the Leases were executed,
the Debtors filed for chapter 11 protection.  They subsequently defaulted on the Leases
for each of the Aircraft by failing to make rent payments necessary to service the debt
under the Indenture, and they moved to reject the Leases.  The Leases were rejected by
order, dated March 7, 2006, that also gave the Debtors authority to implement certain
transactions contemplated in a term sheet entitled "Restructuring of Leases Relating to
British Aerospace Avro 146-RJ85A Aircraft."  The Lender, BAE, and its Indenture

---

[5] TIA § 2(c).  For example, the Aircraft had to be put in service and used in the United States for a
sufficient number of days per year to satisfy certain Internal Revenue Code conditions.

Trustee, U.S. Bank, filed proofs of claim (the "BAE Claims") for damages based on rejection of the Leases and failure to perform under the original transaction documents. They also foreclosed on the Aircraft; BAE placed credit bids at the foreclosure sales and became the owner of the Aircraft.  GFCC as prior owner of the Aircraft did not bid on the Aircraft and was foreclosed out, with adverse tax consequences.

On July 7, 2006, GFCC filed its Claim in the amount of $30,024,932.80.  The Claim is for amounts GFCC alleges are owed for indemnification under the TIA for tax losses relating to the Aircraft, as well as amounts alleged to be owed for fees and expenses under the indemnification provisions of the Participation Agreement.[6]

<u>The BAE Stipulation and Order</u>

By notice of presentment, dated May 17, 2007, the Debtors sought approval of a stipulation (the "BAE Stipulation") between the Debtors, U.S. Bank National Association as Indenture Trustee and BAE, settling the amount of BAE's Claims with respect to the Aircraft.  The BAE Stipulation recited that, in accordance with the transaction documents, BAE's proofs of claim "were calculated by reference to the Stipulated Loss Value . . . in accordance with each Prepetition Lease."  The Stipulation went on to assert:

> Allowance of the Allowed Claims plus the fair market value with respect to each relevant aircraft constitutes full payment and discharge of Stipulated Loss Value with respect to each Prepetition Lease as required pursuant to the relevant Prepetition Leases and the other Operative Documents.[7]

---

[6] As noted above, the issue of damages has been severed for subsequent determination.  GFCC alleges that $29,848,962.17 is the "aggregate payment required by the Tax Indemnity Agreements."  (GFCC Claim, ¶ 15.) "[A]n amount not less than $175,970.63" is alleged for fees and expenses pursuant to the indemnification provision of the Participation Agreement.  (GFCC Claim, ¶ 18.)

[7] Fair market value for the Aircraft was presumably based on the amount bid for the Aircraft at the foreclosure sale.  The record does not show what percentage of the total outstanding debt has been paid to BAE, but it has been conceded by all parties that the face amount of BAE's proofs of claim plus the fair market value of the Aircraft does not exceed the unpaid principal and interest on the debt.

The inference from this representation was that the equity would not be entitled to part of the debt's payment or that, in other words, there would not be a large enough recovery of SLV for proceeds to fall through the "waterfall" and provide a recovery to the equity.  To emphasize this point, for the benefit of BAE, § 1 of the BAE Stipulation also provided that each of the claims allowed to BAE

> is fixed, stipulated, and allowed as a general unsecured claim against the bankruptcy estate of Northwest in the amounts set forth in the following table which shall not be subject to subordination, reduction or adjustment in connection with any claims of any owner trustee or owner participant, or otherwise limited . . . .

GFCC objected to approval of the BAE Stipulation, asserting that the BAE Claims should be reduced because it (not BAE) was entitled under the TIA to a claim for the tax component of SLV.  It relied on § 7 of the TIA and on the definition of SLV in § 1 of the Lease, providing for the adjustment of a claim based on SLV under certain circumstances.  The Debtors and BAE responded with the contention that another section of the TIA, § 5(c), was controlling and had the effect of eliminating GFCC's TIA claim altogether.  Since the parties' contractual contentions are similar to those they have made in connection with the instant objection to GFCC's Claim, they will not be discussed in detail at this point.

In any event, GFCC's objection to the BAE settlement came before the Court at a hearing on July 26, 2008.  After hearing from the parties and influenced strongly by a decision in the *Delta Air Lines* case on similar issues, *In re Delta Air Lines, Inc.*, 370 B.R. 552 (Bankr. S.D.N.Y. 2007) ("*Delta I*"), discussed further below, this Court found in an oral decision on July 27, 2007 (the "July Decision") that the Debtors' decision to settle with BAE – giving BAE a claim based on SLV without a deduction for GFCC's

TIA claim – was reasonable in that § 5(c) of the TIA on its face appeared to eliminate

GFCC's TIA claim altogether.  It also found that its decision would not and could not

control GFCC's rights under its proof of claim, as the Debtors had not then even objected

to the GFCC Claim, and that no party had propounded the so-called "cosmic argument,"

that giving a claim to the debt (BAE) for the tax component of SLV would *ipso facto*

preclude the equity from also having a claim for the same loss.  The "cosmic argument"

was rejected in the *Delta* opinion, *Delta I,* 370 B.R. at 556-58, and it has never been put

forward by these Debtors.

