1                 UNITED STATES BANKRUPTCY COURT
                 SOUTHERN DISTRICT OF NEW YORK

2
                          .  Chapter 11
3                          .
                          .  Case No. 05-17930 (ALG)
4  IN RE:                    .
                          .  (Jointly Administered)
5  NORTHWEST AIRLINES            .
    CORPORATION, et al,         .  New York, New York
6                          .  Wednesday, June 25, 2008
                          .  11:05 a.m.
7      Reorganized Debtors.    .
   . . . . . . . . . . . . . . . . .
8
                    TRANSCRIPT OF HEARING
9          BEFORE THE HONORABLE ALLAN L. GROPPER
             UNITED STATES BANKRUPTCY JUDGE
10
  APPEARANCES:
11
  For the Debtors:           Nathan A. Haynes, Esq.
12                        CADWALADER, WICKERSHAM & TAFT, LLP
                       One World Financial Center
13                       New York, New York 10281

14  For the Post-Effective    John Paul G. Igoe, Esq.
    Date Committee:           OTTERBOURG, STEINDLER, HOUSTON
15                        & ROSEN, P.C.
                       230 Park Avenue
16                       New York, New York 10169

17  For Creditor             James Gauthier, Esq.
    Craig Friday:            (Via telephone)
18
  Pro Se:                   Jesse Velez
19

20
  Audio Operator:            Electronically Recorded
21                       by Court Personnel

22  Transcription Company:    Rand Reporting & Transcription, LLC
                       80 Broad Street, Fifth Floor
23                       New York, New York 10004
                       (212) 504-2919
24                       www.randreporting.com

25  Proceedings recorded by electronic sound recording, transcript
  produced by transcription service.

```
                            I N D E X
                             6/25/08

                                                          Page

REORGANIZED DEBTORS' MOTION FOR AN ORDER DISSOLVING        4
THE DISTRIBUTION SUBRESERVES CREATED IN CONNECTION
WITH CONFIRMATION OF THE REORGANIZED DEBTORS' FIRST
AMENDED JOINT AND CONSOLIDATED PLAN OF REORGANIZATION

DEBTORS' MOTION FOR AN ORDER EXTENDING THE                6
ADMINISTRATIVE EXPENSE CLAIMS OBJECTION DEADLINE

FINAL DECREE AND ORDER CLOSING CERTAIN CHAPTER 11 CASES   7

REORGANIZED DEBTORS' TIER III(B) OBJECTION TO PROOF OF    8
CLAIM NUMBER 6335 FILED BY CRAIG S. FRIDAY

DEBTORS' MOTION TO ESTIMATE AND CAP PROOF OF CLAIM        25
NUMBER 10341 FILED BY JESSE VELEZ
```

Note:  Argument by Mr. Gauthier Via Telephone Not Adequately
Recorded for Verbatim Transcription.

1      (Proceedings commence at 11:05 a.m.)

2          THE COURT:  Please be seated.  All right.  <u>Northwest</u>

3  <u>Airlines</u>, may I have -- oh, we should get one party on the

4  phone.

5      (Court personnel dialing for telephonic appearance.)

6          THE COURT:  Good morning.  This is Judge Gropper.  I

7  will take appearances from those in the courtroom, and then

8  from those on the telephone.  I assume I have some

9  representatives on the telephone.

10          MR. GAUTHIER:  That is correct, Your Honor.

11          THE COURT:  All right.

12          MR. HAYNES:  Good morning, Your Honor.  Nathan Haynes,

13  Cadwalader, Wickersham & Taft for the debtors.

14          MR. IGOE:  Good morning, Your Honor.  John Paul Igoe

15  of Otterbourg, Steindler, Houston & Rosen for the post-

16  effective date committee of unsecured creditors.

17          THE COURT:  And will anyone else be appearing?  Are

18  you Mr. Velez?

19          MR. VELEZ:  Yes.

20          THE COURT:  Come forward -- you can sit at the table

21  if you wish -- and just please state your name for the record.

22  You can stay right there.

23          MR. VELEZ:  Right here?  Okay.

24          THE COURT:  Yes.  The microphone picks it up.  Just

25  state your name for the record.

1          MR. VELEZ:  Jesse Velez, a claimant.

2          THE COURT:  All right.  And you're a claimant?

3          MR. VELEZ:  Yes.

4          THE COURT:  All right.  And you are appearing here pro

5    se?  You have no lawyer?

6          MR. VELEZ:  No, sir.

7          THE COURT:  All right.  And on the telephone, please?

8          MR. GAUTHIER:  Good morning, Your Honor.  Jim Gauthier

9    representing Craig Friday who is also present.

10          THE COURT:  All right.  Anyone else on the phone?  All

11   right.  Very good.  Yes?

12          All right.  Please go ahead, Mr. Haynes.

13          MR. HAYNES:  Good morning, Your Honor.  Nathan Haynes,

14   Cadwalader, Wickersham & Taft for the debtors.  Your Honor, by

15   your lead, we will proceed with several uncontested matters in

16   the first instance.

17          THE COURT:  All right.

18          MR. HAYNES:  Initially, Your Honor, the debtors'

19   motion for an order dissolving certain distribution

20   subreserves.  As Your Honor may recall, in connection with the

21   confirmation of the plan, the debtors put a cap on the

22   distribution reserve in this case that was lower than the total

23   amount of disputed and undisputed claims on file at that time.

24   We obtained the approval of the cap based on the debtors'

25   estimate of where the claims pool would ultimately pan out.

1          Ultimately, Your Honor, the debtors' estimates have

2     proven correct, and we are now in a situation where the full

3     amount we are fully reserved for all filed disputed and

4     undisputed claims in the full filed amount of the disputed

5     claims such that if all disputed claims were allowed today in

6     their full filed amount, the holders of such claims would

7     receive the exact same pro rata distribution as all holders of

8     other general unsecured claims who were previously allowed --

9          THE COURT:  Right.  If I recall your papers, you have

10    had about eight billion -- between eight and nine billion

11    dollars of claims that have been allowed.  Is that right?

12         MR. HAYNES:  Yes, Your Honor.  It's -- or I think

13    either the high sevens or the low eights at this point, and

14    there's still about 600 million that we're working -- that

15    we're working on.

16         THE COURT:  600 million is still being worked on.  All

17    right.

18         MR. HAYNES:  So accordingly, Your Honor, we have, just

19    for essentially housekeeping and administrative convenience, we

20    would like to dissolve those subreserves.

21         THE COURT:  All right.  Any --

22         MR. HAYNES:  We did --

23         THE COURT:  Go ahead.

24         MR. HAYNES:  We did receive one informal response from

25    a party who was one of the subreserve claimants whose claim has

1    subsequently been allowed since the -- in the interim period

2    between the last distribution and the distribution that's going

3    to happen on July 1.  And they just wanted us to make clear in

4    the order that they would reserve their catch-up distribution

5    in a timely fashion, which we have made that change, and

6    accordingly there are no other objections or responses to this

7    particular motion, Your Honor.