Based on the above reasoning, the Court approved the BAE Stipulation, which

was entered on August 2, 2007.[8]  The Debtors thereafter objected to the GFCC Claim, the

parties engaged in discovery, and the Court conducted an evidentiary hearing on the

Claim.  On the basis of the entire record, the Court now adopts the following findings of

fact and conclusions of law.

### Decision

The parties' contentions regarding GFCC's tax indemnity claims require the

construction of the TIA.  Two sections of the TIA were particularly relevant in

connection with GFCC's objection to the BAE Stipulation.  GFCC relied on § 7 of the

TIA in support of its contention that the Court should reduce BAE's claim for SLV

because it, not BAE, was entitled to a claim for the tax losses embedded in SLV.  The

Court rejected this application of the TIA and, as discussed below, rejects any such result

again.

---

[8] Despite the limited effect of the decision on the BAE settlement, GFCC appealed the order approving the BAE Stipulation.  The District Court dismissed the appeal on the ground that approval of the BAE Stipulation did not represent a final resolution of the issues.  *See* Order, dated December 3, 2007, of the Hon. Shira A. Scheindlin in Case No. 1:07-cv-07940.  The Court understands that the BAE Stipulation has since been consummated.

The other section of the TIA at issue in connection with the BAE Stipulation, and the principal provision at issue now, is § 5(c) of the TIA, which provides:

> Notwithstanding anything to the contrary in this Agreement, Lessee shall not be required to indemnify Owner Participant with respect to a Loss or Foreign Tax Credit Loss to the extent such Loss or Foreign Tax Credit Loss occurs as a direct result of one or more of the following events: . . . (c) Any event as a result of which Lessee or any other person has paid Stipulated Loss Value or Termination Value, or paid the amount required to be the greater of the fair market value of the Aircraft and Stipulated Loss Value or Termination Value in accordance with the provisions of the Operative Documents except to the extent that such payment does not reflect the timing of the occurrence for Federal income tax purposes . . .

There is no dispute that the TIA would give GFCC a claim in these Chapter 11 proceedings based on its tax losses but for the exclusion in § 5(c).

GFCC argued at the hearing on the BAE Stipulation that § 5(c) of the TIA was not ambiguous and only applies when the lessee-airline has "paid" SLV "in full in cash" and thus where the cash payments have fallen through the "waterfall" to benefit the equity. In response the Debtors and BAE agreed that the section was not ambiguous but contended that a debtor in bankruptcy "pays" a debt by allowing a proof of claim and that the allowance of a claim that is based on or includes a recovery calculated by reference to SLV triggers the exclusion.

At the hearing on the BAE Stipulation and in a subsequent order approving the BAE settlement, the Court accepted the Debtor's construction of § 5(c), finding that the term "paid" should be construed in the context of a bankruptcy case, in that bankruptcy indelibly has an effect on every contract, and that SLV would be "paid" through payment on BAE's proofs of claim for SLV on the Aircraft. As noted above, it was strongly influenced by the similar conclusion of the Court in a *Delta Air Lines* decision,

construing a very similar provision of a tax indemnification agreement entered into by

that airline. The *Delta* Court found that the term "paid" as used in a tax indemnification

agreement was not ambiguous and that it did not mean "paid in full in cash." *See Delta I*,

370 B.R. at 562. In a later decision in the same case, the *Delta* Court dealt with similar

contractual language in another aircraft TIA. In that opinion, the Court surveyed the

meaning of the word "pay" and "paid" and concluded, "every dictionary we have found

defines the word 'pay' in words or substance as the satisfaction of a debt by money or

property sufficient in fact or law to discharge the obligation." *See Delta Air Lines, Inc.*,

381 B.R. at 68 (Bankr. S.D.N.Y. 2008) ("*Delta II*").

Notwithstanding this Court's acceptance of the Debtors' position at the hearing on

the BAE Stipulation, it held that the decision would not and could not be determinative of

the issues that might be raised on an objection to the GFCC proof of claim, even if it

might be "highly persuasive." (Hr'g Tr. 16: 23-24, July 27, 2007.) The Court has since

then reiterated this position at several hearings, and it again rejects the contention (which

the Debtors maintain) that the Court's oral decision on the BAE Stipulation is preclusive

as to the issues on the Debtors' objection to the GFCC proof of claim. The hearing on

the BAE Stipulation was a hearing to approve a settlement, a summary proceeding in

which the Court is directed to canvass a limited record and to determine whether the

settlement is above the lowest level of reasonableness. As the Court said in *In re W.T.*

*Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983), *cert. denied*, 464 U.S. 822 (1983), a case

under the Bankruptcy Act but one which remains good law, "In undertaking an

examination of the settlement, we emphasize that this responsibility of the bankruptcy

judge, and ours upon review, is not to decide the numerous questions of law and fact

raised by appellants but rather to canvass the issues and see whether the settlement fall[s] below the lowest point in the range of reasonableness." (internal quotations omitted); *see also Copeland v. Merrill Lynch & Co., Inc.*, 47 F.3d 1415, 1422-23 (5th Cir. 1995). Moreover, the Debtors had not even objected to the GFCC Claim, and GFCC had a statutory right to a hearing on the Claim before it could be disallowed. *Cf. In re Orion Pictures Corp.*, 4 F.3d 1095, 1098-99 (2d Cir. 1993) (summary proceeding not appropriate for extended trial on disputed issues).