8            THE COURT:  All right.  Does anyone wish to be heard?

9    All right.  Then we will grant that relief.

10           MR. HAYNES:  Thank you, Your Honor.  Turning your

11   attention to item two in the uncontested matters, the debtors'

12   motion for an entry of an order extending the administrative

13   expense and claim objection deadline under the plan of

14   reorganization.

15           Your Honor, at this point, the claims that we were

16   seeking to extend the objection deadline with respect to are

17   all the subject of continuing negotiations with the counter

18   parties.  We may ultimately have to file objections, but we're

19   optimistic that we will be able to resolve these claims, and

20   accordingly to ease the burden on the estate as well as the

21   Court.  We have -- instead of filing an objection and

22   proceeding on that ground, we would like some more time to try

23   to work it out with these particular parties.

24           THE COURT:  And you have given notice to these

25   parties?

1     MR. HAYNES:  Yes, Your Honor.

2     THE COURT:  Does anyone wish to be heard?  All right.

3 I'll grant that motion.

4     MR. HAYNES:  Thank you.  Your Honor, turning your

5 attention to item three, I'm pleased to present the reorganized

6 debtors' application for a final decree and order closing I

7 think it's twelve of the fourteen cases in these jointly

8 administered cases.  The only cases that will remain open are

9 essentially the holding company case and the operating company

10 case.  There are still certain claims against those particular

11 entities that we are working through and are not quite prepared

12 to try to close those cases at this point.

13     With respect to the other cases that we're seeking to

14 close, there are as noted in the motion several tax claims that

15 we're still working on which will be satisfied and paid

16 consistent with the plan.  And additionally there is an IRS

17 claim that's outstanding that we expect will be resolved

18 shortly.  Beyond that, thee are no outstanding adversary

19 proceedings or other contested matters in those cases.  We

20 would respectfully request that the Court enter an order

21 approving the closure.

22     We did receive a response from the U.S. Trustee who

23 wanted us to amend the proposed order to just provide that we

24 would pay the fees for this quarter as and when due.  We have

25 made that change, and accordingly there is no objections to the

1   relief requested.

2          THE COURT:  And I assume the whole purpose is to avoid

3   next quarter's U.S. Trustee fees.

4          MR. HAYES:  That's correct, Your Honor.

5          THE COURT:  Well, since you have cases outstanding, I

6   think it's appropriate.  I don't know that you could close all

7   the cases before you have really resolved all the claims, but

8   under the circumstances -- does anyone wish to be heard?  All

9   right.  I'll grant the relief requested.

10         MR. HAYNES:  Thank you, Your Honor.  Your Honor, that

11  takes us to the first contested matter, the reorganized

12  debtors' objections to the claim filed by Craig Friday.  As

13  Your Honor may gather from the papers in this matter, there has

14  been a long history of litigation between these two, between

15  Northwest and Mr. Friday.

16         And, Your Honor, the debtors do want to take advantage

17  of the fresh start provided by the bankruptcy code to end their

18  continuous litigation with Mr. Friday.  And I think that there

19  is three things going on here.  The first is with respect to a

20  wage claim filed by Mr. Friday, who is seeking wages from 1999

21  to the present.

22         Notwithstanding the voluminous documentation with

23  respect to this matter, the answer on that particular aspect of

24  the claim is very simple, which is that the Ninth Circuit has

25  already ruled that he has terminated his employment voluntarily

1  in 1999.  That decision was rendered in 2002, and it has not

2  been overturned.

3          In addition, it's undisputed that he has been

4  receiving disability retirement pension which he would not

5  receive if he were -- if he had not voluntarily terminated.

6  Accordingly, Your Honor, that particular claim is done by

7  operation of res judicata.

8          Similarly, the next aspect of the claim for pass

9  travel, the Department of Labor has twice ruled that the

10  company did not remove his pass travel as a form of

11  retaliation, and in any event his claim for such pass travel

12  was late.

13          Finally, Your Honor, he is seeking wages and treatment

14  for I believe several hundred thousand dollars for the time

15  prior to December of 1999 when he was taken off the line for a

16  fitness-for-duty exam.  And I think there's three aspects to

17  the debtors' response.  The first is we can't find a grievance

18  that he said -- he said he has filed one.  He said he wants to

19  pursue it, but we haven't seen it.

20          Secondly, in December of 1999, in connection with a

21  settlement, he waived all outstanding grievances.  And I quote

22  from the transcript:

23          "And is it also your agreement and intention to

24          dismiss all the grievances associated with you that

25          are pending against the company except for the

1          grievance related to harassment which will be heard

2          either in January or February that you have filed,

3          have ever filed, and that dismissal, do you

4          understand, would be with prejudice?"

5          And to that he responded "yes."

6          And finally, as Your Honor may recall, over a year

7 ago, Captain Friday obtained relief from this Court to allow

8 him to commence an action in a non-bankruptcy forum to compel

9 arbitration of this purported grievance.  During that time he

10 has not done so.  Instead he filed a whistle-blower complaint

11 with the Department of Labor which was in violation of the

12 automatic stay and beyond the scope of this Court's relief.

13 That action was ultimately resolved against Mr. Friday, as

14 well.

15          Accordingly, Your Honor, we respectfully request that

16 Mr. Friday's claim be expunged.  The claim does relate just to

17 these three aspects, and as I've set forth, unless you have any

18 further questions, I would turn the podium to Mr. Gauthier.

19          THE COURT:  All right.  Now, you say the action in the

20 DOL that was brought after the date of the petition was

21 resolved against Captain Friday.

22          MR. HAYNES:  As I understand it, that's correct.

23          THE COURT:  Is that information in the record?

24          MR. HAYNES:  Let me check, Your Honor.

25          THE COURT:  All right.  All right.  Mr. Gauthier or

1  Gauthier.

2        MR. GAUTHIER: Yes, Your Honor.

3        THE COURT: I don't mean to mispronounce your name.

4        MR. GAUTHIER: That's fine, Gauthier or Gauthier.

5        THE COURT: All right. And you're an attorney

6  appearing for Captain Friday today?

7        MR. GAUTHIER: That is correct, Your Honor.

8        THE COURT: All right. I have your papers. I have

9  read the papers from both sides. Please go ahead.

10        MR. GAUTHIER: Thank you, Your Honor. I would respond

11  to the debtors' objection with respect to the points that he

12  raised first. On the wage claim issues, Northwest

13  (indiscernible) references the 1999, where Mr. Friday moved

14  into disability retirement, and the dismissal by the federal

15  court of the claims related to that termination.

16        What Northwest is failing to understand is that Mr.

17  Friday's claim as filed in this Court relates to the fact that

18  -- well, let me first say Northwest has made the statement that

19  Mr. Friday was not an employee. Mr. Friday has no right to

20  (indiscernible) arbitration under the Early Labor Act. And,

21  you know, the reality is that when he went on medical

22  disability retirement, the contract (indiscernible) to return

23  to work, the only medical standard to return to work is just

24  possession of a first-class flight physical (indiscernible).