In any event, after the BAE Stipulation was approved, the Debtors objected to the GFCC Claim, and GFCC responded with evidentiary materials as well as many of the arguments it had previously made. Northwest responded with the same contentions previously made, as well as the argument that the Court's decision on the BAE Stipulation constituted collateral estoppel on the objection to GFCC's Claim. The Court authorized limited discovery, which the parties took, and it held a one-day hearing on the GFCC Claim and objection. Based on a much more complete record, the Court now comes to a different conclusion as to the meaning of § 5(c) of the TIA than it did in its oral decision in July 2007. It does not, however, question the reasonableness or binding effect of the BAE Stipulation. As further discussed below, there is no overlap or inconsistency between the BAE and GFCC claims that would require the Court to reject either of them.

<u>Ambiguity</u>

Before considering the evidence adduced at the hearing, it is necessary to determine whether any evidence outside the text of the contracts at issue should be received. Northwest objected, and continues to object to receipt of evidence outside the

contracts on the ground that the term "paid" as used in § 5(c) is not ambiguous.  GFCC

also took the position in its opposition to the BAE Stipulation that the term "paid" as used

in § 5(c) is not ambiguous, and as stated above, the Court's oral decision was based on

this premise.  GFCC has now changed its position and contends – correctly, as discussed

below – that the word "paid" is susceptible to more than one reasonable interpretation,

and that it is appropriate for the Court to admit extrinsic evidence to aid in the

construction of the term.

Under the applicable law of New York,[9] "[a]n ambiguity exists where the terms of

a contract could suggest 'more than one meaning when viewed objectively by a

reasonably intelligent person who has examined the context of the entire integrated

agreement and who is cognizant of the customs, practices, usages and terminology as

generally understood in the particular trade or business.'" *Alexander & Alexander Servs.*

*v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998), quoting

*Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997) (New York law).

The determination "whether a contract provision is ambiguous is to be made by the court

as a matter of law." *Greenfield v. Philles Records*, 98 N.Y. 2d 562, 569, 750 N.Y.S.2d

565, 789 N.E.2d 166 (2002).   There is also no question that "[t]his determination is made

by examining the face of the agreement itself, without considering extrinsic evidence."

*Id.*, citing *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002) (construing New

York law).  The Court must construe the parties' intent in light of all of the provisions of

the agreement in question, together with any related agreements entered into

concurrently.  A contract is not ambiguous merely because the parties offer different

---

[9] The TIAs here are governed by New York law.

constructions of the same term.  *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993).

The *Delta* Court in its first decision construed the meaning of the word "paid" as used in a similar tax indemnification agreement without resort to extrinsic evidence, and its conclusion was persuasive when this Court issued its oral decision on the BAE Stipulation.  *Delta I*, 370 B.R. at 552.[10]  The *Delta* Court returned to the issue at greater length in its second decision on TIA issues, examining the term "paid" in the context of the *Delta* documents, and concluding that the term "paid" meant satisfied in the airline-lessee's bankruptcy.  Notwithstanding this respected authority, the parties to this case have provided numerous examples of disputes where the meaning of the word "paid" has been, variously, "paid in full in cash" and "satisfied."  For example, Northwest cites a case in which a court construed "paid" in the context of a bankruptcy to mean "satisfied." *See In re Keck, Mahin & Cate*, 241 B.R. 583 (Bankr. N.D. Ill. 1999).  GFCC cites contrary authority that supports its interpretation of the word "paid" as meaning paid in full in cash.  *See Scotto v. Brink's, Inc.*, 962 F.2d 225, 227 (2d Cir. 1992) (interpretation of the word "paid" as used in a collective bargaining agreement); *P.G. Lake, Inc. v. Comm'r of Internal Revenue*, 148 F.2d 898, 900 (5th Cir. 1945) (interpretation of the word "paid" as used in the Internal Revenue Code); *Levine v. Ribicoff*, 201 F. Supp. 692, 694 (S.D.N.Y. 1962) (claim for social security benefits).[11]

---

[10] The tax indemnification agreements at issue in the *Delta* case were also governed by New York law.