25        Mr. Friday presented that, or Captain Friday presented

that to Northwest Airlines, and they refused to allow him to

return to work at the end of the seventh year.  He retained his

first-class physical during this period, and Northwest refused

to let him return to work, and they refused to process

grievances related to that, and in fact those materials were.

Northwest's ongoing approach is that our non-response

to Captain Friday's grievances (indiscernible) is our response.

The net result of that is Captain Friday's claim of right is

after those previous matters, and it deals with the seven years

after he voluntarily terminated to go on medical retirement.

And it deals with Northwest's retirement to allow him to

process the right to return to work under the disability

provisions of the contract.

That is the part that has not been addressed by

Northwest.  That is the part that was not addressed by the

Department of Labor.  Since everybody likes to jump on the, he

terminated his employment and therefore he has no rights.  His

right and his grievance (indiscernible) post those cases and

post-termination.  So Captain Friday --

THE COURT:  Did he continue to receive disability

payments throughout the entire period?

MR. GAUTHIER:  That's correct.  He did, Your Honor.

THE COURT:  And does he still?

MR. GAUTHIER:  In December of 2006, the seven-year

period expired.  Captain Friday couldn't get his grievances

heard, and Northwest issued Captain Friday a formal retirement

from the airline. I believe that was in December 2006. And

like I said, that very clearly shows that he did not terminate

his employment in 1999. Otherwise, how could he possibly have

retired formally in December of 2007?

So in this case (indiscernible) his ability to return

to work, and their intentional refusal to allow him to

arbitrate, and yet every time he would get into a different

type of forum, they would not permit him to go forward. The

same goes for the pass travel. Captain Friday has had his pass

privileges come and go over the last seven years, and it's not

uncommon for him to find out that his pass privileges are there

and Northwest argues that they were not taken away, and then

when he goes to use them, he finds that, you know, when his

name is put in, that they won't allow it. And again Northwest

is taking two different tacks on that.

And his pension with the airline, both as a retired

pilot and as a disabled pilot provides that he has had travel

benefits. And the only reason they were taken away from him

was in retaliation for his whistle-blower activities.

THE COURT: Now, was there a Department of Labor

hearing?

MR. GAUTHIER: No.

THE COURT: Or were there Department of Labor

proceedings?

1    MR. GAUTHIER:  There have been, yes, but not on that.

2    THE COURT:  And the DOL proceedings had nothing to do

3  with his travel privileges?

4    MR. GAUTHIER:  Well, they're still looking at that,

5  Your Honor.  It was part of their consideration.  I don't know

6  if they have actually made a final ruling on that or not.  The

7  Department of Labor has had to go back and reevaluate his

8  position, and because, you know, it wasn't what they had

9  accepted, that they were misled, they have now acknowledged

10  Captain Friday is an employee or was an employee during all

11  material times.  And Congressman Reichert thought that

12  (indiscernible) get them to redo their secondary finding.

13    With respect to the grievance issues, there is no

14  doubt that in the disability retirement hearing that

15  (indiscernible), they basically make the statement that Captain

16  Friday terminated his employment, and in the material that you

17  have, what they don't state or continue to state is that

18  whatever rights Captain Friday or anybody under the plan, under

19  disability retirement, they have the same -- we would like to

20  put on the record if we could (indiscernible) that Craig Friday

21  would retain the rights as any other retired Northwest pilot

22  should he meet the conditions under the pension plan and under

23  the contract to return to work in the future.

24    So, you know, again, he's not being terminated.  He's

25  been forced into medical retirement until he can return to work

and provide a certified physical, and that's part of his

contract under Section 13 and 15 and 20.  And like I said,

that's been the big rub and why this case keeps going forward.

It has nothing to do with whether or not, you know -- you know,

the issue -- I mean, the issues are relating to whether or not

Captain Friday had a right to return to work, not whether he

terminated his employment back in 1999.

His grievances have never been heard, and Northwest

has repeatedly refused to process his grievances.  We have run

out of options to (indiscernible) grievances are reviewed.  Not

only the grievances, not -- and I want to make it clear we are

not asking this Court to determine the merits of Captain

Friday's grievances or anything else.  All we're asking the

Court to do is look at the grievances that Captain Friday has

filed since his medical retirement, and because our wage claim

doesn't arise out of the termination (indiscernible) his

inability to return to work even though he met all the

requirements of the first-class physical.  You know, that's

where the monetary claim arises (indiscernible) supposed to

look at this thing and take a (indiscernible) approach for

resolution of it, and basically bifurcate the matter into two

parts.

One, retain the jurisdiction of the claim until

Northwest arbitrates Captain Friday's grievances, and leave it

up to the federal arbitrators to determine the merits of

whether or not he even has a claim or not. This Court has no jurisdiction on that aspect of it.

And then if, in fact, a determination is made by the federal arbitrator that there is a financial claim or a judgment or an award is made, then it can come up before this Court to be determined on whether that claim should be, you know, dealt with through the bankruptcy court as, you know, something that should be discharged under Northwest's request that they now get a fresh start.

Captain Friday would like to have a fresh start, as well, and they have deprived him of his ability to return to what he loves. (indiscernible) for seven years until finally he's forced into, you know, formal retirement. The grievances that Captain Friday is seeking to enforce are all post-retirement grievances. They are not grievances that existed at the time of his moving onto medical disability retirement. And again, those are the grievances that they have repeatedly refused to process.

And, you know, there's no dispute in the materials that are submitted to the Court, Captain Friday is allowed, as a retired pilot, to file grievances and have those heard, and Northwest is refusing. The DOL is in the process of redoing their investigation and dealing with this matter.

The DOL is the action that Captain Friday chose to pursue. This Court has opened the door, and in the last

1  (indiscernible) and the Court said that this is a matter of

2  (indiscernible) and Captain Friday that is here before Your

3  Honor, and they are asking for some method to compel Northwest

4  Airlines to (indiscernible) the grievances that they have --

5        THE COURT:  Are you saying I opened the door to a

6  Department of Labor proceeding?  I'd like to know where in the

7  record that appears.

8        MR. GAUTHIER:  Well, Your Honor, I don't have the

9  order in front of me, but you indicated that Captain Friday

10  could pursue his grievance process.

11        THE COURT:  His grievance process.  What does that

12  have to do with the Department of Labor?

13        MR. GAUTHIER:  Because they can enforce the grievance

14  process as one of their remedies.

15        THE COURT:  I certainly would like to know more about

16  that.  I don't understand that that's the first -- is that the

17  first stage in the grievance?  You go first to the Department

18  of Labor?  You said that they can enforce.  Is that the first

19  step you take in seeking to pursue a grievance?

20        MR. GAUTHIER:  No, Your Honor.  That's correct.  It is

21  the --

22        THE COURT:  And was there any other step that this man

23  took to pursue the grievance rights that he may have received,

24  anything else?  Did he ask the union or ask the company for a

25  hearing, or did he present a grievance in writing to the

1  company?

2      MR. GAUTHIER:  Yes, he did, Your Honor.

3      THE COURT:  When was that?  Where is that in the

4  record?  Show me where that is in your papers.

5      MR. GAUTHIER:  Oh, I don't believe we provided that,

6  Your Honor, because we didn't understand that that would be an

7  issue.