[11] Counsel to AT&T Credit Holdings, Inc., which has a pending claim similar to that of GFCC, has cited several additional cases construing the word "paid," as paid in cash in full.  *See Oneida County v. Tibbits*, 125 Wis. 9, 15-16, 102 N.W. 897, 899 (Wis. 1905) (dispute relating to tax collection); *Moses v. U.S.*, 28 F. Supp. 817, 819 (S.D.N.Y. 1939) (dispute over the payment of estate taxes); *Budge v. Post*, 544 F. Supp. 370, 384-85 (N.D. Tex. 1982) (discussion of the affirmative defense of payment with respect to breach of contract action). It also cited another bankruptcy case, *In re Emergency Beacon Corp.*, 48 B.R. 341, 348 (Bankr. S.D.N.Y. 1985), where a bankruptcy trustee argued unsuccessfully that a claimant had received

None of this authority is determinative as to the manner in which the term is used in § 5(c) of the TIA, but it does support the contention that the term "payment" can be used in two different senses, to mean "paid in cash in full" and to mean "satisfied." Indeed, the Second Circuit has taken note of the dual meaning of the term. *Zeig v. Massachusetts Bonding & Ins. Co.*, 23 F.2d 665, 666 (2d Cir. 1928), involved a contractual requirement that primary insurance be "exhausted in the payment of claims" prior to the liability of the excess insurer. The Circuit Court construed the term against the insurer, noting "[t]here is no need of interpreting the word 'payment' as only relating to payment in cash. It *often* is used as meaning the satisfaction of a claim by compromise, or in other ways…." *Id.* (emphasis added). Although the result in *Zeig* supports Northwest's construction of the term, the Court acknowledged that the term is "often" used in a different manner, and one Court has described *Zeig* as finding that the term is ambiguous. *See Comerica v. Zurich American Ins. Co.*, 498 F.Supp. 2d 1019, 1030 (E.D. Mich. 2007) ("The cases that follow *Zeig* generally rely on an ambiguity in the definition. . . . .").[12] In this case, unlike *Zeig*, there is no reason to construe an ambiguous term against either of the parties. Since § 5(c) can be fairly read to have two different meanings based upon the meaning of the word "paid," it must be concluded that an ambiguity exists and that it would be error to exclude extrinsic evidence as to the intent of the parties in drafting § 5(c) of the TIA.

---

"payment" of $35,354.10 by receipt of accounts receivable in that face amount but of a value of only $16,000. The Court found that the turnover of accounts receivable "is not the equivalent of payment . . . ."

[12] Other courts have construed similar language to find that the excess insurer's liability only arises "after the primary insurer has paid claims", using the term to mean payment in cash. *See Zurich Ins. Co. v. Heil Co.*, 815 F.2d 1122, 1124 (7th Cir. 1987); *New Process Baking Co. v. Federal Ins. Co.*, 923 F.2d 62, 63 (7th Cir. 1991); *Regents of Univ. of Michigan v. Employees of Agency Rent-a-Car Hospital Assoc.*, 898 F.Supp. 492, 494 (E.D. Mich. 1995) (collecting cases). The various uses of the term "payment" in indemnity insurance were at issue in the Second Circuit's recent decision in *Asbestosis Claimants v. Amer. SS Owners Mutual Prot. & Indem. Ass'n, Inc.*, 533 F.3d 151 (2d Cir. 2008).

The Evidence

The evidence presented at the hearing on the Debtors' objection to the GFCC

Claim consisted primarily of the testimony of the lawyers for the parties who had

negotiated the TIA.  It appeared from their testimony that the documents governing the

leveraged leases for the five Avro aircraft, including the TIAs, were "cloned" virtually

word-for-word from the documentation of an earlier transaction involving three A320

aircraft (the "A320 Transaction").  The lawyers who drafted the TIAs for all eight

Aircraft were tax lawyers, and they testified that while they had extensively negotiated

the tax aspects of the TIAs, they had never discussed § 5(c), one of the exclusionary

provisions, and they had never given any thought to the possibility that there might be a

bankruptcy default that triggered rights under the TIA.[13]  Although in the presence of

hindsight the lawyers each advocated the construction of § 5(c) advanced by his client,

and each contended that the TIA should be read in his client's favor, there had been no

discussion or negotiation of § 5(c) at the time.

The lawyers' testimony clarified the record only negatively – they had apparently

never expressly discussed how § 5(c) would be applied or construed.  However, in

addition to the lawyers' testimony, GFCC introduced the deposition testimony of Keith

McWalter ("McWalter") of Babcock & Brown ("Babcock"), which served as

Northwest's financial advisor and equity placement agent.  Babcock solicited, as

Northwest's agent, equity investors for both the A320 and the Avro transactions, as it had

done many times in the past in other aircraft leveraged leases.  McWalter prepared the

statement of terms or "term sheet" for the A320 Transaction that was used as an offering

---

[13] The corporate lawyers, who might have given some thought to the possibility of bankruptcy, were in the next room but were apparently not consulted about the TIAs.  They did not testify.

memorandum to solicit an equity investor for the A320 deal and thereafter for the Avro

transaction.  The term sheet served as the template for the final documentation of both

deals.  Babcock drafted the provision in the section of the term sheet relating to "Federal

Income Tax Indemnification" that listed exceptions to Northwest's indemnification

obligations.  One such exception, in subparagraph 3 on page 14, provided that Northwest

would not be required to indemnify the equity as a result of  "Events which require

Lessee to pay Stipulated Loss Value or Termination Value or an amount measured in

respect of Stipulated Loss Value or Termination Value, *provided that such amounts shall

have been paid to the Equity Investor.*" (Claimant's Exh. 3, Bates No. WS-GFCC

001476) (emphasis added.)   There is no dispute that this term sheet clause was the

antecedent to the § 5(c) exclusion in the TIAs.