8      THE COURT:  Well, it certainly is an issue.  It's a

9  major issue.

10     MR. GAUTHIER:  Then, Your Honor, we --

11     THE COURT:  The debtors certainly raised it.  They

12  claim that for purposes of laches, you waived any grievance

13  rights that I may have given you.  Where -- so there is nothing

14  in the record on this proceeding that indicates that he asked

15  for a grievance, he asked to pursue a grievance with the

16  company.

17     MR. GAUTHIER:  Your Honor, we understood, number one,

18  that your Court wouldn't deal with grievances.

19     THE COURT:  My court?  Well, then my prior allowance

20  of this grievance to go forward you're saying is a nullity

21  because I'm not dealing with grievances?  Is that what you're

22  telling me?

23     MR. GAUTHIER:  No, Your Honor.  What I am saying is

24  that your order, as it was understood about Captain Friday to

25  proceed with -- you basically (indiscernible) left it open to

1  any forum to try --

2  THE COURT:  No.  I didn't -- certainly didn't open it

3  to any forum.  There is a procedure relating to grievances.

4  That doesn't mean that parties can run into other courts and

5  other agencies.  I'll give you forty-eight hours -- I'll give

6  you until -- I'll give you a week to get me all the

7  information, certified and with appropriate affidavits, that he

8  started a grievance proceeding with the company in accordance

9  with the ordinary grievance procedures.  If, as you say, he did

10  it.  I gather the company is telling me they have no record of

11  it.  Is that right?

12  MR. HAYNES:  Your Honor, how this plays out, this

13  order was entered in connection with Captain Friday and another

14  employee.  And the way that the grievance procedure works is

15  that the grievance -- as I understand it, a grievance is

16  submitted to the company.  The company -- if the company does

17  nothing, it's deemed denied, and then it goes to -- the union

18  has the ability to send it to arbitration.

19  In this instance, I don't know if he submitted any

20  grievance.  We don't have it in the record here.  But had he

21  submitted the grievance, it would have -- the company

22  presumably would have reviewed it and determined whether to

23  proceed on it or not.  And if they did not, then ALPA would

24  have the ability to take it to arbitration.

25  THE COURT:  Then where does the DOL come in?

1   MR. HAYNES:  The DOL has nothing to do with it.

2   Thereafter, and this is how the <u>Sturge</u> (phonetic) matter played

3   out.  Sturge, in connection with that order that you entered,

4   commenced an action against the debtors in a non-bankruptcy --

5   in district court to compel arbitration under the collective

6   bargaining agreement.

7       I'm not suggesting we want Mr. Friday to do that, but

8   that's how that's working out because similarly the debtors

9   denied the grievance, ALPA didn't pursue it, and so he --

10  Sturge commenced an action against the debtors to compel

11  arbitration.  That is how normally it would have played out.

12      Here he hasn't done that.  He's sat for over a year

13  now and he knows --

14      THE COURT:  Well, they're telling me that he sent a

15  grievance in, and I'll give you an opportunity to provide some

16  information, something to support that.

17      MR. GAUTHIER:  I will.

18      THE COURT:  Do you have it in your files?

19      MR. GAUTHIER:  I don't have it here at my office.  No,

20  Your Honor.

21      THE COURT:  All right.  We'll see.

22      MR. GAUTHIER:  It will be presented to you within one

23  week, Your Honor.

24      THE COURT:  All right.  What else?  You said a moment

25  ago, Mr. Gauthier, that you wanted to bifurcate issues.  Until

1 an arbitrator determines if there is a financial claim, I

2 should simply keep the matter before me.  You said I have no

3 jurisdiction to decide whether there is a claim or not.  It

4 sounds to me like you want arbitration, and that the

5 determination of the arbitrator, as far as you are concerned,

6 would be final.

7        MR. GAUTHIER:  That is correct, Your Honor.

8        THE COURT:  Final, absolutely final.  Enough of this

9 after ten years.

10        MR. GAUTHIER:  That's correct.

11        THE COURT:  All right.  I'm not saying that you're

12 entitled to that relief or I'll grant it, but the record should

13 be perfectly clear that it will be final if it's pursued.  Now,

14 what did you want bifurcated?

15        MR. GAUTHIER:  I want the matter to be -- the

16 grievances bifurcated from the monetary claim before you so

17 that Captain Friday can appear before a federal arbitrator and

18 have his grievances heard.

19        THE COURT:  Well, what is the grievance then?

20        MR. GAUTHIER:  There are several grievances, Your

21 Honor, related to his meeting the requirements of returning to

22 work under the pension rule.

23        THE COURT:  But that has -- that's the basis for your

24 monetary claim, that he should have been allowed to go back to

25 work.  And I am assuming, although I haven't asked you, that he

1  would make more money as an active pilot than he would -- than

2  he got for disability benefits.  Is that -- and the difference

3  is your monetary claim, is it not?

4          MR. GAUTHIER:  That is correct, Your Honor.

5          THE COURT:  All right.  So there is a difference.  So

6  if you grieve his right to return to work, doesn't the -- or

7  does the arbitrator ordinarily decide how much your damages

8  are?

9          MR. GAUTHIER:  That would be correct, Your Honor.

10          THE COURT:  So what are you asking this Court -- what

11  are you bifurcating?  Does it --

12          MR. GAUTHIER:  I (indiscernible) that this Court

13  retain jurisdiction over monetary awards and judgments against

14  the debtor.

15          MR. HAYNES:  Your Honor, if I may, I think he's

16  suggesting that the -- that in his view, an arbitrator should

17  determine the validity amount of the claim, and that it will be

18  subject to the plan in this Court.

19          THE COURT:  Oh, I see.  All right.  Mr. Gauthier, it

20  seems to me -- and does the arbitrator also decide whether or

21  not his flight privileges were wrongfully taken from him?

22          MR. GAUTHIER:  Yes.  There trip grievance is already

23  of record, so that's an easy one.

24          THE COURT:  All right.  Are there -- so both of these

25  claims in your view should be arbitrated?

1    MR. GAUTHIER:  That's correct, Your Honor.

2    THE COURT:  What should not be arbitrated, other than

3 the fact that if there is a decision by the arbitrator that he

4 is entitled to X dollars, that that then comes back to this

5 Court as a claim in the bankruptcy case?  It doesn't get paid

6 in dollars necessarily.  It may be a claim, and therefore it

7 gets paid out in stock.

8    MR. GAUTHIER:  All right.  Whatever the compensation

9 is is ultimately determined between the debtors, the Court, and

10 Captain Friday, you know, that's what exists, but he's going to

11 have the first right to be able to have his claims heard by the

12 arbitrator.

13    THE COURT:  All right.  You want all of his claims

14 arbitrated, and you want the arbitrator to make an award which

15 he could then bring back and get admitted as a claim in this

16 bankruptcy case.

17    MR. GAUTHIER:  Or amended claim, yes, Your Honor.

18    THE COURT:  All right.  Well, I assume it would be

19 less than the amount of the claim that he originally filed.