McWalter testified as to his understanding of the clause and the meaning of

"paid" in the context thereof and stated unequivocally that the term "payment" in the

term sheet meant "actual payment of the stipulated loss value to the equity investor."

(Dep. Tr. p. 53, lines 3-4.)  McWalter stated that "the exception contemplated payment"

and that he does not believe that discharge of the Airline's obligations under the TIA for

less than full payment  "was ever considered.  Certainly not by me."  *Id.* p. 54, lines 10-

19.  And he further testified that he reviewed successive drafts of the actual documents

that were drafted based on the term sheet, and that the term sheet and the TIA as drafted

"embody the same concept."  *Id.* at p. 67, line 11.  The concept, he repeated, was standard

in TIAs:  "The general understanding of this sort of clause is that it's a zero-sum gain

[game], and to the extent the dollars are paid and received, the obligation under the TIA

would offset."  *Id.* at p. 73, lines 7-10.

This testimony, from Northwest's agent who drafted the term sheet that served as an offering memorandum with which Northwest solicited equity investors for the transaction, obviously undermines its entire case. Northwest's response to the testimony (to the extent it has even taken note of McWalter's testimony in its post-trial papers) is not persuasive. Northwest points out, correctly, that the key phrase in the term sheet, "provided that such amounts shall have been paid to the Equity Investor," did not find its way into the final documentation. According to Northwest, the inference to be drawn from this omission is that the parties did not intend to require that any part of SLV actually be "paid in cash" to the equity in order for the § 5(c) exclusion to apply.

The problem with this contention is that Northwest's own witness, the tax lawyer who represented it in the transaction, testified without qualification that § 5(c) was "consistent with the terms of [the] term sheet." (Hr'g Tr. 160:2-4, Feb. 13, 2008.) He then provided a lengthy and thoroughly unconvincing explanation as to how words that state "paid to the equity investor" can be construed to mean (in Northwest's view) amounts that are *not* paid to the equity investor but paid to the debt. (*Id.* at 160:8 – 162:2.) He pointed out, first, that most amounts ultimately payable to the equity investor are in fact payable to the owner trustee, which holds the equity on behalf of the equity investor. He also pointed out that most amounts payable to the owner trustee are pledged to the debt as additional collateral security, and thus that the debt may be able to foreclose on amounts payable to the equity. However, while these points may explain why the lawyers might not have included the words "paid to the equity investor" in the final documents, because amounts payable to the equity might be subject to a security interest of the debt or be payable to the debt through operation of the waterfall, they do

17

not explain the basic business point that McWalter made – that the word "paid" in § 5(c)

does not mean satisfied, and that § 5(c) is operative only where the equity investor has

received actual payment through the waterfall.

<u>Construction of the Documents as a Whole</u>

Beyond the construction of § 5(c), it is the Court's duty to construe the TIA as a

whole together with any related agreements entered into concurrently.  All provisions of

the documents must, if possible, be given effect.  *Two Guys from Harrison-N.Y., Inc. v.*

*S.F.R. Realty Assocs*, 63 N.Y.2d 396, 403, 472 N.E.2d 315, 318, 482 N.Y.S.2d 465, 468

(1984).  Moreover, "[u]nder New York law, 'all writings which form part of a single

transaction and are designed to effectuate the same purpose must be read together, even

though they were executed on different dates and were not all between the same parties.'"

*TVT Records v. Island Def Jam Music Group*, 412 F.3d 82, 89 (2d Cir. 2005), quoting

*This is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998); *see also Carvel Corp. v.*

*Diversified Mgmt. Group, Inc.*, 930 F.2d 228, 233 (2d Cir. 1991).  Close examination of

other provisions of the TIA, read together with the other leveraged lease documents,

confirms that the appropriate reading of the exclusionary provision in § 5(c) is that the

parties did not intend it to be triggered by "satisfaction" of the debt.

One provision of the TIA to take into account is § 7, which provides for an

adjustment to SLV under certain circumstances:

> If any amount is required to be paid by Lessee under Section 4 hereof,
> Owner Participant will recompute the Stipulated Loss Value
> percentages and Termination Value percentages and Special Purchase
> Price with respect to the Aircraft to reflect such payment in accordance
> with the manner in which such values were originally computed, or
> adjusted pursuant to Section 3 of the Lease, by Owner Participant, and
> shall certify to Lessee either that such values as set forth in the Lease
> do not require change or, as the case may be, the new values necessary

> to reflect the foregoing recomputation, describing in reasonable detail the basis for computing such new values, and upon such certification such new values shall be substituted for the values appearing in the Lease.