20    MR. GAUTHIER:  I would assume so, Your Honor.

21    THE COURT:  So the amendment would be an easy

22 proposition.  Now, I don't know whether that -- well, what I'm

23 going to do -- well, anything further?  Let me ask you if you

24 wish to make any further statement.

25    MR. GAUTHIER:  No.  I think that concludes my

1  statement, Your Honor.

2  THE COURT:  Thank you.  It's been -- I think it's been

3  very helpful.  And, again, you have a week to put in papers.

4  The debtor can respond if it wishes to, but I --

5  MR. HAYNES:  Your Honor, I don't mean to -- I can see

6  where this -- I don't mean to be difficult about the situation,

7  but this is --

8  THE COURT:  Well, I'm not demanding --

9  MR. HAYNES:  Okay.

10  THE COURT:  I'm not determining the matter.  I'm not

11  determining that arbitration is appropriate --

12  MR. HAYNES:  Okay.

13  THE COURT:  -- in this case.  I do think the debtors

14  can think about it if they wish to, but I'm not trying to urge

15  the parties to go in one direction or another.  I'm trying to

16  clarify what the issues are.  And if you want me to decide the

17  matter and don't want to consent to an arbitration, that would

18  finally determine it.  I'm not going to rule today.

19  MR. HAYNES:  Very well, Your Honor.

20  MR. GAUTHIER:  Thank you, Your Honor.

21  THE COURT:  All right.  Then I'll take it under

22  advisement.  You have until next Wednesday to put in any papers

23  relating to the grievance that you believe has already been put

24  in motion, and I'll give the debtors until the following

25  Monday, July 7th, to respond.

1      MR. GAUTHIER:  Very good, Your Honor.

2      THE COURT:  All right.  And you'll obviously send them

3 a copy of any papers that you provide.  And thank you very much

4 for helping to clarify the situation.

5      We have now another claim.  You are welcome to stay on

6 the telephone if you wish, but --

7      MR. HAYNES:  Your Honor, if I may trouble the Court to

8 extend our response time to July 10, if that would be

9 satisfactory.

10      THE COURT:  That would be the following Wednesday?

11      MR. HAYNES:  Yes, Your Honor.

12      THE COURT:  That's fine.

13      MR. HAYNES:  Thank you, Your Honor.

14      MR. GAUTHIER:  We're going to drop out, Your Honor.

15 Thank you.

16      THE COURT:  All right.  Thank you.

17      MR. GAUTHIER:  Thank you, counsel.

18      MR. HAYNES:  Thank you.

19      THE COURT:  All right.  Now we'll take up Mr. Velez's

20 claim.

21      MR. HAYNES:  Your Honor, this is the reorganized

22 debtors' motion to estimate and cap proof of Claim Number 10341

23 files by Mr. Velez.  To be perfectly clear, we are not asking

24 this Court to address the merits of the underlying claim.

25 Rather, this is a matter of categorization under the plan.

1    And the reason why it's important, the debtors

2  believe, to get a ruling on this is because this is a claim

3  that is subject to the alternative dispute resolution

4  procedures, and the parties are essentially comparing apples

5  and oranges right now.  Mr. Velez thinks he has potentially a

6  five-million-dollar claim.

7    The debtors' position is that under the plan, even if

8  that claim was completely and 100 percent valid and in the full

9  filed amount, because of the operation of the subordination

10 provisions of the plan, he would not be entitled to a recovery

11 on any part of that claim except for his actual pecuniary loss,

12 which according to papers he initially filed the debtors

13 believe would not exceed approximately $82,000.

14    THE COURT:  All right.

15    MR. HAYNES:  In response, I think Mr. Velez and the

16 debtors are talking past each other.  He seems to think we're

17 attacking the validity of the claim or suggesting that this

18 Court's ruling would somehow make a determination in that

19 respect, and it would not.  But I just -- the debtors are

20 trying to manage the expectations with respect to this claim,

21 and such that Mr. Velez would understand that even if his claim

22 were allowed, that because of the plan and the way it works, he

23 wouldn't be entitled to a distribution on a majority of the

24 claim.

25    THE COURT:  All right.  Let me see if I understand

your view of the claim and the elements of the claim, and I can also -- obviously I'll ask Mr. Velez. I'm looking at -- also, by the way, before we start, Mr. Velez gave me a letter. It doesn't show a copy to you. I'll hand you a copy of a letter dated June 21.

Did you give a copy to the debtor? You have to give -- anything you give to me has to go to the --

MR. VELEZ: No, Your Honor. That was just on a personal level.

THE COURT: -- lawyers for the debtor. And you state that you apologize. There's nothing for you to apologize for, nor is there any need for you to come up to New York for hearings before the Court, but I am pleased that you are here. I mean, I'm not trying to deter you from coming. I'm simply trying to make it a little easier for parties who don't come from New York to be heard, and you certainly could be heard by telephone.

Now, you have a claim. The purpose of this proceeding is not to determine it, determine any part of it, but to determine whether parts of it are under the plan and under the bankruptcy provisions subordinated to other claims. And since general unsecured claims haven't been paid in full, then there would be no recovery.

Now, my recollection of the plan, and I don't have the pages before me, is that punitive damages were unquestionably

1  subordinated in the plan.  The reason for that provision is the

2  following:  Thousands of creditors like yourself, including

3  employees who took very substantial wage cuts and benefit cuts

4  and got a claim as part compensation, thousands of individuals

5  and many companies and other creditors are putting claims

6  against the airline.

7       There is no question that the airline is not paying

8  those claims in full.  It's providing stock.  The stock was

9  worth more a year ago when they came out of bankruptcy.  It's

10 worth less today, but even when they came out, general

11 creditors, including thousands of union members, were not going

12 to get paid in full.  I'm talking about the union claims.  They

13 weren't individual union member claims, but the unions got big

14 claims, and perhaps your union is the flight attendants union.

15       MR. VELEZ:  Yes, sir.

16       THE COURT:  I believe got a large claim, too, and

17 whether or not you shared, I don't know.  I don't know what the

18 -- you did not because you were already --

19       MR. VELEZ:  Been terminated.

20       THE COURT:  -- off the payroll.

21       MR. VELEZ:  Right.

22       THE COURT:  But the fact that general creditors

23 weren't being paid in full meant that the plan could

24 appropriately provide the punitive damages -- which are to

25 punish the defendant -- would not be paid because they're not

1   for actual loss.  And in bankruptcy it's not at all unusual for

2   punitive damages to be subordinated.  That if general claims

3   get paid in full, well, then perhaps punitive damage claims can

4   be paid.  But when they're not, we don't usually pay claims for

5   anything other than real losses.

6           So I think I can state very easily, although I'll hear

7   from you, that all of your punitive damage claims should be

8   subordinated.  Now, what are they?  I look at the schedule that

9   you attached to your June 8th pleading, and I see under the

10  heading of Mr. Lori (phonetic) a schedule adding up to $4.6

11  million, including other costs of 3,155,000.  I see that

12  3,155,000 made up of $500,000 emotional distress, and

13  $2,655,000 for punitive damages.