In effect, this provision requires the following adjustment to SLV: if "any amount" is "required to be paid" to the equity under the TIA, the equity will adjust the amounts payable under the lease to reflect such payment so that it does not receive any duplicative or overlapping payments (e.g., through SLV). At the hearing GFCC argued in support of its objection to the BAE Stipulation that this provision *required* that SLV to be paid to the debt be reduced, but this argument was demonstrably wrong. The parties did not contend that the amounts payable to BAE under the Stipulation exceeded principal and interest on the debt, and as BAE was quick to point out, any adjustments provided for in § 7 of the TIA cannot cause the amounts payable to the debt to be reduced to less than full principal and interest on the debt.[14]

At the hearing on approval of the BAE Stipulation, the Court rejected GFCC's overbroad construction of § 7. It again rejects the contention that the BAE Claims based

---

[14] Section 3(d)(v) of the Lease provides:

> Anything contained in the Participation Agreement or this Lease to the contrary notwithstanding, each installment of Basic Rent payable hereunder, whether or not adjusted in accordance with this Section 3(d), shall, and each payment of Termination Value and Stipulated Loss Value, whether or not adjusted in accordance with this Section 3(d), shall, together with all other amounts (including an amount equal to the Funding Loss Amount, if any, payable by Lessor on the Secured Certificates) payable by Lessee pursuant to this Lease, in each case be, under any circumstances and in any event, in an amount at least sufficient to pay in full, on the date on which such amount of Rent is due, any payments then required to be made on account of the principal of, Funding Loss Amount, if any, and interest on the Secured Certificates. It is agreed that no installment of Basic Rent or payment of Termination Value or Stipulated Loss Value shall be increased or adjusted by reason of (i) any attachment or diversion of Rent on account of (A) Lessor Liens or (B) any Indenture Trustee's Liens or Loan Participant Lien on or against the Trust Estate, any part thereof or the Operative Documents arising as a result of claims against the indenture Trustee not related to the transactions contemplated by the Operative Documents, (ii) any modification of the payment terms of the Secured Certificates made without the prior written consent of Lessee or (iii) the acceleration of any Secured Certificate or Secured Certificates due to the occurrence of an 'Event of Default' (as defined in the Trust Indenture) which does not constitute an Event of Default hereunder.

on SLV should have been reduced.  Since it was conceded that BAE was not allowed a claim for more than principal and interest on the debt, there was no basis for a reduction in its allowed claim, even though the claim was set by reference to SLV.

Nevertheless, the presence of a § 7 adjustment provides some support for GFCC's construction of the contracts as a whole.  The documents in question have been developed over many years by sophisticated counsel who have, like the lawyers who testified, devoted their careers to the intricacies of leveraged leases.  If GFCC's construction of the term "paid" as meaning "paid in cash" is accepted, the provisions of the TIA work effectively.  If the equity gets "paid" its tax losses through payment of SLV and application of the waterfall, amounts it might otherwise make claim to are reduced by a recalculation of SLV – but not below an amount sufficient to pay principal and interest on the debt (reflecting the fact that debt gets paid before equity).

There is no similar provision that adjusts SLV or any other entitlement under the TIA if Northwest's construction of the term "paid" in § 5(c) is accepted.  In Northwest's construction of the term, the right of the debt to file a claim that could contain a dollar of tax losses as part of SLV is enough to eliminate the equity's entire TIA claim.  Northwest does not explain why the parties would not have provided for a sharing arrangement similar to § 7, reducing the claim of the equity for any tax losses paid to the debt, if they had intended § 5(c) to be read in the fashion Northwest construes it.

Northwest suggests that the absence of an alternative sharing provision was intentional, and that the word "paid" in § 5(c) should be construed to mean "satisfied" as a means of protecting it against even the possibility of duplicative claims from the debt and the equity for the "same tax loss."  No one testified, however, that this was the

20

purpose of § 5(c), and McWalter testified that the provision should be construed

differently.  Moreover, as noted above, Northwest never made the "cosmic argument"

that the debt and equity could not each have a claim framed by reference to the same tax

losses.  It is not contested that the question is what the parties intended in the contracts

they made.

In any event, under the facts of this case, there are no duplicative claims.  First,

the record is clear that BAE was never even afforded a claim for "full SLV."  BAE's

Claims were for SLV minus an amount equal to the fair market value of the aircraft that

BAE sold in a foreclosure sale and applied to the debt.[15]  BAE's Claims were thus

calculated "by reference to" SLV, as the BAE Stipulation provided, but it cannot be said

that its Claims were for "full SLV."[16]

Even if the BAE Claims had been based on "full SLV," rather than SLV reduced

by the value of the aircraft, it could only be said that the BAE claims for SLV (including

a factor based on the equity's tax loss) would be "duplicative" of the equity's claim for

the same tax loss if the debt's claims were for more than its lost principal and interest.