14          So I can state on this record -- and on your own

15  papers but I'll hear from you -- that tentatively the punitive

16  damages should be subordinated, and you would get no recovery

17  from them.  They're not necessarily disallowed, but by being

18  subordinated under the facts of this matter, you would get

19  nothing.

20          Now I will go back and ask the debtors why the

21  emotional distress damages -- assuming that there are any

22  because that's another question, but I'm not dealing with that

23  today -- why those fell within the concept of subordination

24  under the plan.

25          MR. HAYNES:  Your Honor, under the --

1    THE COURT:  And -- okay.  Well, let's start with that

2    question.

3          MR. HAYNES:  Your Honor, under the plan, damages that

4    are not for actual pecuniary losses are subordinated.  And the

5    applicable law here under Title 7, the cap on compensatory

6    damages under Title 7 differentiates between future pecuniary

7    losses on the one hand and emotional pain, suffering,

8    inconvenience, et cetera, and other non-pecuniary losses on the

9    other.

10         And, in addition, that there's case law.  For

11   instance, the Elvid (phonetic) case out of the Ninth Circuit

12   that says Title 7 places a cap on the total amount of

13   compensatory damages that may be awarded for emotional pain and

14   other non-pecuniary losses.  Accordingly, the courts in the

15   circuit that applies here view emotional distress damages as

16   non-pecuniary.  Because they're non-pecuniary, it's our view

17   that those would be subordinated under the plan, which

18   subordinates claims other than for actual pecuniary loss.

19         THE COURT:  All right.  Now, I see a calculation --

20         MR. HAYNES:  If you look at Paragraph 15 and 16 of our

21   initial objection -- our motion, Your Honor, that breaks down

22   our view of the particular aspects of the claim.

23         THE COURT:  Yes.  I was looking at that, and you say

24   of the five million, 3.3 million are punitive and exemplary

25   damages, and my only question is as to the $500,000 of that

being within the concept. But I have to go back and look at

what the plan says, as well, with regard to subordination

because I don't hear you saying that I should eliminate these

damages because they're not under Title 7 or they're not

timely. That's not an issue.

MR. HAYNES: That's not -- well --

THE COURT: It might be an issue.

MR. HAYNES: It may be an issue, but we're not --

that's not the issue we're raising before the Court.

THE COURT: That's not an issue today. All right.

Now, of the other damages, on the damages summary, I see

damages for earnings of 134,000 and lost income for past, and

95,000 for lost fringe benefits for the past.

MR. HAYNES: Your Honor --

THE COURT: And that's the amount that you say should

remain as a claim.

MR. HAYNES: Your Honor, this subsequent filing with

these numbers is inconsistent with his prior breakdown of his

damages. His prior breakdown of damages had net current loss

back wages at only $55,768, and that was in his claim summary

that he submitted in connection with the ADR procedure.

But if --

THE COURT: All right. Now, why -- all right. But go

ahead, finish your sentence.

MR. HAYNES: That's just an issue we would like to

1  raise with the Court.

2          THE COURT:  All right.  That's a minor -- not minor to

3  Mr. Velez, but in terms of setting an estimated amount, it's a

4  minor issue.  Why isn't future lost wages an appropriate claim

5  for actual losses?

6          MR. HAYNES:  Your Honor, in the Ninth Circuit, claims

7  for front pay are not considered to be compensatory damages.

8  They're considered equitable, and in the enforcement guidance,

9  one of the enforcement guidance publications by the U.S. EEOC,

10 it specifically says that front pay is excluded from the

11 definition of compensatory damages.

12         THE COURT:  All right.  And the other element in Mr.

13 Velez's chart is -- I believe that's all we have, lost income,

14 lost fringe benefits, future income, future benefits.  We have

15 punitive damages and we have emotional suffering.  And is that

16 all?  I think that -- is that everything as far as the debtor

17 is concerned?

18         MR. HAYNES:  Well, he did --

19         THE COURT:  Those are the four elements?

20         MR. HAYNES:  To be --

21         THE COURT:  Five elements?

22         MR. HAYNES:  To be clear, he did -- perhaps he's

23 broken them down farther in his claim summary that he

24 previously submitted, but he did include in that claim summary

25 195,000 for legal fees.

1          THE COURT:  Oh, ninety-five, yeah, uh-huh.

2          MR. HAYNES:  And loans and sold property of 55,000,

3   and then retraining costs of 240,000.

4          THE COURT:  And what are you asking me to do about

5   those?

6          MR. HAYNES:  Well, Your Honor, Mr. Velez initially is

7   pro se, and has -- and so we're questioning the legal fee

8   aspect, and moreover, to the extent that he hasn't actually

9   paid this out to anybody, there's no actual pecuniary loss

10  here.  In addition, again, California law as set forth in our

11  motion makes clear that recovery -- excuse me -- that

12  litigation expenses and attorneys' fees are separate from

13  pecuniary losses under Title 7.  But in any event, he hasn't --

14  we don't believe he's spent any of this amount.

15         THE COURT:  All right.

16         MR. HAYNES:  So there's no loss.  And, frankly, we

17  didn't quite understand the loans and sold property aspect of

18  it, but there was no backup indicating there was any actual

19  spent on his part there that would be compensable in any event.

20         THE COURT:  All right.  And you believe this -- the

21  determination of damages should be in what form?

22         MR. HAYNES:  Your Honor, right now we're still

23  optimistic that if we can get a reasonable cap on this claim,

24  that we'll be able to work with Mr. Velez to resolve the claim

25  consistent with the ADR procedures under the plan.  If and to

1   the extent that the arbitrator determines in Northwest's favor

2   and Mr. Velez wishes to contest that, then we would decide at

3   that point in which -- what would be the most appropriate forum

4   in which that matter should go forward.

5           THE COURT:  All right.  Mr. Velez, you can come to the

6   podium or you can stay there, whatever you prefer.

7           MR. VELEZ:  Your Honor, thank you for allowing me in

8   your court, and again that note that I sent you was on a

9   personal level.  I just happen to have a psychological

10  condition that when I hear a stern voice or any yelling, I

11  start getting nervous.

12          THE COURT:  I certainly hope you didn't hear me

13  yelling because I didn't yell.

14          MR. VELEZ:  It just came out a little bit abrupt, and

15  it was --

16          THE COURT:  Well, I try to clarify matters, and when

17  they're not clarified I may get a little impatient sometimes.

18          MR. VELEZ:  And I -- I'd like to elaborate a little

19  bit on that.  I seem to be lost at that moment, and it's --

20          THE COURT:  Well, maybe what you should do is get a

21  lawyer to represent you.  You have apparently had Mr. Lori help

22  you on the damages calculation.

23          MR. VELEZ:  Yes, Your Honor.  As far as that, and I

24  could tell you why I don't have a lawyer is because I have

25  exhausted every single financial cent that I have, including my

1  parents' retirement, as well as my 401(k) and any other money
2  that I've earned in my life.  And I'm about ready to lose my
3  home, not because I took a sub-prime loan but because I feel
4  that Northwest Airlines does owe some kind of payment for what
5  they did to me.