As noted above, BAE's Claims do not exceed the debt's lost principal and interest.

Moreover, if the debt's claim based on SLV had exceeded its loss, the Debtors were not

without a remedy.  In another claims objection in these Chapter 11 cases, Northwest

---

[15] The proofs of claim filed by BAE confirm that its claims were calculated on the basis of SLV minus the fair market value of the aircraft.  The Court can take judicial notice of these pleadings.  *See Missionary Baptist Foundation v. Huffman*, 712 F.2d 206, 211 (5th Cir. 1983); *In re H.E. Graf, Inc.*, 125 B.R. 604, 606 (Bankr. E.D. Ca. 1991).  The proceeds of the sale of the aircraft went to BAE, the secured debt holder, rather than to GFCC as owner, in light of BAE's security interest in the planes.  GFCC does not question this result.

[16] As noted above, the Debtors put language in the BAE Stipulation that "[a]llowance of the Allowed Claims plus the fair market value with respect to each relevant aircraft constitutes full payment and discharge of Stipulated Loss Value with respect to each Prepetition Lease as required pursuant to the relevant Prepetition Leases and the other Operative Documents."  The Stipulation thus uses the ambiguous word "payment" but it does not and could not bar GFCC's Claim, especially as, in approving the Stipulation, the Court reserved GFCC's rights under its proof of claim.

21

objected to a claim based on SLV that vastly exceeded the amount payable on the debt

(the remaining lease payments) on the ground that such a recovery was unenforceable as

an unreasonable liquidated damages penalty.  In a decision being rendered concurrently

with the instant decision, the Court has sustained the Reorganized Debtors' Tier III(B)

Objection to Proofs of Claim Numbers 5904 and 5905 filed by ALG DC-9 L.L.C.

(Docket No. 7984).

Northwest argues that parties recognized, in the opinions of their respective

counsel, that their rights could be affected by bankruptcy.[17]  There is no doubt that

bankruptcy overrides many provisions of state law.  *See, e.g., Hanover Nat'l Bank v.*

*Moyses*, 186 U.S. 181, 189 (1902); *Von Hoffman v. City of Quincy*, 71 U.S. 535, 550

(1867); *U.S. v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1002 (2d Cir.

1991).[18]  Northwest does not assert that § 5(c) is unenforceable in bankruptcy, however.

---

[17] For example, the opinion letter of Winston & Strawn, special counsel to GFCC in connection with the
Avros transaction, states

> [t]he Participation Agreement and the Tax Indemnity Agreement constitute legal,
> valid and binding obligations of the Owner Participant, enforceable against the
> Owner Participant in accordance with their respective terms, except as the
> enforceability thereof may be limited by applicable bankruptcy, insolvency,
> fraudulent conveyance, reorganization, moratorium or similar laws affecting the
> enforcement of creditors' rights generally, and except as enforcement thereof is
> subject to general principles of equity (regardless of whether such enforceability is
> considered in a proceeding at law or in equity.  (Joint Exhibit D, at Bates No. GFCC
> TIA 03300-03301.)

The opinion letter of Cadwalader, Wickersham & Taft, special counsel to Northwest in the Avros
transaction, states

> [t]he Lessee Documents constitute the legal, valid and binding obligations of Lessee
> enforceable against Lessee in accordance with their respective terms except as may
> be limited by . . . (B) applicable bankruptcy, insolvency, fraudulent conveyance,
> reorganization, moratorium or similar laws affecting the rights of creditors or lessors
> generally . . . .  (Joint Exhibit D at Bates No. GFCC TIA 03275).

The Tax Indemnity Agreement is included in the definition of Lessee Documents.

[18] There are provisions of the TIA that are unenforceable by reason of the Debtors' bankruptcy.  For
example, GFCC relies on at least two provisions of the TIA that are unenforceable by reason of the

Northwest seeks to enforce § 5(c) and thereby to eliminate altogether any claim of GFCC

based on the TIA.  The question in this case thus is not how damages provided for in a

contract should be treated in bankruptcy or whether any part of a contract is

unenforceable as a result of a bankruptcy filing.  The question in this case is whether the

parties intended that § 5(c), in or out of bankruptcy, should render the remainder of the

TIA unenforceable.