6       Now, I'd like to point out that I have cooperated with
7  the ADR procedure fully.  I have in many instances have talked
8  to counsel.  I have talked to their Minneapolis counsel, Ms.
9  Tracy Steinberg.  I have talked to Ms. Melissa Stepman
10 (phonetic).  And all this time it has not been about making all
11 these millions of dollars.  My main purpose of contesting
12 Northwest Airlines' termination of my employment is that they
13 did not give me equal rights under Title 7 when they terminated
14 me.  They did no investigation whatsoever.

15      We're talking a twenty-year veteran, a purser who has
16 never had a complaint, terminated on the "he said" of a
17 supervisor who has been complained time and time and after, and
18 a base manager who had been sued and lost under the same
19 conditions of discrimination and harassment.

20      Now, the reason I winded up in this demise is because
21 I am a witness to a harassment and discrimination, and I know
22 counsel will cringe at this, but it involves Mr. Orville Mukes
23 (phonetic) which also has a claim here in the bankruptcy court.
24 Eric Emerson at the time was my manager.  He actually
25 retaliated against me because he knew I was going to testify.

1  They went ahead and trumped up charges against me.  Mr. Baker,

2  the supervisor who was actually not my supervisor, assaulted me

3  on a flight and then claimed that I did that.  He said/he said

4  situation.

5      They went ahead and hired a arbitrator who actually

6  has been banned from ever again ruling on any union property

7  because of his deliberation.  Actually, Mr. -- Senator Arlen

8  Specter has criticized this arbitrator's ruling.  Furthermore,

9  I would like to bring up to the Court that the National

10 Arbitration Forum which would probably be deliberating on my

11 arbitration should the Court allow me to go into arbitration

12 has actually been sued by the City of San Francisco because out

13 of 18,000 cases that they have deliberated on and applied

14 arbitrators to, only 30 has gone in favor of the consumer so --

15      THE COURT:  Now, you said a moment ago that, you know,

16 if the Court would permit you to go to arbitration.  Is that

17 what you want?

18      MR. VELEZ:  Your Honor, at this point because the

19 National Forum of Arbitration is the one that Northwest chose,

20 I don't feel comfortable with that.  I would possibly feel more

21 comfortable actually seeing my case in civil court.  Now, I

22 believe --

23      THE COURT:  So you don't want me to grant arbitration?

24 All right.  I just want to understand.

25      MR. VELEZ:  Sure.

1        THE COURT:  You just said, if the Court would allow me

2   to go to arbitration, but that's now what you really want.

3        MR. VELEZ:  Right.  And, you know, I will say

4   something that I've been kind of standing here in your court

5   for the last three days watching how you deliberate.  And you

6   say you don't know anything about airlines or the music

7   business.  I don't know anything about the law.  I am standing

8   --

9        THE COURT:  Well, what I said a few days ago, if you

10  were here --

11       MR. VELEZ:  Managing, right.

12       THE COURT:  -- is that I don't -- you know, it's a

13  well-known statement when somebody says, I'm not running the

14  airline.

15       MR. VELEZ:  Right, right.

16       THE COURT:  So I made a comment in a music case that I

17  probably know less about running a music company than I know

18  about running an airline, and I don't know very much about

19  running an airline.  That's not my job.

20       MR. VELEZ:  Right again, Your Honor.  And the way I'm

21  trying to convey this is that I have had to been the one to

22  learn about the law here.  When Northwest went into bankruptcy,

23  this is a totally different field.  This is Chinese to me.

24  Okay.  Now I am basically putting myself in your hands to make

25  a decision on what's fair.

1    THE COURT: All right. Can I ask you a question?

2    MR. VELEZ: Yes, sir.

3    THE COURT: In your calculations, your damages summary

4    that Mr. Lori apparently helped you with or --

5    MR. VELEZ: Yes.

6    THE COURT: Which is fine. Again, I would urge you,

7    if you can, to get his assistance, or the assistance of any

8    lawyer. But there is a column under damages summary for future

9    values and present values. The present value number -- the

10   numbers aren't that different, but the present value numbers

11   are a little bit higher. Well, no. There's the each -- under

12   each column there is a column past and there is a column

13   future. Can you explain what those columns mean?

14   MR. VELEZ: You know, Your Honor, I really can't

15   explain it without his assistance.

16   THE COURT: Okay.

17   MR. VELEZ: Because he actually did that on a

18   computer, and he took my information, you know, to be able to

19   help me out during the mediation. I want to point out, and now

20   that we're talking about the forum, I've been trying to

21   negotiate with the debtors for quite some time, and it's been a

22   process of three years.

23   They -- Ms. Stepman called me and told me that she

24   needed to turn down my claim because it was over a million. I

25   told Ms. Stepman that I would have an attorney draw up a

counteroffer that would be under a million.

Now, in every single counteroffer that we have submitted to Northwest, the one thing that stands out is reinstatement of my job.  California, the Government Code Section 12:9:40 will basically allow a court to reinstate me if they find that there has been malice and wrongdoing.  I can prove the malice and wrongdoing.  Actually, today as we speak, Mr. Orville Mukes is having his arbitration, union arbitration which was mandated by this Court to go back and do their administrative remedies.

There has been testimony that has surfaced that will prove that Eric Emerson did, along with some other employees, malicely conspire to have this African American terminated, and discredit me and terminate me to validate the claims against Mr. Mukes.

Now, it seems to me that knowing that Mr. Mukes will come up ahead on this arbitration, and that he will regain his job as well as losses, emotional distress and all that, it seems to me that I would be entitled to something like that if I am able to present my case in an appropriate venue.

Now, I know that your court is basically under bankruptcy, and I -- again, I don't understand anything about bankruptcy.  What I'm saying, Your Honor, is that even though Cadwalader -- and I'm sorry if I mispronounced that -- says that I can't prove it, that's their say.  I can prove my claim

1   beyond a reasonable doubt.

2          And furthermore I would like to also say about the

3   negotiations that I've been doing with Northwest and

4   Cadwalader, the other day, the reason I was stunned was because

5   I had made an arrangement, an agreement verbal, and I would

6   like to thank Mr. Lehman for teaching me a valuable lesson.  We

7   made an agreement over the phone that they would ask the Court

8   to allow me thirty days to be able to write this motion.

9          Now, I am dyslexic.  It's -- I mean, I know that it

10  looks like I may have been a lawyer in a previous life, but it

11  takes a lot for me to be able to write something like this.

12  And I am on the medication and therapy so, you know, I pat

13  myself on the back.  But what's been happening is that Mr.

14  Lehman told me, okay, you will have the thirty days, you do not

15  have to agree to a cap of 700,000.

16         The other day he sends another attorney, and I can't

17  remember his name, and they did the complete opposite.  That's

18  why I was stunned, Your Honor.  Okay.  I don't have it in

19  writing, okay, and maybe that's the way he operates.  I don't

20  know the law.

21         The other thing that I would like to point out is that

22  all the notices that they submit to the Court on file get sent

23  to my place at the very last moment.  This was issued

24  yesterday.  It arrived at my home in Florida in the afternoon.