Considering the record as a whole, there is no reason to read this clause as if it

had a meaning in the context of bankruptcy different from its meaning outside of

bankruptcy.  This is especially so because, as GFCC argues, contract rights are

commonly dictated by state law, and "[u]nless some federal interest requires a different

result, there is no reason why such interests should be analyzed differently simply

because an interested party is involved in a bankruptcy proceeding."  *Butner v. United

States*, 440 U.S. 48, 55 (1979).  There is no contrary federal interest that requires a

different analysis in this case.  In *Travelers Casualty & Surety Co. v. Pacific Gas &

Electric Co.*, 127 S. Ct. 1199, 1205 (2007), the Supreme Court recently stated,

"'[c]reditors' entitlements in bankruptcy arise in the first instance from the underlying

substantive law creating the debtor's obligation, subject to any qualifying or contrary

provisions of the Bankruptcy Code.'"  *Id.* at 1204-05, quoting *Raleigh v. Illinois Dep't of*

---

Debtors' filing.  These are § 9 of the TIA, which states that "all payments to be made to Owner Participant by Lessee pursuant to this Agreement shall be made in United States dollars" and § 15 of the TIA, which states that "[s]ubject to the provisions of the fourth paragraph of Section 4(e), Lessee's and Owner Participant's respective payment obligations under this Agreement shall be absolute and unconditional and shall not be affected by any circumstances including, without limitation, the circumstances described in Section 18 of the lease."  Section 18 of the Lease, in turn, states, in part:

> Lessee's obligation to pay all Rent payable hereunder shall be absolute and unconditional and shall not be affected by any circumstance, including, without limitation, . . . (iii) any insolvency, bankruptcy, reorganization or similar case or proceedings by or against Lessee (or any Sublessee) or any other person . . . .

These provisions are obviously affected by or unenforceable as a consequence of a bankruptcy filing.

*Revenue*, 530 U.S. 15, 20 (2000). The Debtors have not identified any "qualifying or contrary" provisions of the Bankruptcy Code at issue in this case.

In conclusion, the full record establishes that the GFCC Claim is not duplicative of the BAE Claim. The latter is less than the unpaid principal and interest on the debt and while the BAE Claims were calculated "by reference to SLV," they do not, as discussed above, constitute even a claim based on "full SLV." GFCC's Claim under the TIA is based on the tax losses it incurred as a consequence of Northwest's rejection of the aircraft leases and the subsequent foreclosure by BAE. Northwest agreed to indemnify GFCC for these losses in the TIA in separate, carefully delineated contracts.[19] Since there is no Code provision or public policy that would preclude such indemnification, and since the exception created by § 5(c) of the TIA cannot be fairly read to eliminate GFCC's right to indemnification, the Debtors' objection to the GFCC Claim must be overruled.[20]

---

[19] Thus, GFCC does not contend that it has a claim for its tax losses because the waterfall was not sufficient to provide it with payment or any similar reason. GFCC has disclaimed any claim based on its lost investment return, which was also provided for in the waterfall. GFCC's Claim is based squarely on tax indemnification rights provided in each TIA. Moreover, it is worth noting that the amounts payable to the equity under the TIA are "excluded payments" and not part of the collateral package given to the debt. The security granted to the Indenture Trustee does not include: ". . . all payments required to be made under the Tax Indemnity Agreement by Lessee and all payments of Supplemental Rent by Lessee in respect of any amounts payable under the Tax Indemnity Agreement . . ." (Indenture, p. 6.)

[20] One of the *amicus* parties cites several opinions from other districts in support of its argument that the *Delta* decisions are inconsistent with decisions or orders in other airline bankruptcies in which TIA claims have been allowed in negotiated or filed amounts, despite the presence of exclusions similar to § 5(c). *See General Foods Credit Corp. v. United Air Lines, Inc. (In re UAL Corp.)*, 2007 U.S. Dist. Lexis 5422 (N.D. Ill. Jan. 22, 2007); *In re Kmart Corp.*, 362 B.R. 361 (Bankr. N.D. Ill. 2007), *aff'd Philip Morris Capital Corp. v. Kmart Corp.*, 2007 U.S. Dist. LEXIS 79531 (N.D. Ill., Oct. 24, 2007); *In re Nat'l Energy & Gas Transmission (f/k/a PG&E Nat'l Energy Group, Inc.)*, Case No. 03-30459PM, slip op. (Bankr. D. Md. Nov. 9, 2005). While these opinions involve TIA claims by equity participants in leveraged leases, they were issued in different cases, presumably with different facts and different contract language. As conceded by the *amicus*, none of them actually addressed the issue before the Court; for example, the *UAL* decision did not address the application of an exclusionary provision of the tax indemnity agreement there because the debtors in that case conceded that the lender's deficiency claim did not constitute a payment of full SLV. These cases do not aid in the resolution of the matter at bar.

## <u>Conclusion</u>

For the reasons set forth above, the objection to the GFCC Claim is overruled.

The Court reserves all issues as to the amount of the GFCC Claim, as well as the issue

whether fees and expenses are payable under the Participation Agreement and, if so, in

what amount.  The parties should contact Chambers to schedule further proceedings and

submissions on these remaining issues as necessary, and GFCC should settle an

appropriate order on five days' notice.

Dated: New York, New York
      September 5, 2008


                     */s/ Allan L. Gropper*
                     UNITED STATES BANKRUPTCY JUDGE