25  There's no way I could have contested this, so I'm --

1      THE COURT:  What are you referring to, their reply?

2      MR. VELEZ:  Yes, their response.

3      THE COURT:  All right.  Well, their response isn't

4  late, but you had an -- it's only three pages.  You had a

5  chance to read it before now?

6      MR. VELEZ:  Yes.  I had a chance to read it.

7      THE COURT:  Okay, good.

8      MR. VELEZ:  But that's only because my neighbor

9  actually picked up the FedEx package because there wasn't a

10  signature required.

11      THE COURT:  Well, I certainly would have given you

12  more time to read it, and --

13      MR. VELEZ:  So --

14      THE COURT:  But I'm glad you had a chance.

15      MR. VELEZ:  And that's the same thing that happened

16  when they submitted their estimate to cap the damages.  They

17  sent it knowing that it was Memorial weekend, and there was no

18  way that I could have gone to a law library to be able to

19  research my rights.

20      So, Your Honor, I guess what I'm trying to say is that

21  under the circumstances, the fact that I am not an attorney,

22  the fact that I do have a condition, and that clearly they're

23  claiming that I already had my arbitration.  Well, I've stated

24  a few laws here that basically says that arbitration is not

25  binding, that I can take it to civil court if I want to.

1    I guess what I'm saying, Your Honor, is that they want

2 to cap it at $82,000.  That's not going to pay for anything

3 that I've spent, the emotional distress, none of that at all.

4 I've made offers to the debtors.

5    THE COURT:  Well, I don't want to hear what they were.

6 Don't tell me any of the specifics, anything about the offers.

7    MR. VELEZ:  Well, it's been very reasonable.  Okay.

8    THE COURT:  Okay.  That's all -- you really shouldn't

9 -- I don't -- it's not appropriate for me to get in the middle

10 of settlement discussions.

11    MR. VELEZ:  I understand.  I guess what I'm trying to

12 convey here is that I am not putting any objections for them to

13 settle this claim, but I do want the attorneys and, you know,

14 I'm competing against three different law firms, the in-house,

15 the ones in Minneapolis, and Mr. Haynes here.  I would like

16 them to at least deal with me in an up-front and fair manner,

17 and not to try to minimize the costs when they -- they've read

18 all this.  They've read my files.  They have every single piece

19 of paper, yet they claim that they -- Mr. Lehman told me that

20 he didn't get the supplemental, that all they have is this.

21    Well, that supplemental was submitted during the

22 mediation, and Mr. Lori had actually had arrived at certain

23 conditions for settlement during the mediation.  Northwest's

24 counsel was embarrassed to stand there at the very end of the

25 day when they knew they already had certain things ironed out

1  to offer $1,000 after they knew I had spent about $8,000 just

2  to get to Minneapolis to hire a counsel to review the claim

3  damages and to represent me.

4          And, you know, respectfully, I don't want to use

5  laymen's terms, but I've just been getting jerked around

6  because they know my financial status.  They know I'm not being

7  represented.  Your Honor, the way I look at is if they are

8  allowed to do this, that's basically saying, okay, anytime that

9  there's something wrong, any kind of racial discrimination, any

10  kind of hate crimes, which is this is plainly a hate crime.

11  Okay.  A burned Puerto Rican flag inside a personal mailbox is

12  a hate crime.  When the supervisor tries to dissuade the person

13  from calling the police and then tampers with the evidence,

14  that is malice.  I can prove all this.  I have the witnesses.

15          Now, I don't want to take away from the other

16  claimants.  All I want, Your Honor, is my job back, a certain

17  amount of restitution which I am entitled to, and that's it.

18  The calculations that Mr. Lori made here, obviously he's an

19  attorney.  Again, I don't know anything about the law, but they

20  must be valid because I came close to the same calculations.

21          THE COURT:  All right.  Thank you very much, Mr.

22  Velez.  I am going to study the papers, and I'll get out a

23  written ruling as soon as I can.

24          MR. VELEZ:  Thank you, Your Honor.  I appreciate your

25  time.

1          THE COURT:  Thank you very much for coming up to

2    court.

3          MR. VELEZ:  Thank you.

4          THE COURT:  Anything further, Mr. Haynes?

5          MR. HAYNES:  No, Your Honor.

6          THE COURT:  All right.  Then we have concluded the

7    agenda for today.  Thank you.

8          MR. HAYNES:  Thank you, Your Honor.

9          THE COURT:  Also, you have one matter on I think next

10   Wednesday.  Is there any reason why you shouldn't put that on

11   for the middle of July when you're back here again?

12         MR. HAYNES:  I will speak to opposing counsel on that,

13   Your Honor.

14         THE COURT:  Yeah.  I think unless there's some reason

15   I have to put another major hearing on for that day.

16         MR. HAYNES:  Very well, Your Honor.

17         THE COURT:  Also, I have notice that I have a request

18   by Mr. Small on behalf of AT&T for a conference so he can make

19   a motion for summary judgment on one of the TIA matters.  I

20   think we should -- I think all parties who are interested in

21   the same issue should have an opportunity to be heard on that.

22   He wants to amend the scheduling order.  I don't know if it's

23   premature or not, but maybe it would make sense to have a

24   hearing -- well, he scheduled this actually for July 16th,

25   which is your mid July --

1  MR. HAYNES:  That's correct.

2  THE COURT:  Maybe we should have a hearing then, and I

3  think all of the parties to the TIA issue should be at least

4  given an opportunity to appear.  And I would think that should

5  include GFCC because I have been troubled by the -- deciding

6  any of the issues without giving everybody an opportunity to be

7  heard on what are very similar issues, I think.  And I don't

8  know that -- well, anyway, I shouldn't go any further on GFCC

9  without them being here, but I think they might be also given

10  an opportunity.

11  I gather that BAE has been paid.

12  MR. HAYNES:  Yes.

13  THE COURT:  So that there's no -- I mean, GFCC would

14  like obviously a determination, but they can tell me, and if

15  you would tell them of this colloquy, they can tell me if

16  there's any need for them to be out in front any longer.

17  MR. HAYNES:  Very well.

18  THE COURT:  Thank you.

19  MR. HAYNES:  Thank you, Your Honor.

20  THE COURT:  And I appreciate it if you would tell Mr.

21  Small of this colloquy and ask him to consult with the other

22  claimants who are parties to this pretrial order.

23  MR. HAYNES:  I certainly will.

24  THE COURT:  Thank you.

25  MR. HAYNES:  Thank you.

1    THE COURT:  All right.  Thank you very much.

2    (Proceedings concluded at 1:03 p.m.)

3    *****

4    CERTIFICATION

5    I, certify that the foregoing is a correct transcript

6    from the electronic sound recording of the proceedings in the

7    above-entitled matter to the best of my knowledge and ability.

8

9    Agency Typist:  Ilene Watson

10

11   _____        June 28, 2008

12   Coleen Rand, AAERT Cert. No. 341
     Certified Court Transcriptionist
13   For Rand Reporting & Transcription, LLC

14

15

16

17

18

19

20

21

22

23

24

25